1   Michael W. Sobol (State Bar No. 194857)
    *msobol@lchb.com*
2   Roger N. Heller (State Bar No. 215348)
    *rheller@lchb.com*
3   Allison Elgart (State Bar No. 241901)
    *aelgart@lchb.com*
4   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
5   San Francisco, CA  94111-3339
    Telephone:  (415) 956-1000
6   Facsimile:  (415) 956-1008

7   *Attorneys for Plaintiffs*

8

9                        UNITED STATES DISTRICT COURT

10                      NORTHERN DISTRICT OF CALIFORNIA
11                              SAN JOSE DIVISION

12

13   ADAM WEISBLATT, JOE HANNA, and        Case No.  CV 10-02553 PVT
     DAVID TURK, individually and on behalf
14   of all others similarly situated,      **FIRST AMENDED CLASS ACTION
                                            COMPLAINT**
15                    Plaintiffs,
                                            **DEMAND FOR JURY TRIAL**
16   v.

17   APPLE INC., AT&T INC., AT&T
     MOBILITY LLC, and Does 1-10,
18
                      Defendants.
19

20
             Upon personal knowledge as to their own acts and status, and based upon their
21
     investigation, their counsel's investigation and information and belief as to all other matters,
22
     Plaintiffs Adam Weisblatt, Joe Hanna, and David Turk ("Plaintiffs"), on behalf of themselves and
23
     all others similarly situated, allege as follows:
24
                              **<u>NATURE OF THE ACTION</u>**
25
             1.      This is a class action brought by consumers who were baited into purchases of 3G-
26
     enabled Apple iPads with promises of flexible "unlimited" data plans, only to have that promise
27
     reneged upon within weeks of their purchases.
28

2.      An iPad is a wireless computer marketed and used for downloading and storing large amounts of multi-media data and applications, viewing and listening to video, movies, and music, as well as sending and receiving email.  For the months preceding the April 30, 2010 release of the 3G-enabled iPad, Apple and AT&T promoted the availability of an accompanying "unlimited data" service plan, touting it as a material benefit of the 3G-enabled iPad.  Apple and AT&T promised consumers flexibility with their data plans, allowing them the ability to freely switch back and forth between the limited data plan, the unlimited data plan, and no 3G data plan, based on their budgets and data needs.

3.      Defendants' promotion of the flexible unlimited 3G data plan continued up to, and after, June 2, 2010, when they announced that within 5 days—that is, as of June 7, 2010—they would discontinue providing the unlimited data plan.  The iPad purchasers who initially opted for the limited data plan were stripped of their ability to later opt for the unlimited data plan, and even those customers who were signed up for the unlimited data plan can no longer switch to a limited data plan, then later opt for the unlimited plan again, as was originally promised.  Apple and AT&T announced this policy change within just weeks after selling at least hundreds of thousands of 3G-enabled iPads upon the product's initial launch.

4.      Defendants' representations induced Plaintiffs and other customers to pay an additional $130 for the 3G capability.  The availability of a flexible unlimited data plan was material to purchasers' decisions because it allows customers to download video, music and other data-intensive content on their iPads without incurring excessive charges, and also allows them to not pay for unlimited data when they do not need it.  Defendants' ubiquitous marketing of the unlimited data plan and the option for customers to turn such plan on and off based on their data needs, on their respective websites and elsewhere, reflects Defendants' keen awareness that these promised options were highly important to customers' purchase decisions.

5.      Plaintiffs and the Class seek damages, restitution, and injunctive relief for Defendants' ubiquitous false representations, on their respective websites and elsewhere, that customers who purchase iPads with 3G capability would be able to freely switch in and out of an unlimited 3G data plan each month as their data needs demanded.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. CV 10-02553 PVT

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and there is minimal diversity because Plaintiffs and numerous members of the Class are citizens of different states than Defendants.

7.      This Court has personal jurisdiction over Defendants because Apple is headquartered in, and is incorporated in, California; a substantial portion of the wrongdoing alleged in this Complaint took place in California; Defendants are authorized to do business in California; Defendants have sufficient minimum contacts with California and/or Defendants otherwise intentionally avail themselves of the markets in California through the promotion, marketing and sale of their products and services in California to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper under 28 U.S.C. § 1391(a) because Apple has its headquarters in this District and is incorporated in this District, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

9.      **Intra-district Assignment**:  Pursuant to Northern District of California Civil Local Rules 3-2 and 3-5, assignment to the San Jose Division of the Northern District of California is appropriate.  Defendant Apple Inc. is headquartered in Santa Clara County, and thus a substantial part of the events or omissions which give rise to the claims occurred in Santa Clara County.

## PARTIES

10.      Plaintiff Adam Weisblatt is a citizen of, and resides in, Fulton, New York.

11.      Plaintiff Joe Hanna is a citizen of, and resides in, Moreno Valley, California.

12.      Plaintiff David Turk is a citizen of, and resides in, Tacoma, Washington.

13.      Defendant Apple Inc. ("Apple") is a California corporation with its headquarters in Cupertino, California.

14.      Apple is a multi-national corporation that designs and markets computer software, personal computers, and consumer electronics, including mobile devices such as the iPhone and

iPad.  By revenue, Apple is the largest mobile device company in the world.  Apple markets and sells its products and services directly to its customers in stores and online.

15.     Defendant AT&T Inc. is a Delaware corporation with its headquarters in Dallas, Texas.

16.     Defendant AT&T Mobility LLC is a wholly-owned subsidiary of AT&T Inc., with its headquarters in Atlanta, Georgia.

17.     AT&T Inc. and AT&T Mobility LLC are collectively referred to herein as "AT&T."  Apple and AT&T are collectively referred to herein as "Defendants."

18.     AT&T provides telecommunication products and services to consumers, businesses, and other telecommunication service providers under the AT&T brand worldwide. AT&T Mobility LLC began operations in October 2000, and in 2004 acquired AT&T Wireless Services, Inc.  Upon AT&T Inc.'s acquisition of BellSouth in 2006, AT&T Mobility became a wholly-owned subsidiary of AT&T Inc.  By revenue, AT&T is the largest wireless carrier and is the second largest provider of mobile telephony service in the United States, with over 85.1 million wireless customers and more than 150 million total customers.

19.     Through an agreement with Apple, AT&T is, and at all relevant times has been, the exclusive provider of wireless service for all iPads.  On information and belief, Apple receives substantial consideration from AT&T in exchange for allowing AT&T to be the exclusive provider of wireless service for all iPads.

## ALLEGATIONS APPLICABLE TO ALL COUNTS

20.     Apple first announced the release of the iPad (both the 3G-enabled and non-3G-enabled versions) on or around January 27, 2010, in a video presentation given by its CEO, Steve Jobs, hosted on Apple's website.

21.     On or around April 3, 2010, Defendants began selling "WiFi" (not 3G-enabled) iPads.

22.     On or around April 30, 2010, Defendants began selling 3G-enabled iPads, with exclusive AT&T 3G service.  The only difference between WiFi iPads and 3G-enabled iPads is the ability, with the later, to connect to, and download data via, AT&T's 3G wireless network.

1   The iPads with 3G capability cost customers approximately $130 more (before tax) than the

2   equivalent iPad models without 3G capability.  *See* Exhibit A, attached hereto.  Customers were

3   able to pre-order 3G-enabled iPads beginning on approximately March 12, 2010.  Apple

4   advertised the "No-contract, 3G service," telling customers that "[i]n the U.S., 3G service is

5   available from AT&T.  You can choose from breakthrough data plans – no long-term contract

6   required."  *See* Exhibit A, attached hereto.  AT&T likewise advertised the 3G-capable versions of

7   the iPad, and consumers could follow a link on AT&T's website to purchase 3G-capable iPads.

8   *See* Exhibit B, attached hereto.

9       23.    Since its launch, Defendants have sold well over 2 million iPads.  (*See*

10   http://cbs5.com/local/iPad.Apple.sales.2.1724762.html).  On information and belief, a substantial

11   portion of the iPads that Defendants have sold have been iPads with 3G capability.

12       24.    From April 30, 2010 until June 7, 2010, Defendants offered prospective purchasers

13   of the 3G-capable iPads two 3G data plans: (a) 250 MB of data for $14.99 per month, with

14   additional data available in 250 MB increments for an added charge; or (b) unlimited 3G data for

15   $29.99 per month.  *See* Exhibits A-C, attached hereto.

16       25.    Starting with its introduction in January 2010, and continuing until June 7, 2010,

17   Defendants heavily trumpeted the availability of the flexible, no-contract, unlimited 3G data plan

18   in marketing the 3G-enabled iPad to consumers.  For example, in his January 27, 2010 video

19   presentation announcing the launch of the iPad, Apple CEO Steve Jobs promised that customers

20   who purchased 3G-enabled iPads would have access to an "awesome," "no contract" unlimited

21   data plan as a result of a "breakthrough deal with AT&T."  Both Apple and AT&T repeatedly

22   advertised the unlimited 3G data plan option as a key feature of the iPad, on their websites and

23   elsewhere.

24       26.    Customers who purchased 3G-capable iPads were not required to chose a single

25   3G data plan to apply to their service for any longer than a one month period.  Rather, according

26   to Defendants' representations, whether or not customers initially signed up for the unlimited data

27   plan, customers would be able to sign up for, and change, their data plans each month as their

28

data needs demanded, and, specifically, would be able to "upgrade to" or "switch" in and out of the unlimited data plan on a monthly basis in the future as their data needs demanded.

27.     From the time they began marketing the 3G-capable iPad until June 7, 2010, Defendants consistently and expressly promised prospective customers that if they purchased a 3G-capable iPad, they could later upgrade to the unlimited data plan and could switch in and out of the unlimited data plan as their data needs demanded.   For example, Apple advertised to prospective iPad 3G customers:

a.     "**No-contract 3G service.**  In the United States, 3G service is available through a breakthrough deal with AT&T.  *You choose the amount of data per month you want to buy — 250MB or unlimited*.  If you choose the 250MB plan, you'll receive onscreen messages as you get close to your monthly data limit so *you can decide whether to turn off 3G or upgrade to the unlimited plan*.  Best of all, there's no long-term contract.  *So if you have a business trip or vacation approaching, just sign up for the month you'll be traveling and cancel when you get back*. You don't need to visit a store to get 3G service. You can sign up, check your data usage, manage your account, or cancel your service — all from your iPad."  Exhibit C, attached hereto (emphasis added).

b.     **"Manage your data plan**.  iPad makes it easy to choose the data plan that works best for you.  *When you need more data, you can add another 250MB or upgrade to the Unlimited Data plan*.  Because you sign up for a data plan in monthly increments, you can cancel your plan at any time and then sign up again whenever you need 3G service."  Exhibit C, attached hereto (emphasis added).

c.     "[Y]ou can monitor your data usage and change your plan at any time, including switching to unlimited data or cancelling 3G service if you know you won't need it."  Exhibit A, attached hereto.

d.     "As you get close to your monthly data limit, you'll receive onscreen messages to help you decide whether to upgrade to another 250MB or switch to the unlimited plan."  Exhibit A, attached hereto.

e. "There are two monthly data plans: 250MB or unlimited. There's no contract, and you can sign up and change your service right on your iPad." Exhibit A, attached hereto.

28. Likewise, AT&T advertised on its website: "AT&T offers two data plan options – 250MB or unlimited data, with recurring monthly charge and no long-term contract. To help you manage your data with a 250 MB plan, iPad will notify you at 20%, 10%, and when there's no more data available, so you can decide if you want to add more data or upgrade to an unlimited data plan." Exhibit B, attached hereto.

29. An unlimited 3G data plan is material to iPad customers because customers can use the iPad to, among other things, download data-intensive applications and content, such as music and full-length movies and other video content, capabilities for which Defendants expressly marketed the iPad to consumers. On information and belief, for example, under a $14.99 per month, 250 MB plan, a consumer could download a little over 2 hours of video content per month before incurring overage charges, whereas under the $29.99 per month unlimited data plan, a consumer could finish a 3 hour movie, and download unlimited other movies and content, without incurring any overage charges.

30. Having the option to turn the unlimited data plan on and off is material to customers because it allows them access to unlimited data, at a reasonable flat cost, when they need it (such as when they are going on vacation, and want to use their iPads to download full-length movies), while at the same time allowing them to not pay for unlimited data when they do not need it.

31. Defendants marketed and advertised the unlimited data plan, and the ability to switch in and out of the unlimited data plan, to induce consumers to purchase iPads with 3G capability. The iPads with 3G capability cost significantly more than the equivalent iPads without 3G capability, but they were seen as worth the added cost by consumers who wanted the flexibility and option of getting unlimited 3G data for a fixed cost when they needed it.

32. Defendants' representations regarding the continued availability of flexible, unlimited data service plans were material to customers' decisions to purchase iPads with 3G

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. CV 10-02553 PVT

capability, Defendants intended that customers rely on those representations, and Plaintiffs and the Class did rely on those representations in making their purchase decisions.

33.     Defendants' representations, between January 27, 2010 and June 7, 2010, regarding the continued availability of flexible, unlimited data service plans for purchasers of iPads with 3G capability, were false, and Defendants knew or should have known that those representations were false when they made them.  Contrary to their numerous representations, which were designed to induce customers to purchase 3G-enabled iPads and thereby drive up sales and Defendants' profits, Defendants had no intention of providing customers with a flexible unlimited 3G data plan.

34.     On or around June 2, 2010, Defendants announced, through a press release, that as of June 7, 2010, they would no longer offer an unlimited 3G data plan for iPad customers.  *See* Exhibit D, attached hereto.  Defendants provided no other notice of this policy change to customers who purchased 3G-capable iPads either before or after the June 2, 2010 press release was issued.

35.     Pursuant to this change, customers can no longer choose to pay a fixed monthly rate for unlimited 3G data, but rather are required to choose between other, limited data plans. *See* Exhibit D, attached hereto.  Many of the applications for which the iPad can be used, and for which Defendants expressly marketed the iPad to customers—such as downloading movies and other video content—would cause customers to significantly exceed the limits of the new limited data plans that are available, thus resulting in overages and corresponding additional charges to customers.

36.     On information and belief, after June 7, 2010, customers who purchased iPads with 3G capability before June 7, 2010 and who were signed up for an unlimited data plan as of June 7, 2010 can maintain an unlimited plan, however if those customers *ever* discontinue subscribing to the unlimited data plan (*e.g.,* by changing to a different plan or choosing to have no 3G plan for a particular month), they cannot switch back to the unlimited data plan.  On information and belief, customers who purchased iPads with 3G capability before June 7, 2010 and who were signed up for a limited data plan as of June 7, 2010, will *never* have the option to

1    sign up for an unlimited data plan or, for that matter, to switch in and out of the unlimited data

2    plan.  With respect to those customers who purchased 3G-enabled iPads before June 7, 2010 but

3    had not signed up for any 3G data plan as of June 7, 2010, there are inconsistent reports as to their

4    options after June 7, 2010.  At least some of these customers have been denied by Defendants the

5    ability to *ever* sign up for the unlimited data plan, even as a one-time, non-flexible option, while it

6    appears that some others may have been given a one-time option to sign up for a non-flexible

7    unlimited data plan.  In all cases, none of these customers will have the option of switching in and

8    out of the unlimited plan as their data needs demand, as was promised.

9         37.     In other words, even though Defendants widely trumpeted to customers the

10    availability of the unlimited 3G data plan and, specifically, that customers would be able to

11    switch in an out of the unlimited data plan in the future as their data needs demanded, at least

12    many of those customers who did not initially sign up for the unlimited data plan will *never* have

13    the option of "switching" or "upgrading" to the unlimited data plan in the future, as was

14    promised, and all such customers have lost the promised ability to switch in and out of the

15    unlimited data plan.  Likewise, those customers who did initially sign up for the unlimited data

16    plan have lost the ability to switch in and out of the unlimited data plan, as was promised.

17         38.     Defendants unilaterally withdrew the flexible unlimited data plan option just over

18    a month after they started selling iPads with 3G capability.  Defendants stripped Plaintiffs and the

19    Class of one of the key promised benefits of purchasing a 3G-capable iPad in some cases just

20    days (and, at most, about a month) after they purchased their iPads in reliance on Defendants'

21    misrepresentations.

22         39.     Without the availability of a flexible, no-contract unlimited 3G data plan, the 3G-

23    enabled iPads that Plaintiffs and the Class purchased from Defendants are of significantly reduced

24    value and utility.

25         40.     Defendants' unilateral withdrawal of the unlimited data plan option was timed to

26    occur after Apple's 14-day return deadline expired for the substantial number of customers,

27    including Plaintiffs, who bought 3G-capable iPads during the initial rush when the product was

28    first launched.  *See, e.g.*, http://news.ycombinator.com/item?id=1397702.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. CV 10-02553 PVT

41.     Defendants' misrepresentations continued right up to the time they withdrew the unlimited data plan option.  As of at least June 5, 2010—three days *after* Defendants announced the June 7, 2010 change and just two days before the change was scheduled to take effect (*see* Exhibit D, attached hereto)—Apple continued to falsely advertise on its website that purchasers of 3G-capable iPads would be able to "upgrade" to the unlimited data plan, and switch in and out of the unlimited data plan, in the future.  *See* Exhibit E, attached hereto.  As of at least June 5, 2010, AT&T also continued to advertise this option despite the pending change that rendered the representation completely false.  *See* Exhibit F, attached hereto.

42.     Even after the June 7, 2010 change took effect, Apple's website continued to misrepresent to customers that the unlimited data plan was available for 3G-capable iPads and that customers would be able to upgrade in the future to the unlimited data plan, and switch in and out of the unlimited data plan, as their data needs demanded.  *See* Exhibit G, attached hereto.

43.     On or around June 4, 2010, apparently in response to concerns raised about how the pending data plan changes would apply in light of the existing back log of iPad orders, Defendants made an announcement reassuring consumers that the unlimited data plan would be available for all customers who ordered 3G-enabled iPads before June 7, 2010, even if they received their iPads after June 7, 2010.  During the period between the June 2, 2010 announcement of the June 7, 2010 change and the implementation of the June 7, 2010 change, Defendants continued to represent that customers who purchased 3G-enabled iPads would be able to switch in an out of the unlimited 3G data plan based on their monthly data needs.  *See, e.g.,* Exhibits E and F, attached hereto.  Despite these representations, all customers who ordered iPads before June 7, 2010, but did not receive their iPads until after June 7, 2010, were denied the ability to switch in and out of the unlimited data plan based on their monthly data needs, as was promised.  Moreover, on information and belief, Defendants denied many of these customers the right to *initially* sign up for the unlimited data plan, when they received their iPads, even as a one time, non-flexible option.

44.     By their conduct, Defendants have been unjustly enriched and have damaged Plaintiffs and the Class.

**PLAINTIFF ADAM WEISBLATT**

45.     On April 8, 2010, Plaintiff Adam Weisblatt purchased a 16 GB WiFi (non-3G-capable) iPad for a total purchase price of $538.92, including tax.  On April 30, 2010, Mr. Weisblatt returned that iPad and paid an additional $140.40 ($130 plus the additional tax) in exchange for the equivalent 16 GB model iPad with 3G capability.  Both his original April 8, 2010 purchase and the April 30, 2010 exchange/purchase were made at an Apple store in Syracuse, New York.

46.     Before purchasing his 3G-capable iPad, Mr. Weisblatt saw representations, on Apple's website and in various industry publications (which, on information and belief, were based on Defendants' statements), regarding the iPad with 3G capability, which at the time was scheduled to be released shortly.  In particular, Mr. Weisblatt saw representations, including on Apple's website, that: (a) one of the available data plans for the 3G-capable iPad would be unlimited 3G data downloading for a fixed monthly rate; and (b) if he purchased a 3G-capable iPad, he would be able to switch in and out of the unlimited 3G data plan in the future as his monthly data needs demanded.

47.     Similarly, on April 30, 2010, the day that Mr. Weisblatt purchased his 3G-capable iPad, customer service representatives at the Apple store where he made the purchase represented to Mr. Weisblatt that if he purchased a 3G-capable iPad: (a) one of his data plan options would be an unlimited 3G data plan for a fixed monthly rate; and (b) he would be able to switch in and out of the unlimited 3G data plan in the future as his monthly data needs demanded.

48.     Based on these representations, Mr. Weisblatt decided to exchange his WiFi (non-3G-capable) iPad and pay an extra $140.40 (with tax) for a 3G-capable iPad.  Mr. Weisblatt decided that the 3G-capable iPad was worth the additional cost because, in some months, unlimited 3G data access would allow him to work outside of the office for several hours a week that he otherwise would have to spend in the office, and allow him access to data-intensive content when he is away from home.

49.     On May 2, 2010, two days after he purchased his 3G-enabled iPad, Mr. Weisblatt signed up for the unlimited 3G data plan, and he was signed up for the unlimited data plan as of

1     June 7, 2010.  However, due to variances in his work and life schedules, there are several months

2     each year where an unlimited 3G data plan would not benefit Mr. Weisblatt.  Thus, Mr. Weisblatt

3     anticipated using the unlimited data plan in some months and not in others.  The appeal to Mr.

4     Weisblatt of the 3G-capable iPad was that, according to Defendants' representations, unlimited

5     3G data would be available to him for the months that he needed it, but he was not required to pay

6     for unlimited data in the months that he did not need it.

7          50.     As a result of Defendants' June 7, 2010 policy change, Mr. Weisblatt no longer

8     has the option to switch in and out of the unlimited 3G data plan, as he was promised.

9          51.     Had he known that his access to the unlimited 3G data plan option would be

10     restricted in the way it has been pursuant to the June 7, 2010 change (*i.e.*, that he would not be

11     allowed to switch in and out of the unlimited data plan based on his needs), Mr. Weisblatt would

12     not have purchased the iPad with 3G capability.

13          52.     Mr. Weisblatt has been, and will continue to be, injured as a result of Defendants'

14     conduct alleged herein, in that, *inter alia*, he paid more than he otherwise would have for his iPad

15     and/or related services, has been denied important benefits that he was promised by Defendants

16     and that he paid for, and will be assessed excessive charges for downloading data to his iPad.

17                               **PLAINTIFF JOE HANNA**

18          53.     On April 30, 2010, Plaintiff Joe Hanna purchased a 64 GB 3G-enabled iPad at a

19     Best Buy store in Moreno Valley, California.  The total purchase price for his iPad was $829.00

20     plus sales tax.

21          54.     Before he made his April 30, 2010 iPad purchase, Mr. Hanna researched both the

22     3G-enabled and WiFi versions of the iPad on Apple's website.  Mr. Hanna saw representations,

23     including on Apple's website, that: (a) one of the available data plans for the 3G-capable iPad

24     would be unlimited 3G data downloading for a fixed monthly rate; and (b) if he purchased a 3G-

25     capable iPad, he would be able to switch in and out of the unlimited 3G data plan in the future as

26     his monthly data needs demanded.

27          55.     Based on these representations, Mr. Hanna decided to purchase a 3G-enabled iPad

28     instead of a WiFi iPad.  Mr. Hanna decided that the 3G-capable iPad was worth the additional

1    cost because he wanted to be able to use his iPad to download videos and other data-intensive

2    content during certain times when he would be away from home and not near a WiFi "hot spot,"

3    and he understood that a flexible, no contract unlimited 3G data plan would allow him to do so.

4         56.    Mr. Hanna has not purchased a 3G data plan since he purchased his 3G-enabled

5    iPad on April 30, 2010.  He has not needed to purchase a 3G data plan during this time because

6    he has generally been either home or in another place where he has WiFi access.  However, when

7    he purchased his iPad, Mr. Hanna planned to sign up for the unlimited 3G data plan in certain

8    months when he is on vacation or otherwise away from home or WiFi access, and then turn off

9    the unlimited data plan when he did not need it.  Thus, Mr. Hanna anticipated using the unlimited

10   data plan in some months and not in others.  The appeal to Mr. Hanna of the 3G-capable iPad,

11   and the reason why he bought the 3G-capable iPad, was that, according to Defendants'

12   representations, unlimited 3G data would be available to him for the months that he needed it, but

13   he was not required to pay for unlimited 3G data (or any 3G data plan, for that matter) in the

14   months that he did not need it.

15        57.    As a result of Defendants' June 7, 2010 policy change, Mr. Hanna will never have

16   the option of signing up for the unlimited 3G data plan or the option to switch in and out of the

17   unlimited 3G data plan as his data needs demand, as he was promised.

18        58.    Had he known the truth about his data plan options, Mr. Hanna would not have

19   purchased the iPad with 3G capability.

20        59.    Mr. Hanna has been, and will continue to be, injured as a result of Defendants'

21   conduct alleged herein, in that, *inter alia*, he paid more than he otherwise would have for his iPad

22   and/or related services, has been denied important benefits that he was promised by Defendants

23   and that he paid for, and will be assessed excessive charges for downloading data to his iPad.

24                      **PLAINTIFF DAVID TURK**

25        60.    On April 30, 2010, Plaintiff David Turk purchased two 3G-enabled iPads (for him

26   and his wife) at an Apple Store in Tukwila, Washington, one a 16 GB model and the other a 64

27   GB model.  The total purchase price for these two iPads was $1,458.00 plus sales tax.

28

61.     On May 18, 2010, Mr. Turk purchased a third 3G-enabled iPad, a 32 GB model, for his daughter.  Mr. Turk ordered this third iPad through Apple's online store.  The total purchase price for this iPad was $796.80 ($729.00 plus tax).  He received this iPad on approximately June 5, 2010.

62.     Before he purchased his three 3G-enabled iPads, Mr. Turk researched the 3G-enabled iPad on Apple's website.  Mr. Turk saw representations, including on Apple's website, that: (a) one of the available data plans for the 3G-capable iPad would be unlimited 3G data downloading for a fixed monthly rate; and (b) if he purchased a 3G-capable iPad, he would be able to switch in and out of the unlimited 3G data plan in the future (including upgrading to the unlimited data plan mid-month in any given month) as his data needs demanded.

63.     Based on these representations, Mr. Turk decided to purchase the three 3G-enabled iPads.

64.     For one of the two 3G-enabled iPads that he purchased on April 30, 2010, Mr. Turk signed up for the unlimited 3G data plan on April 30, 2010, and, for that iPad, he was signed up for the unlimited 3G data plan as of June 7, 2010.  For the other 3G-enabled iPad that he purchased on April 30, 2010, Mr. Turk initially signed up for the limited 250MB 3G data plan on May 4, 2010.  He upgraded to the unlimited data plan shortly thereafter, and, for that iPad, he was signed up for the unlimited 3G data plan as of June 7, 2010.  When he purchased these two iPads on April 30, 2010, Mr. Turk anticipated that, for each iPad, he would sign up for the unlimited data plan in some months and not in others, based on his and his wife's changing 3G data needs. The appeal to Mr. Turk of the 3G-capable iPad was that, according to Defendants' representations, unlimited 3G data would be available to him and his wife for the months that they needed it, but he was not required to pay for unlimited data in the months that they did not need it.

65.     As a result of Defendants' June 7, 2010 policy change, with respect to both of the 3G-enabled iPads that he purchased on April 30, 2010, Mr. Turk no longer has the option to switch in and out of the unlimited 3G data plan, as he was promised.

66.     For the 3G-enabled iPad that Mr. Turk purchased for his daughter, and which he received on June 5, 2010, his daughter attempted to sign up for the unlimited 3G data plan on June 15, 2010, however she was not allowed to do so at that time.  On June 20, 2010, Mr. Turk and his daughter were able to sign up for the unlimited 3G data plan for this iPad.  Mr. Turk and his daughter would have instead signed up for a limited 3G data plan for this iPad at that time, based on their expected data needs that month, but they signed up for the unlimited 3G data plan because, as a result of Defendants' June 7, 2010 policy change, they believed this was their only chance to ever sign up for an unlimited 3G data plan, albeit without the option to switch in and out of the unlimited data plan based on their data needs, an option they were promised and which they had intended to take advantage of.

67.     As a result of Defendants' June 7, 2010 policy change, with respect to the 3G-enabled iPad that Mr. Turk purchased for his daughter, Mr. Turk and his daughter will not have the option to switch in and out of the unlimited 3G data plan based on their data needs, as was promised.

68.     Had he known the truth about the 3G data plan options, Mr. Turk would not have purchased the three iPads with 3G capability.

69.     Mr. Turk has been, and will continue to be, injured as a result of Defendants' conduct alleged herein, in that, *inter alia*, he paid more than he otherwise would have for his iPads and/or related services, has been denied important benefits that he was promised by Defendants and that he paid for, and will be assessed excessive charges for downloading data to his iPads.

## CLASS ACTION ALLEGATIONS

70.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, as members of a proposed nationwide class (the "Class") initially defined as:

> All persons in the United States who purchased or ordered an Apple iPad with 3G capability on or before June 6, 2010.
>
> Excluded from this Class is any person, firm, trust, corporation, or other entity related to or affiliated with Apple Inc., AT&T Inc., and AT&T Mobility LLC.

71.     This action is brought and may properly be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these provisions.

72.     <u>Typicality Under Rule 23(a)(1).</u>  The Class is so numerous that the individual joinder of all members is impracticable.  While the Class's exact number and the identity of Class members is currently unknown and can only be ascertained through appropriate discovery, Plaintiffs are informed and believes that the Class includes at least tens of thousands of individuals, if not many more.

73.     <u>Commonality Under Rule 23(a)(2).</u>  Common legal and factual questions exist that predominate over any questions affecting only individual Class members.  These common questions, which do not vary from Class member to Class member, and which may be determined without reference to any Class member's individual circumstances, include, but are not limited to whether:

a.     The offer of an unlimited data plan and/or the ability to switch in and out of an unlimited data plan are material facts that reasonable purchasers would have considered important in making their purchase decisions;

b.     Defendants engaged in unfair, false, misleading, or deceptive acts or practices regarding its marketing and sale of 3G-capable iPads, in violation of the UCL;

c.     Defendants represented, through their words and conduct, that their iPads with 3G capability had characteristics, uses, or benefits they did not actually have, in violation of the CLRA;

d.     Defendants advertised the 3G-capable iPads with the intent not to sell them as advertised, in violation of the CLRA;

e.     Defendants' conduct regarding the marketing and sale of its 3G iPads was likely to mislead or deceive, and is therefore fraudulent, within the meaning of the UCL;

1                  f.      Defendants' conduct alleged herein constitutes false advertising in

2 violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.;

3                  g.      Defendants' conduct alleged herein constitutes fraud and/or

4 intentional misrepresentation;

5                  h.      Defendants' conduct alleged herein constitutes negligent

6 misrepresentation;

7                  i.      Defendants have been unjustly enriched by their conduct alleged

8 herein;

9                  j.      Plaintiffs and the Class are entitled to injunctive and/or other

10 equitable relief, including restitution and disgorgement, and if so, the nature and amount of such

11 relief;

12                  k.      Defendants are liable for actual and/or compensatory damages, and,

13 if so, the amount of such damages;

14                  l.      Defendants are liable for punitive damages, and if so, the amount of

15 such damages.

16      74.      <u>Typicality Under Rule 23(a)(3).</u>  Plaintiffs' claims are typical of the Class

17 members' claims.  Defendants' common course of conduct caused Plaintiffs and all Class

18 members the same damages.  In particular, Defendants' conduct caused each Class member's

19 economic losses.  Likewise, Plaintiffs and other Class members must prove the same facts in

20 order to establish the same claims.

21      75.      <u>Adequacy of Representation Under Rule 23(a)(4).</u>  Plaintiffs are adequate Class

22 representatives because they are Class members and their interests do not conflict with Class

23 interests.  Plaintiffs retained counsel competent and experienced in consumer protection class

24 actions, and together Plaintiffs and counsel intend to prosecute this action vigorously for the

25 Class's benefit.  Plaintiffs and their counsel will fairly and adequately protect Class interests.

26      76.      The Class can be properly maintained under Rule 23(b)(2).  Defendants have acted

27 or refused to act, with respect to some or all issues presented in this Complaint, on grounds

28

1  generally applicable to the Class, thereby making appropriate final injunctive relief with respect

2  to the Class as a whole.

3       77.     The Class can be properly maintained under Rule 23(b)(3). A class action is

4  superior to other available methods for the fair and efficient adjudication of this litigation because

5  individual litigation of each Class member's claim is impracticable. Even if each Class member

6  could afford individual litigation, the court system could not. It would be unduly burdensome if

7  thousands of individual cases proceed. Likewise, individual litigation presents a potential for

8  inconsistent or contradictory judgments, the prospect of a race for the courthouse, as well as the

9  risk of an inequitable allocation of recovery among those with equally meritorious claims.

10 Individual litigation further increases the expense and delay to all parties and the courts because it

11 requires individual resolution of common legal and factual questions. By contrast, the class

12 action device presents far fewer management difficulties and provides the benefit of a single

13 adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### (Intentional Misrepresentation)

17      78.     Plaintiffs, individually and on behalf of the Class, incorporate by reference all of

18 the allegations contained in the preceding paragraphs of this Complaint.

19      79.     As alleged herein, in the course of conducting their business of selling iPads and

20 related services, Defendants have intentionally made numerous material misrepresentations of

21 fact to Plaintiffs and all members of the Class concerning the benefits of purchasing an iPad with

22 3G capability and the nature of customers' unlimited 3G data plan options.

23      80.     Defendants intentionally failed to disclose material information regarding the

24 nature of 3G data plan options to Plaintiffs and the Class.

25      81.     Defendants' misrepresentations alleged herein were the type of misrepresentations

26 that are material—*i.e.,* a reasonable person would attach importance to them and would be

27 induced to act on the information in making purchase decisions.

28

82.     Defendants knew that the misrepresentations alleged herein were false at the time they made them and/or acted recklessly in making such misrepresentations.

83.     In making the misrepresentations alleged herein, Defendants intended that Plaintiffs and the Class would rely on such misrepresentations and purchase iPads with 3G capability.

84.     Defendants' misrepresentations alleged herein are objectively material to the reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

85.     Plaintiffs and the Class reasonably and justifiably relied to their detriment on Defendants' intentional misrepresentations.

86.     Defendants' intentional misrepresentations were a substantial factor in causing Plaintiffs and the Class to purchase iPads with 3G capability from Defendants.

87.     As a proximate result of Defendants' intentional misrepresentations, Plaintiffs and each member of the Class suffered damages in an amount to be proven at trial.

88.     Defendants directly benefited from, and were unjustly enriched by, their intentional misrepresentations.

89.     Defendants acted with "malice," as that term is defined in Cal. Civ. Code § 3294(c)(1), by engaging in the conduct alleged herein, which was specifically intended by Defendants to cause substantial injury to Plaintiffs and the members of the Class.

90.     Defendants' conduct alleged herein constitutes "fraud," as that term is defined in Cal. Civ. Code 3294(c)(3), because such conduct involved intentional misrepresentations, deceit, and/or concealment of material facts known to Defendants, and was done with the intent to cause injury to their customers.

91.     Plaintiffs and the Class are entitled to actual and punitive damages and attorneys' fees under Cal. Civ. Code § 3294(a).

92.     As a proximate result of Defendants' intentional misrepresentations, Plaintiffs and each member of the Class suffered an ascertainable loss and are entitled to equitable relief and compensatory and punitive damages, in amounts to be proven at trial.

1

2

**SECOND CAUSE OF ACTION**
**(False Promise/Fraud)**

3      93.     Plaintiffs, individually and on behalf of the Class, incorporate by reference all of

4  the allegations contained in the preceding paragraphs of this Complaint.

5      94.     Defendants made false promises to Plaintiffs and all members of the Class

6  regarding the benefits of purchasing iPads with 3G capability and the nature of customers'

7  unlimited 3G data plan options.

8      95.     Defendants made such false promises for the purpose of inducing Plaintiffs and the

9  Class to purchase iPads with 3G capability.

10      96.     The false promises alleged herein were the type of promises considered to be

11  material, *i.e.*, a reasonable person would attach importance to them and would be induced to act

12  on the information in making purchase decisions.

13      97.     Defendants made such false promises with the knowledge that they would not

14  fulfill them and with the intention of not fulfilling them.

15      98.     The false promises alleged herein are objectively material to the reasonable

16  consumer, and therefore reliance upon such promises may be presumed as a matter of law.

17      99.     Plaintiffs and the Class reasonably and justifiably relied to their detriment on

18  Defendants' false promises.

19      100.    Defendants' false promises were a substantial factor in causing Plaintiffs and the

20  Class to purchase iPads with 3G capability from Defendants.

21      101.    As a proximate result of Defendants' false promises, Plaintiffs and each member

22  of the Class suffered damages in an amount to be proven at trial.

23      102.    Defendants directly benefited from, and were unjustly enriched by, having made

24  the false promises alleged herein.

25      103.    Defendants acted with "malice," as that term is defined in Cal. Civ. Code §

26  3294(c)(1), by engaging in the conduct alleged herein, which was specifically intended by

27  Defendants to cause substantial injury to Plaintiffs and the members of the Class.

28

104.    Defendants' conduct alleged herein constitutes "fraud," as that term is defined in Cal. Civ. Code 3294(c)(3), because such conduct involved Defendants making material promises, which Defendants knew to be false, with the intent to cause injury to their customers.

105.    Plaintiffs and the Class are entitled to actual and punitive damages and attorneys' fees under Cal. Civ. Code § 3294(a).

106.     As a proximate result of Defendants' false promises, Plaintiffs and each member of the Class suffered an ascertainable loss and are entitled to equitable relief and compensatory and punitive damages, in amounts to be proven at trial.

## THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

107.    Plaintiffs, individually and on behalf of the Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

108.    As alleged herein, in the course of conducting their business of selling iPads and related services, Defendants have made numerous material misrepresentations of fact to Plaintiffs and all members of the Class concerning the benefits of purchasing an iPad with 3G capability and the nature of customers' unlimited 3G data plan options.

109.    Defendants failed to disclose material information regarding the nature of 3G data plan options to Plaintiffs and the Class.

110.    Defendants' misrepresentations alleged herein were supplied to customers for the purpose of affecting their purchase decisions.

111.    Defendants had no reasonable grounds for believing that their misrepresentations were true.

112.    Defendants failed to exercise reasonable care and/or diligence in communicating their misrepresentations to customers and failing to disclose material information to customers.

113.    Defendants' misrepresentations alleged herein were the type of misrepresentations that are material—*i.e.,* a reasonable person would attach importance to them and would be induced to act on the information in making purchase decisions.

114.    Defendants' misrepresentations alleged herein are objectively material to the reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

115.    Plaintiffs and the Class reasonably and justifiably relied to their detriment on Defendants' misrepresentations.

116.    Defendants' misrepresentations were a substantial factor in causing Plaintiffs and the Class to purchase iPads with 3G capability from Defendants.

117.    As a proximate result of Defendants' misrepresentations, Plaintiffs and each member of the Class suffered damages in an amount to be proven at trial.

118.    Defendants directly benefited from, and were unjustly enriched by, their misrepresentations.

**FOURTH CAUSE OF ACTION**
**(Violation of Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*)**

119.    Plaintiffs, individually and on behalf of the Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

120.    Defendants are "persons" as defined in Cal. Civil Code § 1761(c).

121.    Plaintiffs and the Class members are "consumers" as defined in Cal. Civil Code § 1761(d).

122.    The iPads that Plaintiffs and the Class purchased from Defendants are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a), (b).

123.    The 3G wireless services that Plaintiffs and the Class purchased from Defendants are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a), (b).

124.    The purchases by Plaintiffs and the Class of the goods and services sold by Defendants, alleged herein, constitute "transactions" within the meaning of Cal. Civ. Code §§ 1761(e) and 1770.

125.    In connection with their sale of goods and services to Plaintiffs and the Class, Defendants violated the Consumer Legal Remedies Act ("CLRA") in at least the following ways:

a.      Misrepresenting to Plaintiffs and the Class that they would be able to subscribe to, and switch in and out of, the unlimited data plan in the future as their monthly data needs demanded, whether or not they initially signed up for the unlimited data plan, in violation of Cal. Civ. Code §§ 1770(a)(5), (9), (14), and (16);

b.      Misrepresenting to Plaintiffs and the Class that Defendants' goods and services had characteristics and benefits they did not have, in violation of Cal. Civ. Code § 1770(a)(5);

c.      Misrepresenting to Plaintiffs and the Class that the subject of a transaction has been supplied in accordance with a previous representation when it has not, in violation of Cal. Civ. Code § 1770(a)(16);

d.      Misrepresenting that their transactions with Plaintiffs and the Class conferred benefits and rights on Plaintiffs and the Class, and obligations on Defendants, which were not, in fact, conferred, in violation of Cal. Civ. Code § 1770(a)(14); and

e.      Advertising goods and services to Plaintiffs and the Class with the intent not to sell them as advertised, in violation of Cal. Civ. Code § 1770(a)(9).

126.    In addition, under California law, a duty to disclose arises in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.

127.    Defendants had a duty to disclose to Plaintiffs and the Class the true nature of the unlimited data plan options because: (a) Defendants had exclusive knowledge of the information at the time of sale; (b) Defendants actively concealed from Plaintiffs and the Class the true nature of the unlimited data plan options, which was material information to customers; and (c) Defendants made partial representations to Plaintiffs and the Class regarding the nature of the unlimited data plan options.

128.    Defendants violated the CLRA by concealing material information from Plaintiffs and the Class regarding the true nature of the unlimited data plan options when they had a duty to disclose that information.

129.    Defendants' misrepresentations and omissions in violation of the CLRA were likely to mislead consumers.  Plaintiffs and the Class reasonably interpreted Defendants' representations and omissions to mean that they would be able to subscribe to, and switch in and out of, the unlimited data plan in the future as their monthly data needs demanded, whether or not they initially signed up for the unlimited data plan.

130.    Defendants' conduct alleged herein was intentional and was specifically designed to induce customers to purchase iPads with 3G capability.

131.    Defendants' misrepresentations and omissions alleged herein were material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

132.    Plaintiffs and the Class relied to their detriment on Defendants' misrepresentations and omissions in purchasing their iPads with 3G capability.

133.    Plaintiffs, on behalf of themselves and the Class, demand judgment against Defendants under the CLRA for injunctive relief and restitution to Plaintiffs and the Class in an amount to be proven at trial.

134.    Plaintiffs, on behalf of themselves and the Class, further intend to seek compensatory damages and, in light of Defendants' intentional and fraudulent conduct, an award of punitive damages.

135.    Pursuant to Cal. Civ. Code § 1782(a), Plaintiffs will serve Defendants with notice of their alleged violations of the CLRA by certified mail return receipt requested.  If, within thirty days after the date of such notification, Defendants fail to provide appropriate relief for their violation of the CLRA, Plaintiffs will amend this Complaint to seek monetary (both compensatory and punitive) damages under the CLRA.

136.    Notwithstanding any other statements in this Complaint, Plaintiffs do not seek monetary damages in conjunction with his CLRA claim, and will not do so, until this thirty-day period has passed.

### FIFTH CAUSE OF ACTION
**(Violation of Cal. Bus. & Prof. Code Section 17200, *et seq.*—Unlawful, Fraudulent, and Unfair Business Acts and Practices)**

137.    Plaintiffs, individually and on behalf of the Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

138.    Defendants' conduct alleged herein constitutes unfair and deceptive business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*  Such conduct includes, but is not limited to, (a) misrepresenting to Plaintiffs and the Class that they would be able to subscribe to, and switch in and out of, the unlimited data plan in the future as their monthly data needs demanded, whether or not they initially signed up for the unlimited data plan; (b) concealing the true nature of the unlimited data plan options from Plaintiffs and the Class; and (c) denying Plaintiffs and the Class the promised benefit of the continuing option to switch in and out of the unlimited data plan and unilaterally imposing upon Plaintiffs and the Class a choice between less advantageous data plan options.

139.    In addition, the conduct alleged herein constitutes fraud, intentional misrepresentation, negligent misrepresentation, unjust enrichment, and violations of the CLRA, thus providing the basis for a finding of liability under the "unlawful" prong of Cal. Bus. & Prof. Code §§ 17200 *et seq*.

140.    Defendants' unfair, unlawful, and deceptive acts and practices alleged herein were specifically designed to induce Plaintiffs and the Class to purchase iPads with 3G capability.

141.    Defendants' unfair, unlawful, and deceptive acts and practices alleged herein have deceived and/or are likely to deceive Plaintiffs and other reasonable consumers.

142.    Defendants' misrepresentations and omissions alleged herein were material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

143.    Defendants' misrepresentations and omissions alleged herein are objectively material to the reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

144.    Plaintiffs and the Class relied to their detriment on Defendants' misrepresentations and omissions in purchasing their 3G-capable iPads from Defendants.

145.    Plaintiffs and each member of the Class have been damaged as a result of Defendants' unfair, unlawful, and deceptive conduct alleged herein.  They are entitled to injunctive relief and restitution, in an amount to be proven at trial.

<u>**SIXTH CAUSE OF ACTION**</u>
**(Violation of Cal. Bus. & Prof. Code Section 17500, *et seq.*—False Advertising)**

146.    Plaintiffs, individually and on behalf of the Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

147.    Defendants have committed acts of untrue and misleading advertising, as defined by Cal. Bus. & Prof Code §§ 17500*, et. seq.*, by, *inter alia*: (a) falsely advertising, on their respective websites and elsewhere, that customers who purchased the iPad with 3G capability would be able to subscribe to, and switch in and out of, the unlimited data plan in the future as their monthly data needs demanded, whether or not they initially signed up for the unlimited data plan; and (b) concealing material information about the unlimited 3G data plan options from consumers.

148.    Defendants' misrepresentations and omissions alleged herein deceive or have the tendency to deceive the general public regarding the benefits of purchasing a 3G-capable iPad and the nature of the unlimited data plan options.

149.    Defendants' misrepresentations and omissions alleged herein were the type of misrepresentations that are material—*i.e.,* a reasonable person would attach importance to them and would be induced to act on the information in making purchase decisions.

150.    Defendants' misrepresentations and omissions alleged herein are objectively material to the reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

151.   Defendants' false advertising continued right up until, and in fact after, the end of the Class period.

152.   Unless restrained by this Court, Defendants could continue to engage in untrue and misleading advertising, as alleged above, in violation of Cal. Bus. & Prof Code §§ 17500, *et. seq.*

153.   As a result of the foregoing, Plaintiffs and each member of the Class have been injured and have lost money or property, and are entitled to restitution and injunctive relief.

**SEVENTH CAUSE OF ACTION**
**(Unjust Enrichment)**

154.   Plaintiffs, individually and on behalf of the Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

155.   As alleged herein, Defendants intentionally and/or recklessly made false representations to Plaintiffs and the Class to induce them to purchase iPads with 3G capability. Plaintiffs and the Class have reasonably relied on these false representations in purchasing iPads with 3G capability.

156.   As alleged herein, Defendants made false promises to Plaintiffs and the Class which Defendants did not intend to keep, and which Defendants did not keep, to induce Plaintiffs and the Class to purchase iPads with 3G capability.  Plaintiffs and the Class have reasonably relied on these false promises in purchasing iPads with 3G capability.

157.   As alleged herein, Plaintiffs and the Class did not receive all of the benefits that they were promised by Defendants, and paid more to Defendants for their products and services than they otherwise would have paid, and will continue to do so.

158.   It would be inequitable and unconscionable for Defendants to retain the profits, benefits, and other compensation they obtained from their deceptive, misleading, and unlawful conduct alleged herein.

159.   Plaintiffs and the Class are entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon, all profits, benefits, and other compensation obtained by Defendants from their deceptive, misleading, and unlawful conduct alleged herein.

**PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the Class, request that the Court order the following relief and enter judgment against Defendants as follows:

a.  An Order certifying the proposed Class and appointing Plaintiffs and their counsel to represent the Class;

b.  An Order that Defendants be permanently enjoined from its improper activities and conduct described herein;

c.  A judgment awarding Plaintiffs and the Class actual and compensatory damages in an amount according to proof;

d.  A judgment awarding Plaintiffs and the Class restitution in an amount according to proof, including without limitation, restitution of, disgorgement of, and/or the imposition of a constructive trust upon, all profits, benefits, and other compensation obtained by Defendants from their deceptive, misleading, and unlawful conduct alleged herein;

e.  A judgment awarding Plaintiffs and the Class punitive damages;

f.  Pre-judgment and post-judgment interest;

g.  Attorneys' fees and expenses and the costs of this action; and

h.  All other and further relief as the Court deems necessary, just and proper.

**JURY DEMAND**

Plaintiffs hereby demands a trial by jury.

- 28 -

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. CV 10-02553 PVT

1    Respectfully submitted,

2  Dated: June 23, 2010    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

3

4    By: _____
            Michael W. Sobol

5    Michael W. Sobol (State Bar No. 194857)
     *msobol@lchb.com*
6    Roger N. Heller (State Bar No. 215348)
     *rheller@lchb.com*
7    Allison Elgart (State Bar No. 241901)
     *aelgart@lchb.com*
8    Embarcadero Center West
     275 Battery Street, 29th Floor
9    San Francisco, CA 94111-3339
     Telephone: (415) 956-1000
10   Facsimile: (415) 956-1008

11    *Attorneys for Plaintiffs*

12
882386.1
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 29 -