1   Michael W. Sobol (State Bar No. 194857)
    *msobol@lchb.com*
2   Roger N. Heller (State Bar No. 215348)
    *rheller@lchb.com*
3   Allison Elgart (State Bar No. 241901)
    *aelgart@lchb.com*
4   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
5   San Francisco, CA  94111-3339
    Telephone:  (415) 956-1000
6   Facsimile:  (415) 956-1008

7   *Attorneys for Plaintiffs*

8   *[Additional Counsel listed on signature page]*

9

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA
12                          SAN JOSE DIVISION

13

14  ADAM WEISBLATT, JOE HANNA, DAVID          Case Nos.  CV 10-02553 RMW, 5:10-CV-
    TURK, and COLETTE OSETEK, individually    02588-RMW, 5:10-CV-04253-RMW
15  and on behalf of all others similarly situated,
                                              **MASTER CONSOLIDATED COMPLAINT**
16                  Plaintiffs,
                                              **DEMAND FOR JURY TRIAL**
17  v.

18  APPLE INC., AT&T MOBILITY LLC,
    and Does 1-10,
19                  Defendants.

20

21

22          Upon personal knowledge as to their own acts and status, and based upon their

23  investigation, their counsel's investigation and information and belief as to all other matters,

24  Plaintiffs Adam Weisblatt, Joe Hanna, David Turk, and Colette Osetek ("Plaintiffs"), on behalf of

25  themselves and all others similarly situated, allege as follows:

26

27

28

**NATURE OF THE ACTION**

1.      This is a class action brought by consumers baited into purchasing 3G-enabled Apple iPads with the promise of flexible, "unlimited" data plans, only to have that promise reneged upon within weeks of their purchases.

2.      An iPad is a wireless computer marketed and used for downloading and storing large amounts of multi-media data and applications, viewing and listening to video, movies, and music, and sending and receiving email.  For the months preceding the April 30, 2010 release of the 3G-enabled iPad, Defendant Apple Inc. ("Apple") and Defendant AT&T Mobility LLC ("AT&T") promoted the availability of an accompanying "unlimited data" service plan, touting it as a material benefit of the 3G-enabled iPad.  Apple and AT&T promised consumers flexibility with their data plans, allowing them the ability to freely switch back and forth among the limited 3G data plan, the unlimited 3G data plan, and no 3G data plan, based on their budgets and data needs.  This appealed to customers since using an iPad to download data-rich content could quickly become expensive, as users who exceeded monthly data limits are hit with substantial overage fees.

3.      Defendants' promotion of the flexible, unlimited 3G data plan started as early as January 27, 2010, and continued up to and after June 2, 2010, when they announced that within 5 days—that is, as of June 7, 2010—they would discontinue providing the unlimited data plan.  The iPad purchasers who initially opted for the limited data plan were stripped of their ability to later opt for the unlimited data plan, and even those customers who were signed up for the unlimited data plan can no longer switch to a limited data plan or no data plan, then later opt for the unlimited plan again, as was originally promised.  Apple and AT&T announced this policy change within just weeks after selling at least hundreds of thousands of 3G-enabled iPads upon the product's initial launch.

4.      Defendants' representations induced Plaintiffs and other customers to pay an additional $130 for each iPad with 3G capability.  The availability of a flexible, unlimited data plan was material to purchasers' decisions because it would have allowed customers to download video, music and other data-intensive content on their iPads without incurring excessive charges,

- 2 -

and also would have enabled them to avoid paying for unlimited data when they do not need it. Defendants' ubiquitous marketing of the unlimited data plan and the option for customers to turn such plan on and off based on their data needs, on their respective websites and elsewhere, reflects Defendants' keen awareness that these promised options were highly important to customers' purchase decisions. When Defendants' so-called "breakthrough deal" to provide the flexible, unlimited 3G data plan and the ability to switch in and out of it was scrapped, Plaintiffs and the Class were left with iPad devices of significantly reduced value and utility.

5.      Plaintiffs and the Class seek damages, restitution, and injunctive relief for Defendants' ubiquitous false representations, on their respective websites and elsewhere, that customers who purchase iPads with 3G capability would be able to freely switch in and out of an unlimited 3G data plan each month as their data needs and budgets demanded.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and there is minimal diversity because Plaintiffs and numerous members of the Class are citizens of different states than Defendants.

7.      This Court has personal jurisdiction over Defendants because Apple is headquartered in, and is incorporated in, California; a substantial portion of the wrongdoing alleged in this Complaint took place in California; Defendants are authorized to do business in California; Defendants have sufficient minimum contacts with California and/or Defendants otherwise intentionally avail themselves of the markets in California through the promotion, marketing and sale of their products and services in California to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper under 28 U.S.C. § 1391(a) because Apple has its headquarters in this District and is incorporated in this District, Apple and AT&T are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets of this District through the promotion, marketing, distribution, and sale of its products in this District,

and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

9.      In particular, the representations, claims, and statements at issue in this case emanated from California.  Those statements were first made during an Apple presentation held in San Francisco.  The statements were subsequently repeated on Apple's website, which is hosted in California, and in various press releases and advertisements, written and/or produced in California.  Upon information and belief, AT&T's similar representations, claims, and statements similarly emanated from AT&T operations and employees based in California, and AT&T's negotiations and contracts with Apple took place and arose, wholly or in large part, with a California corporation.

10.      **Intra-district Assignment**:  Pursuant to Northern District of California Civil Local Rules 3-2 and 3-5, assignment to the San Jose Division of the Northern District of California is appropriate.  Defendant Apple Inc. is headquartered in Santa Clara County, and thus a substantial part of the events or omissions which give rise to the claims occurred in Santa Clara County.

## <u>PARTIES</u>

11.      Plaintiff Adam Weisblatt is a citizen of, and resides in, Fulton, New York.

12.      Plaintiff Joe Hanna is a citizen of, and resides in, Moreno Valley, California.

13.      Plaintiff David Turk is a citizen of, and resides in, Tacoma, Washington.

14.      Plaintiff Colette Osetek is a citizen of, and resides in, Dorchester, Massachusetts.

15.      Defendant Apple is a California corporation with its headquarters in Cupertino, California.

16.      Apple is a multi-national corporation that designs and markets computer software, personal computers, and consumer electronics, including mobile devices such as the iPhone and iPad.  By revenue, Apple is the largest mobile device company in the world.  Apple markets and sells its products and services directly to its customers in stores and online.

17.      Defendant AT&T, a wholly-owned subsidiary of AT&T Inc., is a Delaware corporation with its principal place of business in Atlanta, Georgia.  AT&T maintains extensive

1    contacts with the State of California, and in particular with the Northern District. AT&T has

2    operated in California since 1878.  Upon information and belief, the company connected the first

3    telephone call in California, constructed the country's first transcontinental phone line from

4    California, and built California's largest fiber optic network, totaling more than 31,000 miles.

5    Each day, AT&T handles more than 300 million phone calls in California.  In 2007, AT&T spent

6    more than $8.3 billion in California, including more than $2 billion in building and expanding

7    broadband and wireless networks in California.  Its 2007 California payroll was $3,412,500,000,

8    representing more than 46,500 employees, at all levels, from retail salespersons, to high-level

9    company managers.

10           18.     Upon information and belief, AT&T paid $1,275,440,000 in local and state taxes

11   in California in 2007.  AT&T has hundreds of retail stores throughout California, including over

12   100 retail stores in this District.  It also maintains business operations in Sacramento, San Ramon,

13   San Diego, Agoura Hills, Newport Beach, Los Angeles, Fresno, and San Francisco, including

14   finance, advertising, and account management operations.  One hundred percent of residential

15   customer locations in California have access to AT&T broadband service.

16           19.     AT&T provides telecommunication products and services to consumers,

17   businesses, and other telecommunication service providers under the AT&T brand worldwide.

18   AT&T Mobility LLC began operations in October 2000, and in 2004 acquired AT&T Wireless

19   Services, Inc.  Upon AT&T Inc.'s acquisition of BellSouth in 2006, AT&T Mobility became a

20   wholly-owned subsidiary of AT&T Inc.  By revenue, AT&T is the largest wireless carrier and is

21   the second largest provider of mobile telephony service in the United States, with over 85.1

22   million wireless customers and more than 150 million total customers.

23           20.     Through an agreement with Apple, AT&T is, and at all relevant times has been,

24   the exclusive provider of wireless service for all iPads.  On information and belief, Apple receives

25   substantial consideration from AT&T in exchange for allowing AT&T to be the exclusive

26   provider of wireless service for all iPads.

27           21.     AT&T Mobility LLC is referred to herein as "AT&T."  Apple and AT&T are

28   collectively referred to herein as "Defendants."

**ALLEGATIONS APPLICABLE TO ALL COUNTS**

22.     Apple first announced the release of the iPad (both the 3G-enabled and non-3G-enabled versions) on or around January 27, 2010, in a video presentation given in San Francisco by its CEO, Steve Jobs, hosted on Apple's website.

23.     The iPad is a 1.5-pound, high-resolution, LED-backlit, in-plane switching (IPS), 9.7-inch display featuring a touch screen and powered by an Apple-designed microchip.  It is a half-inch thick and is similar to an Apple iPod, but the size of a standard notepad.  The regular, non-3G-enabled iPad is fitted with Wi-Fi connectivity; thus, to connect to the internet, its users must be within range of a wireless internet "hotspot." It retails for $499 (16-gigabyte version), $599 (32-gigabyte version), or $699 (64-gigabyte version).

24.     On or around April 3, 2010, Defendants began selling "WiFi" (non-3G-enabled) iPads.

25.     On or around April 30, 2010, Defendants began selling 3G-enabled iPads, with exclusive AT&T 3G service.  The sole difference between WiFi iPads and 3G-enabled iPads is the ability to connect to, and download data via, AT&T's 3G wireless network without a WiFi connection.

26.     The 3G-enabled iPad retails for $629 (16-gigabyte version), $729 (32-gigabyte version), or $829 (64-gigabyte version).  Thus, the 3G-enabled iPad is sold at a premium of $130 (before tax) over the standard iPad without 3G capability.  *See* Exhibit A, attached hereto.

27.     Customers were able to pre-order 3G-enabled iPads beginning on or about March 12, 2010.  Apple advertised the "No-contract, 3G service" for the 3G-enabled iPad, telling customers that "[i]n the U.S., 3G service is available from AT&T.  You can choose from breakthrough data plans – no long-term contract required."  *See* Exhibit A, attached hereto.  AT&T likewise advertised the 3G-enabled versions of the iPad, and consumers could follow a link on AT&T's website to purchase 3G-enabled iPads.  *See* Exhibit B, attached hereto.

28.     Between the launch of the iPad and the filing of the initial Weisblatt complaint, Defendants sold well over 2 million iPads.  (*See*

1     http://cbs5.com/local/iPad.Apple.sales.2.1724762.html).  On information and belief, a substantial

2     portion of those sales are iPads with 3G capability, which carried the premium price.

3          29.      From April 30, 2010 until June 7, 2010, Defendants offered prospective purchasers

4     of the 3G-enabled iPads two 3G data plans: (a) 250 MB of data for $14.99 per month, with

5     additional data available in 250 MB increments for an added charge; or (b) unlimited 3G data for

6     $29.99 per month.  *See* Exhibits A-C, attached hereto.

7          30.      Starting with its introduction in January 2010, and continuing until June 7, 2010,

8     Defendants heavily trumpeted the availability of the flexible, no-contract, unlimited 3G data plan

9     in marketing the 3G-enabled iPad to consumers.  For example, in his January 27, 2010 video

10     presentation announcing the launch of the iPad, which was hosted on Apple's website (the

11     "January 27th Apple iPad Presentation"), Apple CEO Steve Jobs promised that customers who

12     purchased 3G-enabled iPads would have access to an "awesome," "no contract" unlimited data

13     plan as a result of a "breakthrough deal with AT&T."  During the presentation, Jobs made the

14     following representations and promises about wireless data plans for the 3G-enabled iPad:

> Now, what does it cost for the data plans?  Well, in the U.S.,
> telecom companies usually charge about $60 a month for a data
> plan for a laptop.  We've got a real breakthrough here.  We've got
> two awesome plans for iPad owners.  The first one gives you up to
> 250 megabytes of data per month.  That's a fair bit of data.  Most
> people will get by on that.  Up to 250 megabytes of data per month,
> just $14.99.  $14.99.  And if you feel you need more, we have an
> unlimited plan for just $29.99.  So these are real breakthrough
> prices.  We've got a breakthrough deal with AT&T. It's providing
> the service.  $14.99 for up to 250 megabytes, $29.99 for unlimited
> data. . . . And, there's no contract, it's prepay.[1]

21     Jobs' statements were accompanied and reinforced by a giant video monitor image displaying

22     "Breakthrough deal with AT&T" and "No contract – cancel anytime."

23          31.      The no-contract, unlimited data plan was billed by Defendants as a "breakthrough

24     deal."  Macworld called the plan one of the iPad's "five best surprises," and it was extremely

25     well-received in the press and by Apple devotees.

26

---

27     [1] The video is available online at
28     http://www.youtube.com/watch?v=C7XtZKn6kt8&feature=related.  The quoted excerpt begins at
    6:57.

32.     Both Apple and AT&T repeatedly and heavily advertised the unlimited 3G data plan option as a key feature of the iPad, on their websites and elsewhere, throughout the Class Period (as defined below).

33.     Customers who purchased 3G-enabled iPads were not required to choose a particular 3G data plan for any longer than a one-month period.  Rather, according to Defendants' representations, whether or not customers initially signed up for the unlimited data plan, customers would be able to sign up for, and change, their data plans each month as their data needs demanded, and, specifically, would be able to "upgrade to" or "switch" in and out of the unlimited data plan on a monthly basis in the future as their data needs demanded.

34.     From the time they began marketing the 3G-enabled iPad until June 7, 2010, Defendants consistently and expressly promised prospective customers that if they purchased an iPad with 3G capability, they could later upgrade to the unlimited data plan and could switch in and out of the unlimited data plan as their data needs demanded.   For example, Apple advertised to prospective 3G-enabled iPad customers:

a.      "**No-contract 3G service.**  In the United States, 3G service is available through a breakthrough deal with AT&T. *You choose the amount of data per month you want to buy — 250MB or unlimited*.  If you choose the 250MB plan, you'll receive onscreen messages as you get close to your monthly data limit so *you can decide whether to turn off 3G or upgrade to the unlimited plan*.  Best of all, there's no long-term contract. *So if you have a business trip or vacation approaching, just sign up for the month you'll be traveling and cancel when you get back*. You don't need to visit a store to get 3G service. You can sign up, check your data usage, manage your account, or cancel your service — all from your iPad."  Exhibit C, attached hereto (emphasis added).

b.      **"Manage your data plan**.  iPad makes it easy to choose the data plan that works best for you. *When you need more data, you can add another 250MB or upgrade to the Unlimited Data plan*.  Because you sign up for a data plan in monthly increments, you can cancel your plan at any time and then sign up again whenever you need 3G service."  Exhibit C, attached hereto (emphasis added).

c.    "[Y]ou can monitor your data usage and change your plan at any time, including switching to unlimited data or cancelling 3G service if you know you won't need it."  Exhibit A, attached hereto.

d.    "As you get close to your monthly data limit, you'll receive onscreen messages to help you decide whether to upgrade to another 250MB or switch to the unlimited plan."  Exhibit A, attached hereto.

e.    "There are two monthly data plans:  250MB or unlimited.  There's no contract, and you can sign up and change your service right on your iPad."  Exhibit A, attached hereto.

35.    Likewise, AT&T advertised on its website:  "AT&T offers two data plan options – 250MB or unlimited data, with recurring monthly charge and no long-term contract.  To help you manage your data with a 250 MB plan, iPad will notify you at 20%, 10%, and when there's no more data available, so you can decide if you want to add more data or upgrade to an unlimited data plan."  Exhibit B, attached hereto.

36.    In addition, on or about January 27, 2010, AT&T released a "fact sheet" concerning wireless data plans for the 3G-enabled iPad, which featured the same no-contract, unlimited data plan discussed above and stated: "Once you sign up for iPad 3G data service, you can add to or cancel your domestic plan at any time – no penalty."  *See* Exhibit D, attached hereto.

37.    An unlimited 3G data plan is material to iPad customers because customers can use the iPad to, among other things, download data-intensive applications and content, such as music and full-length movies and other video content, capabilities for which Defendants expressly marketed the iPad to consumers.  On information and belief, for example, under a $14.99 per month, 250 MB plan, a consumer could download a little over 2 hours of video content per month before incurring overage charges, whereas under the $29.99 per month unlimited data plan, a consumer could finish a 3-hour movie, and download unlimited other movies and content, without incurring any overage charges.

38.     Having the option to turn the unlimited data plan on and off is material to customers because it allows them access to unlimited data, at a reasonable flat cost, when they need it (such as when they are going on vacation, and want to use their iPads to download full-length movies), while at the same time allowing them to not pay for unlimited data when they do not need it.

39.     Defendants marketed and advertised the unlimited data plan, and the ability to switch in and out of the unlimited data plan, to induce consumers to purchase iPads with 3G capability.  The iPads with 3G capability cost significantly more than the equivalent iPads without 3G capability, but they were seen as worth the added cost by consumers who wanted the flexibility and option of getting unlimited 3G data for a fixed cost when needed.

40.     Defendants' representations regarding the continued availability of flexible, unlimited data service plans were material to customers' decisions to purchase iPads with 3G capability, Defendants intended that customers rely on those representations, and Plaintiffs and the Class did rely on those representations in making their purchase decisions.

41.     Defendants' representations, between January 27, 2010 and June 7, 2010, regarding the continued availability of flexible, unlimited data service plans for purchasers of iPads with 3G capability, were false, and Defendants knew or should have known that those representations were false when they made them.  Contrary to their numerous representations, which were designed to induce customers to purchase 3G-enabled iPads and thereby drive up sales and Defendants' profits, Defendants had no intention of providing customers with a flexible, unlimited 3G data plan.

42.     On or around June 2, 2010, Defendants announced, through a press release, that as of June 7, 2010, they would no longer offer an unlimited 3G data plan for iPad customers.  *See* Exhibit E, attached hereto.  Defendants provided no other notice of this policy change to customers who purchased 3G-enabled iPads either before or after the June 2, 2010 press release was issued.  In contrast to their initial marketing blitz, relatively little effort was expended on this announcement.

43.   Pursuant to this change, customers can no longer choose to pay a fixed monthly rate for unlimited 3G data, but rather are required to choose between other, limited data plans. *See* Exhibit E, attached hereto.  Many of the applications for which the iPad can be used, and for which Defendants expressly marketed the iPad to customers—such as downloading movies and other video content—would cause customers to significantly exceed the limits of the new limited data plans that are available, thus resulting in overages and corresponding additional charges to customers.

44.   On information and belief, after June 7, 2010, customers who purchased iPads with 3G capability before June 7, 2010 and who were signed up for an unlimited data plan as of June 7, 2010 can maintain an unlimited plan; however, if those customers *ever* discontinue subscribing to the unlimited data plan (*e.g.*, by changing to a different plan or choosing to have no 3G plan for a particular month), they cannot switch back to the unlimited data plan.  On information and belief, customers who purchased iPads with 3G capability before June 7, 2010 and who were signed up for a limited data plan as of June 7, 2010, will *never* have the option to sign up for an unlimited data plan or, for that matter, to switch in and out of the unlimited data plan.  With respect to those customers who purchased 3G-enabled iPads before June 7, 2010 but had not signed up for any 3G data plan as of June 7, 2010, there are inconsistent reports as to their options after June 7, 2010.  At least some of these customers have been denied by Defendants the ability to *ever* sign up for the unlimited data plan, even as a one-time, non-flexible option, while it appears that some others may have been given a one-time option to sign up for a non-flexible, unlimited data plan.  In all cases, none of these customers will have the option of switching in and out of the unlimited plan as their data needs demand, as was promised.

45.   In other words, even though Defendants widely trumpeted to customers the availability of the unlimited 3G data plan and, specifically, that customers would be able to switch in an out of the unlimited data plan in the future as their data needs demanded, many of those customers who did not initially sign up for the unlimited data plan will *never* have the option of "switching" or "upgrading" to the unlimited data plan in the future, as was promised, and all such customers have lost the promised ability to switch in and out of the unlimited data

- 11 -

plan.  Thus, despite Defendants' representations that the 3G data plan would be both "unlimited" and "no-contract," a de facto long-term contract is now required to keep the promised benefit of unlimited 3G data.

46.     Defendants unilaterally withdrew the flexible, unlimited data plan option just over a month after they started selling iPads with 3G capability.  Defendants stripped Plaintiffs and the Class of one of the key promised benefits of purchasing a 3G-enabled iPad – in some cases just days (and, at most, about a month) after they purchased their iPads in reliance on Defendants' misrepresentations.

47.     Without the availability of a flexible, no-contract unlimited 3G data plan, the 3G-enabled iPads that Plaintiffs and the Class purchased from Defendants are of significantly reduced value and utility.

48.     Defendants' unilateral withdrawal of the unlimited data plan option was timed to occur after Apple's 14-day return deadline expired for the substantial number of customers, including Plaintiffs, who bought 3G-enabled iPads during the initial rush when the product was first launched.  *See*, *e.g.*, http://news.ycombinator.com/item?id=1397702.

49.     Defendants' misrepresentations continued right up to the time they withdrew the unlimited data plan option.  As of at least June 5, 2010—three days *after* Defendants announced the June 7, 2010 change and just two days before the change was scheduled to take effect (*see* Exhibit E, attached hereto)—Apple continued to falsely advertise on its website that purchasers of 3G-enabled iPads would be able to "upgrade" to the unlimited data plan, and switch in and out of the unlimited data plan, in the future.  *See* Exhibit F, attached hereto.  As of at least June 5, 2010, AT&T also continued to advertise this option despite the pending change that rendered the representation completely false.  *See* Exhibit G, attached hereto.

50.     Even after the June 7, 2010 change took effect, Apple's website continued to misrepresent to customers that the unlimited data plan was available for 3G-enabled iPads and that customers would be able to upgrade in the future to the unlimited data plan, and switch in and out of the unlimited data plan, as their data needs demanded.  *See* Exhibit H, attached hereto.

51.     On or around June 4, 2010, apparently in response to concerns raised about how the pending data plan changes would apply in light of the existing back log of iPad orders, Defendants made an announcement reassuring consumers that the unlimited data plan would be available for all customers who ordered 3G-enabled iPads before June 7, 2010, even if they received their iPads after June 7, 2010.  During the period between the June 2, 2010 announcement of the June 7, 2010 change and the implementation of the June 7, 2010 change, Defendants continued to represent that customers who purchased 3G-enabled iPads would be able to switch in an out of the unlimited 3G data plan based on their monthly data needs.  *See, e.g.,* Exhibits F and G, attached hereto.  Despite these representations, all customers who ordered iPads before June 7, 2010, but did not receive their iPads until after June 7, 2010, were denied the ability to switch in and out of the unlimited data plan based on their monthly data needs, as was promised.  Moreover, on information and belief, Defendants denied many of these customers the right to *initially* sign up for the unlimited data plan, when they received their iPads, even as a one time, non-flexible option.

52.     By their conduct, Defendants have been unjustly enriched and have damaged Plaintiffs and the Class.

## PLAINTIFF ADAM WEISBLATT

53.     On April 8, 2010, Plaintiff Adam Weisblatt purchased a 16 GB WiFi (non-3G-enabled) iPad for a total purchase price of $538.92, including tax.  On April 30, 2010, Mr. Weisblatt returned that iPad and paid an additional $140.40 ($130 plus the additional tax) in exchange for the equivalent 16 GB model iPad with 3G capability.  Both his original April 8, 2010 purchase and the April 30, 2010 exchange/purchase were made at an Apple store in Syracuse, New York.

54.     Before purchasing his 3G-enabled iPad, Mr. Weisblatt saw representations, on Apple's website and in various industry publications (which, on information and belief, were based on Defendants' statements), regarding the iPad with 3G capability, which at the time was scheduled to be released shortly.  In particular, Mr. Weisblatt saw representations from Defendants, including on Apple's website, that: (a) one of the available data plans for the 3G-

1   enabled iPad would be unlimited 3G data downloading for a fixed monthly rate; and (b) if he

2   purchased a 3G-enabled iPad, he would be able to switch in and out of the unlimited 3G data plan

3   in the future as his monthly data needs demanded.

4          55.    Similarly, on April 30, 2010, the day that Mr. Weisblatt purchased his 3G-enabled

5   iPad, customer service representatives at the Apple store where he made the purchase represented

6   to Mr. Weisblatt that if he purchased a 3G-enabled iPad: (a) one of his data plan options would be

7   an unlimited 3G data plan for a fixed monthly rate; and (b) he would be able to switch in and out

8   of the unlimited 3G data plan in the future as his monthly data needs demanded.

9          56.    Based on the representations about the unlimited data plan and the ability to switch

10  in and out of it, Mr. Weisblatt decided to exchange his WiFi (non-3G-enabled) iPad and pay an

11  extra $140.40 (with tax) for a 3G-enabled iPad.  Mr. Weisblatt decided that the 3G-enabled iPad

12  was worth the additional cost because, in some months, unlimited 3G data access would allow

13  him to work outside of the office for several hours a week that he otherwise would have to spend

14  in the office, and allow him access to data-intensive content when he is away from home.

15         57.    On May 2, 2010, two days after he purchased his 3G-enabled iPad, Mr. Weisblatt

16  signed up for the unlimited 3G data plan, and he was signed up for the unlimited data plan as of

17  June 7, 2010.  However, due to variances in his work and life schedules, there are several months

18  each year where an unlimited 3G data plan would not benefit Mr. Weisblatt.  Thus, Mr. Weisblatt

19  anticipated using the unlimited data plan in some months and not in others.  The appeal to Mr.

20  Weisblatt of the 3G- enabled iPad was that, according to Defendants' representations, unlimited

21  3G data would be available to him for the months that he needed it, but he was not required to pay

22  for unlimited data in the months that he did not need it.

23         58.    As a result of Defendants' June 7, 2010 policy change, Mr. Weisblatt no longer

24  has the option to switch in and out of the unlimited 3G data plan, as he was promised.

25         59.    Had he known that his access to the unlimited 3G data plan option would be

26  restricted in the way it has been pursuant to the June 7, 2010 change (*i.e.*, that he would not be

27  allowed to switch in and out of the unlimited data plan based on his needs), Mr. Weisblatt would

28  not have purchased the iPad with 3G capability.

60.     Mr. Weisblatt has been, and will continue to be, injured as a result of Defendants' conduct alleged herein, in that, *inter alia*, he paid more than he otherwise would have for his iPad and/or related services, has been denied important benefits that he was promised by Defendants and that he paid for, and will be assessed excessive charges for downloading data to his iPad.

### PLAINTIFF JOE HANNA

61.     On April 30, 2010, Plaintiff Joe Hanna purchased a 64 GB 3G-enabled iPad at a Best Buy store in Moreno Valley, California.  The total purchase price for his iPad was $829.00 plus sales tax.

62.     Before he made his April 30, 2010 iPad purchase, Mr. Hanna researched both the 3G-enabled and WiFi versions of the iPad on Apple's website.  Mr. Hanna saw representations from Defendants, including on Apple's website, that: (a) one of the available data plans for the 3G- enabled iPad would be unlimited 3G data downloading for a fixed monthly rate; and (b) if he purchased a 3G- enabled iPad, he would be able to switch in and out of the unlimited 3G data plan in the future as his monthly data needs demanded.

63.     Based on these representations, Mr. Hanna decided to purchase a 3G-enabled iPad instead of a WiFi iPad.  Mr. Hanna decided that the 3G- enabled iPad was worth the additional cost because he wanted to be able to use his iPad to download videos and other data-intensive content during certain times when he would be away from home and not near a WiFi "hot spot," and he understood that a flexible, no contract unlimited 3G data plan would allow him to do so.

64.     Mr. Hanna has not purchased a 3G data plan since he purchased his 3G-enabled iPad on April 30, 2010.  He has not needed to purchase a 3G data plan during this time because he has generally been either home or in another place where he has WiFi access.  However, when he purchased his iPad, Mr. Hanna planned to sign up for the unlimited 3G data plan in certain months when he is on vacation or otherwise away from home or WiFi access, and then turn off the unlimited data plan when he did not need it.  Thus, Mr. Hanna anticipated using the unlimited data plan in some months and not in others.  The appeal to Mr. Hanna of the 3G- enabled iPad, and the reason why he bought the 3G- enabled iPad, was that, according to Defendants' representations, unlimited 3G data would be available to him for the months that he needed it, but

1   he was not required to pay for unlimited 3G data (or any 3G data plan, for that matter) in the

2   months that he did not need it.

3          65.     As a result of Defendants' June 7, 2010 policy change, Mr. Hanna will never have

4   the option of signing up for the unlimited 3G data plan or the option to switch in and out of the

5   unlimited 3G data plan as his data needs demand, as he was promised.

6          66.     Had he known the truth about his data plan options, Mr. Hanna would not have

7   purchased the iPad with 3G capability.

8          67.     Mr. Hanna has been, and will continue to be, injured as a result of Defendants'

9   conduct alleged herein, in that, *inter alia*, he paid more than he otherwise would have for his iPad

10  and/or related services, has been denied important benefits that he was promised by Defendants

11  and that he paid for, and will be assessed excessive charges for downloading data to his iPad.

12                          **PLAINTIFF DAVID TURK**

13         68.     On April 30, 2010, Plaintiff David Turk purchased two 3G-enabled iPads (for him

14  and his wife) at an Apple Store in Tukwila, Washington, one a 16 GB model and the other a 64

15  GB model.  The total purchase price for these two iPads was $1,458.00 plus sales tax.

16         69.     On May 18, 2010, Mr. Turk purchased a third 3G-enabled iPad, a 32 GB model,

17  for his daughter.  Mr. Turk ordered this third iPad through Apple's online store.  The total

18  purchase price for this iPad was $796.80 ($729.00 plus tax).  He received this iPad on

19  approximately June 5, 2010.

20         70.     Before he purchased his three 3G-enabled iPads, Mr. Turk researched the 3G-

21  enabled iPad on Apple's website.  Mr. Turk saw representations from Defendants, including on

22  Apple's website, that: (a) one of the available data plans for the 3G- enabled iPad would be

23  unlimited 3G data downloading for a fixed monthly rate; and (b) if he purchased a 3G- enabled

24  iPad, he would be able to switch in and out of the unlimited 3G data plan in the future (including

25  upgrading to the unlimited data plan mid-month in any given month) as his data needs demanded.

26         71.     Based on these representations, Mr. Turk decided to purchase the three 3G-enabled

27  iPads.

28

72.     For one of the two 3G-enabled iPads that he purchased on April 30, 2010, Mr. Turk signed up for the unlimited 3G data plan on April 30, 2010, and, for that iPad, he was signed up for the unlimited 3G data plan as of June 7, 2010.  For the other 3G-enabled iPad that he purchased on April 30, 2010, Mr. Turk initially signed up for the limited 250MB 3G data plan on May 4, 2010.  He upgraded to the unlimited data plan shortly thereafter, and, for that iPad, he was signed up for the unlimited 3G data plan as of June 7, 2010.  When he purchased these two iPads on April 30, 2010, Mr. Turk anticipated that, for each iPad, he would sign up for the unlimited data plan in some months and not in others, based on his and his wife's changing 3G data needs. The appeal to Mr. Turk of the 3G- enabled iPad was that, according to Defendants' representations, unlimited 3G data would be available to him and his wife for the months that they needed it, but he was not required to pay for unlimited data in the months that they did not need it.

73.     As a result of Defendants' June 7, 2010 policy change, with respect to both of the 3G-enabled iPads that he purchased on April 30, 2010, Mr. Turk no longer has the option to switch in and out of the unlimited 3G data plan, as he was promised.

74.     For the 3G-enabled iPad that Mr. Turk purchased for his daughter, and which he received on June 5, 2010, his daughter attempted to sign up for the unlimited 3G data plan on June 15, 2010, however she was not allowed to do so at that time.  On June 20, 2010, Mr. Turk and his daughter were able to sign up for the unlimited 3G data plan for this iPad.  Mr. Turk and his daughter would have instead signed up for a limited 3G data plan for this iPad at that time, based on their expected data needs that month, but they signed up for the unlimited 3G data plan because, as a result of Defendants' June 7, 2010 policy change, they believed this was their only chance to ever sign up for an unlimited 3G data plan, albeit without the option to switch in and out of the unlimited data plan based on their data needs, an option they were promised and which they had intended to take advantage of.

75.     As a result of Defendants' June 7, 2010 policy change, with respect to the 3G-enabled iPad that Mr. Turk purchased for his daughter, Mr. Turk and his daughter will not have

1    the option to switch in and out of the unlimited 3G data plan based on their data needs, as was

2    promised.

3         76.    Had he known the truth about the 3G data plan options, Mr. Turk would not have

4    purchased the three iPads with 3G capability.

5         77.    Mr. Turk has been, and will continue to be, injured as a result of Defendants'

6    conduct alleged herein, in that, *inter alia*, he paid more than he otherwise would have for his

7    iPads and/or related services, has been denied important benefits that he was promised by

8    Defendants and that he paid for, and will be assessed excessive charges for downloading data to

9    his iPads.

10                    **PLAINTIFF COLETTE OSETEK**

11        78.    Plaintiff Colette Osetek purchased a 3G-enabled 64 GB iPad at an Apple store in

12   Braintree, Massachusetts on April 30, 2010.  She paid $829.00, plus sales tax, for the iPad.

13        79.    Before she purchased the three 3G-enabled iPad, Ms. Osetek researched both the

14   standard Wi-Fi version of the iPad and the 3G-enabled iPad.  Ms. Osetek became aware of

15   Defendants' representations, including those on Apple's website, that: (a) one of the two data

16   plans  available for the 3G-enabled iPad would be unlimited 3G data downloading for a fixed

17   monthly rate; and (b) taking advantage of the unlimited 3G data plan did not require a long-term

18   contract; rather, she would be able to switch back and forth between the unlimited 3G data plan

19   and the less-expensive 250 MB plan based on her changing data needs, including the flexibility to

20   upgrade to the unlimited data plan even during a month that she had signed up for the 250MB

21   data plan.

22        80.    These representations were material to Ms. Osetek's decision to purchase the 3G-

23   enabled iPad, and she decided to purchase the 3G-enabled iPad based on these representations.

24        81.    Ms. Osetek signed up for the unlimited data plan on May 7, 2010.  She purchased

25   the unlimited data plan believing that she would have the flexibility to switch in and out of the

26   unlimited data plan based on her needs for any particular month.

27

28

82.     As a result of Defendants' June 7, 2010 policy change, Ms. Osetek will not have the option to switch in and out of the unlimited 3G data plan based on her data needs, as was promised.

83.     Had she known the truth about the 3G data plan options, Ms. Osetek would not have purchased the iPad with 3G capability.

84.     Ms. Osetek has been, and will continue to be, injured as a result of Defendants' conduct alleged herein, in that, *inter alia*, she paid more than she otherwise would have for her iPad and/or related services, has been denied important benefits that she was promised by Defendants and that she paid for, and will be assessed excessive charges for downloading data to her iPad.

## CLASS ACTION ALLEGATIONS

85.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, as members of a proposed nationwide class (the "Class") initially defined as:

> All persons in the United States who purchased or ordered an Apple iPad with 3G capability between January 27, 2010 and June 7, 2010.
>
> Excluded from this Class is any person, firm, trust, corporation, or other entity related to or affiliated with Apple Inc. and AT&T Mobility LLC.

86.     This action is brought and may properly be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these provisions.

87.     Numerosity Under Rule 23(a)(1).  The Class is so numerous that the individual joinder of all members is impracticable.  While the Class's exact number and the identity of Class members is currently unknown and can only be ascertained through appropriate discovery, Plaintiffs are informed and believes that the Class includes at least hundreds of thousands of individuals, if not many more.

88.     Commonality Under Rule 23(a)(2).  Common legal and factual questions exist that predominate over any questions affecting only individual Class members.  These common

questions, which do not vary from Class member to Class member, and which may be determined without reference to any Class member's individual circumstances, include, but are not limited to whether:

      a.     The offer of an unlimited data plan and/or the ability to switch in and out of an unlimited data plan are material facts that reasonable purchasers would have considered important in making their purchase decisions;

      b.     Defendants engaged in unfair, false, misleading, or deceptive acts or practices regarding its marketing and sale of 3G-enabled iPads, in violation of the UCL;

      c.     Defendants represented, through their words and conduct, that their iPads with 3G capability had characteristics, uses, or benefits they did not actually have, in violation of the CLRA;

      d.     Defendants advertised the 3G-enabled iPads with the intent not to sell them as advertised, in violation of the CLRA;

      e.     Defendants' conduct regarding the marketing and sale of its 3G-enabled iPads was likely to mislead or deceive, and is therefore fraudulent, within the meaning of the UCL;

      f.     Defendants' conduct alleged herein constitutes false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.;

      g.     Defendants' conduct alleged herein constitutes fraud and/or intentional misrepresentation;

      h.     Defendants' conduct alleged herein constitutes negligent misrepresentation;

      i.     Defendants have been unjustly enriched by their conduct alleged herein;

      j.     Plaintiffs and the Class are entitled to injunctive and/or other equitable relief, including restitution and disgorgement, and if so, the nature and amount of such relief;

1                       k.        Defendants are liable for actual and/or compensatory damages, and,

2    if so, the amount of such damages;

3                       l.        Defendants are liable for punitive damages, and if so, the amount of

4    such damages.

5           89.      <u>Typicality Under Rule 23(a)(3).</u>  Plaintiffs' claims are typical of the Class

6    members' claims.  Defendants' common course of conduct caused Plaintiffs and all Class

7    members the same damages.  In particular, Defendants' conduct caused each Class member's

8    economic losses.  Likewise, Plaintiffs and other Class members must prove the same facts in

9    order to establish the same claims.

10          90.      <u>Adequacy of Representation Under Rule 23(a)(4).</u>  Plaintiffs are adequate Class

11   representatives because they are Class members and their interests do not conflict with Class

12   interests.  Plaintiffs retained counsel competent and experienced in consumer protection class

13   actions, and together Plaintiffs and counsel intend to prosecute this action vigorously for the

14   Class's benefit.  Plaintiffs and their counsel will fairly and adequately protect Class interests.

15          91.     The Class can be properly maintained under Rule 23(b)(2).  Defendants have acted

16   or refused to act, with respect to some or all issues presented in this Complaint, on grounds

17   generally applicable to the Class, thereby making appropriate final injunctive relief with respect

18   to the Class as a whole.

19          92.     The Class can be properly maintained under Rule 23(b)(3).  A class action is

20   superior to other available methods for the fair and efficient adjudication of this litigation because

21   individual litigation of each Class member's claim is impracticable.  Even if each Class member

22   could afford individual litigation, the court system could not.  It would be unduly burdensome if

23   thousands of individual cases proceed.  Likewise, individual litigation presents a potential for

24   inconsistent or contradictory judgments, the prospect of a race for the courthouse, as well as the

25   risk of an inequitable allocation of recovery among those with equally meritorious claims.

26   Individual litigation further increases the expense and delay to all parties and the courts because it

27   requires individual resolution of common legal and factual questions.  By contrast, the class

28

action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### (Intentional Misrepresentation)

93.     Plaintiffs, individually and on behalf of the Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

94.     As alleged herein, in the course of conducting their business of selling iPads and related services, Defendants have intentionally made numerous material misrepresentations of fact to Plaintiffs and all members of the Class concerning the benefits of purchasing an iPad with 3G capability and the nature of customers' unlimited 3G data plan options.

95.     Defendants intentionally failed to disclose material information regarding the nature of 3G data plan options to Plaintiffs and the Class.

96.     Defendants' misrepresentations alleged herein were the type of misrepresentations that are material—*i.e.,* a reasonable person would attach importance to them and would be induced to act on the information in making purchase decisions.

97.     Defendants knew that the misrepresentations alleged herein were false at the time they made them and/or acted recklessly in making such misrepresentations.

98.     In making the misrepresentations alleged herein, Defendants intended that Plaintiffs and the Class would rely on such misrepresentations and purchase iPads with 3G capability.

99.     Defendants' misrepresentations alleged herein are objectively material to the reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

100.     Plaintiffs and the Class reasonably and justifiably relied to their detriment on Defendants' intentional misrepresentations.

101.     Defendants' intentional misrepresentations were a substantial factor in causing Plaintiffs and the Class to purchase iPads with 3G capability from Defendants.

102.    As a proximate result of Defendants' intentional misrepresentations, Plaintiffs and each member of the Class suffered damages in an amount to be proven at trial.

103.    Defendants directly benefited from, and were unjustly enriched by, their intentional misrepresentations.

104.    Defendants acted with "malice," as that term is defined in Cal. Civ. Code § 3294(c)(1), by engaging in the conduct alleged herein, which was specifically intended by Defendants to cause substantial injury to Plaintiffs and the members of the Class.

105.    Defendants' conduct alleged herein constitutes "fraud," as that term is defined in Cal. Civ. Code 3294(c)(3), because such conduct involved intentional misrepresentations, deceit, and/or concealment of material facts known to Defendants, and was done with the intent to cause injury to their customers.

106.    Plaintiffs and the Class are entitled to actual and punitive damages and attorneys' fees under Cal. Civ. Code § 3294(a).

107.    As a proximate result of Defendants' intentional misrepresentations, Plaintiffs and each member of the Class suffered an ascertainable loss and are entitled to equitable relief and compensatory and punitive damages, in amounts to be proven at trial.

## SECOND CAUSE OF ACTION
### (False Promise/Fraud)

108.    Plaintiffs, individually and on behalf of the Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

109.    Defendants made false promises to Plaintiffs and all members of the Class regarding the benefits of purchasing iPads with 3G capability and the nature of customers' unlimited 3G data plan options.

110.    Defendants made such false promises for the purpose of inducing Plaintiffs and the Class to purchase iPads with 3G capability.

111.    The false promises alleged herein were the type of promises considered to be material, *i.e.*, a reasonable person would attach importance to them and would be induced to act on the information in making purchase decisions.

1   112.   Defendants made such false promises with the knowledge that they would not

2   fulfill them and with the intention of not fulfilling them.

3   113.   The false promises alleged herein are objectively material to the reasonable

4   consumer, and therefore reliance upon such promises may be presumed as a matter of law.

5   114.   Plaintiffs and the Class reasonably and justifiably relied to their detriment on

6   Defendants' false promises.

7   115.   Defendants' false promises were a substantial factor in causing Plaintiffs and the

8   Class to purchase iPads with 3G capability from Defendants.

9   116.   As a proximate result of Defendants' false promises, Plaintiffs and each member

10  of the Class suffered damages in an amount to be proven at trial.

11  117.   Defendants directly benefited from, and were unjustly enriched by, having made

12  the false promises alleged herein.

13  118.   Defendants acted with "malice," as that term is defined in Cal. Civ. Code §

14  3294(c)(1), by engaging in the conduct alleged herein, which was specifically intended by

15  Defendants to cause substantial injury to Plaintiffs and the members of the Class.

16  119.   Defendants' conduct alleged herein constitutes "fraud," as that term is defined in

17  Cal. Civ. Code 3294(c)(3), because such conduct involved Defendants making material promises,

18  which Defendants knew to be false, with the intent to cause injury to their customers.

19  120.   Plaintiffs and the Class are entitled to actual and punitive damages and attorneys'

20  fees under Cal. Civ. Code § 3294(a).

21  121.    As a proximate result of Defendants' false promises, Plaintiffs and each member

22  of the Class suffered an ascertainable loss and are entitled to equitable relief and compensatory

23  and punitive damages, in amounts to be proven at trial.

### THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

24

25  122.   Plaintiffs, individually and on behalf of the Class, incorporate by reference all of

26  the allegations contained in the preceding paragraphs of this Complaint.

27  123.   As alleged herein, in the course of conducting their business of selling iPads and

28  related services, Defendants have made numerous material misrepresentations of fact to Plaintiffs

and all members of the Class concerning the benefits of purchasing an iPad with 3G capability
and the nature of customers' unlimited 3G data plan options.

124.    Defendants failed to disclose material information regarding the nature of 3G data
plan options to Plaintiffs and the Class.

125.    Defendants' misrepresentations alleged herein were supplied to customers for the
purpose of affecting their purchase decisions.

126.    Defendants had no reasonable grounds for believing that their misrepresentations
were true.

127.    Defendants failed to exercise reasonable care and/or diligence in communicating
their misrepresentations to customers and failing to disclose material information to customers.

128.    Defendants' misrepresentations alleged herein were the type of misrepresentations
that are material—*i.e.,* a reasonable person would attach importance to them and would be
induced to act on the information in making purchase decisions.

129.    Defendants' misrepresentations alleged herein are objectively material to the
reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a
matter of law.

130.    Plaintiffs and the Class reasonably and justifiably relied to their detriment on
Defendants' misrepresentations.

131.    Defendants' misrepresentations were a substantial factor in causing Plaintiffs and
the Class to purchase iPads with 3G capability from Defendants.

132.    As a proximate result of Defendants' misrepresentations, Plaintiffs and each
member of the Class suffered damages in an amount to be proven at trial.

133.    Defendants directly benefited from, and were unjustly enriched by, their
misrepresentations.

**FOURTH CAUSE OF ACTION**
**(Violation of Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*)**

134.    Plaintiffs, individually and on behalf of the Class, incorporate by reference all of
the allegations contained in the preceding paragraphs of this Complaint.

135. Defendants are "persons" as defined in Cal. Civil Code § 1761(c).

136. Plaintiffs and the Class members are "consumers" as defined in Cal. Civil Code § 1761(d).

137. The iPads that Plaintiffs and the Class purchased from Defendants are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a), (b).

138. The 3G wireless services that Plaintiffs and the Class purchased from Defendants are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a), (b).

139. The purchases by Plaintiffs and the Class of the goods and services sold by Defendants, alleged herein, constitute "transactions" within the meaning of Cal. Civ. Code §§ 1761(e) and 1770.

140. In connection with their sale of goods and services to Plaintiffs and the Class, Defendants violated the Consumer Legal Remedies Act ("CLRA") in at least the following ways:

a. Misrepresenting to Plaintiffs and the Class that they would be able to subscribe to, and switch in and out of, the unlimited data plan in the future as their monthly data needs demanded, whether or not they initially signed up for the unlimited data plan, in violation of Cal. Civ. Code §§ 1770(a)(5), (9), (14), and (16);

b. Misrepresenting to Plaintiffs and the Class that Defendants' goods and services had characteristics and benefits they did not have, in violation of Cal. Civ. Code § 1770(a)(5);

c. Advertising goods and services to Plaintiffs and the Class with the intent not to sell them as advertised, in violation of Cal. Civ. Code § 1770(a)(9);

d. Misrepresenting that their transactions with Plaintiffs and the Class conferred benefits and rights on Plaintiffs and the Class, and obligations on Defendants, which were not, in fact, conferred, in violation of Cal. Civ. Code § 1770(a)(14); and

e. Misrepresenting to Plaintiffs and the Class that the subject of a transaction has been supplied in accordance with a previous representation when it has not, in violation of Cal. Civ. Code § 1770(a)(16).

141.   In addition, under California law, a duty to disclose arises in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.

142.   Defendants had a duty to disclose to Plaintiffs and the Class the true nature of the unlimited data plan options because: (a) Defendants had exclusive knowledge of the information at the time of sale; (b) Defendants actively concealed from Plaintiffs and the Class the true nature of the unlimited data plan options, which was material information to customers; and (c) Defendants made partial representations to Plaintiffs and the Class regarding the nature of the unlimited data plan options.

143.   Defendants violated the CLRA by concealing material information from Plaintiffs and the Class regarding the true nature of the unlimited data plan options when they had a duty to disclose that information.

144.   Defendants' misrepresentations and omissions in violation of the CLRA were likely to mislead consumers.  Plaintiffs and the Class reasonably interpreted Defendants' representations and omissions to mean that they would be able to subscribe to, and switch in and out of, the unlimited data plan in the future as their monthly data needs demanded, whether or not they initially signed up for the unlimited data plan.

145.   Defendants' conduct alleged herein was intentional and was specifically designed to induce customers to purchase iPads with 3G capability.

146.   Defendants' misrepresentations and omissions alleged herein were material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

147.   Plaintiffs and the Class relied to their detriment on Defendants' misrepresentations and omissions in purchasing their iPads with 3G capability.

148.     Plaintiffs, on behalf of themselves and the Class, demand judgment against Defendants under the CLRA for injunctive relief and restitution to Plaintiffs and the Class in an amount to be proven at trial.

149.     Plaintiffs, on behalf of themselves and the Class, seek compensatory damages and, in light of Defendants' intentional and fraudulent conduct, an award of punitive damages.

150.     Pursuant to Cal. Civ. Code § 1782(a), on June 23, 2010, Plaintiffs' counsel, on behalf of Plaintiffs Adam Weisblatt, Joe Hanna, and David Turk, served Apple Inc. and AT&T Mobility LLC by United States certified mail, return receipt requested, with notice of Apple Inc.'s and AT&T Mobility LLC's violations of the CLRA.  A true and accurate copy of the CLRA demand notice is attached hereto as Exhibit I.  AT&T Mobility LLC acknowledged receipt of the CLRA demand notice on June 28, 2010, as evidenced by the Domestic Return Receipt signed by its agent, a true and accurate copy of which is attached hereto as Exhibit J.  Apple Inc. acknowledged receipt of the CLRA demand notice on June 25, 2010, as evidenced by the Domestic Return Receipt signed by its agent, a true and accurate copy of which is attached hereto as Exhibit K.  Plaintiffs' counsel on behalf of Colette Osetek also served Apple Inc. with notice of Apple Inc.'s violations of the CLRA on September 27, 2010.  A true and accurate copy of the demand letter is also attached hereto as Exhibit L.

151.     Defendants AT&T Mobility LLC and Apple Inc. have failed to provide appropriate relief for their violations of the CLRA within 30 days of their receipt of Plaintiffs' demand notices.  Accordingly, pursuant to §§ 1780 and 1782(b) of the CLRA, Plaintiffs are entitled to recover actual damages, punitive damages, attorneys' fees and costs, and any other relief the Court deems proper.

## FIFTH CAUSE OF ACTION
**(Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*—Unlawful, Fraudulent, and Unfair Business Acts and Practices)**

152.     Plaintiffs, individually and on behalf of the Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

153.     Defendants' conduct alleged herein constitutes unfair and deceptive business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*.  Such conduct includes, but

- 28 -

1   is not limited to, (a) misrepresenting to Plaintiffs and the Class that they would be able to

2   subscribe to, and switch in and out of, the unlimited data plan in the future as their monthly data

3   needs demanded, whether or not they initially signed up for the unlimited data plan; (b)

4   concealing the true nature of the unlimited data plan options from Plaintiffs and the Class; and (c)

5   denying Plaintiffs and the Class the promised benefit of the continuing option to switch in and out

6   of the unlimited data plan and unilaterally imposing upon Plaintiffs and the Class a choice

7   between less advantageous data plan options.

8       154.    The conduct alleged herein constitutes fraud, intentional misrepresentation,

9   negligent misrepresentation, unjust enrichment, and violations of the CLRA and the Cal. Bus. &

10  Prof. Code §§ 17500, *et seq.*, thus providing the basis for a finding of liability under the

11  "unlawful" prong of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

12      155.    The conduct herein is "unfair" because it offends established public policy and/or

13  is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to customers.

14      156.    Defendants' unfair, unlawful, and deceptive acts and practices alleged herein were

15  "fraudulent" and have deceived and/or are likely to deceive Plaintiffs and other reasonable

16  consumers.

17      157.    Defendants' unfair, unlawful, and deceptive acts and practices alleged herein were

18  specifically designed to induce Plaintiffs and the Class to purchase iPads with 3G capability.

19      158.    Defendants' misrepresentations and omissions alleged herein were material in that

20  a reasonable person would attach importance to such information and would be induced to act

21  upon such information in making purchase decisions.

22      159.    Defendants' misrepresentations and omissions alleged herein are objectively

23  material to the reasonable consumer, and therefore reliance upon such misrepresentations may be

24  presumed as a matter of law.

25      160.    Plaintiffs and the Class relied to their detriment on Defendants' misrepresentations

26  and omissions in purchasing their 3G-enabled iPads from Defendants.

27

28

161.    Plaintiffs and each member of the Class have been damaged as a result of Defendants' unfair, unlawful, and deceptive conduct alleged herein.  They are entitled to injunctive relief and restitution, in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**(Violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.—False Advertising)**

162.    Plaintiffs, individually and on behalf of the Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

163.    Defendants have committed acts of untrue and misleading advertising, as defined by Cal. Bus. & Prof Code §§ 17500*, et. seq*., by, *inter alia*: (a) falsely advertising, on their respective websites and elsewhere, that customers who purchased the iPad with 3G capability would be able to subscribe to, and switch in and out of, the unlimited data plan in the future as their monthly data needs demanded, whether or not they initially signed up for the unlimited data plan; and (b) concealing material information about the unlimited 3G data plan options from consumers.

164.    Defendants' misrepresentations and omissions alleged herein deceive or have the tendency to deceive the general public regarding the benefits of purchasing a 3G-enabled iPad and the nature of the unlimited data plan options.

165.    Defendants' misrepresentations and omissions alleged herein were the type of misrepresentations that are material—*i.e.,* a reasonable person would attach importance to them and would be induced to act on the information in making purchase decisions.

166.    Defendants' misrepresentations and omissions alleged herein are objectively material to the reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

167.    Defendants' false advertising continued right up until, and in fact after, the end of the Class period.

168.    Unless restrained by this Court, Defendants could continue to engage in untrue and misleading advertising, as alleged above, in violation of Cal. Bus. & Prof Code §§ 17500*, et. seq.*

169.     As a result of the foregoing, Plaintiffs and each member of the Class have been injured and have lost money or property, and are entitled to restitution and injunctive relief.

### SEVENTH CAUSE OF ACTION
#### (Unjust Enrichment)

170.     Plaintiffs, individually and on behalf of the Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

171.     As alleged herein, Defendants intentionally and/or recklessly made false representations to Plaintiffs and the Class to induce them to purchase iPads with 3G capability. Plaintiffs and the Class have reasonably relied on these false representations in purchasing iPads with 3G capability.

172.     As alleged herein, Defendants made false promises to Plaintiffs and the Class which Defendants did not intend to keep, and which Defendants did not keep, to induce Plaintiffs and the Class to purchase iPads with 3G capability.  Plaintiffs and the Class have reasonably relied on these false promises in purchasing iPads with 3G capability.

173.     As alleged herein, Plaintiffs and the Class did not receive all of the benefits that they were promised by Defendants, and paid more to Defendants for their products and services than they otherwise would have paid, and will continue to do so.

174.     It would be inequitable and unconscionable for Defendants to retain the profits, benefits, and other compensation they obtained from their deceptive, misleading, and unlawful conduct alleged herein.

175.     Plaintiffs and the Class are entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon, all profits, benefits, and other compensation obtained by Defendants from their deceptive, misleading, and unlawful conduct alleged herein.

### PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and the Class, request that the Court order the following relief and enter judgment against Defendants as follows:

a.     An Order certifying the proposed Class and appointing Plaintiffs and their counsel to represent the Class;

1          b.      An Order that Defendants be permanently enjoined from its

2    improper activities and conduct described herein;

3          c.      An Order directing Apple to accept from Plaintiffs and Class

4    Members returns of any 3G-enabled iPads purchased during the Class Period, for full refund, with

5    no restocking fee, for a period of six (6) months following the date of any such Order;

6          d.      An Order mandating that Defendants restore to Plaintiffs and Class

7    Members the flexible, unlimited data plan Defendants promised and advertised, for such period as

8    the Court deems reasonable;

9          e.      A judgment awarding Plaintiffs and the Class actual and

10   compensatory damages in an amount according to proof;

11         f.      A judgment awarding Plaintiffs and the Class restitution in an

12   amount according to proof, including without limitation, restitution of, disgorgement of, and/or

13   the imposition of a constructive trust upon, all profits, benefits, and other compensation obtained

14   by Defendants from their deceptive, misleading, and unlawful conduct alleged herein;

15         g.      A judgment awarding Plaintiffs and the Class punitive damages;

16         h.      Pre-judgment and post-judgment interest;

17         i.      Attorneys' fees and expenses and the costs of this action; and

18         j.      All other and further relief as the Court deems necessary, just and

19   proper.

20                         **JURY DEMAND**

21         Plaintiffs hereby demand a trial by jury.

22

23

24

25

26

27

28

1

2    Dated: December 10, 2010

3

4

5

6

7

8

9

10

11

12

13    Dated: December 10, 2010

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP


By:    /s/ *Michael W. Sobol*
          Michael W. Sobol

Michael W. Sobol (State Bar No. 194857)
*msobol@lchb.com*
Roger N. Heller (State Bar No. 215348)
*rheller@lchb.com*
Allison Elgart (State Bar No. 241901)
*aelgart@lchb.com*
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

*Proposed Lead Plaintiffs' Counsel and Interim Class Counsel*

THE WESTON FIRM


By:    /s/ *Gregory S. Weston*
          Gregory S. Weston

Gregory S. Weston
*greg@westonfirm.com*
888 Turquoise Street
San Diego, CA 92109
Telephone:  (858) 488-1672
Facsimile:  (480) 247-4553

Jack Fitzgerald
*jack@westonfirm.com*
2811 Sykes Court
Santa Clara, California 95051
Telephone:  (408) 459-0305

*Proposed Interim Class Counsel*

1

Dated: December 10, 2010                    SCHUBERT JONCKHEER & KOLBE LLP

2

3                                           By:___/s/ Willem F. Jonckheer_____
                                                   Willem F. Jonckheer
4

5                                           Willem F. Jonckheer
                                            *wjonckheer@schubertlawfirm.com*
6                                           Jason A. Pikler
                                            *jpikler@schubertlawfirm.com*
7                                           Three Embarcadero Center
                                            Suite 1650
8                                           San Francisco, CA 94111
                                            Telephone:  (415) 788-4220
                                            Facsimile:  (415) 788-0161
9
                                            Peter A. Lagorio
10                                          *plagorio@lagoriolaw.com*
                                            LAW OFFICE OF PETER A. LAGORIO
11                                          63 Atlantic Avenue
                                            Boston, MA 02110
12                                          Telephone:  (617) 367-4200
                                            Facsimile:  (617) 227-3384
13
                                            *Proposed Interim Class Counsel*
14

15

16    I, Michael W. Sobol, am the ECF User whose ID and password are being used to file this

17    Stipulation.  In compliance with General Order 45, section X.B., I hereby attest that concurrence

18    in the filing of the document has been obtained from each of the other signatories.

19                                          By: ___/s/ *Michael W. Sobol*_____
                                                   Michael W. Sobol
20

21

22

23

24

25

26

27

28

# EXHIBIT A



you know you won't need it. Learn more about iPad with Wi-Fi + 3G



**The best way to experience the web, email, photos, and video.**
Page through websites, write an email, flick through photos, or watch a movie with just the touch of a finger.
Learn about iPad features



**A design that's thin, light, and brilliant.**
iPad has a 9.7-inch, high-resolution LED-backlit IPS display and incredible Multi-Touch capability. Yet it's thin and light enough to take anywhere.
Learn about iPad design



**Thousands of apps made just for iPad. With more coming every day.**
Right now you can discover over a thousand apps on the App Store made just for iPad — with more coming every day. And if that's not enough, you can also run almost 200,000 iPhone apps.[1]
Learn about iPad apps



**Introducing iBooks. A new way to read and buy books.**
Download the free iBooks app from the App Store. More than a great ebook reader, it's also an amazing place to browse and shop for books.[4]
Learn more about the iBookstore

## What's included.

### In the box
iPad
Dock Connector to USB Cable
10W USB Power Adapter
SIM eject tool
(Wi-Fi + 3G model only)
Documentation



### Mac requirements
Mac computer with USB 2.0 port
Mac OS X v10.5.8 or later
iTunes 9.1 or later (free download)
iTunes Store account
Internet access

### PC requirements
PC with USB 2.0 port
Windows 7; Windows Vista; or
Windows XP Home or Professional
with Service Pack 3 or later
iTunes 9.1 or later (free download)
iTunes Store account
Internet access

## 3G data plan FAQs.

**What are the 3G data plan options from AT&T?**
There are two monthly data plans: 250MB or unlimited. There's no contract, and you can sign up and change your service right on your iPad. In addition, AT&T data plans include unlimited access to over 20,000 Wi-Fi hotspots at locations including Starbucks, Barnes & Noble, and more.

**How can I find out if I have coverage in my area?**
Simply enter your street address, city, and state or zip code in the AT&T Data Coverage Viewer.

**Am I required to purchase a data plan if I buy an iPad with Wi-Fi + 3G?**
No. When you're ready to use 3G service, just sign up right on your iPad. You can always use the built-in 802.11n Wi-Fi to access the Internet.

**Can I use my current iPhone service plan with the iPad?**
No. The cellular plan for iPhone is separate from the iPad plan.

**Can I use my iPad while traveling outside of the U.S.?**
You can connect to Wi-Fi hotspots anywhere in the world. Please check with AT&T regarding international 3G usage.

**If I choose the 250MB plan, what happens when I reach my monthly limit?**
As you get close to your monthly data limit, you'll receive onscreen messages to help you decide whether to upgrade to another 250MB or switch to the unlimited plan. You can also check your data usage anytime in Settings.

**How do I sign up for an AT&T 3G data plan?**
On your iPad, tap Settings and choose Cellular Data. Then type in your user information, select a plan, and enter your credit card information. There's no need to visit a store or call customer service.
Learn how to sign up, monitor, and manage your 3G service — all from your iPad

**Are iPhone and iPad SIM cards interchangeable?**
No. Your iPhone SIM card will not fit into your iPad.



 **Questions? Just ask.** Talk with a knowledgeable Apple specialist. Call 1-800-MY-APPLE

Buy your iPad with complete confidence.

**Technical Support and the iPad Warranty**



Every iPad comes with complimentary telephone technical support within 90 days of your iPad purchase. In addition, your iPad, its rechargeable battery, and all included accessories are covered against defects for one year from the original purchase date by a limited hardware warranty.



**Genius Bar** — Available at every Apple Retail Store, it's the place for free advice, insight, and friendly, hands-on technical support for your iPad, Mac, iPod, iPhone, or Apple TV. Make a reservation ahead of time to guarantee your spot. Learn more about the Genius Bar at Apple Retail Stores.

**AppleCare Protection Plan**



Extend your technical support and hardware coverage for two years from the original purchase date of your iPad with the AppleCare Protection Plan. You get direct access to Apple's own experts for questions and advice about using your iPad. And you get repair or replacement service — including parts and labor — on your iPad, its battery, and included accessories. (For further details, read terms and conditions.)

**Just $99.00** — Simply add the AppleCare Protection Plan to your order after selecting your iPad.

Learn more about the AppleCare Protection Plan.



Complimentary support
Additional coverage with the AppleCare Protection Plan

**Accessories for your iPad.**



**iPad Keyboard Dock**
The iPad Keyboard Dock combines a charging dock with a full-size keyboard. The dock includes a rear dock connector port and an audio line out port.
**$69.00** Learn more ▸



**iPad Dock**
The iPad Dock lets you dock and charge your iPad. It includes a rear dock connector and an audio line out port.
**$29.00** Learn more ▸



**iPad 10W USB Power Adapter**
The iPad 10W USB Power Adapter lets you charge your iPad directly through an electrical outlet. And the 6-foot-long power cord allows you to charge it from an even greater distance.
**$29.00** Learn more ▸



**iPad Case**
The iPad Case not only protects your iPad, it can be used in various positions. So it's easy to type, look at photos and slideshows, or watch movies.
**$39.00** Learn more ▸



**Apple iPad Camera Connection Kit**
The Camera Connection Kit gives you two ways to import photos and videos from a digital camera: using the camera's USB cable or using the included SD card reader.
**$29.00** Learn more ▸

**iPad Dock Connector to VGA Adapter**
The iPad Dock Connector to VGA Adapter lets you connect your iPad to a TV, monitor, projector, or LCD that uses a VGA connector or cable so you can watch slideshows and movies.
**$29.00** Learn more ▸

1  1GB = 1 billion bytes; actual formatted capacity less.
2  Wireless service and some features not available in all areas.

3.  Application availability and pricing are subject to change.

4.  iBooks is available only in the U.S.

Apple Store (U.S.)     Change Country     Education Store     Business Store     Government Store          Help     Account     Site Map     Security Policy     Contact Us

Copyright © 2010 Apple Inc. All rights reserved     Terms of Use     Privacy Policy     Sales and Refunds          You can also order from The Apple Store by calling 1-800-MY-APPLE

# EXHIBIT B



Skip To Content    att.com    Wireless Home    [Messaging]    Business Center    About Us    My Account

Find a Store    Coverage Viewer    Español    Cart 🛒    Search    [Go]

Cell Phones & Devices    Cell Phone Plans    Prepaid GoPhone    Services    Ringtones & Apps    Accessories    Packages & Deals

# AT&T 3G Data Plans for iPad

| Data per month | Price per month* |
| --- | --- |
| 250 MB | $14.99 |
| Unlimited | $29.99 |

### Data Service from AT&T

Extend the data coverage for your Apple® iPad™ Wi-Fi + 3G even further. Sign up for 3G data service from AT&T, the nation's fastest 3G network. AT&T offers two data plan options - 250 MB or unlimited data, with recurring monthly charge and no long-term contract.

To help you manage your data with a 250 MB plan, iPad will notify you at 20%, 10%, and when there's no more data available, so you can decide if you want to add more data or upgrade to an unlimited data plan. To provide a seamless data experience, your domestic data service will be automatically renewed every 30 days, unless you decide to cancel your service before the end of the 30 days.

### AT&T 3G Network + Wi-Fi

AT&T has the nation's fastest 3G network, covering more than 230 million people across the U.S. And once you have the right data plan in place, you can fully experience iPad with Wi-Fi + 3G for superfast Web browsing and downloads, at more than 20,000 AT&T Wi-Fi Hot Spot locations nationwide. AT&T Hot Spot partners include participating Barnes & Noble and Starbucks locations.

### Coverage Viewer

AT&T has the fastest 3G network in America. Enter your ZIP Code to check your coverage area.

ZIP Code    

View national map

### Buy iPad

iPad is available for purchase at Apple stores and online.

Find an Apple Store
Apple online

### Find a Hot Spot

Connect quickly and seamlessly to thousands of AT&T Wi-Fi Hot Spots nationwide.

Find an AT&T
Hot Spot near you

### Micro-SIM for iPad

Need to order a replacement SIM card for your iPad with Wi-Fi + 3G?

Get a new SIM

### International Data

AT&T offers international data plans for people with the travel bug.

Learn more

Plans expire when you have used all the data included in your plan, or in 30 days, whichever occurs first.
Domestic Plans automatically renew every 30 days unless you cancel prior to your Domestic Plan renewing.

Wireless Service Agreement    |    Cell Phone Records Security

AT&T on the Web    att.com                        att.net
                   Shop. Service. Support.         E-mail - News - Weather & More

Privacy Policy  |  Careers  |  Contact Us  |  Terms of Use  |  Site Map  |  Accessibility

©2010 AT&T Intellectual Property. All rights reserved. AT&T, the AT&T logo and all other AT&T marks contained herein are trademarks of AT&T Intellectual Property and/or AT&T affiliated companies.
AT&T 36USC220506

YELLOWPAGES.COM    Digital White & Yellow Pages    U S A    Proud sponsor of the U.S. Olympic Team.



# EXHIBIT C

## iPad

Features    Design    Apps for iPad    Gallery    Guided Tours    Tech Specs    

# iPad with Wi-Fi + 3G. The best way to stay connected.

All iPad models come with built-in 802.11n Wi-Fi. If you want to extend your network coverage further, choose iPad with Wi-Fi + 3G and sign up for access to 3G data service."



**Take a network with you wherever you go.**
iPad with Wi-Fi + 3G offers superfast data speeds up to 7.2 Mbps over 3G cellular networks around the world. It's perfect when you're out and about with no access to a Wi-Fi network, because you can still get a fast connection for surfing the web, sending and receiving email, or getting directions. Since iPad seamlessly switches between 3G and even faster Wi-Fi, you always get the best connection available. And with AT&T data plans, you'll have access to over 20,000 Wi-Fi hotspots, including Starbucks, Barnes and Noble, and more.

**No-contract 3G service.**
In the United States, 3G service is available through a breakthrough deal with AT&T. You choose the amount of data per month you want to buy — 250MB or unlimited. If you choose the 250MB plan, you'll receive onscreen messages as you get close to your monthly data limit so you can decide whether to turn off 3G or upgrade to the unlimited plan. Best of all, there's no long-term contract. So if you have a business trip or

AT&T 3G Data Plans for iPad

| Data per month | Price per month |
|---|---|
| **250MB** | **$14.99** |
| **Unlimited** | **$29.99** |

One month is based on 30 consecutive days, and starts at the date and time of your purchase.

vacation approaching, just sign up for the month you'll be traveling and cancel when you get back. You don't need to visit a store to get 3G service. You can sign up, check your data usage, manage your account, or cancel your service — all from your iPad.

**Sign up, monitor, and manage your 3G service — all from your iPad.**

**Sign up on your iPad.**
You can sign up for 3G data service with AT&T at any time — right on your iPad. There's no need to visit a store or call customer service. Just tap Settings and

Recurring Domestic Plan Options

The selected plan will start immediately. Your credit card will automatically be billed every 30 days on the date your current plan ends.

**250 MB of data for 30 days for $14.99**

Unlimited data for 30 days for $29.99

Payment & Billing Information

Apple - iPad - Stay connected everywhere you go.  Page 2 of 2

Case 5:10-cv-02553-RMW   Document 65   Filed 12/10/10   Page 44 of 71

choose Cellular Data. Then type in your user information, select a plan, and enter your credit card information.



**Monitor your data usage.**
You can check your data usage in Settings on your iPad anytime. iPad will even let you know when you're about to reach your 250MB data limit. You'll get three alerts — at 20 percent, 10 percent, and zero. With each alert, you can choose to add more data or wait and do it later. Tap Now and iPad opens the Cellular Data Plan window so you can update your data plan.

**Manage your data plan.**
iPad makes it easy to choose the data plan that works best for you. When you need more data, you can add another 250MB or upgrade to the Unlimited Data plan. Because you sign up for a data plan in monthly increments, you can cancel your plan at any time and then sign up again whenever you need 3G service.



**Get to know iPad.**
Watch the Guided Tours.



**A whole new world of apps.**
Discover apps made just for iPad.



**MobileMe and iPad.**
Keep your iPad in sync with all your devices.



**Buy iPad.** From $499

Apple Online Store
Buy your iPad and get free shipping

Apple Retail Store
Find a store to buy your iPad

Call 1-800-MY-APPLE (800-692-7753).

'3G data plan sold separately.

# EXHIBIT D



# AT&T 3G Data Plans for Apple iPad
## Simple Pricing on the Nation's Fastest 3G Network with Access to Nation's Largest Wi-Fi Network* (at no additional cost)

AT&T is offering simple and straightforward 3G pre-paid data plans for iPad – complete with easy, on-device activation and management. Data plans for iPad include access to more than 20,000 AT&T Wi-Fi Hot Spots nationwide at no additional cost. Check out 3G plans for iPad, and some helpful Q&A, below.

## Domestic Data Plans for iPad
*Recurring monthly charge with no long term contract*
- $14.99 per month for 250 MB
- $29.99 per month for unlimited data
- Unlimited access – no added cost – to AT&T's 20,000+ Wi-Fi Hot Spots

### Helpful Reminders
✓ One month is based on 30 consecutive days, and starts at the date and time of your purchase
✓ Charges will appear on credit card bill
✓ Change domestic data plan at any time
✓ Visit Settings>Cellular Data on iPad to check data use

**How do I manage my 3G plan for iPad? Can I turn service off or change my plan?**
Once you sign up for iPad 3G data service, you can add to or cancel your domestic plan at any time – no penalty. For domestic plans, if you do not cancel, your service will automatically renew every 30 days to provide a more seamless data experience on an ongoing basis. For example, if you activate service on May 9, your service will automatically renew 30 days later with the same plan. If you do make a change, a new 30-day window begins.

**What happens if I exceed the amount of data in my selected plan before the end of one month?**
With the on-device management system, you can check your data usage in Settings>Cellular Data on your iPad at anytime. Also, for the $14.99 plan, iPad will even let you know when you're about to reach your 250 MB data limit. You'll get three alerts — at 20 percent, 10 percent, and zero. With each alert, you can choose to add more data or wait and do it later.

If you do exceed the amount of data in your plan, your plan will expire, but it's easy to add another one. Also, with domestic plans, you can wait until the 30th day from your purchase when your plan will automatically renew going forward.

For additional support, visit www.apple.com/ipad/3g

*Based on non-municipal company owned and operated sites.*
*3G Services not available in all areas. For terms and conditions visit www.att.com for Wireless Service Terms Session Based Wireless Data Services Agreement.*

# EXHIBIT E

## AT&T Announces New Lower-Priced Wireless Data Plans to Make Mobile Internet More Affordable to More People

**Dallas, Texas, June 02, 2010**

ShareThis

AT&T*, the U.S. smartphone leader, today introduced new wireless data plans that make it more affordable for more people to enjoy the benefits of the mobile Internet. Customers can pick the new data plan that best meets their needs – either a $15 per month entry plan or a $25 per month plan with 10 times more data. Current smartphone customers are not required to switch to the new plans, but can choose to do so without a contract extension.

"AT&T helps mobilize everything on the Internet – your favorite web sites, TV shows, music, games and social networks. Virtually everything previously done while sitting at a computer can now be done on the go," said Ralph de la Vega, president and CEO, AT&T Mobility and Consumer Markets. "To give more people the opportunity to experience these benefits, we're breaking free from the traditional 'one-size-fits-all' pricing model and making the mobile Internet more affordable to a greater number of people."

Each plan includes unlimited access at no additional charge to more than 20,000 AT&T Wi-Fi Hot Spots in the U.S. Customers can also use unlimited Wi-Fi at home, in the office or elsewhere if available. AT&T will also help customers manage their wireless data usage by sending free text messages after customers reach different usage intervals and by providing online tools, including a smartphone app that shows monthly usage information.

The new wireless data plans – including a new tethering option – will be available beginning June 7. Current AT&T voice and texting plans are unchanged.

**More Choice**

The new AT&T plans provide large amounts of data to enable people to enjoy their favorite online activities:

- **DataPlus.** Provides 200 megabytes (MB) of data – for example, enough to send/receive 1,000 emails (no attachments), plus send/receive 150 emails with attachments, plus view 400 Web pages, plus post 50 photos on social media sites, plus watch 20 minutes of streaming video – for just $15 per month.** This plan, which can save customers up to 50 percent off their wireless data charges, is designed for people who primarily like to surf the web, send email and use social networking apps. If customers exceed 200 MB in a monthly billing cycle, they will receive an additional 200 MB of data usage for $15 for use in the cycle. Currently, 65 percent of AT&T smartphone customers use less than 200 MB of data per month on average.

- **DataPro.** Provides 2 gigabytes (GB) of data – for example, enough to send/receive 10,000 emails (no attachments), plus send/receive 1,500 emails with attachments, plus view 4,000 Web pages, plus post 500 photos to social media sites, plus watch 200 minutes of streaming video – for $25 per month.** Should a customer exceed 2 GB during a billing cycle, they will receive an additional 1 GB of data for $10 for use in the cycle. Currently, 98 percent of AT&T smartphone customers use less than 2 GB of data a month on average.

- **Tethering.** Smartphone customers – including iPhone customers – who choose the DataPro plan have the option to add tethering for an additional $20 per month. Tethering lets customers use their smartphones as a modem to provide a broadband connection for laptop computers, netbooks or other computing devices. Tethering for iPhones will be available when Apple releases iPhone OS 4 this summer.

With the new wireless data plans, pricing for a smartphone voice and data bundle now starts at just $54.99 per month for an individual plan, or $24.99 per month for an additional line on a FamilyTalk plan, $15 per month less than the price of the previous entry level bundle.

For new iPad customers, the $25 per month 2 GB plan will replace the existing $29.99 unlimited plan. iPad customers will continue to pre-pay for their wireless data plan and no contract is required. Existing iPad customers who have the $29.99 per month unlimited plan can keep that plan or switch to the new $25 per month plan with 2 GB of data.

**Wi-Fi at 20,000 AT&T Hot Spots**

The vast majority of smartphones that AT&T offers have built-in Wi-Fi, which lets the devices automatically switch from the wireless network to a Wi-Fi hotspot without prompting, making Wi-Fi even more convenient and easy to use. This enables customers to use Wi-Fi in the home, office and at public locations where available. Wi-Fi will generally provide consistently fast speeds and does not count against a customer's monthly data plan usage total. In addition, virtually all AT&T smartphone customers have access at no additional charge to more than 20,000 AT&T Wi-Fi Hot Spots in the U.S. Customers can get more information on how to use Wi-Fi and find the location of AT&T Wi-Fi Hot Spots at

News Sources

RSS News Releases
RSS Spanish News Releases
RSS Podcasts
WAP Mobile News
Learn more about receiving AT&T news.

www.att.com/whataccess.

## Monitoring and Managing Usage

To help customers easily check their data usage, AT&T has made the information readily available in a number of ways***:

- **Customer Text Notifications On Data Usage.** When customers begin to approach their monthly usage limit, AT&T will send three text notifications – after they reach 65 percent, 90 percent and 100 percent of the threshold. Customers will also be sent emails if AT&T has their email address.

- **Data Usage Monitoring.** Additionally, customers with iPhones and other select devices can use the free AT&T myWireless application to check data usage. The application is available for download in several smartphone app stores. Also, AT&T customers can call *DATA# from their wireless phone to check their data usage for the current billing period. They receive a free text message with their usage information. Customers can also go online to www.att.com/wireless to see all of their usage information, past and present.

- **Data Calculator.** The easy-to-use online data calculator enables customers to estimate their mobile data usage and get a better sense for which data plan is right for them. It's located at www.att.com/datacalculator.

Customers can learn more about the new plans online at www.att.com/dataplans, by contacting AT&T customer service at 1-800-331-0500, or by visiting an AT&T retail store.

AT&T expects these new data plans to have minimal revenue impact this year and to not affect previous guidance for 2010.

* AT&T products and services are provided or offered by subsidiaries and affiliates of AT&T Inc. under the AT&T brand and not by AT&T Inc.

** Usage examples are estimates. Individual results will vary based upon customer's Internet usage patterns.

*** Customers will see their usage reflected in their tools generally within 15 hours or less of actual data usage.

Largest Wi-Fi network claim based on non-municipal company and owned and operated hotspots. An 802.11 b/g enabled device required.

## About AT&T

AT&T Inc. (NYSE:T) is a premier communications holding company. Its subsidiaries and affiliates – AT&T operating companies – are the providers of AT&T services in the United States and around the world. With a powerful array of network resources that includes the nation's fastest 3G network, AT&T is a leading provider of wireless, Wi-Fi, high speed Internet and voice services. A leader in mobile broadband, AT&T also offers the best wireless coverage worldwide, offering the most wireless phones that work in the most countries. It also offers advanced TV services under the AT&T U-verseSM and AT&T |DIRECTVSM brands. The company's suite of IP-based business communications services is one of the most advanced in the world. In domestic markets, AT&T Advertising Solutions and AT&T Interactive are known for their leadership in local search and advertising. In 2010, AT&T again ranked among the 50 Most Admired Companies by FORTUNE® magazine.

Additional information about AT&T Inc. and the products and services provided by AT&T subsidiaries and affiliates is available at . This AT&T news release and other announcements are available at  and as part of an RSS feed at . Or follow our news on Twitter at @ATTNews. Find us on Facebook at  to discover more about our consumer and wireless services or at  to discover more about our small business services.

© 2010 AT&T Intellectual Property. All rights reserved. AT&T, the AT&T logo and all other marks contained herein are trademarks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks contained herein are the property of their respective owners.

## Cautionary Language Concerning Forward-Looking Statements

Information set forth in this news release contains financial estimates and other forward-looking statements that are subject to risks and uncertainties, and actual results may differ materially. A discussion of factors that may affect future results is contained in AT&T's filings with the Securities and Exchange Commission. AT&T disclaims any obligation to update or revise statements contained in this news release based on new information or otherwise. This news release may contain certain non-GAAP financial measures. Reconciliations between the non-GAAP financial measures and the GAAP financial measures are available on the company's

Web site at . *Accompanying financial statements follow.*

ShareThis

# EXHIBIT F

# iPad

Features    Design    Apps for iPad    Gallery    Guided Tours    Tech Specs     Buy Now

# iPad with Wi-Fi + 3G. The best way to stay connected.

All iPad models come with built-in 802.11n Wi-Fi. If you want to extend your network coverage further, choose iPad with Wi-Fi + 3G and sign up for access to 3G data service.



### Take a network with you wherever you go.

iPad with Wi-Fi + 3G offers superfast data speeds up to 7.2 Mbps over 3G cellular networks around the world. It's perfect when you're out and about with no access to a Wi-Fi network, because you can still get a fast connection for surfing the web, sending and receiving email, or getting directions. Since iPad seamlessly switches between 3G and even faster Wi-Fi, you always get the best connection available. And with AT&T data plans, you'll have access to over 20,000 Wi-Fi hotspots, including Starbucks, Barnes and Noble, and more.

### No-contract 3G service.

In the United States, 3G service is available through a breakthrough deal with AT&T. You choose the amount of data per month you want to buy — 250MB or unlimited. If you choose the 250MB plan, you'll receive onscreen messages as you get close to your monthly data limit so you can decide whether to turn off 3G or upgrade to the unlimited plan. Best of all, there's no long-term contract. So if you have a business trip or

**AT&T 3G Data Plans for iPad**

| Data per month | Price per month |
|---|---|
| **250MB** | **$14.99** |
| **Unlimited** | **$29.99** |

One month is based on 30 consecutive days, and starts at the date and time of your purchase.

vacation approaching, just sign up for the month you'll be traveling and cancel when you get back. You don't need to visit a store to get 3G service. You can sign up, check your data usage, manage your account, or cancel your service — all from your iPad.

### Sign up, monitor, and manage your 3G service — all from your iPad.

### Sign up on your iPad.

You can sign up for 3G data service with AT&T at any time — right on your iPad. There's no need to visit a store or call customer service. Just tap Settings and

**Recurring Domestic Plan Options**

The selected plan will start immediately. Your credit card will automatically be billed every 30 days  on the date your current plan ends.

**250 MB of data for 30 days for $14.99**

Unlimited data for 30 days for $29.99    ✓

**Payment & Billing Information**

choose Cellular Data. Then type in your user information, select a plan, and enter your credit card information.



**Monitor your data usage.**

You can check your data usage in Settings on your iPad anytime. iPad will even let you know when you're about to reach your 250MB data limit. You'll get three alerts — at 20 percent, 10 percent, and zero. With each alert, you can choose to add more data or wait and do it later. Tap Now and iPad opens the Cellular Data Plan window so you can update your data plan.

**Manage your data plan.**

iPad makes it easy to choose the data plan that works best for you. When you need more data, you can add another 250MB or upgrade to the Unlimited Data plan. Because you sign up for a data plan in monthly increments, you can cancel your plan at any time and then sign up again whenever you need 3G service.





**Get to know iPad.**
Watch the Guided Tours.



3G data plan sold separately.

**A whole new world of apps.**
Discover apps made just for iPad.



**MobileMe and iPad.**
Keep your iPad in sync with all your devices.



**Buy iPad.** From $499

Apple Online Store
Buy your iPad and get free shipping

Apple Retail Store
Find a store to buy your iPad

Call 1-800-MY-APPLE (800-692-7753).

# EXHIBIT G



Skip To Content   att.com   Wireless Home   Personal   Business Center   About Us   My Account

Find a Store   Coverage Viewer   Español   Cart   Search   Go

Cell Phones & Devices   Cell Phone Plans   Prepaid GoPhone   Services   Ringtones & Apps   Accessories   Packages & Deals

# AT&T 3G Data Plans for iPad

| Data per month | Price per month* |
| --- | --- |
| 250 MB | $14.99 |
| Unlimited | $29.99 |

## Data Service from AT&T

Extend the data coverage for your Apple® iPad™ Wi-Fi + 3G even further. Sign up for 3G data service from AT&T, the nation's fastest 3G network. AT&T offers two data plan options - 250 MB or unlimited data, with recurring monthly charge and no long-term contract.

To help you manage your data with a 250 MB plan, iPad will notify you at 20%, 10%, and when there's no more data available, so you can decide if you want to add more data or upgrade to an unlimited data plan. To provide a seamless data experience, your domestic data service will be automatically renewed every 30 days, unless you decide to cancel your service before the end of the 30 days.

## AT&T 3G Network + Wi-Fi

AT&T has the nation's fastest 3G network, covering more than 230 million people across the U.S. And once you have the right data plan in place, you can fully experience iPad with Wi-Fi + 3G for superfast Web browsing and downloads, at more than 20,000 AT&T Wi-Fi Hot Spot locations nationwide. AT&T Hot Spot partners include participating Barnes & Noble and Starbucks locations.

## Coverage Viewer

AT&T has the fastest 3G network in America. Enter your ZIP Code to check your coverage area.

ZIP Code 

View national map

## Buy iPad

iPad is available for purchase at Apple stores and online.

Find an Apple Store

Apple online

## Find a Hot Spot

Connect quickly and seamlessly to thousands of AT&T Wi-Fi Hot Spots nationwide.

Find an AT&T Hot Spot near you

## Micro-SIM for iPad

Need to order a replacement SIM card for your iPad with Wi-Fi + 3G?

Get a new SIM

## International Data

AT&T offers international data plans for people with the travel bug.

Learn more

Plans expire when you have used all the data included in your plan, or in 30 days, whichever occurs first.
Domestic Plans automatically renew every 30 days unless you cancel prior to your Domestic Plan renewing.

Wireless Service Agreement   |   Cell Phone Records Security

AT&T on the Web

att.com
Shop. Service. Support.

att.net
E-mail · News · Weather & More

Privacy Policy   |   Careers   |   Contact Us   |   Terms of Use   |   Site Map   |   Accessibility

©2010 AT&T Intellectual Property. All rights reserved. AT&T, the AT&T logo and all other AT&T marks contained herein are trademarks of AT&T Intellectual Property and/or AT&T affiliated companies. AT&T 36USC220506

YELLOWPAGES.COM   Digital White & Yellow Pages   USA   Proud Sponsor of the U.S. Olympic Team



# EXHIBIT H

iPad          Features    Design    Apps for iPad    Gallery    Guided Tours    Tech Specs    [Buy Now]

# iPad with Wi-Fi + 3G. The best way to stay connected.

All iPad models come with built-in 802.11n Wi-Fi. If you want to extend your network
coverage further, choose iPad with Wi-Fi + 3G and sign up for access to 3G data service.*



### Take a network with you wherever you go.

iPad with Wi-Fi + 3G offers superfast data speeds up to 7.2 Mbps over 3G cellular networks around
the world. It's perfect when you're out and about with no access to a Wi-Fi network, because you
can still get a fast connection for surfing the web, sending and receiving email, or getting
directions. Since iPad seamlessly switches between 3G and even faster Wi-Fi, you always get the
best connection available. And with AT&T data plans, you'll have access to over 20,000 Wi-Fi
hotspots, including Starbucks, Barnes and Noble, and more.

### No-contract 3G service.

In the United States, 3G service is available
through a breakthrough deal with AT&T. You
choose the amount of data per month you want
to buy — 250MB or unlimited. If you choose the
250MB plan, you'll receive onscreen messages as
you get close to your monthly data limit so you
can decide whether to turn off 3G or upgrade to
the unlimited plan. Best of all, there's no long-
term contract. So if you have a business trip or

**AT&T 3G Data Plans for iPad**

| Data per month | Price per month |
|----------------|-----------------|
| **250MB** | $14.99 |
| **Unlimited** | $29.99 |

One month is based on 30 consecutive days, and starts at the
date and time of your purchase.

vacation approaching, just sign up for the month you'll be traveling and cancel when you get back.
You don't need to visit a store to get 3G service. You can sign up, check your data usage, manage
your account, or cancel your service — all from your iPad.

### Sign up, monitor, and manage your 3G service — all from your iPad.

### Sign up on your iPad.

You can sign up for 3G data service with
AT&T at any time — right on your iPad.
There's no need to visit a store or call
customer service. Just tap Settings and



choose Cellular Data. Then type in your user information, select a plan, and enter your credit card information.



**Monitor your data usage.**
You can check your data usage in Settings on your iPad anytime. iPad will even let you know when you're about to reach your 250MB data limit. You'll get three alerts — at 20 percent, 10 percent, and zero. With each alert, you can choose to add more data or wait and do it later. Tap Now and iPad opens the Cellular Data Plan window so you can update your data plan.

**Manage your data plan.**
iPad makes it easy to choose the data plan that works best for you. When you need more data, you can add another 250MB or upgrade to the Unlimited Data plan. Because you sign up for a data plan in monthly increments, you can cancel your plan at any time and then sign up again whenever you need 3G service.



**Get to know iPad.**
Watch the Guided Tours.



**A whole new world of apps.**
Discover apps made just for iPad.



**MobileMe and iPad.**
Keep your iPad in sync with all your devices.



**Buy iPad.** From $499

Apple Online Store
Buy your iPad and get free shipping

Apple Retail Store
Find a store to buy your iPad

Call 1-800-MY-APPLE (800-692-7753).

3G data plan sold separately.

# EXHIBIT I

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

ATTORNEYS AT LAW

MICHAEL W. SOBOL
PARTNER

EMBARCADERO CENTER WEST
275 BATTERY STREET, 29TH FLOOR
SAN FRANCISCO, CALIFORNIA  94111-3339
TELEPHONE: (415) 956-1000
FACSIMILE: (415) 956-1008
mail@lchb.com
www.lchb.com

NEW YORK
NASHVILLE

June 23, 2010

**VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED**

Apple Inc.
C T Corporation System
818 West Seventh Street
Los Angeles, CA 90017

AT&T Inc.
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

AT&T Mobility LLC
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

      Re:  Notice of Violation of California Consumer Legal Remedies Act

Dear Apple Inc., AT&T Inc., and AT&T Mobility LLC:

     We represent Adam Weisblatt, Joe Hanna, and David Turk (collectively, "Plaintiffs"), who purchased 3G-enabled iPads between April 30, 2010 and June 7, 2010.  This letter provides notice pursuant to the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* ("CLRA"), to Apple Inc. ("Apple") and AT&T Inc. and AT&T Mobility LLC ("AT&T") (collectively, "Defendants") that they have engaged in conduct which violates the CLRA.

     On April 8, 2010, Mr. Weisblatt purchased a 16 GB WiFi (non-3G-enabled) iPad. On April 30, 2010, the day of Defendants' release of the 3G-enabled iPad, Mr. Weisblatt exchanged his WiFi iPad and paid $140.40 ($130.00 plus tax) for the acquisition of a 3G-enabled 16 GB iPad.  Mr. Weisblatt acquired the 3G-enabled iPad specifically to have the ability to

iPad Litigation
June 23, 2010
Page 2

download data and access data-intensive applications and content via a 3G network, and based upon Defendants' representations of the availability of a flexible, month-to-month unlimited 3G data plan.

On April 30, 2010, Mr. Hanna purchased a 64 GB 3G-enabled iPad, paying $130.00 more (plus tax) for his iPad than he would have had to pay for the equivalent 64 GB iPad without 3G capability.  Mr. Hanna purchased the 3G-enabled iPad specifically to have the ability to download data and access data-intensive applications and content via a 3G network, and based upon Defendants' representations of the availability of a flexible, month-to-month unlimited 3G data plan.

On April 30, 2010, Mr. Turk purchased a 16 GB 3G-enabled iPad and a 64GB 3G-enabled iPad, for he and his wife, paying $130 more (plus tax) for each of these iPads than he would have had to pay for the equivalent iPads without 3G capability.  On May 18, 2010, Mr. Turk purchased a 32 GB 3G-enabled iPad for his daughter, paying $130.00 more (plus tax) for this iPad than he would have had to pay for the equivalent 32 GB iPad without 3G capability.  Mr. Turk purchased these 3G-enabled iPads specifically so that he and his family would have the ability to download data and access data-intensive applications and content via a 3G network, and based upon Defendants' representations of the availability of a flexible, month-to-month unlimited 3G data plan.

Defendants misrepresented to Plaintiffs and the general public that whether or not they initially signed up for the unlimited data plan with their 3G-enabled iPads, they would continue to have the option to "upgrade" to the unlimited data plan and to switch in and out of the unlimited data plan as their monthly needs demanded.  For example, Apple advertised to prospective iPad 3G customers:

- "**No-contract 3G service.**  In the United States, 3G service is available through a breakthrough deal with AT&T.  *You choose the amount of data per month you want to buy — 250MB or unlimited*.  If you choose the 250MB plan, you'll receive onscreen messages as you get close to your monthly data limit so *you can decide whether to turn off 3G or upgrade to the unlimited plan*.  Best of all, there's no long-term contract.  *So if you have a business trip or vacation approaching, just sign up for the month you'll be traveling and cancel when you get back*. You don't need to visit a store to get 3G service. You can sign up, check your data usage, manage your account, or cancel your service — all from your iPad."

- "**Manage your data plan**.  iPad makes it easy to choose the data plan that works best for you.  *When you need more data, you can add* another *250MB or upgrade to the* Unlimited Data plan.  Because you sign up for a data plan in monthly increments, you can cancel your plan at any time and then sign up again whenever you need 3G service."

iPad Litigation
June 23, 2010
Page 3

- "[Y]ou can monitor your data usage and change your plan at any time, including switching to unlimited data or cancelling 3G service if you know you won't need it."

- "As you get close to your monthly data limit, you'll receive onscreen messages to help you decide whether to upgrade to another 250MB or switch to the unlimited plan."

- "There are two monthly data plans:  250MB or unlimited.  There's no contract, and you can sign up and change your service right on your iPad."

Likewise, AT&T advertised:  "AT&T offers two data plan options – 250MB or unlimited data, with recurring monthly charge and no long-term contract.  To help you manage your data with a 250 MB plan, iPad will notify you at 20%, 10%, and when there's no more data available, so you can decide if you want to add more data or upgrade to an unlimited data plan."

On May 2, 2010, two days after he acquired his 3G-enabled iPad, Mr. Weisblatt signed up for an unlimited 3G data plan for one month.  One month later, his unlimited data plan automatically renewed for an additional month.  Mr. Hanna has not yet had the need to sign up for a 3G data plan for his iPad.  On May 4, 2010, Mr. Turk signed up for an unlimited 3G data plan for one month for one of the iPads he purchased on April 30, 2010.  On May 4, 2010, Mr. Turk signed up for a limited 250MB 3G data plan for the other iPad he purchased on April 30, 2010, and shortly thereafter upgraded to an unlimited 3G data plan for that iPad for one month.  Mr. Turk's two unlimited data plans have since renewed for an additional month.  On June 15, 2010, Mr. Turk's daughter attempted to sign up for an unlimited 3G data plan for the iPad that Mr. Turk purchased for her, but she was not allowed to do so.  On June 20, 2010, Mr. Turk and his daughter signed up for an unlimited 3G data plan for one month for the iPad that Mr. Turk purchased for his daughter.

On June 2, 2010, AT&T issued a press release stating that the unlimited data plan would not be available to customers who purchased 3G-enabled iPads after June 6, 2010.  However, even after June 2, 2010, Defendants continued to misrepresent on their respective Web sites that purchasers of a 3G-enabled iPad would be able to upgrade to the unlimited data plan, and be able to switch in and out of the unlimited data plan, in the future.  Nowhere did Defendants adequately disclose that customers who were able to sign up in time for the unlimited data plan would nonetheless no longer be able to switch in and out of the unlimited data plan, as they were expressly promised.

On June 7, 2010, Defendants reneged on their representations and promises to provide an unlimited 3G data plan on a flexible, month-to-month basis.  As a result, Mr. Weisblatt no longer has the option of switching back and forth between unlimited and limited data plans.  Instead, Mr. Weisblatt, as is the case with any 3G-enabled iPad purchaser who as of June 7, 2010 was signed up for an unlimited data plan, must retain his current unlimited data plan or else lose that option forever, and thereafter be required to purchase monthly limited data plans only.  Likewise, Mr. Hanna and other customers who purchased iPads

iPad Litigation
June 23, 2010
Page 4

prior to June 7, 2010, but who were not signed up for an unlimited data plan as of June 7, 2010, no longer have the option to switch in and out of an unlimited data plan in the future or, for that matter, to ever sign up for the unlimited data plan at any time in the future.  Similarly, for his three iPads, Mr. Turk has been denied the option to switch in and out of the unlimited 3G data plan based on his and his family's data needs, as was promised.

Defendants' misrepresentations regarding the flexible, month-to-month unlimited 3G data plan misled Plaintiffs and were likely to mislead the general public.  Defendants violated the CLRA's proscription against false representations regarding the characteristics, use, and benefit of goods by actively and expressly misrepresenting to Plaintiffs and their other customers, in their marketing and advertising, the material fact that if customers purchased a 3G-enabled iPad, they could later upgrade to the unlimited data plan and could switch in and out of the unlimited data plan as their monthly data needs demanded.

The information about the true nature of the unlimited data plan options was information that a reasonable consumer would find relevant and rely upon in deciding whether to purchase a 3G-enabled iPad.  Plaintiffs and the other customers reasonably interpreted Defendants' representations and omissions to mean that they would be able to subscribe to, and switch in and out of, the unlimited data plan in the future as their monthly needs demanded, whether or not they initially signed up for the unlimited data plan.  Had they known that their access to the unlimited 3G data plan option would be restricted in the way it has been pursuant to the June 7, 2010 change, they would not have purchased the 3G-enabled iPads.

Defendants' misrepresentations of material facts violated: (a) Cal. Civil Code § 1770(a)(5)'s proscription against representing that goods have uses, benefits, or characteristics they do not actually have; (b) Cal. Civ. Code § 1770(a)(14)'s proscription against representing that transactions confer or involve benefits and rights on their customers, and obligations on Defendants, which were not in fact conferred; (c) Cal. Civ. Code § 1770(a)(9)'s proscription against advertising goods with the intent not to sell them as advertised; and (d) Cal. Civ. Code § 1770(a)(16)'s proscription against representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

As you are aware, on June 9, 2010, Mr. Weisblatt commenced a civil class action against the Defendants in the United States District Court for the Northern District of California (*Weisblatt v. Apple Inc., et al.*, N.D. Cal. Case No. CV 10-02553 PVT), alleging claims under the California common law and violations of the California consumer protection statues.  On June 23, 2010, Plaintiffs filed a First Amended Class Action Complaint ("FAC"), alleging the same claims.  A copy of the FAC, the operative complaint in the case, is attached hereto.  Included among the claims brought by Plaintiffs is a claim seeking injunctive relief under the CLRA.

On behalf of Mr. Weisblatt, Mr. Hanna, and Mr. Turk, we hereby demand, pursuant to Cal. Civ. Code § 1782, that within thirty (30) days of receiving this letter, Defendants:  (1) reinstate their prior policy of providing an unlimited 3G data plan on a flexible, month-to-month basis, for all purchasers of 3G-enabled iPad who purchased their iPad on or before June 6, 2010; and (2) agree to compensate all customers that these practices have harmed.

iPad Litigation
June 23, 2010
Page 5


If Defendants fail to comply with this demand within thirty (30) days after its receipt of this letter, then pursuant to the CLRA, we intend to seek from Defendants all compensatory and punitive damages, restitution, and any other appropriate equitable relief.

If you have any questions regarding this notice and demand, feel free to contact me at (415) 956-1000.

Very truly yours,

Michael W. Sobol

881907.2

# EXHIBIT J



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

AT&T Mobility LLC
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Scott Gilbert_   ☐ Agent ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
_Scott Gilbert_   JUN 28 2010

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)
7006 1300 0001 0127 7375

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
EMBARCADERO CENTER WEST
275 BATTERY STREET, 29TH FLOOR
SAN FRANCISCO, CA 94111-3339

RNH

# EXHIBIT K

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Apple Inc.
C T Corporation System
818 West Seventh Street
Los Angeles, CA 90017

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Rudyr_    ☐ Agent  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

9448-0001

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7008 1300 0001 0127 7351

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**UNITED STATES POSTAL SERVICE**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
EMBARCADERO CENTER WEST
275 BATTERY STREET, 29TH FLOOR
SAN FRANCISCO, CA 94111-3339

RWH

# EXHIBIT L

# SCHUBERT JONCKHEER & KOLBE LLP
### Attorneys at Law

Robert C. Schubert
Willem F. Jonckheer
Miranda P. Kolbe
—
Dustin L. Schubert
Jason A. Pikler

September 27, 2010

Certified Mail -- Return Receipt Requested

Steve Jobs
Chief Executive Officer and Director
Apple, Inc.
1 Infinite Loop
Cupertino, CA 95014
Telephone Number: (408) 996-1010

Re:   *Notice of Violations of the Consumer Legal Remedies Act ("CLRA")*

Dear Mr. Jobs:

Pursuant to § 1782 of the California Consumers Legal Remedies Act, my client, Colette Osetek, hereby gives notice to Apple, Inc. ("Apple") that Apple violated the CLRA in connection with Apple's marketing, advertising, and sale of its iPad Wi-Fi + 3G ("iPad 3G") device.

On September 20, 2010, Ms. Osetek filed a class action complaint against Apple Inc., *Osetek v. Apple, Inc.*, Case No. 10-cv-4253, in the Northern District of California, San Jose Division, on behalf of herself and all similarly situated consumers. The allegations of the complaint, which is attached as Exhibit A to this letter, are incorporated here by reference. Pursuant to § 1782(d) of the Civil Code, the complaint currently seeks to enjoin Apple's violations of the CLRA but does not seek damages in connection with the claim. However, if Apple fails to rectify its violations of the CLRA by providing the relief set forth below within thirty (30) days of this notice, Ms. Osetek will file an amended complaint to add a request for compensatory and punitive damages in connection with her CLRA claim, on behalf of herself and the Class.

As described more fully in the complaint, Apple violated the CLRA by making false and deceptive promises to purchasers of the iPad 3G that, as a result of a "breakthrough deal with AT&T," they would be able to use their 3G-enabled iPads with an "unlimited" data plan on AT&T's 3G network. Moreover, Apple falsely and deceptively represented that this unlimited data plan would not require a contract; rather, iPad 3G purchasers could switch in and out of the unlimited data plan as their data needs demanded,

However, just over a month after Ms. Osetek and thousands of other consumers purchased their 3G-enabled iPads, the flexible, no-contract, unlimited 3G data plan that Apple promised consumers was eliminated. Apple's misrepresentations regarding the availability and characteristics of the unlimited 3G data plan induced Ms. Osetek, and similarly situated consumers, to purchase the iPad 3G device. As a consequence of Apple's unfair and deceptive acts, Ms. Osetek and members of the general public have suffered pecuniary losses, including

Steve Jobs
September 27, 2010
Page Two

but not limited to the price difference between the iPad 3G and the standard iPad sold without 3G connectivity.

Apple's conduct violated the following sections of the CLRA:

    a.    Cal. Civ. Code § 1770(a)(5): Representing to consumers that Apple's goods and services had characteristics and benefits they did not have;

    b.    Cal. Civ. Code § 1770(a)(9): Advertising goods and services to consumers with the intent not to sell them as advertised;

    c.    Cal. Civ. Code §1770(a)(14): Representing that their transactions with consumers conferred benefits and rights on the consumers, and obligations on Apple, which were not, in fact, conferred; and

    d.    Cal. Civ. Code § 1770(a)(16): Representing to consumers that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

Ms. Osetek hereby demands that Apple remedy its violations of Section 1770 by paying, to all consumers who purchased a 3G-enabled iPad before June 7, 2010, the difference in price between the iPad 3G and the price of the standard iPad without 3G connectivity, including any increase in sales tax.

Sincerely,

Willem F. Jonckheer, Esq.

Attorney for Colette Osetek