1    Michael W. Sobol (State Bar No. 194857)
      *msobol@lchb.com*
2    Roger N. Heller (State Bar No. 215348)
      *rheller@lchb.com*
3    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
      275 Battery Street, 29th Floor
4    San Francisco, CA  94111-3339
      Telephone:  (415) 956-1000
5    Facsimile:  (415) 956-1008

6    *Attorneys for Plaintiffs and Interim Class Counsel*

7

8

9                      **UNITED STATES DISTRICT COURT**

10                  **NORTHERN DISTRICT OF CALIFORNIA**

11                          **SAN JOSE DIVISION**

12

13   In Re Apple and AT&T iPad Unlimited          Case No. 5:10-cv-02553 RMW
     Data Plan Litigation
14                                                **DECLARATION OF ROGER N. HELLER**
                                                  **IN SUPPORT OF PLAINTIFFS' MOTION**
15   ALL CONSOLIDATED ACTIONS                     **FOR ORDER GRANTING**
                                                  **PRELIMINARY APPROVAL OF**
16                                                **PROPOSED CLASS ACTION**
                                                  **SETTLEMENTS AND RELATED RELIEF**
17

18                                                Judge:        Hon. Ronald M. Whyte

19

20

21

22

23

24

25

26

27

28

I, Roger N. Heller, declare as follows:

1.      I am a member in good standing of the California State Bar and a partner at Lieff, Cabraser, Heimann & Bernstein, LLP ("LCHB"), Interim Class Counsel in these consolidated cases.  I have personal knowledge of the matters set forth herein, and could and would testify competently thereto if called upon to do so.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the Stipulation of Settlement entered into between Plaintiffs, on behalf of themselves and others similarly situated, and defendant Apple Inc., including all exhibits thereto (the "Apple Settlement").

3.      Attached hereto as **Exhibit B** is a true and correct copy of the Stipulation of Settlement entered into between Plaintiff Joe Hanna, on behalf of himself and others similarly situated, and defendant AT&T Mobility LLC, including all exhibits thereto (the "ATTM Settlement").

**Background and Experience**

4.      LCHB is one of the oldest, largest, most respected, and most successful law firms in the country representing plaintiffs in class actions, and brings to the table a wealth of class action experience.  LCHB has been repeatedly recognized over the years as one of the top plaintiffs' law firms in the country by both The National Law Journal and The American Lawyer. *See, e.g.*, The Plaintiffs' Hot List, National Law Journal (Oct. 1, 2012) (LCHB has received this same award each year from 2003 through 2012); J. Triedman, A New Lieff, The American Lawyer (Dec. 2006), at 13 ("one of the nation's premier plaintiffs' firms"); A. Frankel, Sweet Sixteen, Litigation 2004, Supplement to The American Lawyer & Corporate Counsel (Dec. 2004), at 8-10.

5.      LCHB has vindicated the rights of, and recovered hundreds of millions of dollars for, consumers in class litigation.  Attached hereto as **Exhibit C** is a true and correct copy of LCHB's firm resume, which describes the firm's experience in class action and other complex litigation.  As set forth therein, LCHB represents plaintiffs in consumer, securities, employment, antitrust, civil rights, and mass tort cases.  Numerous examples of consumer class actions in which LCHB served in a leadership role and achieved excellent results for consumers are listed in

1   the Declaration of Michael W. Sobol in Support of Plaintiffs' Administrative Motion for Entry of

2   Initial Case Management Order and Appointment of Interim Counsel, filed earlier in this

3   litigation (Docket No. 67-1), which is incorporated herein by reference.

4          6.      LCHB has been involved in all or virtually all aspects of the litigation and

5   settlement of this matter.  The primary LCHB attorneys that have worked on these cases are

6   myself, my partner Michael W. Sobol, and former LCHB associate Allison Elgart.

7          7.      Michael W. Sobol, Lead Plaintiffs' Counsel in this litigation, is a 1989

8   graduate of Boston University School of Law.  Mr. Sobol practiced law in Massachusetts from

9   1989 to 1997.  From 1995 through 1997, he was a Lecturer in Law at Boston University School

10  of Law.  In 1997, Mr. Sobol left his position as partner in the Boston firm of Shafner, Gilleran &

11  Mortensen, P.C. to move to San Francisco, where he joined LCHB.  Since joining LCHB in 1997,

12  Mr. Sobol has almost exclusively represented plaintiffs in consumer protection class actions.  He

13  has been a partner with LCHB since 1999, and is currently in his twelfth year as head of LCHB's

14  consumer practice group.  Mr. Sobol has served as plaintiffs' class counsel in numerous

15  nationwide consumer class action cases.

16         8.      I graduated from Columbia University School of Law in 2001, where I was

17  a Senior Editor for the *Columbia Law Review*.  From 2001 through 2005, I was a litigation

18  associate at O'Melveny & Myers LLP.  From 2005 through 2008, I worked for the non-profit law

19  firm Disability Rights Advocates, where I was a Senior Staff Attorney and worked primarily on

20  prosecuting class actions under federal and state anti-discrimination laws.  I joined LCHB in

21  2008, and became a partner at LCHB in 2011.  During my entire time at LCHB, my practice has

22  been focused on consumer protection class actions.  I have successfully represented large classes

23  in numerous consumer cases, including cases involving consumer banking, credit cards, false

24  advertising, and insurance practices.  I was named a Northern California Super Lawyer (2013),

25  and have been a finalist for the CAOC Consumer Attorney of the Year Award (2012 and 2013)

26  and a finalist for the Public Justice Trial Lawyer of the Year Award (2012).

27         9.      Allison S. Elgart was an associate at LCHB from 2006 until 2011.  Ms.

28  Elgart graduated *magna cum laude* from Brown University in 2000, and from Harvard Law

---

2                                              Case No.  CV 10-02553 RMW

DECLARATION OF ROGER N. HELLER

School in 2005, where she was Editor-in-Chief of the *Harvard Civil Rights-Civil Liberties Law Review* and a practicing member of the Harvard Legal Aid Bureau.  Immediately after graduating from law school, Ms. Elgart clerked for the Honorable Robert P. Patterson, Jr. of the United States District Court for the Southern District of New York.  While at LCHB, Ms. Elgart focused on representing plaintiffs in employment discrimination litigation and consumer protection class action cases.

### Plaintiffs' Investigation and Settlement Negotiations in These Cases

10.     Before filing the initial *Weisblatt* complaint, LCHB conducted a diligent investigation regarding the factual and legal issues involved in these cases.  Those efforts, as well as the efforts of the other proposed Class Counsel, continued after the filing of the initial complaints.  Among other things, Class Counsel have conducted extensive legal research regarding the claims and other legal issues that have arisen, or were expected to arise, in this litigation, and have litigated multiple dispositive motions.  Class Counsel have also thoroughly investigated the factual issues involved, including the various iPad purchase paths, the representations that were made during the relevant time period, the experiences of the class members, and the impact of the alleged misconduct on the class.   Class Counsel have been contacted by numerous class members about their experiences.  LCHB, alone, has been contacted by hundreds of class members since the initial complaint was filed.

11.     LCHB was involved in, and I was personally involved in, every  or virtually every aspect of the settlement negotiations in these cases.  At all times, Plaintiffs and the defendants were represented by well-qualified counsel with significant experience litigating and settling consumer class actions and other complex cases.  At all times, the negotiations have been arms-length.

12.     Following preliminary communications regarding settlement, Plaintiffs and Apple agreed to mediate the claims against Apple with the Hon. Daniel Weinstein (Ret.) and Catherine A. Yanni, Esq. of JAMS.  An initial, full-day mediation session was held in June 2011, and a second formal session was held subsequently.  In addition, counsel for Plaintiffs and Apple engaged in continued follow-up discussions with the help of Ms. Yanni.  The parties reached an

1   agreement in principle on key deal terms with the assistance of the mediators.  After an agreement

2   in principle was reached between Plaintiffs and Apple on the merits, the parties, with the

3   assistance of the mediators, reached an agreement in principle regarding attorneys' fees for the

4   Apple Settlement.  Counsel for Plaintiffs and Apple thereafter worked on finalizing the settlement

5   and drafting settlement papers.  In connection with the mediations with Apple, Class Counsel

6   conducted targeted discovery which allowed them to assess the merits of their claims against the

7   defendants as well as potential measures of class damages.  Among other things, Class Counsel

8   reviewed and analyzed contemporaneous internal documents and iPad sales data from during and

9   around the proposed class period.

10          13.     In July 2012, Plaintiff's counsel and counsel for ATTM began preliminary

11  discussions regarding a possible resolution of the claims against ATTM.  Following extensive

12  arms-length negotiations between counsel, which included numerous teleconferences over the

13  course of several months, Plaintiff and ATTM reached an agreement in principle on key deal

14  terms.  After an agreement in principle was reached between Plaintiff and ATTM on the merits,

15  the parties reached an agreement in principle regarding attorneys' fees and costs for the ATTM

16  Settlement.

17          14.     During the past months, the parties have worked extensively on finalizing

18  the respective settlement agreements and the related papers and processes.  These efforts have

19  included considerable work by all parties and their counsel to coordinate the notice program and

20  claims process among the two settlements.

21          15.     Based on my experience and my knowledge regarding the factual and legal

22  issues in these cases, it is my opinion that the Apple Settlement and ATTM Settlement are both

23  fair, reasonable and adequate, and are in the best interests of the respective class members.

24

25          I declare under penalty of perjury that the foregoing is true and correct.  Executed this

26  12th day of September, 2013, San Francisco, California.

                                          */s/ Roger N. Heller*
27                                          Roger N. Heller

28  1129029.1

EXHBIT A

1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

11

| | |
|---|---|
| In re Apple and AT&T iPad Unlimited Data Plan Litigation | Case No. 5:10-CV-02553 RMW |
| ALL CONSOLIDATED ACTIONS | STIPULATION OF SETTLEMENT |

17                **SETTLEMENT AGREEMENT AND RELEASE**

18          This Settlement Agreement and Release ("Agreement") is made by and between:  (1)

19   Apple Inc. and (2) Adam Weisblatt, Joe Hanna, David Turk, Colette Osetek and Aaron Friedman,

20   individually and as representatives of the "Settlement Class" as defined below (collectively the

21   "Parties").
                                **DEFINITIONS**
22

23          As used herein, the following terms have the meanings set forth below:

24          A.      "Apple" shall mean Apple Inc., a California corporation, and any successors

25   thereto.

26          B.      "iPad 3G" shall mean Apple's original iPad with 3G capability (iPad with WiFi +

27   3G), first offered for sale in approximately April 2010.

28

SETTLEMENT AGREEMENT AND RELEASE
Case No. 5:10-cv-02553 RMW                                                                    1
sf- 3325839

C.     "Class Representatives" or "Plaintiffs" shall mean Adam Weisblatt, Joe Hanna, David Turk, Colette Osetek and Aaron Friedman.

D.     "Class Member" shall mean each member of the Settlement Class, as defined in Section I.A below.

E.     "Settlement Class Member" shall mean and include every Class Member who does not validly and timely request exclusion from the Settlement Class.

F.     "Notice Date" shall mean the last date on which notice is published, mailed or emailed as provided in Section IV.C, D and G below; provided, however, that backup mailed notice pursuant to Section IV.E below or other remailing of notice shall not affect or delay the Notice Date.

G.     "Settlement" shall mean the settlement described herein.

H.     "Settlement Administrator" shall mean Kurtzman Carson Consultants LLC, an independent settlement administrator, subject to Court approval.  Apple, together with ATTM, shall pay the costs of the Settlement Administrator incurred in connection with this Settlement.

I.     "Releasing Persons" shall mean Plaintiffs, each Settlement Class Member, and their respective heirs, executors, administrators, representatives, agents, partners, successors, and assigns.

J.     "Released Persons" shall mean Apple and each of its past or present directors, officers, employees, agents, insurers, shareholders, attorneys, advisors, consultants, representatives, partners, affiliates, parents, subsidiaries, joint venturers, independent contractors, wholesalers, resellers, distributors, retailers, related companies, and divisions, and each of their predecessors, successors, heirs, and assigns; provided, however, that neither AT&T Mobility LLC nor any of its parents or subsidiaries shall be a "Released Person" as defined herein.

K.     "Class Counsel" shall mean:
Michael W. Sobol
Roger N. Heller
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111

1    Gregory S. Weston
       Jack Fitzgerald
2    The Weston Firm
       1405 Morena Blvd, Suite 201
3    San Diego, CA 92110

4    Willem F. Jonckheer
       Schubert Jonckheer & Kolbe LLP
5    Three Embarcadero Center
       Suite 1650
6    San Francisco, CA 94111

7    Gayle M. Blatt
       Casey, Gerry, Schenk, Francavilla, Blatt & Penfield LLP
8    110 Laurel Street
       San Diego, CA 92101
9
       Michael Ian Rott
10    Eric Overholt
       Hiden, Rott & Oertle, LLP
11    2635 Camino del Rio South, Suite 306
       San Diego, CA 92108
12

13       L.    "Class Notice" shall mean the Notice of Pendency and Proposed Settlements of

14 Class Action, substantially in the form attached hereto as Exhibit A.

15       M.    "Summary Notice" shall mean the Summary Notice of Settlement, substantially in

16 the form attached hereto as Exhibit B.

17       N.    "Postcard Notice" shall mean the Postcard Notice of Settlement, substantially in

18 the form attached hereto as Exhibit C.

19       O.    "Published Notice" shall mean the Published Notice of Settlement, substantially in

20 the form attached hereto as Exhibit D.

21       P.    "ATTM" shall mean AT&T Mobility LLC, a Delaware limited liability company,

22 and any successors.

23       Q.    "Dual Summary Notice" shall mean the Dual Summary Notice of Settlement,

24 substantially in the form attached hereto as Exhibit E.

25       R.    "Dual Postcard Notice" shall mean the Dual Postcard Notice of Settlement,

26 substantially in the form attached hereto as Exhibit F.

27

28

SETTLEMENT AGREEMENT AND RELEASE
Case No. 5:10-cv-02553 RMW
sf- 3325839

3

**RECITALS**

This Agreement is made for the following purposes and with reference to the following facts:

A.     Between June and September 2010, three class action complaints were filed against Apple in the United States District Court for the Northern District of California.  These actions were titled *Weisblatt et al. v. Apple Inc. et al.* (N.D. Cal. Case No. 5:10-cv-02553), *Logan v. Apple Inc. et al.* (N.D. Cal. Case No. 5:10-cv-02588) and *Osetek v. Apple Inc.* (N.D. Cal. Case No. 5:10-cv-04253).  A fourth class action complaint, *Friedman v. Apple Inc. et al.* (S.D. Cal. Case No. 5:10-cv-2403) was filed in the United States District Court for the Southern District of California on November 22, 2010.  The *Weisblatt*, *Logan* and *Osetek* actions were consolidated for all purposes on December 6, 2010.  The *Friedman* action was transferred to the United States District Court for the Northern District of California on April 18, 2011, and was consolidated with the *Weisblatt*, *Logan* and *Osetek* actions for all purposes on May 31, 2011.  The four consolidated actions are hereinafter referred to as the "Actions."

B.     A Master Consolidated Complaint ("MAC") was filed on December 10, 2010, and a First Amended Master Consolidated Complaint ("Complaint") was filed in the Actions on August 9, 2011.  The allegations of the MAC and the Complaint were substantially the same with respect to Apple.  The Complaint alleged that Apple and ATTM promoted the availability of an "unlimited" ATTM 3G data service plan for the iPad 3G (the "Unlimited Plan") and the ability to freely switch between the Unlimited Plan, other data plans and no data plan; that on June 7, 2010, the Unlimited Plan was eliminated; and that thereafter, customers who had signed up for other data plans could no longer sign up for the Unlimited Plan and customers who had previously signed up for the Unlimited Plan could no longer switch in and out of the Unlimited Plan.  The Complaint alleged causes of action for intentional misrepresentations and omissions; false promise and fraud; negligent misrepresentations and omissions; violations of the California Consumers Legal Remedies Act, Cal. Civ. Code § 1770 *et seq.* and the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; and for restitution and injunctive relief.  The Complaint sought damages, restitution and injunctive relief.

C.      Apple filed its Answer to the MAC on January 13, 2011.  In its Answer to the MAC, Apple generally denied the allegations therein and alleged various affirmative defenses. Apple has not answered the Complaint.

D.      Apple disputes the claims alleged in the Actions and does not by this Agreement admit any liability or wrongdoing whatsoever.  Apple has agreed to enter into this Agreement to avoid the further expense, inconvenience, and distraction of burdensome and protracted litigation.

E.      Class Counsel and the Class Representatives believe that the claims asserted in the Actions possess merit.  Class Counsel and the Class Representatives have examined and considered the benefits to be obtained under the proposed settlement set forth in this Agreement, and the risks and delay associated with the continued prosecution of this complex and potentially time-consuming litigation.  Moreover, Class Counsel have conducted discovery of Apple, have investigated the facts and law relevant to the merits of the claims, and have concluded in consideration of all of these circumstances, that the proposed settlement set forth in this Agreement is fair, adequate, reasonable, and in the best interests of the Settlement Class.

F.      Following preliminary communications regarding settlement, the Parties agreed to mediate the claims raised against Apple with the Hon. Daniel Weinstein (Ret.) and Catherine A. Yanni, Esq. of JAMS.  An initial, full-day mediation session was held with Judge Weinstein and Ms. Yanni, and a second session was held thereafter.  In addition, the Parties engaged in further, follow-up discussions with Ms. Yanni.  During the course of their mediation efforts, the Parties engaged in arms-length negotiations between counsel and, with the assistance of Judge Weinstein and Ms. Yanni, reached an agreement in principle regarding the merits.  After an agreement in principle regarding the merits was reached, the Parties, with the assistance of the mediators, reached an agreement in principle regarding attorneys' fees and costs.

G.      The Parties desire to settle the Actions as to the Plaintiffs, the Settlement Class Members and Apple, in their entirety with respect to all potential claims arising out of the facts that were or could have been alleged in the Complaint.  The Parties intend this Agreement to bind Apple, Plaintiffs (both as Class Representatives and individually), and all Settlement Class Members.

**NOW, THEREFORE**, in light of the foregoing, for good and valuable consideration, the Parties, and each of them, hereby warrant, represent, acknowledge, covenant, and agree, subject to approval by the Court, as follows:

**I.      CERTIFICATION OF THE SETTLEMENT CLASS**

**A.      Definition of the Settlement Class**

The "Settlement Class" shall be defined as follows:

> All United States residents who purchased or ordered an Apple iPad with 3G capability (iPad 3G) in the United States on or before June 7, 2010.  The Settlement Class excludes Apple; any entity in which Apple has a controlling interest; Apple's directors, officers, and employees; Apple's legal representatives, successors, and assigns; and wholesalers, resellers, retailers and distributors.

**B.      Stipulation Respecting Conditional Certification**

The Parties stipulate and agree that, subject to Court approval, the Settlement Class described in Section I.A above should be conditionally certified solely for purposes of the settlement embodied in this Agreement.  If, for any reason, this Agreement is not approved by the Court, the stipulation for certification and all of the agreements contained herein shall be considered null and void and may not be referred to or used as evidence or for any other purpose whatsoever in the Actions or any other action or proceeding.

**II.      CONSIDERATION FOR SETTLEMENT; CLAIMS PROCESS**

**A.      $40 Cash Payment**

Settlement Class Members who submit a valid claim in accordance with Sections II.B and IX.B below shall receive a $40 cash payment in the form of a check.  There is a limit of one cash payment per iPad 3G.  Settlement payments will be solely through a claims-made process, payable by Apple through the Settlement Administrator.

**B.      Claims Process**

**1.      Claim Forms**

A Settlement Class Member must submit a valid Claim Form to receive a cash payment from the Settlement.  The Claim Forms shall be substantially in the forms attached hereto as

1   Exhibits G through J.  To submit a valid Claim Form, Settlement Class Members must confirm

2   (by checking a check box) the following statement:

3   ☐ The ability to switch in and out of the "unlimited" data plan was
    a factor in my decision to purchase an iPad 3G.

4

5   Settlement Class Members shall affirm that the statements in the Claim Form are true and correct

6   to the best of their knowledge and belief.

7                    2.        **Submission of Claims**

8          Settlement Class Members shall have the option of submitting claims using one of the

9   following methods:

10                           a.        Settlement Class Members may submit a Claim Form electronically

11  through the Settlement Website.  The Summary Notices and Dual Summary Notices emailed to

12  Settlement Class Members shall contain a hyperlink to the appropriate online Claim Form.  The

13  Postcard Notices and Dual Postcard Notices mailed to Settlement Class Members shall contain

14  the web address for the appropriate online Claim Form.

15                           b.        Settlement Class Members may submit a Claim Form by mail at

16  their own expense.  The Settlement Website shall include a downloadable, printable Claim Form

17  and Settlement Class Members may obtain a hard copy Claim Form from the Settlement

18  Administrator.

19                   3.        **Claims Period**

20         To be valid, Claim Forms submitted online via the Settlement Website must be submitted

21  no later than ninety (90) days after the Notice Date.  To be valid, Claim Forms submitted by mail

22  must be postmarked no later than ninety (90) days after the Notice Date.

23                   4.        **Modification by Agreement**

24         The Parties may make non-material modifications to the claims process as necessary by

25  mutual agreement without Court approval.

26                   5.        **Special Class Member Rights Provision**

27         If a Settlement Class Member has a legal guardian, or due to age or disability, has

28  executed a power of attorney authorizing another to manage their financial affairs, the guardian or

attorney may submit a Claim Form. The Settlement Administrator may require reasonable proof of the guardian's or attorney's authority.  Claims shall not be transferable in any other circumstances.

      **C.**    **Payment of Notice Costs and Costs of Administration**

      Apple, together with ATTM, shall pay all costs of notice and of administering the settlement as provided for in this Section II and in Sections IV and IX.B below.

**III.**    **OBTAINING COURT APPROVAL OF THE AGREEMENT**

      **A.**    Upon full execution of this Agreement, the Parties shall take all necessary steps to obtain an Order from the Court, substantially in the form of Exhibit K hereto (the "Preliminary Approval Order"), granting conditional certification of the Settlement Class, granting preliminary approval of this Agreement, and approving the forms and methods of notice to the Settlement Class set forth herein.  The Preliminary Approval Order shall further set a date for a hearing ("Final Approval Hearing") at which the Court will determine whether the requirements for certification of the Settlement Class have been met; whether the proposed settlement should be finally approved as fair, reasonable, adequate, and in the best interests of the Settlement Class Members; whether the award of fees and expenses to Class Counsel should be approved; whether the award of service awards to the Class Representatives should be approved; and whether a final judgment should be entered dismissing the Action on the merits and with prejudice against the Class Representatives and the Settlement Class Members.

      **B.**    If at any point the Court does not approve this Agreement, the Agreement shall terminate and be of no force or effect, unless the Parties voluntarily agree to modify this Agreement in the manner necessary to obtain Court approval.

**IV.**    **NOTICE, REQUESTS FOR EXCLUSION AND OBJECTIONS**

      The Parties agree to, and will request approval by the Court of, the following forms and methods of notice to the Settlement Class:

      **A.**    Apple will provide the Settlement Administrator with known, reasonably available email and street addresses, serial numbers, and IMEI numbers for the Class Members based upon its customer records regarding those iPad 3G purchases and orders falling within the Settlement

1   Class definition.  Apple shall transmit this information to the Settlement Administrator no later

2   than 10 (ten) business days after entry of the Preliminary Approval Order.  Within the same time

3   frame, Apple shall also transmit to ATTM the IMEI numbers for the potential Settlement Class

4   members.  To the extent feasible, using the IMEI numbers provided by Apple, ATTM shall

5   identify for the Settlement Administrator any persons potentially within the "ATTM Non-

6   Subscriber Settlement Class" (as that term is defined in the ATTM Settlement).  Those persons

7   potentially within the ATTM Non-Subscriber Settlement Class shall be put on a Dual Notice List.

8   All other Class Members for whom information is provided by Apple shall be put on an Apple

9   Notice List.  However, to the extent the Court grants preliminary approval of this Settlement, but

10  does not grant preliminary approval of the separate settlement between plaintiffs and ATTM in

11  this litigation, the Settlement Administrator shall instead use all of the information provided by

12  Apple to create a single Apple Notice List with all Class Members for whom information is

13  provided by Apple.

14          B.      The Settlement Administrator shall establish and maintain a toll-free telephone

15  number ("Toll-Free Number") which Class Members may call to request copies of the Class

16  Notice and Claim Form.  The Settlement Administrator shall further establish and maintain a

17  settlement website, at the address www._____.com ("Settlement Website"), where Settlement

18  Class Members may submit online Claim Forms, and which shall include, without limitation, the

19  Class Notice, a downloadable Claim Form, copies of the Complaint and this Agreement,

20  Frequently Asked Questions, and the Toll-Free Number.  The Toll-Free Number and the

21  Settlement Website shall be fully operative on or before the first date notice is emailed or mailed

22  to the Class Members.

23          C.      The Settlement Administrator shall email the Summary Notice to those Class

24  Members for whom an email address is included in the Apple Notice List.  The Settlement

25  Administrator shall email the Dual Summary Notice to those Class Members for whom an email

26  address is included in the Dual Notice List.  However, to the extent the Court grants preliminary

27  approval of this Settlement, but does not grant preliminary approval of the separate settlement

28  between plaintiffs and ATTM in this litigation, the Settlement Administrator shall email the

SETTLEMENT AGREEMENT AND RELEASE
Case No. 5:10-cv-02553 RMW
sf- 3325839

9

1  Summary Notice to all Class Members for whom an email address is included in the Apple

2  Notice List.

3         D.     The Settlement Administrator shall send, via first-class mail postage pre-paid, the

4  Postcard Notice to those Class Members for whom an email address is not included, and a

5  mailing address is included, in the Apple Notice List.  The Settlement Administrator shall send,

6  via first-class mail postage pre-paid, the Dual Postcard Notice to those Class Members for whom

7  an email address is not included, and a mailing address is included, in the Dual Notice List.

8  However, to the extent the Court grants preliminary approval of this Settlement, but does not

9  grant preliminary approval of the separate settlement between plaintiffs and ATTM in this

10  litigation, the Settlement Administrator shall mail the Postcard Notice to those Class Members for

11  whom an email address is not included, and a mailing address is included, in the Apple Notice

12  List.

13         E.     For those Class Members for whom email Summary Notice or Dual Summary

14  Notice is returned undeliverable, the Settlement Administrator shall mail the Postcard Notice to

15  such Class Members to the extent a mailing address is included in the Apple Notice List, or the

16  Dual Postcard Notice to such Class Members to the extent a mailing address is included in the

17  Dual Notice List.

18         F.     All mailing addresses used for mailing the Postcard Notice and Dual Postcard

19  Notice shall be updated by the Settlement Administrator through the United States Postal

20  Service's National Change of Address database.  For mailed Postcard Notices and Dual Postcard

21  Notices that are returned with forwarding address information, the Settlement Administrator shall

22  remail the Postcard Notice or Dual Postcard Notice, as appropriate, once to the new address

23  indicated.

24         G.     At their expense, Apple, together with ATTM, shall cause a copy of the Published

25  Notice to be published once in *Macworld* and once on a different date in *USA Today*.  The

26  Published Notice in *Macworld* shall not be less than 1/4 of a page in size.  The Published Notice

27  in *USA Today* shall not be less than 1/8 of a page in size.  However, to the extent the Court grants

28  preliminary approval of this Settlement, but does not grant preliminary approval of the separate

1   settlement between plaintiffs and ATTM in this litigation, Apple, at its expense, shall cause

2   copies of the Published Notice to be published once in *Macworld* and once on a different date in

3   *USA Today*, subject to the same minimum size requirements as set forth above in this paragraph.

4          H.     The timing for mailing, emailing, and publishing the notices shall be directed by

5   the Preliminary Approval Order.  The Class Notice, Summary Notice, Dual Summary Notice,

6   Postcard Notice, Dual Postcard Notice, and Published Notice shall all include the address of the

7   Settlement Website and the Toll-Free Number.

8          I.     Class Members who so request will receive a reminder email sent by the

9   Settlement Administrator.

10         J.     The Class Notice shall provide procedures whereby Class Members may exclude

11  themselves from the Settlement Class or, if they do not timely exclude themselves, object to the

12  Settlement.

13         K.     Class Members shall have the right to exclude themselves from the Settlement

14  Class during the opt-out period.  The opt-out period shall run for forty five (45) days after the

15  Notice Date.  To be valid, a request for exclusion must be in writing, must be mailed to the

16  Settlement Administrator at the address indicated in the Class Notice, postmarked no later than

17  forty five (45) days after the Notice Date, and must clearly state the Class Member's desire to

18  exclude themselves from the Settlement Class.  Any Class Member who does not timely and

19  validly request exclusion shall be a Settlement Class Member and shall be bound by the terms of

20  this Agreement.  No later than five (5) business days following the end of the opt-out period, the

21  Settlement Administrator  shall provide Class Counsel and counsel for Apple with a final list of

22  Class Members who submitted timely and valid requests for exclusion.  Prior to or at the Final

23  Approval Hearing, the Court shall be provided with a final list of Class Members who submitted

24  timely and valid requests for exclusion.

25         L.     Class Members who do not submit timely and valid requests for exclusion may file

26  objections to the Settlement, Class Counsel's request for attorneys' fees and costs, and/or the

27  requested service awards for the Class Representatives.  To be considered, an objection must be

28  in writing, must be mailed to the Clerk of the Court and the Settlement Administrator at the

1  addresses indicated in the Class Notice, must be postmarked no later than forty five (45) days

2  after the Notice Date, and must include all of the information specified in the Class Notice.  Class

3  Counsel shall file their application for attorneys' fees and costs in advance of the deadline for

4  mailing objections.  Once it is filed, Class Counsel's application for attorneys' fees and costs shall

5  be posted on the Settlement Website.

6         M.      Apple, together with ATTM, shall pay all costs of the notice program and other

7  costs of administering the Settlement pursuant to this Section IV.

8  **V.      PAYMENT OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**
**         TO CLASS COUNSEL; SERVICE AWARDS**

9

10         A.      Apple agrees not to oppose, or solicit or support opposition to, a request by Class

11  Counsel for attorney's fees and costs in an amount up to $1,500,000.

12         B.      Apple shall not be liable for any fees or expenses in connection with the Actions or

13  this litigation, other than the settlement payments made to eligible Settlement Class Members

14  pursuant to the claims process as set forth herein, attorneys' fees and costs awarded by the Court

15  (up to a maximum of $1,500,000), the costs of the notice program, claims administration, and

16  other administrative costs related to the Settlement as set forth herein, and payment of any service

17  awards to the Class Representatives (up to a maximum of $1,000 per Class Representative).

18  Class Counsel agree that they will not seek any additional fees or costs from Apple in connection

19  with the Actions or the settlement of the Actions.  Apple expressly agrees that it will not seek to

20  recover its Court costs, attorneys' fees, or expenses once the Court enters a dismissal of the

21  Actions.

22         C.      No later than ten (10) banking days following the Effective Date as defined below,

23  Apple shall pay any Court-awarded attorneys' fees and costs ("Fees Amount") to Class Counsel,

24  who shall, in their discretion, allocate and distribute such award.  Apple shall pay the Fees

25  Amount to:  Lieff, Cabraser, Heimann & Bernstein LLP, c/o Roger N. Heller, 275 Battery Street,

26  29th Floor, San Francisco, CA 94111.  Plaintiffs and Class Counsel agree to provide Apple all

27  identification information necessary to effectuate the payment of the Fees Amount and service

28  awards awarded to the named Plaintiffs including, but not limited to, Taxpayer Identification

SETTLEMENT AGREEMENT AND RELEASE
Case No. 5:10-cv-02553 RMW
sf- 3325839

12

1   Number(s), completed Internal Revenue Service Form W-9(s), and wire transfer information.

2   Apple shall have no liability with respect to the allocation of attorneys' fees and costs among

3   counsel.

4          D.      The payment by Apple of Class Counsel's attorneys' fees and costs is separate

5   from and in addition to the other relief afforded the Settlement Class Members in this Agreement.

6   The Court's award of any such attorneys' fees and costs shall be separate from its determination

7   of whether to approve the Settlement.  In the event the Court approves the Settlement, but

8   declines to award Class Counsel's attorneys' fees and costs in the amount requested by Class

9   Counsel, the Settlement will nevertheless be binding on the Parties to the extent permissible under

10  applicable law.

11         E.      Class Counsel shall petition the Court for, and Apple shall not oppose, service

12  awards in the amount of $1,000 for each of the Class Representatives, in recognition of their

13  efforts on behalf of the Settlement Class.  To the extent they are awarded by the Court, Apple

14  shall pay the Class Representatives service awards, up to a maximum of $1,000 each, within ten

15  (10) banking days of the Effective Date, as defined herein.  The payment by Apple of any service

16  awards to the Class Representatives is separate from, and in addition to, the other relief afforded

17  to the Settlement Class Members in this Agreement.  The Court's award of any service awards to

18  Class Representatives shall be separate from its determination of whether to approve the

19  Settlement.  In the event the Court approves the Settlement, but declines to award Class

20  Representatives service awards in the amounts requested by Class Counsel, the Settlement will

21  nevertheless be binding on the Parties.

22  **VI.    FINAL ORDER AND JUDGMENT APPROVING SETTLEMENT AND**
          **DISMISSING CLAIMS OF SETTLEMENT CLASS MEMBERS WITH**
23        **PREJUDICE; RELEASE OF CLAIMS BY SETTLEMENT CLASS MEMBERS**

24         **A.     Entry of Final Order and Judgment**

25         Upon the Court's approval of this Agreement and the Settlement set forth herein, an Order

26  substantially in the form attached hereto as Exhibit L and judgment substantially in the form

27  attached hereto as Exhibit M ("Judgment") shall be entered dismissing the claims of Plaintiffs and

28  of the Settlement Class Members against Apple with prejudice.

SETTLEMENT AGREEMENT AND RELEASE
Case No. 5:10-cv-02553 RMW                                                                      13
sf- 3325839

**B.** **Release of Claims**

     1.    As of the Effective Date of this Agreement as defined below, Releasing Persons hereby fully and irrevocably release and forever discharge Released Persons from any and all liabilities, claims, cross-claims, causes of action, rights, actions, suits, debts, liens, contracts, agreements, damages, costs, attorneys' fees, losses, expenses, obligations, or demands, of any kind whatsoever, whether known or unknown, existing or potential, or suspected or unsuspected, whether raised by claim, counterclaim, setoff, or otherwise, including any known or unknown claims, which they have or may claim now or in the future to have, that were or could have been alleged or asserted against any of the Released Persons in the Actions related to or regarding the availability of the Unlimited Plan, the ability to sign up for the Unlimited Plan or the ability to switch in or out of the Unlimited Plan, and any alleged misrepresentation or failure to disclose concerning the availability of the Unlimited Plan, the ability to sign up for the Unlimited Plan or the ability to switch in or out of the Unlimited Plan ("Released Claims").

     2.    Plaintiffs, on behalf of themselves and all Settlement Class Members, hereby waive any and all provisions, rights, and benefits conferred by section 1542 of the California Civil Code or any comparable statutory or common law provision of any other jurisdiction.  Section 1542 reads as follows:

> <u>Certain Claims Not Affected By General Release</u>:  A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Although the releases granted under this Agreement are not general releases, Plaintiffs, on behalf of themselves and of all Settlement Class Members, nonetheless expressly acknowledge that Plaintiffs and the Settlement Class Members are waiving the protections of section 1542 and of any comparable statutory or common law provision of any other jurisdiction.

     3.    As of the Effective Date, by operation of entry of Judgment, the Released Parties shall be deemed to have fully released and forever discharged Plaintiffs, all other Class Members and Class Counsel from any and all claims of abuse of process, malicious prosecution, or any other claims arising out of the initiation, prosecution or resolution of the Actions,

1   including, but not limited to, claims for attorneys' fees, costs of suit or sanctions of any kind, or

2   any claims arising out of the allocation or distribution of any of the consideration distributed

3   pursuant to this Settlement.

4          4.      Notwithstanding the entry of Judgment, this Court shall retain jurisdiction

5   of the Actions until such time as the Court determines that the Settlement is fully consummated

6   according to the terms and conditions of this Agreement.

7   **VII.   PLAINTIFFS' CLAIMS AND THE BENEFITS OF SETTLEMENT**

8          A.      Before commencing the Actions and during settlement negotiations, Class Counsel

9   conducted an examination and evaluation of the relevant law and facts to assess the merits of

10   Plaintiffs' claims and potential claims and to determine how best to serve the interests of the

11   Class.  Further, Apple provided Class Counsel with information requested to permit them to

12   assess the merits of their claims and potential claims and negotiate a settlement.  Class Counsel

13   and the Class Representatives believe that the claims asserted in the Actions have merit.

14          B.      However, Class Counsel and the Class Representatives, on behalf of the

15   Settlement Class, have agreed to settle the Actions pursuant to the provisions of this Agreement

16   after considering, among other things:  (a) the benefits to Plaintiffs and the Settlement Class

17   Members under the Settlement; (b) the attendant risks and uncertainty of litigation, especially in

18   complex actions such as this, as well as the difficulties and delays inherent in such litigation; and

19   (c) the desirability of consummating this Settlement to provide effective timely relief to Plaintiffs

20   and the Settlement Class Members.

21          C.      In consideration of all of these circumstances, Class Counsel and the Class

22   Representatives have concluded that the proposed Settlement set forth in this Agreement is fair,

23   adequate, reasonable, and in the best interests of the Settlement Class.

24   **VIII.   APPLE'S DENIAL OF LIABILITY; AGREEMENT AS DEFENSE IN FUTURE
25          PROCEEDINGS**

26          A.      Apple has indicated its intent vigorously to contest each and every claim in the

27   Actions, and continues vigorously to deny all of the material allegations in the Actions.  Apple

28   enters into this Agreement without in any way acknowledging any fault, liability, or wrongdoing

SETTLEMENT AGREEMENT AND RELEASE
Case No. 5:10-cv-02553 RMW
sf- 3325839

15

of any kind. Apple nonetheless has concluded that it is in its best interests that the Actions be settled on the terms and conditions set forth herein in light of the expense that would be necessary to defend the Actions, the benefits of disposing of protracted and complex litigation, and the desire of Apple to conduct its business unhampered by the distractions of continued litigation.

B.      Neither this Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be construed as an admission or concession by Apple of the truth of any of the allegations in the Actions, or of any liability, fault, or wrongdoing of any kind, nor as an admission or concession by Plaintiffs of any lack of merit of their claims against Apple.

C.      To the extent permitted by law, neither this Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be offered as evidence or received in evidence in any pending or future civil, criminal, or administrative action or proceeding to establish any liability or admission by Apple.

D.      To the extent permitted by law, the Agreement may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding which may be instituted, prosecuted, or attempted for Released Claims as defined herein.

## IX.   ADMINISTRATIVE AND IMPLEMENTATION MATTERS

### A.   Effective Date of the Agreement

The "Effective Date" of this Agreement shall be the first day after which all of the following events and conditions of this Agreement have been met or have occurred:

1.      All of the Parties and their counsel have executed this Agreement;

2.      The Court has conditionally certified the Settlement Class, preliminarily approved the Settlement embodied in this Agreement, and provided for approved notice to the Settlement Class by entry of an order substantially in the form of Exhibit K hereto;

3.      Following the final date for Class Members to exclude themselves from the Settlement Class pursuant to Section IV.K hereof, and no less than seven (7) days prior to the Final Approval Hearing, the Settlement Administrator has verified in writing or via email to the

1  Parties that fewer than three thousand (3,000) of the Class Members have submitted timely and

2  valid requests to exclude themselves from the Settlement Class, except that if this condition is not

3  met, Apple shall have the option to give written notice to Class Counsel waiving this condition

4  and stating that Apple intends to proceed with the Settlement set forth in this Agreement;

5          4.      The Court has entered an Order finally approving the Settlement

6  substantially in the form attached hereto as Exhibit L and has entered Judgment substantially in

7  the form attached hereto as Exhibit M; and

8          5.      The Judgment has become "final" in that the time for appeal of, or writ as

9  to, the Judgment has expired or, if any such appeal and/or petition for review is taken and the

10  Settlement is affirmed, the time period during which further petition for hearing, appeal, or writ

11  of certiorari can be taken has expired.  If the Judgment is set aside, materially modified, or

12  overturned by the trial court or on appeal, and is not fully reinstated on further appeal, the

13  Judgment shall not become "final" as contemplated by this subsection.

14        **B.**     **Settlement Claims Administration.**

15          1.      The Settlement Administrator shall receive both online and mailed Claim

16  Forms on behalf of Apple.

17          2.      Apple, through the Settlement Administrator, shall have the right to verify

18  the accuracy of information submitted during the claims process to ensure that claimants are

19  Settlement Class Members and have submitted valid claims.

20          3.      For any Settlement Class Member who submits a Claim Form determined

21  by the Settlement Administrator to be defective or incomplete, the Settlement Administrator shall

22  mail a notice directly to such Settlement Class Member notifying them of the missing information

23  and/or deficiencies and providing them with an opportunity to cure (the "Cure Notice").

24  Settlement Class Members shall have a 45-day period to cure defective or incomplete claims,

25  which shall run from the date of mailing of the Cure Notice to the Settlement Class Member.  The

26  45-day cure period may extend after the end of the period for submission of Claim Forms so long

27  as the original Claim Form was timely submitted.  Settlement Class Members shall have only one

28  opportunity to cure.

4.      The Settlement Administrator shall have the right to reject any claims that are deemed to be fraudulent or invalid or any claims that are deemed to be defective or incomplete after the Settlement Class Member has been provided an opportunity to cure pursuant to Section IX.B.3 above.  For all rejected claims, the Settlement Administrator will provide Class Counsel either with copies of the relevant Claim Form, Cure Notice, and any correspondence or other documents submitted by the claimant in response to a Cure Notice, or with a list of rejected claims (including the Settlement Class Member's name, address, and telephone number and the reason for rejection).  If the Settlement Administrator provides a list rather than copies of the Claim Forms, Cure Notices, and other documents, Class Counsel shall have a reasonable opportunity to inspect originals or copies of the relevant Claim Forms, Cure Notices, and other documents.  Counsel for the Parties will first attempt to resolve any disputes concerning rejected claims informally between themselves.  The Court shall retain jurisdiction to resolve any disputes concerning rejected claims for which counsel cannot reach an agreement.

5.      By no later than ninety (90) days after the Effective Date, the Settlement Administrator shall mail settlement payment checks to Settlement Class Members who submit valid claims.  The settlement payment checks shall be mailed to the addresses provided in the Claim Forms.  All settlement payment checks issued shall be void if not negotiated within one hundred twenty (120) calendar days of their date of issue and shall contain a legend specifying this period.  Settlement payment checks that are not returned or negotiated within one hundred twenty (120) calendar days of their date of issue shall not be reissued.

## X.      MISCELLANEOUS PROVISIONS

### A.      Extensions Of Time

Unless otherwise ordered by the Court herein, the Parties may jointly agree to reasonable extensions of time to carry out any of the provisions of this Agreement.

### B.      No Pending Actions

Each of the Parties represents and warrants that he, she, or it is not aware of any other lawsuits or administrative proceedings regarding data plans for the iPad 3G.

**C.     Integration**

This Agreement, including all exhibits, constitutes a single, integrated written contract expressing the entire agreement of the Parties relative to the subject matter hereof.  No covenants, agreements, representations, or warranties of any kind whatsoever have been made by any Party hereto, except as provided for herein or attached as an Exhibit hereto.

**D.     Governing Law**

This Agreement shall be construed in accordance with, and be governed by, the laws of the State of California, without regard to the principles thereof regarding choice of law.

**E.     Gender and Plurals**

As used in this Agreement, the masculine, feminine, or neuter gender, and the singular or plural number, shall each be deemed to include the others whenever the context so indicates.

**F.     Survival of Warranties and Representations**

The warranties and representations of this Agreement are deemed to survive the date of execution hereof.

**G.     Representative Capacity**

Each person executing this Agreement in a representative capacity represents and warrants that he or she is empowered to do so.

**H.     Counterparts**

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, even though all Parties do not sign the same counterparts.

**I.     Cooperation of Parties**

The Parties to this Agreement agree to prepare and execute all documents, to seek Court approvals, to defend Court approvals, and to do all things reasonably necessary to complete the Settlement described in this Agreement.

**J.     Execution Voluntary**

This Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them.  The Parties represent and warrant to each

1   other that they have read and fully understand the provisions of this Agreement and have relied

2   on the advice and representation of legal counsel of their own choosing.  Each of the Parties,

3   including through counsel, has cooperated in the drafting and preparation of this Agreement and

4   has been advised by counsel regarding the terms, effects, and consequences of this Agreement.

5   Accordingly, in any construction to be made of this Agreement, this Agreement shall not be

6   construed as having been drafted solely by any one or more of the Parties.

7       **K.     Notices**

8           1.     All Notices to Class Counsel provided for herein shall be sent by email or

9   facsimile to:  Roger N. Heller, Lieff, Cabraser, Heimann & Bernstein, LLP, 275 Battery Street,

10  29th Floor, San Francisco, California 94111-3339, facsimile number (415) 956-1008,

11  rheller@lchb.com, with a hard copy sent by overnight mail.

12          2.     All Notices to Apple provided for herein shall be sent by facsimile or email

13  to Penelope A. Preovolos, Morrison & Foerster LLP, 425 Market Street, San Francisco,

14  California 94105-2482, facsimile number (415) 268-7522, ppreovolos@mofo.com, with a hard

15  copy sent by overnight mail.

16          3.     The notice recipients and addresses designated in Section X.K.1-2 above

17  may be changed by written notice pursuant to this Section.

18          4.     Upon the request of any of the Parties, the Parties agree to promptly

19  provide each other with copies of objections, requests for exclusion, or other filings received as a

20  result of the Class Notice.

21      **L.     Modification and Amendment**

22          Except as provided in Section II.B.4 hereof, this Agreement may be amended or modified

23  only by a written instrument signed by the Parties' counsel and approved by the Court.

24      **M.     Continuing Jurisdiction**

25          The United States District Court for the Northern District of California shall retain

26  jurisdiction over the Parties and all such disputes regarding the Actions and the Settlement.

27

28

1

**N.    Confidentiality**

2

The terms of this Agreement, including the fact of the proposed Settlement, shall remain

3

completely confidential until all documents are executed and a motion for preliminary approval of

4

the Settlement is filed, unless otherwise ordered by the Court.

5

6

Dated: _September 10_, 2013

7

8

9

APPLE INC.

By: _____

Title: _Director, Commercial Litigation_

10

Dated: _____, 2013

11

12

ADAM WEISBLATT

_____
Adam Weisblatt

13

Dated: _____, 2013

14

15

16

JOE HANNA

_____
Joe Hanna

17

Dated: _____, 2013

18

19

DAVID TURK

_____
David Turk

20

Dated: _____, 2013

21

22

23

COLETTE OSETEK

_____
Colette Osetek

24

Dated: _____, 2013

25

26

27

28

AARON FRIEDMAN

_____
Aaron Friedman

1  **N.    Confidentiality**

2      The terms of this Agreement, including the fact of the proposed Settlement, shall remain

3  completely confidential until all documents are executed and a motion for preliminary approval of

4  the Settlement is filed, unless otherwise ordered by the Court.

5

6  Dated: _____, 2013     APPLE INC.

7                                         By: _____

8                                         Title: _____

9

10  Dated: _SEPTEMBER 5th_, 2013          ADAM WEISBLATT

11                                        _____
                                          Adam Weisblatt
12

13  Dated: _____, 2013     JOE HANNA

14

15                                        _____
                                          Joe Hanna
16

17  Dated: _____, 2013     DAVID TURK

18                                        _____
                                          David Turk
19

20  Dated: _____, 2013     COLETTE OSETEK

21

22                                        _____
                                          Colette Osetek
23

24  Dated: _____, 2013     AARON FRIEDMAN

25                                        _____
                                          Aaron Friedman
26

27

28

**N.    Confidentiality**

The terms of this Agreement, including the fact of the proposed Settlement, shall remain completely confidential until all documents are executed and a motion for preliminary approval of the Settlement is filed, unless otherwise ordered by the Court.

Dated: _____, 2013    APPLE INC.

By: _____

Title: _____

Dated: _____, 2013    ADAM WEISBLATT

_____
Adam Weisblatt

Dated: September 6th, 2013    JOE HANNA

_____
Joe Hanna

Dated: _____, 2013    DAVID TURK

_____
David Turk

Dated: _____, 2013    COLETTE OSETEK

_____
Colette Osetek

Dated: _____, 2013    AARON FRIEDMAN

_____
Aaron Friedman

**N.   Confidentiality**

The terms of this Agreement, including the fact of the proposed Settlement, shall remain completely confidential until all documents are executed and a motion for preliminary approval of the Settlement is filed, unless otherwise ordered by the Court.

Dated: _____, 2013     APPLE INC.

By: _____

Title: _____

Dated: _____, 2013     ADAM WEISBLATT

_____
Adam Weisblatt

Dated: _____, 2013     JOE HANNA

_____
Joe Hanna

Dated: ___9/6_____, 2013     DAVID TURK

_____
David Turk

Dated: _____, 2013     COLETTE OSETEK

_____
Colette Osetek

Dated: _____, 2013     AARON FRIEDMAN

_____
Aaron Friedman

**N.    Confidentiality**

The terms of this Agreement, including the fact of the proposed Settlement, shall remain completely confidential until all documents are executed and a motion for preliminary approval of the Settlement is filed, unless otherwise ordered by the Court.


Dated: _____, 2013        APPLE INC.

By:  _____

Title: _____


Dated: _____, 2013        ADAM WEISBLATT

_____

Adam Weisblatt


Dated: _____, 2013        JOE HANNA

_____

Joe Hanna


Dated: _____, 2013        DAVID TURK

_____

David Turk


Dated: *Sept. 12,* _____, 2013        COLETTE OSETEK

_____

Colette Osetek


Dated: _____, 2013        AARON FRIEDMAN

_____

Aaron Friedman

N.    **Confidentiality**

The terms of this Agreement, including the fact of the proposed Settlement, shall remain completely confidential until all documents are executed and a motion for preliminary approval of the Settlement is filed, unless otherwise ordered by the Court.

Dated: _____, 2013   APPLE INC.

By: _____

Title: _____

Dated: _____, 2013   ADAM WEISBLATT

_____
Adam Weisblatt

Dated: _____, 2013   JOE HANNA

_____
Joe Hanna

Dated: _____, 2013   DAVID TURK

_____
David Turk

Dated: _____, 2013   COLETTE OSETEK

_____
Colette Osetek

Dated: 9/6/_____, 2013   AARON FRIEDMAN

_____
Aaron Friedman

APPROVED AS TO FORM:

Dated: _Sept. 11_____, 2013

MORRISON & FOERSTER LLP
PENELOPE A. PREOVOLOS
STUART C. PLUNKETT
SUZANNA P. BRICKMAN

By: _____
Penelope A. Preovolos
Attorneys for Defendant
APPLE INC.

Dated: _____, 2013

MICHAEL W. SOBOL
ROGER N. HELLER
LIEFF, CABRASER, HEIMANN & BERNSTEIN,
LLP

By:_____
Michael W. Sobol
Attorneys for Plaintiffs and for the Settlement
Class

Dated: _____, 2013

GREGORY S. WESTON
JACK FITZGERALD
THE WESTON FIRM, P.C.

By:_____
Gregory S. Weston
Attorneys for Plaintiffs and for the Settlement
Class

Dated: _____, 2013

WILLEM F. JONCKHEER
SCHUBERT JONCKHEER & KOLBE LLP

By:_____
Willem F. Jonckheer
Attorneys for Plaintiffs and for the Settlement
Class

APPROVED AS TO FORM:

Dated: _____, 2013        MORRISON & FOERSTER LLP
                                      PENELOPE A. PREOVOLOS
                                      STUART C. PLUNKETT
                                      SUZANNA P. BRICKMAN


                                      By: _____
                                              Penelope A. Preovolos
                                            Attorneys for Defendant
                                                  APPLE INC.

Dated: _____, 2013        MICHAEL W. SOBOL
                                      ROGER N. HELLER
                                      LIEFF, CABRASER, HEIMANN & BERNSTEIN,
                                      LLP

                                      By: _____
                                              Michael W. Sobol
                                            Attorneys for Plaintiffs and for the Settlement
                                            Class

Dated: _____, 2013        GREGORY S. WESTON
                                      JACK FITZGERALD
                                      THE WESTON FIRM, P.C.


                                      By: _____
                                              Gregory S. Weston
                                            Attorneys for Plaintiffs and for the Settlement
                                            Class

Dated: _____, 2013        WILLEM F. JONCKHEER
                                      SCHUBERT JONCKHEER & KOLBE LLP


                                      By: _____
                                              Willem F. Jonckheer
                                            Attorneys for Plaintiffs and for the Settlement
                                            Class

APPROVED AS TO FORM:

Dated: _____, 2013

MORRISON & FOERSTER LLP
PENELOPE A. PREOVOLOS
STUART C. PLUNKETT
SUZANNA P. BRICKMAN

By:_____
Penelope A. Preovolos
Attorneys for Defendant
APPLE INC.

Dated: _____, 2013

MICHAEL W. SOBOL
ROGER N. HELLER
LIEFF, CABRASER, HEIMANN & BERNSTEIN,
LLP

By:_____
Michael W. Sobol
Attorneys for Plaintiffs and for the Settlement
Class

Dated: _9-6-13_____, 2013

GREGORY S. WESTON
JACK FITZGERALD
THE WESTON FIRM, P.C.

By:_*Greg Weston*_____
Gregory S. Weston
Attorneys for Plaintiffs and for the Settlement
Class

Dated: _____, 2013

WILLEM F. JONCKHEER
SCHUBERT JONCKHEER & KOLBE LLP

By:_____
Willem F. Jonckheer
Attorneys for Plaintiffs and for the Settlement
Class

SETTLEMENT AGREEMENT AND RELEASE
Case No. 5:10-cv-02553 RMW
sf- 3325839

22

1

2   APPROVED AS TO FORM:

3   Dated: _____, 2013          MORRISON & FOERSTER LLP
                                            PENELOPE A. PREOVOLOS
4                                           STUART C. PLUNKETT
                                            SUZANNA P. BRICKMAN
5

6                                           By:_____
                                                   Penelope A. Preovolos
7                                                  Attorneys for Defendant
                                                      APPLE INC.
8

9   Dated: _____, 2013          MICHAEL W. SOBOL
                                            ROGER N. HELLER
10                                          LIEFF, CABRASER, HEIMANN & BERNSTEIN,
                                            LLP
11

12                                          By:_____
                                                   Michael W. Sobol
13                                                 Attorneys for Plaintiffs and for the Settlement
                                                   Class
14

15  Dated: _____, 2013          GREGORY S. WESTON
                                            JACK FITZGERALD
16                                          THE WESTON FIRM, P.C.

17

18                                          By:_____
                                                   Gregory S. Weston
19                                                 Attorneys for Plaintiffs and for the Settlement
                                                   Class
20
    Dated: __9/12_____, 2013          WILLEM F. JONCKHEER
21                                          SCHUBERT JONCKHEER & KOLBE LLP

22                                          By:_____
23                                                 Willem F. Jonckheer
                                                   Attorneys for Plaintiffs and for the Settlement
24                                                 Class

25

26

27

28

    SETTLEMENT AGREEMENT AND RELEASE                                            22
    Case No. 5:10-cv-02553 RMW
    sf- 3325839

1

Dated: _September 6_, 2013

GAYLE M. BLATT
CASEY, GERRY, SCHENK, FRANCAVILLA,
BLATT & PENFIELD LLP

2

3

By: _Gayle M Blatt_

4

Gayle M. Blatt

5

Attorneys for Plaintiffs and for the Settlement
Class

6

Dated: _____, 2013

MICHAEL IAN ROTT
ERIC OVERHOLT
HIDEN ROTT & OERTLE, LLP

7

8

9

By: _____

10

Michael Ian Rott

Attorneys for Plaintiffs and for the Settlement
Class

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Dated: _____, 2013        GAYLE M. BLATT
                                         CASEY, GERRY, SCHENK, FRANCAVILLA,
2                                        BLATT & PENFIELD LLP

3
                                         By:_____
4                                              Gayle M. Blatt
                                             Attorneys for Plaintiffs and for the Settlement
5                                            Class

6  Dated: ___9/6/13___, 2013             MICHAEL IAN ROTT
                                         ERIC OVERHOLT
7                                        HIDEN ROTT & OERTLE, LLP

8
                                         By:_____
9                                              Michael Ian Rott
                                             Attorneys for Plaintiffs and for the Settlement
10                                           Class

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8            UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10              SAN JOSE DIVISION

11

12   In re Apple and AT&T iPad Unlimited Data Plan      Case No. 5:10-cv-02553 RMW
     Litigation

13                                                       CLASS ACTION

14
                    ALL CONSOLIDATED
15                  ACTIONS

16   _____

17

18

19                        **EXHIBIT A**

20          **NOTICE OF PENDENCY AND PROPOSED**
            **SETTLEMENTS OF CLASS ACTION**
21

22

23

24

25

26

27

28

1

2    UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA

3

# If you purchased or ordered an iPad with WiFi + 3G on or before June 7, 2010, you could be entitled to $40 cash from Apple, and other benefits from AT&T, under class action settlements.

*The United States District Court, Northern District of California, authorized this notice. This is not a solicitation from a lawyer. You are not being sued.*

**The Settlements**

- Two settlements have been reached in class action lawsuits. The first settlement, with Apple, will provide a $40 cash payment. The second settlement, with AT&T, will provide a 5GB AT&T data plan for $30/month for up to one year, which is a $20/month discount from the current rate (the "Data Plan Benefit").

- To qualify for either the $40 cash or the Data Plan Benefit, you must have purchased or ordered an iPad 3G in the United States on or before June 7, 2010. In addition, to qualify for the Data Plan Benefit, you must <u>not</u> have signed up for any AT&T 3G data plan for that iPad. You must submit a valid Claim Form to receive benefits.

- Your legal rights are affected whether you act or don't act. Please read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| SUBMIT CLAIMS | The only way to get the $40 cash payment or the Data Plan Benefit. |
| EXCLUDE YOURSELF | Get no payment or benefit. This is the only option that allows you ever to be part of any other lawsuit against Apple or AT&T about the issues in this case. You may exclude yourself from one or both of the settlements. See section 14 for details. |
| OBJECT | Write the Court about why you don't like one or both of the settlements. See section 19 for details. |
| GO TO A HEARING | Ask to speak in Court about the settlements. See section 23 for details. |
| DO NOTHING | Get no payment or benefit. Give up rights. |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the settlements. All benefits will be provided only after any appeals are resolved. Please be patient.

| | WHAT THIS NOTICE CONTAINS |
|---|---|

**BASIC INFORMATION** ............................................................................................. **1**

1. What is this notice? ............................................................................................. 1
2. What is this lawsuit about? ................................................................................. 1
3. Why is this a class action? .................................................................................. 1
4. Why are there settlements? ................................................................................. 1

**WHO IS IN THE SETTLEMENTS** .......................................................................... **1**

5. How do I know if I am part of the settlements? ................................................. 2
6. Are there exceptions to being included? ............................................................ 2
7. If I no longer own my iPad 3G, am I still included? ......................................... 2
8. I'm still not sure if I am included. ..................................................................... 2

**THE SETTLEMENT BENEFITS—WHAT YOU GET** ............................................ **2**

9. What benefits do the settlements provide? ........................................................ 2
10. What are the requirements to receive the $40 cash payment? ........................... 3
11. What are the requirements to receive the Data Plan Benefit? ........................... 3

**HOW YOU GET BENEFITS—SUBMITTING A CLAIM FORM** ........................... **3**

12. How do I submit a claim? ................................................................................... 3
13. When would I receive my benefits? ................................................................... 4

**EXCLUDING YOURSELF FROM THE SETTLEMENTS** ...................................... **4**

14. How do I opt out of the settlements? ................................................................. 4
15. If I don't exclude myself, can I sue Apple or AT&T for the same thing later? ................................................................................................................... 4
16. If I exclude myself, can I get benefits from these settlements? ......................... 4

**THE LAWYERS REPRESENTING YOU** ................................................................. **5**

17. Do I have a lawyer in this case? ......................................................................... 5
18. How will the lawyers be paid? ........................................................................... 5

**OBJECTING TO THE SETTLEMENTS** ................................................................. **5**

19. How can I object to the settlements and/or Class Counsel's fee and expense request? ............................................................................................................... 5
20. What's the difference between objecting and excluding? ................................... 6

**THE COURT'S FAIRNESS HEARING** .................................................................... **6**

21. When and where will the Court decide whether to approve the settlements? ........ 6
22. Do I have to come to the hearing? ..................................................................... 6
23. May I speak at the hearing? ............................................................................... 6

**IF YOU DO NOTHING** ............................................................................................ **7**

24. What happens if I do nothing at all? .................................................................. 7

**GETTING MORE INFORMATION** ......................................................................... **7**

25. Are there more details about the settlements? ................................................... 7
26. How do I get more information? ......................................................................... 7

# BASIC INFORMATION

## 1.    What is this notice?

The purpose of this notice is to provide you with information about two proposed settlements in class action lawsuits, and about your options, before the Court decides whether to approve the settlements.

This notice explains the lawsuits, the settlements, your legal rights, what benefits are available, who is eligible for them, and how to get them.

The Court in charge of the case is the United States District Court for the Northern District of California, and the case is known as *In re Apple and AT&T iPad Unlimited Data Plan Litigation*, Case No. 5:10-cv-02553-RMW.  The people who sued are called Plaintiffs, and the companies they sued, Apple Inc. and AT&T Mobility LLC, are called Defendants.

## 2.    What is this lawsuit about?

The lawsuits claimed that customers who purchased or ordered iPad 3Gs on or before June 7, 2010 were not provided with access to an "unlimited" data plan in the manner originally advertised by Apple and AT&T.  The Complaint filed in this case, available at www._____.com, contains more detail, including a list of the legal claims alleged.  Apple and AT&T deny all allegations and are entering into these settlements to avoid burdensome and costly litigation.  The settlements are not an admission of wrongdoing.

## 3.    Why is this a class action?

In a class action, one or more people, called class representatives, sue on behalf of people who have similar claims.  All these people are a "Class" or "Class Members."  One court resolves the issues for all Class Members, except for those who exclude themselves from the Class.

In this case, there are two classes:  the "Apple Class," with alleged claims against Apple, and the "AT&T Subclass," with alleged claims against AT&T.  The Class Representatives for the Apple Class are Adam Weisblatt, Joe Hanna, David Turk, Colette Osetek, and Aaron Friedman.  The Class Representative for the AT&T Subclass is Joe Hanna.

## 4.    Why are there settlements?

The Court did not decide in favor of the Plaintiffs or the Defendants.  Instead, the parties have agreed to settle the case.  That way, they avoid the cost of a trial, and the people affected will get compensation.  The Class Representatives and their attorneys (called "Class Counsel") believe that the settlements are in the best interests of the Class Members.

# WHO IS IN THE SETTLEMENTS

To see if you are eligible for benefits, you first have to decide if you are an Apple Class Member, an AT&T Subclass Member, or both.

**5.      How do I know if I am part of the settlements?**

The Court has decided that everyone who fits the following description is an "Apple Class Member":  All United States residents who purchased or ordered an Apple iPad with 3G capability (iPad 3G) in the United States on or before June 7, 2010.

The Court has decided that everyone who fits the following description is an "AT&T Subclass Member":  All persons in the United States who purchased or ordered an Apple iPad 3G in the United States on or before June 7, 2010 **and** who did not sign up for or purchase any AT&T data plan for that iPad 3G at any time.

**6.      Are there exceptions to being included?**

The Apple Class does *not* include Apple; any entity in which Apple has a controlling interest; Apple's directors, officers, and employees; Apple's legal representatives, successors, and assigns; and wholesalers, resellers, retailers and distributors.  The AT&T Subclass does *not* include Apple; ATTM; any entity in which ATTM or Apple has a controlling interest; ATTM and Apple's directors and officers; Apple's employees; and ATTM and Apple's legal representatives, successors, and assigns.  Also excluded are all persons who validly request exclusion (see section 14 below).

**7.      If I no longer own my iPad 3G, am I still included?**

Yes.  You may still claim the $40 cash payment from Apple if you meet the other eligibility requirements.  You may still claim the AT&T Data Plan Benefit if you meet the eligibility requirements and affirm on the Claim Form that you no longer have the iPad 3G that you purchased or ordered on or before June 7, 2010; you may use the Data Plan Benefit for a later-generation iPad that you identify on the Claim Form.

**8.      I'm still not sure if I am included.**

If you are still not sure whether you are included, you can visit the website, www._____.com, for more information.

**THE SETTLEMENT BENEFITS—WHAT YOU GET**

**9.      What benefits do the settlements provide?**

**Cash Payment**:  Apple will provide a $40 cash payment to Apple Class Members who meet the requirements described in section 10 below.  There is a limit of one $40 cash payment per iPad 3G.

**Data Plan Benefit**:  AT&T will provide a "Data Plan Benefit" to AT&T Subclass Members who meet the requirements described in section 11 below.  Under the Data Plan Benefit, eligible AT&T Subclass Members will be able to sign up for an AT&T 5GB iPad data plan for a discounted monthly rate of $30/month for up to one year (which is a discount of $20/month from the current $50/month rate).  If AT&T lowers the price of its 5GB iPad data plan, a discount of $20/month will still be provided.  There is a limit of one Data Plan Benefit per qualifying iPad 3G.  The Data Plan Benefit may be used for the iPad 3G that you

sf-3325883

purchased or ordered on or before June 7, 2010 or, if you no longer have that iPad 3G, it may be used for a later-generation iPad that you identify on the Claim Form.  If an AT&T Subclass Member cancels the Data Plan Benefit or otherwise changes his plan before the end of the twelve-month period, the Data Plan Benefit will no longer be available to that AT&T Subclass Member.

**10.      What are the requirements to receive the $40 cash payment?**

To receive the $40 cash payment from Apple, you must: (a) be a United States resident who purchased or ordered an iPad 3G in the United States on or before June 7, 2010; and (b) submit a valid Claim Form.  For information about how to submit a Claim Form, see section 12 below.

**11.      What are the requirements to receive the Data Plan Benefit?**

To be eligible for the Data Plan Benefit, you must: (a) be a United States resident who purchased or ordered an iPad 3G in the United States on or before June 7, 2010 **and** have not signed up for any AT&T 3G data plan for that iPad 3G at any time; and (b) submit a valid Claim Form.  For information about how to submit a Claim Form, see section 12 below.

### HOW YOU GET BENEFITS—SUBMITTING A CLAIM FORM

**12.      How do I submit a claim?**

To receive the $40 cash payment from Apple, the Data Plan Benefit from AT&T, or both, you must submit a valid Claim Form.  As part of the Claim Form, you will be required to affirm that the ability to switch in and out of the AT&T "unlimited" data plan was a factor in your decision to purchase an iPad 3G. Only eligible persons will receive benefits.  Claim Forms can be submitted online or by mail, as described in this section.

Submitting a Claim Form online:  If you received an email notice of this settlement, and you still have that email, you can fill out and submit a Claim Form online (at no cost to you) by following the appropriate link in the email for submitting claims.  If you received a notice of this settlement by postcard, and you still have that postcard, you can fill out and submit a Claim Form online (at no cost to you) by visiting the web address listed in the postcard for submitting claims.  Otherwise, you can also visit www._____.com to submit a Claim Form online (at no cost to you).

Submitting a Claim Form by mail:  If you prefer, you may download and print a Claim Form by visiting www._____.com, fill it out, and mail it (at your own expense) to the Settlement Administrator at [address].  You may also request a hard copy Claim Form by calling 1-888-XXX-XXXX, fill it out, and mail it (at your own expense) to the Settlement Administrator at the mailing address provided in this paragraph.

You must read the instructions carefully and fill out the Claim Form as directed in the instructions.  If you submit a Claim Form by mail you will need to sign the Claim Form.

**Deadline for submitting Claim Forms**:  **Claim Forms submitted online must be submitted by no later than [date].  Claim Forms submitted by mail must be postmarked**

**by no later than [date].  If you fail to submit a Claim Form by the deadline, your claim will be rejected, and you will be deemed to have waived all rights to receive benefits.**  To request a reminder notice before the deadline, go to [www._____.com].

| 13. | When would I receive my benefits? |
|---|---|

The Court will hold a hearing on [date] at 9:00 a.m., to decide whether to approve the settlements.  If the Court approves the settlements, and after any appeals process is completed, eligible Apple Class Members will be sent cash payments, and eligible AT&T Subclass Members will be sent instructions for how to redeem the Data Plan Benefit.  The appeal process can take time, perhaps more than a year.  Please be patient.

### EXCLUDING YOURSELF FROM THE SETTLEMENTS

If you don't want to receive benefits from the settlements, but you want to preserve any right you may have to sue or continue to sue the Defendants about the legal issues in this case, then you must take steps to exclude yourself from one or both of the settlements (sometimes called "opting out").  Read on for details.

| 14. | How do I opt out of the settlements? |
|---|---|

You can exclude yourself (or "opt out") of one or both of the settlements.  To exclude yourself, you must send a letter that clearly states your intent to exclude yourself from the settlement with Apple, the settlement with AT&T, or both settlements.  Be sure to include: your name; your address; your telephone number; whether you want to exclude yourself from the settlement with Apple, the settlement with AT&T, or both settlements; your signature; and reference the case name *In re Apple and AT&T iPad Unlimited Data Plan Litigation*, Case No. 5:10-cv-02553-RMW.  To be valid, you must mail your exclusion request postmarked no later than **[date]**, to: [**Settlement Administrator.**]

You can't exclude yourself on the phone or by fax or e-mail.  If you ask to be excluded from the settlement with Apple, you will not receive any cash payment and you cannot object to the settlement with Apple, but you preserve any right you may have to sue (or continue to sue) Apple about the legal issues in this case.  If you ask to be excluded from the settlement with AT&T, you will not receive the Data Plan Benefit and you cannot object to the settlement with AT&T, but you preserve any right you may have to sue (or continue to sue) AT&T about the legal issues in this case.

| 15. | If I don't exclude myself, can I sue Apple or AT&T for the same thing later? |
|---|---|

No.  Unless you exclude yourself from the settlement with Apple, you give up any right you may have to sue Apple about the legal issues in this case.  If you are within the AT&T Subclass definition (see section 5 above), unless you exclude yourself from the settlement with AT&T, you give up any right you may have to sue AT&T about the legal issues in this case.

**16.     If I exclude myself, can I get benefits from these settlements?**

No.  If you exclude yourself from the settlement with Apple, you may not receive any cash payment.  If you exclude yourself from the settlement with AT&T, you may not receive the Data Plan Benefit.

## THE LAWYERS REPRESENTING YOU

**17.     Do I have a lawyer in this case?**

You are represented in this case by the law firms of Lieff Cabraser Heimann & Bernstein LLP, The Weston Firm, Schubert Jonckheer & Kolbe LLP, Casey, Gerry, Schenk, Francavilla, Blatt & Penfield LLP, and Hiden, Rott & Oertle, LLP.  Together, these lawyers are called Class Counsel.  You will not be charged for these lawyers.  If you want to be represented by your own lawyer, you may hire one at your own expense.

**18.     How will the lawyers be paid?**

Class Counsel will ask the Court for attorneys' fees and expenses of up to $1,750,000, and will also request service awards in the amount of $1,000 each for the five Class Representatives to compensate them for their efforts in this case.  A copy of Class Counsel's application for attorneys' fees and expenses will be posted on the case website (www._____.com) when it is filed.  The Court will determine the proper amount of attorneys' fees and expenses to award Class Counsel and the proper amount of service awards for the Class Representatives.   Apple and AT&T will pay the amounts awarded by the Court in addition to the cash and benefits to the Class.

## OBJECTING TO THE SETTLEMENTS

You can tell the Court that you don't agree with the settlements or some part of them.

**19.     How can I object to the settlements and/or Class Counsel's fee and expense request?**

If you're an Apple Class Member and don't exclude yourself, you can object to the Apple settlement if you don't like any part of it.  If you're an AT&T Subclass Member and don't exclude yourself, you can object to the AT&T settlement if you don't like any part of it.  You can also object to Class Counsel's request for attorneys' fees and expenses and/or to the service awards for the Class Representatives.

The Court will consider your views.  To object, you must send a letter saying that you object to the settlement(s), Class Counsel's request for attorneys' fees and expenses, and/or the requested service awards for the Class Representatives in *In re Apple and AT&T iPad Unlimited Data Plan Litigation*, Case No. 5:10-cv-02553-RMW.  To be valid, your objection must include: (a) your name, address, and telephone number; (b) your signature; (c) a statement that you are a member of the Apple Class and/or the AT&T Subclass and an explanation of the basis upon which you claim to be a member of the Apple Class and/or the AT&T Subclass; (d) all grounds for your objection; and (e) the identity of all counsel, if any,

who represent you.  The objection and any supporting papers must be mailed to the following two addressees, postmarked no later than **[date]**:

| COURT | SETTLEMENT ADMINISTRATOR |
|---|---|
| Clerk of the Court | [ADDRESS] |
| United States District Court | |
| San Jose Division | |
| 280 South 1st Street | |
| San Jose, CA 95113 | |

**20.    What's the difference between objecting and excluding?**

Objecting is simply telling the Court that you don't like something about the settlement(s), the request for attorneys' fees and expenses, and/or the request for service awards.  Excluding yourself is telling the Court that you don't want to be part of the settlement(s).  If you exclude yourself from a settlement, you cannot object to that settlement.

**THE COURT'S FAIRNESS HEARING**

The Court will hold a hearing to decide whether to approve the settlements.  You may attend, and you may ask to speak, but you don't have to.

**21.    When and where will the Court decide whether to approve the settlements?**

The Court will hold a Fairness Hearing at 9:00 a.m. on [date], at the United States District Court for the Northern District of California, San Jose Division, Courtroom 6 (4th Floor) located at 280 South 1st Street, San Jose, California, 95113.  At this hearing the Court will consider whether the settlements are fair, reasonable, and adequate.  If there are objections, the Court will consider them.  The Court will listen to people who have asked to speak at the hearing.  The Court may also consider how much to award Class Counsel and the amount of service awards for the Class Representatives.  After the hearing, the Court will decide whether to approve the settlements.  We do not know how long these decisions will take.

**22.    Do I have to come to the hearing?**

No.  Class Counsel will answer questions that the Court may have.  But, you are welcome to come at your own expense.  If you send an objection, you don't have to come to Court to talk about it.  As long as your written objection was mailed on time and meets the other criteria described in section 19 above, the Court will consider it.  You may also pay your own lawyer to attend, but it's not necessary.

**23.    May I speak at the hearing?**

You may ask the Court for permission to speak at the Fairness Hearing.  To do so, you must send a letter saying that you intend to appear and speak at the Fairness Hearing in "*In re Apple and AT&T iPad Unlimited Data Plan Litigation*, Case No. 5:10-cv-02553-RMW."  Be sure to include the case name and number, your name, address, and telephone number, your signature, and the identity of any lawyers, if any, who will appear on your behalf.  Your letter

of intent to appear and speak must be mailed to the Clerk of the Court and the Settlement Administrator, at the addresses listed in section 19 above, postmarked no later than **[date]**. You cannot speak at the Fairness Hearing if you exclude yourself from the settlements.

### IF YOU DO NOTHING

**24.     What happens if I do nothing at all?**

If you do nothing, you will not receive a cash payment or Data Plan Benefit. If you don't exclude yourself from the Apple settlement, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against Apple about the legal issues in this case. If you don't exclude yourself from the AT&T settlement, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against AT&T about the legal issues in this case.

### GETTING MORE INFORMATION

**25.     Are there more details about the settlements?**

This notice summarizes the proposed settlements.  More details are in the Settlement Agreements, copies of which are available at www.____.com.  Also, copies of the Settlement Agreements and the other documents relating to the case are on file at the United States District Court for the Northern District of California, San Jose Division, and may be examined and copied at any time during regular office hours at the Office of the Clerk, 280 South 1st Street, San Jose, California, 95113.

**26.     How do I get more information?**

You can visit www._____.com, where you will find answers to common questions about the settlements, the Claim Form, a copy of the Complaint in this case, copies of the Settlement Agreements, plus other information.   **Questions may not be directed to the Court.**

Date: _____.

1

2

3

4

5

6

7

8          NORTHERN DISTRICT OF CALIFORNIA

9              SAN JOSE DIVISION

10

11   In re Apple and AT&T iPad Unlimited Data Plan        Case No.    5:10-cv-02553 RMW
     Litigation,
12                                                        **CLASS ACTION**

13

14              ALL CONSOLIDATED
                ACTIONS
15

16

17

18                              **EXHIBIT B**

19          **SUMMARY NOTICE OF SETTLEMENT (APPLE ONLY)**

20

21

22

23

24

25

26

27

28

1

2 <u>**LEGAL NOTICE**</u>

3 # If you purchased or ordered an iPad with WiFi + 3G

4 # on or before June 7, 2010, you could be entitled to $40

5 # cash from Apple under a class action settlement.

6 **The Court authorized this notice. This is not a solicitation from a lawyer. You are not being**

7 **sued. This notice may affect your legal rights. Please read it carefully.**

8 **For more information, visit <u>www._____.com</u> or call 1-800_____.**

9 **Your Personal Claim Number is _____.**

10 You may be entitled to a $40 cash payment from Apple under a settlement that has been reached in

11 class action lawsuits titled ***In re Apple and AT&T iPad Unlimited Data Plan Litigation***. The United

12 States District Court for the Northern District of California authorized this notice. The Court will have

13 a hearing to consider whether to approve the settlement so that the benefits may be provided.

14 **WHO'S AFFECTED?**

15 You're a "Class Member" if you are a United States resident who purchased or ordered an iPad 3G in the

16 United States on or before June 7, 2010.

17 **WHAT'S THIS CASE ABOUT?**

18 The lawsuits claimed that iPad 3G purchasers were not provided with access to an "unlimited" data plan

19 in the manner originally advertised. Apple and ATTM deny all allegations and are entering into this

20 settlement to avoid burdensome and costly litigation. The settlement is not an admission of wrongdoing.

21 **WHAT CAN YOU GET FROM THE SETTLEMENT?**

22 Apple will provide a $40 cash payment to all Class

23 Members who submit a valid Claim Form.

24 **HOW DO YOU RECEIVE BENEFITS?**

25 You must submit a valid Claim Form. The Claim Form will require you to affirm that the ability to

26 switch in and out of the "unlimited" data plan was a factor in your decision to purchase an iPad 3G.

27 You can submit a Claim Form online by following **this link**. Or you can also request a Claim Form by

28 calling 1-888-____. **The Personal Claim Number**

above will assist in making your claim. Only eligible persons will receive benefits.

**IMPORTANT DEADLINES**

**You must submit your Claim Form on or before [date]** or you will lose your right to obtain the cash benefit. If you wish to receive a reminder notice before the deadline, click **here** or go to [www._____.com].

**WHAT ARE YOUR OTHER OPTIONS?**

If you don't want to make a claim and you don't want to be legally bound by the settlement with Apple, you must send a written request postmarked no later than **[date]**. If you don't timely exclude yourself, you will not be able to sue, or continue to sue, Apple about the legal claims in this case and will be bound by any judgment. If you exclude yourself, you will not be eligible to receive benefits under the settlement.

If you do not exclude yourself, you may object to the settlement or Class Counsel's fee application. Objections must be received by [date]. The detailed notice (available by calling 1-800-___ or at www._____.com) describes how to exclude yourself or object. The Court will hold a hearing in this case (***In re Apple and AT&T iPad Unlimited Data Plan Litigation***, Case No. 5:10-02553-RMW) on [date] at 9:00 a.m. to consider whether to approve (1) the settlement; (2) attorneys' fees and expenses for Class Counsel of up to $1,500,000 for this settlement; and (3) service awards of up to $1,000 for each of the five class representatives who represented the class in this case. You may appear at the hearing, but you don't have to. To obtain a detailed notice and Claim Form, or to view Class Counsel's fee application once it is filed, go to www._____.com or call toll free 1-888-_____.

1

2 **WHO REPRESENTS YOU?**

3 The Court has appointed Class Counsel to represent
the Class.  The law firms appointed as Class Counsel

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

are listed in the detailed notice, available by calling 1-
800-___ or at www._____.com.  You may hire your
own attorney, but you will have to pay that attorney.

1
2
3
4
5
6
7
8                        NORTHERN DISTRICT OF CALIFORNIA
9                              SAN JOSE DIVISION
10
11   In re Apple and AT&T iPad Unlimited Data Plan         Case No.    5:10-cv-02553 RMW
     Litigation,
12                                                         **CLASS ACTION**
13
14                        ALL CONSOLIDATED
15                        ACTIONS
16
17
18                              **EXHIBIT C**
19                    **POSTCARD NOTICE OF SETTLEMENT**
20                            **(APPLE ONLY)**
21
22
23
24
25
26
27
28

sf- 3325906

1

2

<u>**LEGAL NOTICE**</u>

3

# If you purchased or ordered an iPad with WiFi + 3G on or before June 7, 2010, you could be entitled to $40 cash from Apple under a class action settlement.

**The Court authorized this notice. This is not a solicitation from a lawyer.  You are not being sued.  This notice may affect your legal rights.  Please read it carefully.**

**For more information, visit <u>www._____.com</u> or call 1-800_____.**

**Your Personal Claim Number is _____.**

You may be entitled to a $40 cash payment from Apple under a settlement that has been reached in class action lawsuits titled *In re Apple and AT&T iPad Unlimited Data Plan Litigation*.  The lawsuits claimed that iPad 3G purchasers were not provided with access to an "unlimited" data plan in the manner originally advertised by Apple and AT&T.  Apple and AT&T deny all allegations.  The settlement is not an admission of wrongdoing.

**WHO'S AFFECTED?**

You're a "Class Member" if you are a United States resident who purchased or ordered an iPad 3G in the United States on or before June 7, 2010.

**WHAT CAN YOU GET FROM THE SETTLEMENT?**

Apple will provide a $40 cash payment to all Class Members who submit a valid Claim Form.

**HOW DO YOU RECEIVE BENEFITS?**

You must submit a valid Claim Form.  The Claim Form will require you to affirm that the ability to switch in and out of the "unlimited" data plan was a factor in your decision to purchase an iPad 3G.

You can submit a Claim Form online by visiting **[claim form specific address]**.  Or you can also request a Claim Form by calling 1-888-____.  **The Personal Claim Number above will assist in making your claim.**  Only eligible persons will receive benefits.

**IMPORTANT DEADLINES**

**You must submit your Claim Form on or before [date] or you will lose your right to obtain the cash benefit.**

**WHAT ARE YOUR OTHER OPTIONS?**

If you don't want to make a claim and you don't want to be legally bound by the settlement or judgment with Apple, you must send a written request postmarked no later than **[date]**.  If you do not exclude yourself, you may object to the settlement or Class Counsel's fee application.  Objections must be received by [date].  The Court will hold a hearing in this case (*In re Apple and AT&T iPad Unlimited Data Plan Litigation*, Case No. 5:10-02553-RMW) on [date] at 9:00 a.m. to consider whether to approve (1) the settlement; (2) attorneys' fees and expenses for Class Counsel of up to $1,500,000 for this settlement; and (3) service awards of up to $1,000 for each of the five class representatives who represented the class in this case.  You may appear at the hearing, but you don't have to. You will be represented by Class Counsel or you may hire your own attorney at your expense.  **For a detailed notice with more information about the settlement, including how to exclude yourself or object, or to see Class Counsel's fee application when it is filed, go to www._____.com or call toll free 1-888-_____.**

1

2

3

4

5

6

7

8                              NORTHERN DISTRICT OF CALIFORNIA

9                                      SAN JOSE DIVISION

10

11    In re Apple and AT&T iPad Unlimited Data Plan          Case No.    5:10-cv-02553 RMW
      Litigation,
12                                                           **<u>CLASS ACTION</u>**

13

14                              ALL CONSOLIDATED
                                ACTIONS
15

16

17

18                                      **EXHIBIT D**

19                          **PUBLISHED NOTICE OF SETTLEMENT**

20

21

22

23

24

25

26

27

28

1
2
3
<u>LEGAL NOTICE</u>

4
# If you purchased or ordered an iPad with WiFi + 3G on or before June 7, 2010, you could be entitled to cash and other benefits under class action settlements.

**The Court authorized this notice. This is not a solicitation from a lawyer.  You are not being sued.  This notice may affect your legal rights.  Please read it carefully.**

**For more information, visit <u>www._____.com</u> or call 1-800_____.**

You may be entitled to a cash payment from Apple and other benefits from AT&T under two settlements that have been reached in class action lawsuits titled ***In re Apple and AT&T iPad Unlimited Data Plan Litigation***.  The United States District Court for the Northern District of California authorized this notice.  The Court will have a hearing to consider whether to approve the settlements so that the benefits may be provided.

**WHO'S AFFECTED?**

You're an "Apple Class Member" if you are a United States resident who purchased or ordered an iPad 3G in the United States on or before June 7, 2010.  You're an "AT&T Subclass Member" if you also did not sign up for an AT&T data plan for that iPad at any time.

**WHAT'S THIS CASE ABOUT?**

The lawsuits claimed that iPad 3G purchasers were not provided with access to an "unlimited" data plan in the manner originally advertised by Apple and AT&T.  Apple and AT&T deny all allegations and are entering into these settlements to avoid burdensome and costly litigation.  The settlements are not an admission of wrongdoing.

**WHAT CAN YOU GET FROM THE SETTLEMENTS?**

Apple will provide a $40 cash payment to all Apple Class Members who submit a valid Claim Form.  In addition, AT&T will provide a "Data Plan Benefit" to AT&T Subclass Members who **did not** sign up for an AT&T 3G data plan for their iPad at any time and who submit a valid Claim Form.  The Data Plan Benefit provides an AT&T 5GB iPad data plan for $30/month for up to one year, which is a $20/month

discount from the current monthly rate; if the monthly rate of the 5GB iPad data plan changes, a discount of $20/month will still be provided.

**HOW DO YOU RECEIVE BENEFITS?**

You must submit a valid Claim Form.  The Claim Form will require you to affirm that the ability to switch in and out of the "unlimited" data plan was a factor in your decision to purchase an iPad 3G.  Go to www._____.com or call 1-888-____ to obtain the Claim Form and detailed instructions. You may submit claims for the Cash Benefit, the Data Plan Benefit, or both.  Only eligible persons will receive benefits.

**IMPORTANT DEADLINES**

**You must submit your Claim Form on or before [date] or you will lose your right to obtain these benefits.**  If you wish to receive a reminder notice before the deadline, go to [www._____.com].

**WHAT ARE YOUR OTHER OPTIONS?**

If you don't want to make a claim and you don't want to be legally bound by the settlement with Apple, the settlement with AT&T, or both settlements, you must send a written request postmarked no later than [date].  If you don't timely exclude yourself, you will not be able to sue, or continue to sue, the defendant in that settlement about the legal claims in this case and will be bound by any judgment.  If you exclude yourself, you will not be eligible to receive benefits under that settlement.

1

2    If you do not exclude yourself, you may object to one
     or both of the settlements or Class Counsel's fee

3    application.  Objections must be received by **[date]**.
     The detailed notice (available by calling 1-800-___ or

4    at www._____.com) describes how to exclude
     yourself or object.  The Court will hold a hearing in

5    this case (***In re Apple and AT&T iPad Unlimited
     Data Plan Litigation*, Case No. 5:10-cv-02553-
     RMW**) on [date] at 9:00 a.m. to consider whether to

6    approve (1) the settlements; (2) attorneys' fees and
     expenses for Class Counsel of up to $1,750,000; and

7    (3) service awards of up to $1,000 for each of the five
     class representatives who represented the class in this

8    case.  You may appear at the hearing, but you don't
     have to.  To obtain a detailed notice and Claim Form,

9    or to review Class Counsel's fee application once it is
     filed, go to www._____.com or call toll free 1-888-

10   _____

11   **WHO REPRESENTS YOU?**

12   The Court has appointed Class Counsel to represent
     the Class.  The law firms appointed as Class Counsel

13   are listed in the detailed notice, available by calling 1-
     800-___ or at www._____.com.  You may hire your

14   own attorney, but you will have to pay that attorney.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8                           NORTHERN DISTRICT OF CALIFORNIA

9                                  SAN JOSE DIVISION

10

11   In re Apple and AT&T iPad Unlimited Data Plan         Case No.    5:10-cv-02553 RMW
     Litigation,
12                                                         **CLASS ACTION**

13

14                            ALL CONSOLIDATED
                              ACTIONS
15

16

17

18                                    **EXHIBIT E**

19              **DUAL SUMMARY NOTICE OF SETTLEMENT**

20

21

22

23

24

25

26

27

28

sf- 3325914

1

2

<u>LEGAL NOTICE</u>

# If you purchased or ordered an iPad with WiFi + 3G on or before June 7, 2010, you could be entitled to $40 cash from Apple, and other benefits from AT&T, under class action settlements.

**The Court authorized this notice. This is not a solicitation from a lawyer.  You are not being sued.  This notice may affect your legal rights.  Please read it carefully.**

**For more information, visit www._____.com or call 1-800_____.**

## Your Personal Claim Number is _____.

You may be entitled to a $40 cash payment from Apple, and other benefits from AT&T, under two settlements that have been reached in class action lawsuits titled *In re Apple and AT&T iPad Unlimited Data Plan Litigation*.  The United States District Court for the Northern District of California authorized this notice.  The Court will have a hearing to consider whether to approve the settlements so that the benefits may be provided.

**WHO'S AFFECTED?**

You're an "Apple Class Member" if you are a United States resident who purchased or ordered an iPad 3G in the United States on or before June 7, 2010.  You're an "AT&T Subclass Member" if you also did not sign up for any AT&T data plan for that iPad at any time.

**WHAT'S THIS CASE ABOUT?**

The lawsuits claimed that iPad 3G purchasers were not provided with access to an "unlimited" data plan in the manner originally advertised by Apple and AT&T.  Apple and AT&T deny all allegations and are entering into these settlements to avoid burdensome and costly litigation.  The settlements are not an admission of wrongdoing.

**WHAT CAN YOU GET FROM THE SETTLEMENTS?**

Apple will provide a $40 cash payment to all Apple Class Members who submit a valid Claim Form.  AT&T will provide a "Data Plan Benefit" to AT&T Subclass Members who **did not** sign up for an AT&T 3G data plan for their iPad at any time and who submit a valid Claim Form.  The Data Plan Benefit provides an AT&T 5GB iPad data plan for $30/month

for up to one year, which is a $20/month discount from the current monthly rate; if the monthly rate of the 5GB iPad data plan changes, a discount of $20/month will still be provided.

**HOW DO YOU RECEIVE BENEFITS?**

You must submit a valid Claim Form.  The Claim Form will require you to affirm that the ability to switch in and out of the "unlimited" data plan was a factor in your decision to purchase an iPad 3G.

You can submit a Claim Form online by following **this link**.  Or you can also request a Claim Form by calling 1-888-____.  **The Personal Claim Number above will assist in making your claim.**  You may submit claims for the Cash Benefit, the Data Plan Benefit, or both.  Only eligible persons will receive benefits.

**IMPORTANT DEADLINES**

**You must submit your Claim Form on or before [date] or you will lose your right to obtain these benefits.**  If you wish to receive a reminder notice before the deadline, click here or go to [www._____.com].

**WHAT ARE YOUR OTHER OPTIONS?**

If you don't want to make a claim and you don't want to be legally bound by the settlement with Apple, the settlement with AT&T, or both settlements, you must send a written request postmarked no later than [date].  If you don't timely exclude yourself, you will not be able to sue, or continue to sue, the defendant in that settlement about the legal claims in this case and will be bound by any judgment.  If you exclude

1

yourself, you will not be eligible to receive benefits under that settlement.

If you do not exclude yourself, you may object to one or both of the settlements or Class Counsel's fee application. Objections must be received by [date]. The detailed notice (available by calling 1-800-___ or at www._____.com) describes how to exclude yourself or object. The Court will hold a hearing in this case (*In re Apple and AT&T iPad Unlimited Data Plan Litigation*, Case No. 5:10-02553-RMW) on [date] at 9:00 a.m. to consider whether to approve (1) the settlements; (2) attorneys' fees and expenses for Class Counsel of up to $1,750,000; and (3) service awards of up to $1,000 for each of the five class

representatives who represented the class in this case. You may appear at the hearing, but you don't have to. To obtain a detailed notice and Claim Form, or to review Class Counsel's fee application once it is filed, go to www._____.com or call toll free 1-888-_____.

**WHO REPRESENTS YOU?**

The Court has appointed Class Counsel to represent the Class. The law firms appointed as Class Counsel are listed in the detailed notice, available by calling 1-800-___ or at www._____.com. You may hire your own attorney, but you will have to pay that attorney.

1

2

3

4

5

6

7

8                NORTHERN DISTRICT OF CALIFORNIA

9                     SAN JOSE DIVISION

10

11   In re Apple and AT&T iPad Unlimited Data Plan      Case No.    5:10-cv-02553 RMW
    Litigation,

12                              **CLASS ACTION**

13

14              ALL CONSOLIDATED

15              ACTIONS

16

17

18                       **EXHIBIT F**

19           **DUAL POSTCARD NOTICE OF SETTLEMENT**

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11

<u>**LEGAL NOTICE**</u>

# If you purchased or ordered an iPad with WiFi + 3G on or before June 7, 2010, you could be entitled to $40 cash from Apple, and other benefits from AT&T, under class action settlements.

**The Court authorized this notice. This is not a solicitation from a lawyer. You are not being sued. This notice may affect your legal rights. Please read it carefully.**

**For more information, visit <u>www._____.com</u> or call 1-800_____.**

## Your Personal Claim Number is _____.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

You may be entitled to a $40 cash payment from Apple, and other benefits from AT&T, under two settlements in class action lawsuits titled ***In re Apple and AT&T iPad Unlimited Data Plan Litigation***. The lawsuits claimed that iPad 3G purchasers were not provided with access to an "unlimited" data plan in the manner originally advertised by Apple and AT&T. Apple and AT&T deny all allegations. The settlement is not an admission of wrongdoing.

**WHO'S AFFECTED?**

You're an "Apple Class Member" if you are a United States resident who purchased or ordered an iPad 3G in the United States on or before June 7, 2010. You're an "AT&T Subclass Member" if you also did not sign up for any AT&T data plan for that iPad at any time.

**WHAT CAN YOU GET FROM THE SETTLEMENTS?**

Apple will provide a $40 cash payment to eligible Apple Class Members. AT&T will provide a "Data Plan Benefit" to eligible AT&T Subclass Members. The Data Plan Benefit provides an AT&T 5GB iPad data plan for $30/month for up to one year, which is a $20/month discount from the current monthly rate.

**HOW DO YOU RECEIVE BENEFITS?**

You must submit a valid Claim Form and meet the eligibility requirements of the settlements. The Claim Form will require you to affirm that the ability to switch in and out of the "unlimited" data plan was a factor in your decision to purchase an iPad 3G. You can submit a Claim Form online by visiting **[claim**

**form specific address]**. Or you can also request a Claim Form by calling 1-888-____. **The Personal Claim Number above will assist in making your claim.** You may submit claims for the Cash Benefit, the Data Plan Benefit, or both. Only eligible persons will receive benefits.

**IMPORTANT DEADLINES**

**You must submit your Claim Form on or before [date] or you will lose your right to obtain these benefits.**

**WHAT ARE YOUR OTHER OPTIONS?**

If you don't want to make a claim and you don't want to be legally bound by the settlement and judgment with Apple, with AT&T, or both, you must send a written request postmarked no later than **[date]**. If you do not exclude yourself, you may object to one or both of the settlements or Class Counsel's fee application. Objections must be received by [date]. The Court will hold a hearing on [date] at 9:00 a.m. to consider whether to approve (1) the settlements; (2) attorneys' fees and expenses for Class Counsel of up to $1,750,000; and (3) service awards of up to $1,000 for each of the five class representatives. You may appear at the hearing, but you don't have to. You will be represented by Class Counsel or you may hire your own attorney at your expense. **For a detailed notice with more information about the settlements, including how to exclude yourself or object, or to see Class Counsel's fee application when it is filed, go to www._____.com or call toll free 1-888-_____.**

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re Apple and AT&T iPad Unlimited Data Plan Litigation | Case No. 5:10-cv-02553 RMW |
| | <u>CLASS ACTION</u> |
| ALL CONSOLIDATED ACTIONS | |

**EXHIBIT G**

**CLAIM FORM FOR DIRECT NOTICE RECIPIENTS (APPLE ONLY)**

## CLAIM FORM

You **must** complete every Section of this Claim Form to be eligible for the $40 cash payment from Apple.  Please see below for further instructions.

### A.  CLAIMANT INFORMATION

You **must** complete every part of this Section (except that providing your e-mail address is optional).  The information you provide will be treated as confidential.  Any payment will be sent to the name and street address you provide.

Name (Full name required):                     (First)                 (Last)

Address:                    _____

City:                       _____

State:                      _____

Zip Code:                   _____

E-mail (optional):          _____

►Personal Claim Number (required): ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐
(If your Personal Claim Number is not automatically filled in, please refer to the email or postcard notice that you received regarding this settlement.  It will list your Personal Claim Number.)

### B.  AFFIRMATION REGARDING UNLIMITED DATA PLAN

You **must** check the box below for your claim to be valid:

☐  The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

### C.  CERTIFICATION

You **must** check the box below for your claim to be valid:

☐  I attest that the information I have provided in this Claim Form is true and correct to the best of my knowledge and belief.

### [SUBMIT BUTTON]

**REMINDER**:  If you don't submit your completed Claim Form on or before **[date]**, your claim for payment will be rejected.

sf-3325921

## INSTRUCTIONS FOR CLAIM FORM

1. READ THESE INSTRUCTIONS CAREFULLY.  IF YOU FAIL TO FOLLOW THESE INSTRUCTIONS, YOU MAY LOSE CERTAIN BENEFITS TO WHICH YOU MIGHT OTHERWISE BE ENTITLED.

2. **What cash benefits are provided for in the settlement with Apple?**
   The settlement with Apple will provide a $40 cash payment if you submit a valid Claim Form.  You are limited to one $40 cash payment per iPad 3G.

3. **How do I submit a claim?**
   You must complete and submit this Claim Form.  You can submit your Claim Form online, at no charge, by clicking [the SUBMIT BUTTON] above.

   If you prefer, you may also download and print a Claim Form by visiting **www._____.com**, fill it out, and mail it (at your own expense) to:  [CLAIMS ADMINISTRATOR].  You can also call **1-888-XXX-XXXX** to request a Claim Form.

   To be valid, your Claim Form must be completely and accurately filled out and must include all required information.  If your Claim Form is incomplete, untimely, or contains false information, it may be rejected by the Claims Administrator.

4. **What is the deadline for submitting a claim?**
   You must submit your Claim Form by **no later than [date]**.  If you fail to submit your Claim Form by the deadline, your claim will be rejected, and you will be deemed to have waived all rights to receive a payment under this settlement.

5. **Where can I get more information?**
   For more information or if you have any questions about completing this Claim Form, please visit **www._____.com**.

   Unless you request exclusion from the Class (as explained in the detailed notice available at www._____.com), you will be bound by the Settlement Agreement and Release and the Final Judgment even if you do not submit the Claim Form.

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re Apple and AT&T iPad Unlimited Data Plan Litigation | Case No. 5:10-cv-02553 RMW |
| | <u>CLASS ACTION</u> |
| ALL CONSOLIDATED ACTIONS | |

**EXHIBIT H**

**CLAIM FORM FOR DIRECT NOTICE RECIPIENTS (DUAL)**

## CLAIM FORM

You only need to fill out this one Claim Form whether you are claiming the $40 cash payment from Apple, the Data Plan Benefit from AT&T, or both benefits.  See below for further instructions.


### A.      CLAIMANT INFORMATION  (All Claims)

You **must** complete every part of this Section to get benefits.  The information you provide will be treated as confidential.  The $40 cash payment will be sent to the street address you provide; instructions for redeeming the Data Plan Benefit will be sent to the e-mail address you provide.

Name (Full name required):         (First)                    (Last)
_____

Address:                      _____

City:                         _____

State:                        _____

Zip Code:                     _____

E-mail (required for Data Plan Benefit; optional for $40 cash payment):         _____

► Personal Claim Number (required): ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐

(If your Personal Claim Number is not automatically filled in, please refer to the email or postcard notice that you received regarding this settlement.  It will list your Personal Claim Number.)


### B.      CLAIM FOR CASH PAYMENT

You **must** complete this Section by checking the box to claim the $40 cash payment from Apple:

☐         The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

### C.     __CLAIM FOR DATA PLAN BENEFIT__

#### 1.     __Section C1__

You **must** complete this Section, by checking **both boxes**, to claim the Data Plan Benefit from AT&T.

☐     The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

☐     I have not signed up for or purchased an AT&T data plan at any time for the iPad 3G that I purchased on or before June 7, 2010.

#### 2.     __Section C2__

Only complete this Section (by checking the box and entering the requested information) if you no longer have the iPad 3G that you purchased or ordered on or before June 7, 2010 and you want to use the Data Plan Benefit for a later-generation iPad that you now have.

☐     I no longer have the iPad 3G that I purchased or ordered on or before June 7, 2010, but currently own a later-generation iPad with the following serial number and IMEI, and would like to use the Data Plan Benefit for this iPad:

Serial number ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ (fill in)

IMEI number ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ (fill in)

(To determine the serial number of your iPad, look on the back of your iPad or go to "About" in your Settings menu.  To determine the IMEI number of your iPad, go to "About" in your Settings menu.)

### D.     CERTIFICATION  (All Claims)

You **must** check the box below for your claim to be valid:

☐     I attest that the information I have provided in this Claim Form is true and correct to the best of my knowledge and belief.

### [SUBMIT BUTTON]

**REMINDER**:  If you don't submit your completed Claim Form on or before **[date]**, your claim will be rejected.

## INSTRUCTIONS FOR CLAIM FORM

1.  READ THESE INSTRUCTIONS CAREFULLY.  IF YOU FAIL TO FOLLOW THESE INSTRUCTIONS, YOU MAY LOSE CERTAIN BENEFITS TO WHICH YOU MIGHT OTHERWISE BE ENTITLED.

2.  **What cash benefits are provided for in the settlement with Apple?**
    The settlement with Apple will provide a $40 cash payment if you submit a valid Claim Form and meet the eligibility requirements set out in the full notice.  You are limited to one $40 cash payment per iPad 3G.

3.  **What benefits are provided for in the settlement with AT&T?**
    The settlement with AT&T will provide a "Data Plan Benefit" if you submit a valid Claim Form and meet the eligibility requirements set out in the full notice.  If you are eligible for the Data Plan Benefit, you will be able to sign up for an AT&T 5GB iPad data plan for a discounted monthly rate of $30/month for up to one year (a discount of $20/month from the regular $50/month rate).  To the extent AT&T lowers the prices of its 5GB iPad data plan, a discount of $20/month will still be provided.  There is a limit of one Data Plan Benefit per qualifying iPad 3G.

4.  **How do I submit a claim?**
    To make a claim for the $40 cash payment, the Data Plan Benefit, or both, complete and submit this Claim Form.  You can submit your Claim Form online, at no charge, by clicking [the SUBMIT BUTTON] above.

    If you prefer, you may also download and print a Claim Form by visiting **www._____.com**, fill it out, and mail it (at your own expense) to:  [CLAIMS ADMINISTRATOR].  You can also call **1-888-XXX-XXXX** to request a Claim Form.

    To be valid, your Claim Form must be completely and accurately filled out and must include all required information.  Only eligible persons will receive benefits.   If your Claim Form is incomplete, untimely, or contains false information, it may be rejected by the Claims Administrator.

5.  **What is the deadline for submitting a claim?**
    You must submit your Claim Form by no later than **[date]**.  If you fail to submit your Claim Form by the deadline, your claim will be rejected, and you will be deemed to have waived all rights to receive benefits under these settlements.

6.  **Where can I get more information?**
    For more information or if you have any questions about completing this Claim Form, please visit **www._____.com.**

    Unless you request exclusion from the Apple Class or AT&T Subclass (as explained in the detailed notice available at www._____.com), you will be bound by the Settlement Agreements and Releases and the Final Judgment even if you do not submit the Claim Form.

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re Apple and AT&T iPad Unlimited Data Plan Litigation | Case No. 5:10-cv-02553 RMW |
| | <u>CLASS ACTION</u> |
| ALL CONSOLIDATED ACTIONS | |

**EXHIBIT I**

**CLAIM FORM FOR INDIRECT NOTICE RECIPIENTS (ONLINE CLAIMS)**

# CLAIM FORM

You only need to fill out this one Claim Form whether you are claiming the $40 cash payment from Apple, the Data Plan Benefit from AT&T, or both benefits.  See below for further instructions.

## A.    **CLAIMANT INFORMATION**  **(All Claims)**

You **must** complete every part of this Section to get benefits.  The information you provide will be treated as confidential.  The $40 cash payment will be sent to the street address you provide; instructions for redeeming the Data Plan Benefit will be sent to the e-mail address you provide.

Name (Full name required):    (First) _____ (Last) _____

Address: _____

City: _____

State: _____

Zip Code: _____

E-mail (required for Data Plan Benefit; optional for $40 cash payment): _____

▶ iPad Serial Number: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐

(Please enter the serial number for the iPad 3G that you purchased or ordered on or before June 7, 2010.  If you purchased or ordered multiple iPad 3Gs on or before June 7, 2010, you must fill out and submit a separate Claim Form for each iPad for which you wish to make a claim.   To determine the serial number of your iPad, look on the back of your iPad or go to "About" in your Settings menu.  If you no longer own your iPad, you can verify your serial number by going to [hyperlink].)

## B.    **CLAIM FOR CASH PAYMENT**

You **must** complete this Section, by checking the box, if you want to claim the $40 cash payment from Apple:

☐    The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

sf-3325926

### C.   <u>CLAIM FOR DATA PLAN BENEFIT</u>

#### 1.   <u>Section C1</u>

You **must** complete this Section, by checking **both boxes**, if you want to claim the <u>Data Plan Benefit</u> from AT&T.

☐   The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

☐   I have not signed up for or purchased an AT&T data plan at any time for the iPad 3G that I purchased on or before June 7, 2010.

#### 2.   <u>Section C2</u>

Only complete this Section (by checking the box and entering the requested information) if you no longer have the iPad 3G that you purchased or ordered on or before June 7, 2010 and you want to use the <u>Data Plan Benefit</u> for a later-generation iPad that you now have.

☐   I no longer have the iPad 3G that I purchased or ordered on or before June 7, 2010, but currently own a later-generation iPad with the following serial number and IMEI, and would like to use the Data Plan Benefit for this iPad:

Serial number ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ (fill in)

IMEI number ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ (fill in)

(To determine the serial number of your iPad, look on the back of your iPad or go to "About" in your Settings menu.  To determine the IMEI number of your iPad, go to "About" in your Settings menu.)

### D.   **CERTIFICATION  (All Claims)**

You **must** check the box below for your claim to be valid:

☐   I attest that the information I have provided in this Claim Form is true and correct to the best of my knowledge and belief.

**[SUBMIT BUTTON]**

**REMINDER**:  If you don't submit your Claim Form on or before **[date]**, your claim will be rejected.

<u>**INSTRUCTIONS FOR CLAIM FORM**</u>

1. READ THESE INSTRUCTIONS CAREFULLY.  IF YOU FAIL TO FOLLOW THESE INSTRUCTIONS, YOU MAY LOSE CERTAIN BENEFITS TO WHICH YOU MIGHT OTHERWISE BE ENTITLED.

2. <u>**What cash benefits are provided for in the settlement with Apple?**</u>
   The settlement with Apple will provide a $40 cash payment if you submit a valid Claim Form and meet the eligibility requirements set out in the full notice.  You are limited to one $40 cash payment per iPad 3G.

3. <u>**What benefits are provided for in the settlement with AT&T?**</u>
   The settlement with AT&T will provide a "Data Plan Benefit" if you submit a valid Claim Form and meet the eligibility requirements set out in the full notice.  If you are eligible for the Data Plan Benefit, you will be able to sign up for an AT&T 5GB iPad data plan for a discounted monthly rate of $30/month for up to one year (a discount of $20/month from the regular $50/month rate).  To the extent AT&T lowers the prices of its 5GB iPad data plan, a discount of $20/month will still be provided.  There is a limit of one Data Plan Benefit per qualifying iPad 3G.

4. <u>**How do I submit a claim?**</u>
   To make a claim for the $40 cash payment, the Data Plan Benefit, or both, complete and submit this Claim Form.  You can submit your Claim Form online, at no charge, by clicking [the SUBMIT BUTTON] above.

   If you prefer, you may also download and print a Claim Form by visiting <u>**www._____.com**</u>, fill it out, and mail it (at your own expense) to:  [CLAIMS ADMINISTRATOR].  You can also call **1-888-XXX-XXXX** to request a Claim Form.

   To be valid, your Claim Form must be completely and accurately filled out and must include all required information.  Only eligible persons will receive benefits.   If your Claim Form is incomplete, untimely, or contains false information, it may be rejected by the Claims Administrator.

5. <u>**What is the deadline for submitting a claim?**</u>
   You must submit your Claim Form by no later than **[date]**.  If you fail to submit your Claim Form by the deadline, your claim will be rejected, and you will be deemed to have waived all rights to receive benefits under these settlements.

6. <u>**Where can I get more information?**</u>
   For more information or if you have any questions about completing this Claim Form, please visit **www._____.com.**

   Unless you request exclusion from the Apple Class or AT&T Subclass (as explained in the detailed notice available at <u>www.\_\_\_\_\_.com</u>), you will be bound by the Settlement Agreements and Releases and the Final Judgment even if you do not submit the Claim Form.

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re Apple and AT&T iPad Unlimited Data Plan Litigation<br><br><br><br>ALL    CONSOLIDATED ACTIONS | Case No. 5:10-cv-02553 RMW<br><br>CLASS ACTION |

**EXHIBIT J**

**CLAIM FORM FOR INDIRECT NOTICE RECIPIENTS (MAILED CLAIMS)**

## CLAIM FORM

You only need to use this one Claim Form whether you are claiming the $40 cash payment from Apple, the Data Plan Benefit from AT&T, or both benefits.  See below for further instructions.

### A.    __CLAIMANT INFORMATION__  (All Claims)

You **must** complete every part of this Section to get benefits.  The information you provide will be treated as confidential.  The $40 cash payment will be sent to the name and street address you provide; instructions for redeeming the Data Plan Benefit will be sent to the e-mail address you provide.

Name (Full name required):    (First) _____ (Last) _____

Address: _____

City: _____

State: _____

Zip Code: _____

E-mail (required for Data Plan Benefit; optional for $40 cash payment): _____

▶ iPad Serial Number: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐

(Please enter the serial number for the iPad 3G that you purchased or ordered on or before June 7, 2010.  If you purchased or ordered multiple iPad 3Gs on or before June 7, 2010, you must fill out and submit a separate Claim Form for each iPad for which you wish to make a claim.  To determine the serial number of your iPad, look on the back of your iPad or go to "About" in your Settings menu.  If you no longer own your iPad, you can verify your serial number by going to [hyperlink].)

### B.    __CLAIM FOR CASH PAYMENT__

You **must** complete this Section, by checking the box, if you want to claim the $40 cash payment from Apple:

☐    The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

### C.   **CLAIM FOR DATA PLAN BENEFIT**

#### 1.   **Section C1**

You **must** complete this Section, by checking **both boxes**, if you want to claim the <u>Data Plan Benefit</u> from AT&T.

☐   The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

☐   I have not signed up for or purchased an AT&T data plan at any time for the iPad 3G that I purchased on or before June 7, 2010.

#### 2.   **Section C2**

Only complete this Section (by checking the box and entering the requested information) if you no longer have the iPad 3G that you purchased or ordered on or before June 7, 2010 and you want to use the <u>Data Plan Benefit</u> for a later-generation iPad that you now have.

☐   I no longer have the iPad 3G that I purchased or ordered on or before June 7, 2010, but currently own a later-generation iPad with the following serial number and IMEI, and would like to use the Data Plan Benefit for this iPad:

Serial number ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ (fill in)

IMEI number ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ (fill in)

(To determine the serial number of your iPad, look on the back of your iPad or go to "About" in your Settings menu.  To determine the IMEI number of your iPad, go to "About" in your Settings menu.)

### D.   **CERTIFICATION  (All Claims)**

You **must** check this box and sign below for your claim to be valid:

☐   I attest that the information I have provided in this Claim Form is true and correct to the best of my knowledge and belief.

_____         _____

**SIGNED**                                    **DATE**

**REMINDER**:  If you don't send your Claim Form so that it is postmarked on or before **[date]**, your claim will be rejected.

**INSTRUCTIONS FOR CLAIM FORM**

1.   READ THESE INSTRUCTIONS CAREFULLY.  IF YOU FAIL TO FOLLOW THESE INSTRUCTIONS, YOU MAY LOSE CERTAIN BENEFITS TO WHICH YOU MIGHT OTHERWISE BE ENTITLED.

2.   **What cash benefits are provided for in the settlement with Apple?**
     The settlement with Apple will provide a $40 cash payment if you submit a valid Claim Form and meet the eligibility requirements set out in the full notice.  You are limited to one $40 cash payment per iPad 3G.

3.   **What benefits are provided for in the settlement with AT&T?**
     The settlement with AT&T will provide a "Data Plan Benefit" if you submit a valid Claim Form and meet the eligibility requirements set out in the full notice.  If you are eligible for the Data Plan Benefit, you will be able to sign up for an AT&T 5GB iPad data plan for a discounted monthly rate of $30/month for up to one year (a discount of $20/month from the regular $50/month rate).  To the extent AT&T lowers the prices of its 5GB iPad data plan, a discount of $20/month will still be provided.  There is a limit of one Data Plan Benefit per qualifying iPad 3G.

4.   **How do I submit a claim?**
     To make a claim for the $40 cash payment, the Data Plan Benefit, or both, complete this Claim Form and mail it (with necessary postage) to: [CLAIMS ADMINISTRATOR].

     If you would prefer, you can also complete and submit a Claim Form online, at no charge to you, by visiting www._____.com.

     To be valid, your Claim Form must be completely and accurately filled out and must include all required information.  Only eligible persons will receive benefits.   If your Claim Form is incomplete, untimely, or contains false information, it may be rejected by the Claims Administrator.

5.   **What is the deadline for submitting a claim?**
     You must submit your Claim Form so that it is postmarked no later than **[date]**.  If you fail to submit your Claim Form by the deadline, your claim will be rejected, and you will be deemed to have waived all rights to receive benefits under these settlements.

6.   **Where can I get more information?**
     For more information or if you have any questions about completing this Claim Form, please visit **www._____.com.**

     Unless you request exclusion from the Apple Class or AT&T Subclass (as explained in the detailed notice available at www._____.com), you will be bound by the Settlement Agreements and Releases and the Final Judgment even if you do not submit the Claim Form.

1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9           NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

11

12   In re Apple and AT&T iPad Unlimited Data Plan     Case No. 5:10-cv-02553 RMW
     Litigation
13                                                     CLASS ACTION

14
               ALL CONSOLIDATED
15             ACTIONS

16

17

18

19                          **EXHIBIT K**
20   **[PROPOSED] ORDER GRANTING CONDITIONAL CERTIFICATION**
     **OF A SETTLEMENT CLASS, APPROVAL OF FORMS AND METHODS**
21        **OF NOTICE, AND PRELIMINARY APPROVAL OF**
              **SETTLEMENT AGREEMENT AND RELEASE**
22

23

24

25

26

27

28

sf-3325935

1

2        WHEREAS, this Court has reviewed the Stipulation of Settlement ("Agreement")

3   entered into by and among defendant Apple Inc. ("Apple"), plaintiffs Adam Weisblatt,

4   Joe Hanna, David Turk, Colette Osetek and Aaron Friedman, as individuals and as "Class

5   Representatives" (collectively the "Parties" in the above-referenced "Action"), together

6   with all exhibits thereto, the record in this Action, and the arguments of counsel;

7        WHEREAS, this Court preliminarily finds, for the purposes of settlement only,

8   that the class alleged in the Action meets all the prerequisites of Federal Rules of Civil

9   Procedure Rule 23 for class certification, including numerosity, commonality, typicality,

10  ascertainability, predominance of common issues, superiority, and that the Class

11  Representatives and Class Counsel are adequate representatives of the Settlement Class;

12       IT IS HEREBY ORDERED AS FOLLOWS:

13       1.    All terms and definitions used herein have the same meanings as set forth in

14  the Agreement.

15       2.    The Court has jurisdiction over the subject matter of the Action, the Class

16  Representatives, the Settlement Class Members, and Apple, and venue is proper in this

17  District.

18       3.    The proposed settlement set forth in the Agreement is hereby preliminarily

19  approved as being fair, reasonable, and adequate such that notice thereof should be given

20  to members of the Settlement Class (as defined in the following paragraph).

21       4.    The Action is provisionally certified as a class action, for the purposes of

22  settlement only, pursuant to Rule 23(b)(3), which class (the "Settlement Class") is

23  defined as follows:

24            All United States residents who purchased or ordered an Apple
              iPad with 3G capability (iPad 3G) in the United States on or
25            before June 7, 2010.  The Settlement Class excludes Apple; any
              entity in which Apple has a controlling interest; Apple's
26            directors, officers, and employees; Apple's legal
              representatives, successors, and assigns; and wholesalers,
27            resellers, retailers and distributors.

28       5.    Certification of the Settlement Class shall be solely for settlement purposes

     and without prejudice to the Parties in the event that the Agreement is not finally

1

1

2   approved by this Court or otherwise does not take effect.  Certification of the Settlement

3   Class shall be vacated and shall have no effect in the event that the Agreement is not

4   finally approved by this Court or otherwise does not take effect.

5       6.   Class Counsel and the Class Representatives are hereby found to be and are

6   therefore appointed as adequate representatives of the Settlement Class:  Michael W.

7   Sobol, Roger N. Heller, Lieff Cabraser Heimann & Bernstein, LLP, 275 Battery Street,

8   29th Floor, San Francisco, CA 94111; Gregory S. Weston, Jack Fitzgerald, The Weston

9   Firm, 1405 Morena Blvd, Suite 201, San Diego, CA 92110; Willem F. Jonckheer,

10  Schubert Jonckheer & Kolbe LLP, Three Embarcadero Center, Suite 1650, San

11  Francisco, CA 94111; Gayle M. Blatt, Casey, Gerry, Schenk, Francavilla, Blatt &

12  Penfield LLP, 110 Laurel Street, San Diego, CA 92101; and Michael Ian Rott, Eric

13  Overholt, Hiden, Rott & Oertle, LLP, 2635 Camino del Rio South, Suite 306, San Diego,

14  CA 92108 are hereby appointed as Class Counsel.  Adam Weisblatt, Joe Hanna, David

15  Turk, Colette Osetek and Aaron Friedman are hereby appointed as Class Representatives.

16      7.   The Court hereby appoints Kurtzman Carson Consultants LLC ("KCC" or

17  "Settlement Administrator") to serve as the Settlement Administrator, and directs KCC to

18  carry out all duties and responsibilities of the Settlement Administrator specified in the

19  Agreement.

20      8.   The Court finds that the forms of notice to the Settlement Class regarding the

21  pendency of the Action, this settlement, and Class Counsel's fee and expense application,

22  attached to the Agreement as Exhibits A through F, and the methods for disseminating

23  notice to members of the Settlement Class in accordance with the terms of the Agreement

24  and this Order, constitute the best notice practicable under the circumstances and

25  constitute valid, due, and sufficient notice to all members of the Settlement Class,

26  complying fully with all requirements, including Federal Rule of Civil Procedure 23 and

27  due process.

28      9.   The Notice of Pendency and Proposed Settlement of Class Action ("Class

Notice"); the Summary Notice of Settlement ("Summary Notice"); the Postcard Notice of

sf-3325935

1

2 Settlement ("Postcard Notice"); the Dual Summary Notice of Settlement ("Dual

3 Summary Notice"); the Dual Postcard Notice of Settlement ("Dual Postcard Notice");

4 and the Published Notice of Settlement ("Published Notice"), which are attached to the

5 Agreement as Exhibits A-F, respectively, are hereby approved as to form.  The Claim

6 Forms, attached to the Agreement as Exhibits G-J, are hereby approved as to form.

7        10.    Apple shall provide the Settlement Administrator with known, reasonably

8 available e-mail and street addresses, serial numbers, and IMEI numbers for the Class

9 Members based upon its customer records regarding those iPad 3G purchases and orders

10 falling within the Settlement Class definition.  Apple shall transmit this information to the

11 Settlement Administrator by no later than 10 (ten) business days after entry of this Order.

12 Within the same time frame, Apple shall also transmit to defendant AT&T Mobility LLC

13 ("ATTM") the IMEI numbers for the potential Settlement Class Members.  To the extent

14 feasible, using the IMEI numbers provided by Apple, ATTM shall identify for the

15 Settlement Administrator any persons potentially within the "ATTM Non-Subscriber

16 Settlement Class" (as that term is defined in the ATTM Settlement).  Those Class

17 Members for whom information is provided by Apple who are potentially within the

18 ATTM Non-Subscriber Settlement Class shall be put on a Dual Notice List.  All other

19 Class Members for whom information is provided by Apple shall be put on an Apple

20 Notice List.

21        11.    The deadline ("Notice Date") for initially mailing and emailing notice, and

22 for publishing notice, pursuant to the terms of the Agreement, shall be _____, 2013.

23 Backup mailed notice, pursuant to the terms of the Agreement and this Order, or other

24 remailing of notice shall not affect or delay the Notice Date.

25        12.    By no later than the first date on which notice is mailed, e-mailed or

26 published, the Settlement Administrator shall establish and maintain a toll-free telephone

27 number ("Toll-Free Number") which Class Members may call to request copies of the

28 Class Notice and Claim Form.  The Settlement Administrator shall further establish and

maintain a settlement website, at the address www._____.com ("Settlement Website"),

3

1

2   where Settlement Class Members may submit online Claim Forms, and which shall

3   include, without limitation, the Class Notice, a downloadable Claim Form, copies of the

4   Complaint and the Agreement, Frequently Asked Questions, and the Toll-Free Number.

5       13.   By no later than the Notice Date, the Settlement Administrator shall e-mail

6   the Summary Notice to those Class Members for whom an e-mail address is included in

7   the Apple Notice List, and shall e-mail the Dual Summary Notice to those Class

8   Members for whom an e-mail address is included in the Dual Notice List.

9       14.   By no later than the Notice Date, the Settlement Administrator shall send,

10  via first-class mail postage pre-paid, the Postcard Notice to those Class Members for

11  whom an e-mail address is not included, and a mailing address is included, in the Apple

12  Notice List, and shall send, via first-class mail postage pre-paid, the Dual Postcard Notice

13  to those Class Members for whom an e-mail address is not included, and a mailing

14  address is included, in the Dual Notice List.  All mailing addresses used for mailing the

15  Postcard Notice and Dual Postcard Notice shall be updated by the Settlement

16  Administrator through the United States Postal Service's National Change of Address

17  database.

18      15.   For those Class Members for whom e-mail Summary Notice or Dual

19  Summary Notice is returned undeliverable, the Settlement Administrator shall mail the

20  Postcard Notice to such Class Members to the extent a mailing address is included in the

21  Apple Notice List, or the Dual Postcard Notice to such Class Members to the extent a

22  mailing address is included in the Dual Notice List.  For mailed Postcard Notices and

23  Dual Postcard Notices that are returned with forwarding address information, the

24  Settlement Administrator shall re-mail the Postcard Notice or Dual Postcard Notice, as

25  appropriate, once to the new address indicated.

26      16.   By no later than the Notice Date, Apple, together with ATTM, shall cause

27  the Published Notice to be published once in *Macworld* and once on a different date in

28  *USA Today*.  The Published Notice in *Macworld* shall not be less than 1/4 of a page in

    size.  The Published Notice in *USA Today* shall not be less than 1/8 of a page in size.

4

1

2       17.    Settlement Class Members who so request shall receive a reminder e-mail

3  notice from the Settlement Administrator.

4       18.    Settlement Class Members shall have the option of submitting claims using

5  one of the following methods:

6          a.    Settlement Class Members may submit a Claim Form electronically

7  through the Settlement Website.  The Summary Notices and Dual Summary Notices emailed

8  to Settlement Class Members shall contain a hyperlink to the appropriate online Claim Form.

9  The Postcard Notices and Dual Postcard Notices mailed to Settlement Class Members shall

10  contain the web address for the appropriate online Claim Form.

11          b.    Settlement Class Members may submit a Claim Form by mail at their

12  own expense.  The Settlement Website shall include a downloadable, printable Claim Form,

13  and Settlement Class Members may obtain a hard copy Claim Form from the Settlement

14  Administrator.

15       19.    Settlement Class Members who wish to claim a cash payment must submit

16  their Claim Form within ninety (90) days from the Notice Date.  Claim Forms submitted

17  by mail must be postmarked by no later than ninety (90) days from the Notice Date.

18       20.    Any person or entity falling within the Settlement Class definition who

19  seeks to be excluded from the Settlement Class must send a request by first class mail,

20  postmarked on or before [45 days after the Notice Date], to the Settlement Administrator

21  at the address indicated in the Class Notice.

22       21.    Any person or entity falling within the Settlement Class definition who does

23  not submit a valid and timely request for exclusion will be bound by the Final Judgment

24  dismissing the Action on the merits and with prejudice.

25       22.    Any Settlement Class Member who does not submit a valid and timely

26  request for exclusion may object to, or comment on, the Agreement, Class Counsel's

27  application for attorneys' fees and expenses, and/or the requested service awards for the

28  Class Representatives.  To be considered, an objection must be in writing, must be mailed

to the Clerk of the Court and the Settlement Administrator, at the addresses indicated in

1

2   the Class Notice, postmarked no later than [45 days after the Notice Date], and must

3   include:  (a) the Settlement Class Member's name, address, and telephone number, (b)

4   the Settlement Class Member's signature; (c) a statement that the objecting person is a

5   member of the Settlement Class and an explanation of the basis upon which they claim to

6   be a member of the Settlement Class; (d) all grounds for the objection; and (e) the

7   identity of all counsel, if any, who represent the Settlement Class Member.  Class

8   Counsel shall file their application for attorneys' fees and costs in advance of the deadline

9   for mailing objections.  Once it is filed, Class Counsel's application for attorneys' fees

10  and costs shall be posted on the Settlement Website.

11      23.    A hearing (the "Final Approval Hearing") shall be held by the Court on

12  _____, 20__, at _____ _.m., to consider and determine whether the requirements for

13  certification of the Settlement Class have been met and whether the proposed settlement

14  of the Action on the terms set forth in the Agreement should be approved as fair,

15  reasonable, adequate, and in the best interests of the Settlement Class Members; whether

16  Class Counsel's fee and expense application should be approved; whether service awards

17  should be awarded to the Class Representatives; and whether the Final Judgment

18  approving the settlement and dismissing the Action on the merits and with prejudice

19  against the Class Representatives and all Settlement Class Members should be entered.

20      24.    The Final Approval Hearing may, from time to time and without further

21  notice to the Settlement Class, be continued or adjourned by Order of the Court.  If the

22  Final Approval Hearing is so continued or adjourned, the new date and time shall be

23  posted on the Settlement Website.

24      25.    Before or at the Final Approval Hearing, the Court shall be provided with a

25  declaration from the Settlement Administrator, confirming that the notice program

26  approved herein has been implemented and setting forth a complete list of all persons and

27  entities who submitted timely and valid requests for exclusion from the Settlement Class.

28      26.    By no later than _____ the Parties shall file any motions in support

of final approval of the Agreement.  By no later than _____, Class Counsel shall

sf-3325935

1

2 file their application for attorneys' fees and expenses.  By no later than [14 days after the

3 deadline for objections], the Parties shall file any additional papers in support of final

4 approval of the Agreement; responses to objections; and/or replies in support of Class

5 Counsel's application for attorneys' fees and expenses.

6       27.    Counsel for the Parties are hereby authorized to utilize all reasonable

7 procedures in connection with the administration of the Agreement which are not

8 materially inconsistent with either this Order or the terms of the Agreement.

9       IT IS SO ORDERED.

10

11 Dated: _____, 2013

12                               _____

                                   RONALD M. WHYTE

13                                   United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re Apple and AT&T iPad Unlimited Data Plan Litigation | Case No. 5:10-cv-02553 RMW |
| | CLASS ACTION |
| ALL CONSOLIDATED ACTIONS | |

12

13

14

15

16

17

18

19 **EXHIBIT L**

20 **[PROPOSED] ORDER APPROVING SETTLEMENT AND DISMISSING CLAIMS OF SETTLEMENT CLASS MEMBERS WITH PREJUDICE**

21

22

23

24

25

26

27

28

1       This matter came on for hearing on _____, 201__.  The Court has considered

2   the Stipulation of Settlement ("Agreement") entered into by and among defendant Apple

3   Inc. ("Apple"), plaintiffs Adam Weisblatt, Joe Hanna, David Turk, Colette Osetek and

4   Aaron Friedman, as individuals and as "Class Representatives" (collectively the "Parties"

5   in the above-referenced "Action"), together with all exhibits thereto, all oral and/or

6   written objections and comments received regarding the Agreement, the arguments and

7   authorities presented by the Parties and their counsel, and the record in the Action, and

8   good cause appearing,

9       IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

10      1.    All terms and definitions used herein have the same meanings as set forth in

11   the Agreement.

12      2.    The Court has jurisdiction over the subject matter of the Action, the Class

13   Representatives, the Settlement Class Members, and Apple, and venue is proper in this

14   District.

15      3.    The Court finds that the notice to the Settlement Class of the pendency of

16   this Action, this settlement, Class Counsel's application for attorneys' fees and expenses,

17   and the application for service awards for Class Representatives, as provided for in the

18   Agreement and by Order of this Court, has been implemented and constituted the best

19   notice practicable under the circumstances to all persons and entities within the definition

20   of the Settlement Class, and fully complied with all requirements, including Federal Rule

21   of Civil Procedure 23 and due process.

22      4.    The Court approves the settlement as set forth in the Agreement and finds

23   that the settlement is in all respects fair, reasonable, adequate, and just to, and in the best

24   interests of, the Settlement Class Members, and further finds as follows:

25          a.    [Findings required by *Churchill Village LLC v. General Electric*

26          *Corp.*, 361 F.3d 566, 575 (9th Cir. 2004).]

27

28

sf-3325940

1                 b.        [Findings required by *Bluetooth Headset Prods. Liab. Litig.*,

2      654 F.3d 935 (9th Cir. 2011).]

3         5.     The Court has considered and hereby overrules all objections to the

4    settlement [add specific findings regarding objections].

5         6.     Pursuant to Rule 23(c), the Settlement Class as finally certified shall be

6    defined as follows:

7                All United States residents who purchased or ordered an Apple
iPad with 3G capability (iPad 3G) in the United States on or
8                before June 7, 2010.  The Settlement Class excludes Apple; any
entity in which Apple has a controlling interest; Apple's
9                directors, officers, and employees; Apple's legal
representatives, successors, and assigns; and wholesalers,
10              resellers, retailers and distributors.

11        7.     Excluded from the Settlement Class are persons and entities who submitted

12   timely and valid requests for exclusion pursuant to section IV.K of the Agreement and

13   this Court's _____, 201__ [Preliminary Approval Order], as determined by the

14   Settlement Administrator.  A list of persons and entities who validly and timely requested

15   exclusion is on file with this Court.

16        8.     The Parties and the Settlement Administrator shall, in good faith, implement

17   and administer the process of verifying, processing and paying claims pursuant to the

18   terms set forth in the Agreement.

19        9.     In connection with this settlement, the Court adjudges that the payment of

20   attorneys' fees and expenses in the total amount of $_____ to Class Counsel is

21   fair, reasonable and justified under the circumstances of this case—given, *inter alia*, the

22   relief achieved for the Settlement Class Members, the time and effort devoted by Class

23   Counsel, the complexity of the legal and factual issues involved, and the contingent

24   nature of the fee—and that said attorneys' fees and expenses shall be paid to Class

25   Counsel pursuant to the terms of the Agreement.  The Court will issue a separate

26   memorandum regarding the award of attorneys' fees and expenses to Class Counsel.

27

28

sf-3325940

1    10.    The Court adjudges that the payment of service awards in the amount of

2    $_____ to each of the Class Representatives, to compensate them for their efforts and

3    commitment on behalf of the Settlement Class, is fair, reasonable, and justified under the

4    circumstances of this case, and that said awards shall be paid to the Class Representatives

5    pursuant to the terms of the Agreement.

6    11.    As of the Effective Date, the Class Representatives and all Settlement Class

7    Members shall be forever barred from bringing or prosecuting, in any capacity, any

8    action or proceeding that involves or asserts any of the Released Claims against any

9    Released Person and shall conclusively be deemed to have released and forever

10   discharged the Released Persons from all Released Claims.

11   12.    The Class Representatives and all Settlement Class Members shall, as of the

12   Effective Date, conclusively be deemed to have acknowledged that the Released Claims

13   may include claims, rights, demands, causes of action, liabilities, or suits that are not

14   known or suspected to exist as of the Effective Date.  The Class Representatives and all

15   Settlement Class Members nonetheless release all such Released Claims against the

16   Released Persons.  Further, as of the Effective Date, the Class Representatives and all

17   Settlement Class Members shall be deemed to have waived any and all protections, rights

18   and benefits of California Civil Code section 1542 and any comparable statutory or

19   common law provision of any other jurisdiction.

20   13.    The benefits and payments described in the Agreement are the only

21   consideration, fees, and expenses Apple or the Released Persons shall be obligated to

22   give to the Class Representatives, Settlement Class Members, and Class Counsel in

23   connection with the Agreement and the payment of attorneys' fees and expenses.

24   14.    All claims asserted against Apple in the Action are settled and dismissed on

25   the merits and with prejudice as to the Class Representatives and all Settlement Class

26   Members.  Notwithstanding the foregoing, this Order does not dismiss any claims that

27   have been or may be asserted in the future by any persons or entities who have validly

28

3
[PROPOSED] ORDER APPROVING SETTLEMENT

sf-3325940

1    and timely requested exclusion from the Settlement Class as provided for in section IV.K

2    of the Agreement.

3        15.    Notwithstanding the dismissal of the claims asserted against Apple in the

4    Action, Apple shall not claim and may not be awarded any costs, attorneys' fees, or

5    expenses.  Apple shall not sue the Class Representatives, Class Counsel, or the Class

6    Members for malicious prosecution or abuse of process based on the filing of the Action.

7        16.    Without affecting the finality of the Judgment in any way, the Court

8    reserves exclusive and continuing jurisdiction over the Action, the Class Representatives,

9    the Settlement Class Members, and Apple for the purposes of supervising the

10   implementation, enforcement, construction, and interpretation of the Agreement, this

11   Order, and the Judgment.

12       17.    The Agreement and this Order are not admissions of liability or fault by

13   Apple or the Released Persons, or a finding of the validity of any claims in the Action or

14   of any wrongdoing or violation of law by Apple or the Released Persons.  The Agreement

15   and settlement are not a concession by the Parties, and to the extent permitted by law,

16   neither this Judgment, nor any of its terms or provisions, nor any of the negotiations or

17   proceedings connected with it, shall be offered as evidence or received in evidence in any

18   pending or future civil, criminal, or administrative action or proceeding to establish any

19   liability of, or admission by Apple, the Released Persons, or any of them.

20   Notwithstanding the foregoing, nothing in this Order shall be interpreted to prohibit the

21   use of this Order or the Judgment in a proceeding to consummate or enforce the

22   Agreement or Judgment, or to defend against the assertion of Released Claims in any

23   other proceeding, or as otherwise required by law.  All other relief not expressly granted

24   to the Settlement Class Members is denied.

25       18.    Counsel for the Parties are hereby authorized to utilize all reasonable

26   procedures in connection with the administration of the Agreement which are not

27   materially inconsistent with either this Order or the terms of the Agreement.

28

sf-3325940

1

IT IS SO ORDERED.

2

3    Dated: _____

4

_____

5    RONALD M. WHYTE
United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT

8

NORTHERN DISTRICT OF CALIFORNIA

9

SAN JOSE DIVISION

10

11

12 In re Apple and AT&T iPad Unlimited Data Plan Litigation | Case No. 5:10-cv-02553 RMW

13 | CLASS ACTION

14 ALL CONSOLIDATED ACTIONS

15

16

17

18

19 **EXHIBIT M**

20 **[PROPOSED] JUDGMENT**

21

22

23

24

25

26

27

28

On _____, 201_, the Court signed and entered its Order Approving Settlement and Dismissing Claims of Settlement Class Members With Prejudice (the "Final Order") in the above-captioned matter as to the following class of persons:

> All United States residents who purchased or ordered an Apple iPad with 3G capability (iPad 3G) in the United States on or before June 7, 2010.  The Settlement Class excludes Apple; any entity in which Apple has a controlling interest; Apple's directors, officers, and employees; Apple's legal representatives, successors, and assigns; and wholesalers, resellers, retailers and distributors; and all persons who validly requested exclusion from the Settlement Class.

**JUDGMENT IS HEREBY ENTERED**, pursuant to Federal Rule of Civil Procedure 58, as to the specified class of persons, plaintiffs Adam Weisblatt, Joe Hanna, David Turk, Colette Osetek and Aaron Friedman, and defendant Apple Inc., on the terms and conditions of the Settlement Agreement approved by the Court's Final Order.

1. The Court, for purposes of this Judgment, adopts the terms and definitions set forth in the Agreement.

2. Payments to Settlement Class Members under the Agreement shall be made as outlined in the Final Order.

3. As of the Effective Date, the Class Representatives and all Settlement Class Members shall be forever barred from bringing or prosecuting, in any capacity, any action or proceeding that involves or asserts any of the Released Claims against any Released Person and shall conclusively be deemed to have released and forever discharged the Released Persons from all Released Claims.

4. The Class Representatives and all Settlement Class Members shall, as of the Effective Date, conclusively be deemed to have acknowledged that the Released Claims may include claims, rights, demands, causes of action, liabilities, or suits that are not known or suspected to exist as of the Effective Date.  The Class Representatives and all Settlement Class Members nonetheless release all such Released Claims against the Released Persons.  Further, as of the Effective Date, the Class Representatives and all Settlement Class Members shall be deemed to have waived any and all protections, rights

1  and benefits of California Civil Code section 1542 and any comparable statutory or

2  common law provision of any other jurisdiction.

3        5.    The Agreement and this Judgment are not admissions of liability or fault by

4  Apple or the Released Persons, or a finding of the validity of any claims in the Action or

5  of any wrongdoing or violation of law by Apple or the Released Persons.  The Agreement

6  and settlement are not a concession by the Parties and to the extent permitted by law,

7  neither this Judgment, nor any of its terms or provisions, nor any of the negotiations or

8  proceedings connected with it, shall be offered as evidence or received in evidence in any

9  pending or future civil, criminal, or administrative action or proceeding to establish any

10 liability of, or admission by Apple, the Released Persons, or any of them.

11 Notwithstanding the foregoing, nothing in this Final Judgment shall be interpreted to

12 prohibit the use of this Judgment in a proceeding to consummate or enforce the

13 Agreement or Judgment, or to defend against the assertion of Released Claims in any

14 other proceeding, or as otherwise required by law.

15

16 JUDGMENT APPROVED AS TO FORM:

17 By:

18

19 _____
   THE HONORABLE RONALD WHYTE
20 DISTRICT JUDGE

21

22

23 JUDGMENT ENTERED:  _____, 201-

24 By:  CLERK OF THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF CALIFORNIA

25

26

27

28

sf-3325952

EXHBIT B

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>Apple and AT&T iPad Unlimited Data Plan Litigation<br><br>ALL CONSOLIDATED ACTIONS | Case Nos. 5:10-cv-02553<br><br>CLASS ACTION<br><br>**STIPULATION OF SETTLEMENT** |

### SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is made by and between: (1) AT&T Mobility LLC ("ATTM") and (2) Joe Hanna, individually and as representative of the "ATTM Non-Subscriber Settlement Class" as defined below (collectively, the "Parties").

### DEFINITIONS

A.      "Apple" means Apple Inc., a California corporation, and any successors.

B.      "Approved Claim" means a claim made by an ATTM Non-Subscriber Settlement Class Member, which complies in all respects with the terms and conditions of this Agreement, which satisfies all requirements described in this

Agreement, and which has been approved as valid by the Settlement Administrator.

C.     "ATTM" means AT&T Mobility LLC, a Delaware limited liability company, and any successors.

D.     "ATTM Non-Subscriber Settlement Class Member" or "Class Member" means every person who meets the definition of the ATTM Non-Subscriber Settlement Class in Section I.A below and does not validly and timely request exclusion from the ATTM Non-Subscriber Settlement Class.

E.     "Claim Form" means the Court-approved form(s) used to submit a claim pursuant to this Agreement.

F.     "Class Counsel" means:

Michael W. Sobol
Roger N. Heller
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111

G.     "Class Notice" means the Notice of Pendency and Proposed Settlements of Class Action, substantially in the form attached hereto as Exhibit A.

H.     "Class Representative" or "Plaintiff" means Joe Hanna.

I.     "Complaint" means the First Amended Master Consolidated Complaint, filed on August 9, 2011.

J.     "Dual Postcard Notice" means the Dual Postcard Notice of Settlement, substantially in the form attached hereto as Exhibit B.

K.     "Dual Summary Notice" means the Dual Summary Notice of Settlement, substantially in the form attached hereto as Exhibit C.

L.     "Effective Date" has the meaning set forth in Section X.A below.

M.     "iPad 3G" means the original iPad with 3G capability (iPad with WiFi + 3G), first offered by Apple for sale on approximately April 30, 2010.

N.     "Notice Date" means the last date on which notice is published, mailed or emailed as provided in Section V.C, D, and G below, provided, however,

that backup mailed notice pursuant to Section V.E below or other remailing of notice shall not affect or delay the Notice Date.

O.     "Published Notice" means the Published Notice of Settlement, substantially in the form attached hereto as Exhibit D.

P.     "Releasing Persons" means Plaintiff, each ATTM Non-Subscriber Settlement Class Member, and their respective heirs, executors, administrators, representatives, agents, partners, successors, and assigns.

Q.     "Released Persons" means ATTM and each of its present and former parents, subsidiaries, divisions and affiliates, and each of their respective present and former officers, directors, employees, agents, insurers, attorneys, administrators, representatives, successors and assigns, provided, however, that neither Apple nor any of its parents or subsidiaries shall be a "Released Person" as defined herein.

R.     "Settlement" means the settlement described herein.

S.     "Settlement Administrator" means Kurtzman Carson Consultants LLC, an independent settlement administrator, subject to Court approval.

T.     "Unlimited Plan" means the unlimited 3G data service plan that was available for the iPad 3G when it was first offered for sale on approximately April 30, 2010.

## RECITALS

**WHEREAS,** Plaintiff sued ATTM in these consolidated actions (the "Actions"), alleging claims concerning the Unlimited Plan for the iPad 3G in the Complaint;

**WHEREAS,** ATTM denies the allegations in the Complaint and denies any wrongdoing or liability for the claims asserted in the Complaint;

**WHEREAS**, Plaintiff and Class Counsel believe that the claims alleged in the Complaint possess merit.

**WHEREAS,** the Parties, acknowledging the uncertain outcome and the risk

3

and delay of further litigation, agree to resolve their outstanding differences through this Settlement;

**WHEREAS**, counsel for the Parties engaged in extensive, bona-fide, arms-length negotiations leading to this Settlement; and

**WHEREAS,** the Parties intend this Settlement to resolve all claims arising out of the facts that were or could have been alleged against ATTM in the Complaint and to bind ATTM, Plaintiff (both as Class Representative and individually), and all ATTM Non-Subscriber Settlement Class Members.

**NOW, THEREFORE**, the Parties, and each of them, warrant, represent, acknowledge, covenant, and agree, subject to final Court approval, as follows.

## I.   THE ATTM NON-SUBSCRIBER SETTLEMENT CLASS

### A.   Definition of the ATTM Non-Subscriber Settlement Class

The "ATTM Non-Subscriber Settlement Class" shall be defined as follows:

> All persons in the United States who purchased or ordered an Apple iPad 3G on or before June 7, 2010 but who did not sign up for or purchase an ATTM data plan for that iPad 3G at any time.  Excluded from this Class are Apple; ATTM; any entity in which ATTM or Apple has a controlling interest; ATTM and Apple's directors and officers; Apple's employees; and ATTM and Apple's legal representatives, successors, and assigns

### B.   Stipulation of Conditional Certification

The Parties stipulate and agree that, subject to Court approval, the ATTM Non-Subscriber Settlement Class should be conditionally certified solely for purposes of this Settlement.  If, for any reason, this Agreement is not given preliminary and final approval by the Court, the stipulation for conditional certification and all of the agreements contained herein shall be considered null and void and may not be referred to or used as evidence or for any other purpose in this action or any other action or proceeding.

## II.     SETTLEMENT BENEFITS AND CLAIMS PROCESS

In consideration for the releases provided below, and subject to final Court approval, each ATTM Non-Subscriber Settlement Class Member who submits an Approved Claim shall be entitled to the following benefits.

### A.     Settlement Data Plan Benefit

Each ATTM Non-Subscriber Settlement Class Member who submits an Approved Claim is eligible to subscribe any iPad 3G purchased or ordered on or before June 7, 2010 (or a later generation iPad only if the requirements set forth in subsection II.A.3 below are met) to an ATTM 5 GB data plan for iPad ("Settlement 5 GB Data Plan") for $30 per month, which is a $20 per month benefit ("Settlement Data Plan Benefit"), subject to the following requirements:

1.     Once an ATTM Non-Subscriber Settlement Class Member subscribes to the Settlement 5 GB Data Plan, the ATTM Non-Subscriber Settlement Class Member may receive the Settlement Data Plan Benefit on a month-to-month basis for up to twelve months.  If an ATTM Non-Subscriber Settlement Class Member cancels the Settlement 5 GB Data Plan or otherwise changes his plan before the end of the twelve-month period, the Settlement Data Plan Benefit will no longer be available to that ATTM Non-Subscriber Settlement Class Member.

2.     An ATTM Non-Subscriber Settlement Class Member must subscribe to the Settlement 5 GB Data Plan no later than 90 days after receiving notice, pursuant to section X.B.5 herein, that his or her claim has been verified and found to be eligible for the Settlement Data Plan Benefit.  Instructions shall be provided in such verification notice regarding how to sign up for the Settlement 5GB Data Plan.

3.     If an ATTM Non-Subscriber Settlement Class Member certifies in their Claim Form that he or she purchased or ordered an iPad 3G on or before June 7, 2010, but no longer owns that iPad and instead now owns a later-generation iPad, then that ATTM Non-Subscriber Settlement Class Member is eligible to

subscribe to the Settlement 5 GB Data Plan and receive the Settlement Data Plan Benefit on the later generation iPad.

4.      An ATTM Non-Subscriber Settlement Class Member is eligible to subscribe to one Settlement 5 GB Data Plan and receive one Settlement Data Plan Benefit for each qualifying iPad 3G purchased or ordered on or before June 7, 2010.

5.      ATTM agrees it will not reduce data speeds in order to limit the amount of data used on each iPad 3G that is subscribed to the Settlement 5 GB Data Plan during the period that the ATTM Non-Subscriber Settlement Class Member is receiving the Settlement Data Plan Benefit.

6.      To the extent ATTM lowers the prices of its Data Connect 5GB for iPad data plans while any ATTM Non-Subscriber Settlement Class Member is receiving the Settlement Data Plan Benefit, the Settlement 5GB Data Plan and Settlement Data Plan Benefit shall be modified as necessary to maintain a $20 per month value until the Settlement Data Plan Benefit expires.

7.      Other than the terms provided in this Agreement, the Settlement 5 GB Data Plan will be governed by the operative terms otherwise applicable to an ATTM DataConnect 5GB for iPad data plan.  The Settlement 5 GB Data Plan benefit is not transferrable.

    B.    **Claims Process**

        1.    **Claim Forms**

To be eligible to receive the Settlement Data Plan Benefit, an ATTM Non-Subscriber Settlement Class Member must submit a Claim Form that is determined by the Settlement Administrator to be an Approved Claim, pursuant to the claim review process set forth in section X.B, below.

The Claim Forms shall be substantially in the forms attached hereto as Exhibits E through G.

To submit a valid Claim Form, ATTM Non-Subscriber Settlement Class Members must confirm (by checking a box) the following statements:

The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

I have not signed up for or purchased any AT&T data plan at any time for the iPad 3G that I purchased on or before June 7, 2010.

Any ATTM Non-Subscriber Settlement Class Member who purchased or ordered an iPad 3G on or before June 7, 2010, but no longer owns that iPad and instead now owns a later-generation iPad, in order to receive the Settlement Data Plan Benefit for that later-generation iPad, must confirm (by checking a box) the following statement, and provide the serial and IMEI numbers of their later generation iPad:

I no longer have the iPad 3G that I purchased or ordered on or before June 7, 2010, but currently own a later-generation iPad with the following serial number and IMEI number, and would like to use the Data Plan Benefit for this iPad.

Information about how to find the serial and IMEI numbers shall be included in the Claim Form.

Each ATTM Non-Subscriber Settlement Class Member shall affirm that the statements in the Data Benefit Claim Form are true and correct to the best of their knowledge and belief.

2.    **Submission of Claims**

ATTM Non-Subscriber Settlement Class Members may submit a Claim Form using one of the following methods:

a.    ATTM Non-Subscriber Settlement Class Members may submit a Claim Form electronically through the Settlement Website.  The Dual Summary Notices emailed to ATTM Non-Subscriber Settlement Class Members shall contain a hyperlink to the appropriate online Claim Form.  The Dual Postcard

Notices mailed to ATTM Non-Subscriber Settlement Class Members shall contain the web address for the appropriate online Claim Form.

        b.     ATTM Non-Subscriber Settlement Class Members may submit a Claim Form by mail at their own expense.  The Settlement Website shall include a downloadable, printable Claim Form and ATTM Non-Subscriber Settlement Class Members may obtain a hard copy Claim Form from the Settlement Administrator.

### 3.    Claims Period

To be valid, Claim Forms submitted online via the Settlement Website must be submitted no later than ninety (90) days after the Notice Date.  To be valid, Claim Forms submitted by mail must be postmarked no later than ninety (90) days after the Notice Date.

### 4.    Modification by Agreement.

The Parties may make non-material modifications to the claims process as necessary by mutual agreement without Court approval.

### 5.    Special Class Member Rights Provision.

If an ATTM Non-Subscriber Settlement Class Member has a legal guardian, or due to age or disability, has executed a power of attorney authorizing another to manage their financial affairs, the guardian or attorney may submit a Claim Form on behalf of that Class Member.  The Settlement Administrator may require reasonable proof of the guardian's or attorney's authority.  Claims shall not be transferable in any other circumstances.

### C.    Notice Costs and Costs of Claims Administration

ATTM, together with Apple, shall pay all =costs of notice and of administering the settlement as provided for in this Section II and in Sections V and X.B below.

### III.   OBTAINING COURT APPROVAL OF THE AGREEMENT

A.     Upon full execution of this Agreement, the Parties shall take all necessary steps to obtain an Order from the Court, substantially in the form of Exhibit H hereto (the "Preliminary Approval Order"), granting conditional certification of the ATTM Non-Subscriber Settlement Class, granting preliminary approval of this Agreement, and approving the forms and methods of notice to the ATTM Non-Subscriber Settlement Class. The Preliminary Approval Order shall further set a date for a Final Approval Hearing at which the Court will determine whether the requirements for certification of the ATTM Non-Subscriber Settlement Class have been met; whether the proposed settlement should be finally approved as fair, reasonable, adequate, and in the best interests of the ATTM Non-Subscriber Settlement Class Members; whether the award of fees and expenses to Class Counsel should be approved; and whether a final judgment should be entered dismissing the action on the merits and with prejudice as to ATTM against the Class Representative and the ATTM Non-Subscriber Settlement Class Members.

B.     Upon execution of this Agreement, the Parties agree to suspend all litigation proceedings in the action, except those necessary to complete this Settlement, subject to the possible resumption of litigation proceedings should the Settlement not receive preliminary or final approval or as otherwise set forth herein.

C.     Upon entry of the Preliminary Approval Order, the Parties agree to stay all proceedings, except those proceedings in furtherance of obtaining final approval of the Settlement.  The Preliminary Approval Order shall provide for such stay and shall also bar and enjoin all Class Members from commencing or prosecuting any action or proceeding in any court or tribunal against the Released Parties asserting Released Claims.

D.     If at any point the Court does not approve this Agreement, the Agreement shall terminate and be of no force or effect, unless the Parties

voluntarily agree to modify this Agreement in a manner necessary to obtain Court approval.

## IV. TERMINATION

A.     This Agreement is conditioned upon preliminary approval and final approval without material modification by the Court.  Among other things, and without limitation, any modification to the provisions governing the definition of the ATTM Non-Subscriber Settlement Class or the settlement benefits terms are deemed material.  In the event that the Agreement is not so approved, any Party may terminate this Agreement in its entirety.  Likewise, in the event that the Agreement is approved without material modification by the Court, but such approval is later reversed, vacated, or materially modified on appeal, each of the Parties shall have the right to terminate the Agreement in its entirety.

B.     In the event that a Party exercises its right to terminate this Agreement, it shall promptly notify the Court and counsel for the other Party in writing and cause the Settlement Administrator to notify the ATTM Non-Subscriber Settlement Class by posting information on the Settlement Website and via the Toll-Free Number maintained by the Settlement Administrator.

C.     Upon termination, this Agreement shall be considered null and void and have no force or effect, no person or entity shall be bound by any of its terms or conditions, and the rights of all persons or entities with respect to the claims and defenses asserted in the action shall be restored to the positions existing immediately prior to the execution of the Agreement.

## V. NOTICE, REQUESTS FOR EXCLUSION AND OBJECTIONS

The Parties agree to, and will request approval by the Court of, the following forms and methods of notice to the ATTM Non-Subscriber Settlement Class:

A.     In connection with the separate settlement agreement between plaintiffs and Apple in this litigation, Apple will provide the Settlement Administrator with known, reasonably available e-mail and street addresses, serial

numbers, and IMEI numbers for the Apple "Class Members" (as that term is defined in the Apple settlement) based upon Apple's customer records regarding those iPad 3G purchases and orders falling within the Apple "Settlement Class" (as that term is defined in the Apple settlement). Apple has agreed to transmit this information to the Settlement Administrator no later than ten (10) business days after entry of the Preliminary Approval Order. Apple will also transmit to ATTM the IMEI numbers of the potential Apple "Class Members." To the extent feasible, and contingent on receiving the IMEI numbers  provided by Apple, ATTM  shall identify for the Settlement Administrator any persons potentially within the ATTM Non-Subscriber Settlement Class. Those persons potentially within the ATTM Non-Subscriber Settlement Class shall be put on a Dual Notice List.

B.     The Settlement Administrator shall establish and maintain a toll-free telephone number ("Toll-Free Number") that persons may call to request copies of the Class Notice and Claim Form. The Settlement Administrator shall establish and maintain a settlement website, at the address www._____.com ("Settlement Website"), where ATTM Non-Subscriber Settlement Class Members may submit online Claim Forms, and which shall include, without limitation, the Class Notice, a downloadable Claim Form, copies of the Complaint and this Agreement, Frequently Asked Questions, and the Toll-Free Number. The Toll-Free Number and the Settlement Website shall be fully operative on or before the first date notice is e-mailed or mailed.

C.     The Settlement Administrator shall e-mail the Dual Summary Notice to those Class Members for whom an e-mail address is included in the Dual Notice List.

D.     The Settlement Administrator shall send, via first-class mail postage pre-paid, the Dual Postcard Notice to those Class Members for whom an e-mail address is not included, and a mailing address is included, in the Dual Notice List.

E.     For those Class Members for whom e-mail Dual Summary Notice is returned undeliverable, the Settlement Administrator shall mail the Dual Postcard Notice to such Class Members to the extent a mailing address is included in the Dual Notice List.

F.     All mailing addresses used for mailing the Dual Postcard Notice shall be updated by the Settlement Administrator through the United States Postal Service's National Change of Address database.  For mailed Dual Postcard Notices that are returned with forwarding address information, the Settlement Administrator shall re-mail the Dual Postcard Notice once to the new address indicated.

G.     ATTM, together with Apple, shall cause a copy of the Published Notice to be published once in *Macworld* and once on a different date in *USA Today*.  The Published Notice published in *Macworld* shall not be less than 1/4 of a page in size.  The Published Notice published in *USA Today* shall not be less than 1/8 of a page in size.

H.     The timing for mailing, emailing, and publishing the notices shall be directed by the Preliminary Approval Order.  The Class Notice, Dual Summary Notice, Dual Postcard Notice, and Published Notice shall all include the address of the Settlement Website and the Toll-Free Number.

I.     Class Members who so request will receive a reminder e-mail notice sent by the Settlement Administrator.

J.     The Class Notice shall provide procedures whereby persons may exclude themselves from the ATTM Non-Subscriber Settlement Class or, if they do not timely exclude themselves, object to the Settlement.

K.     Putative members of the ATTM Non-Subscriber Settlement Class shall have the right to exclude themselves from the ATTM Non-Subscriber Settlement Class during the opt-out period.  The opt-out period shall run for forty-five (45) days after the Notice Date.  To be valid, a request for exclusion must be in writing, must be mailed to the Settlement Administrator at the address indicated in the Class

Notice, postmarked no later than forty-five (45) days after the Notice Date, and must clearly state the request to exclude themselves from the ATTM Non-Subscriber Settlement Class.  Any putative member of the ATTM Non-Subscriber Settlement Class who does not timely and validly request exclusion shall be an ATTM Non-Subscriber Settlement Class Member and shall be bound by the terms of this Agreement.  No later than five (5) business days following the end of the opt-out period, the Settlement Administrator shall provide Class Counsel and counsel for ATTM with a final list of putative class members who submitted timely and valid requests for exclusion.  Prior to or at the Final Approval Hearing, the Court shall be provided with a final list of those who submitted timely and valid requests for exclusion.

L.     ATTM Non-Subscriber Settlement Class Members who do not submit timely and valid requests for exclusion may file objections to the Settlement and/or Class Counsels' request for attorneys' fees and costs.  To be considered, an objection must be in writing, must be mailed to the Clerk of the Court and the Settlement Administrator at the addresses indicated in the Class Notice, postmarked no later than forty-five (45) days after the Notice Date, and must include all of the information specified in the Class Notice.  Class Counsel shall file their application for attorneys' fees and costs in advance of the deadline for mailing objections. Once it is filed, Class Counsels' application for attorneys' fees and costs shall be posted on the Settlement Website.

M.     ATTM, together with Apple, shall pay all costs of the notice program and other costs of administering the Settlement pursuant to this Section V.

## VI. PAYMENT OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES TO CLASS COUNSEL

A.     ATTM agrees not to oppose, or solicit or support opposition to, a request by Class Counsel for attorney's fees and costs in an amount up to $250,000 in connection with this Settlement.

B.     ATTM shall not be liable for any fees or expenses in connection with the Actions or this litigation, other than the benefits provided to eligible ATTM Non-Subscriber Settlement Class Members pursuant to the claims process as set forth herein, attorneys' fees and costs awarded by the Court (up to a maximum of $250,000), and the costs of the notice program, claims administration, and other administrative costs related to the Settlement as set forth herein.  Class Counsel agrees that they will not seek any additional fees or costs from ATTM in connection with the Actions or the settlement of the Actions.  ATTM expressly agrees that it will not seek to recover its Court costs, attorneys' fees, or expenses once the Court enters a dismissal of the Action.

C.     No later than ten (10) banking days following the Effective Date as defined below, ATTM shall pay any Court-awarded attorneys' fees and costs ("Fees Amount") to Class Counsel, who shall, in their discretion, allocate and distribute such award.  ATTM shall pay the Fees Amount, to:  Lieff, Cabraser, Heimann & Bernstein LLP, c/o Roger N. Heller, 275 Battery Street, 29th Floor, San Francisco, CA 9411.  Class Counsel agrees to provide ATTM all identification information necessary to effectuate the payment of the Fees Amount, including, but not limited to, Taxpayer Identification Number(s), completed Internal Revenue Service Form W-9(s), and wire transfer information.  ATTM shall have no liability with respect to the allocation of attorneys' fees and costs among counsel.

D.     The payment by ATTM of Class Counsels' attorneys' fees and costs is separate from and in addition to the other relief afforded the ATTM Non-Subscriber Settlement Class Members in this Agreement.  The Court's award of any such attorneys' fees and costs shall be separate from its determination of whether to approve the Settlement.  In the event the Court approves the Settlement, but declines to award Class Counsels' attorneys' fees and costs in the amount requested by Class Counsel, the Settlement will nevertheless be binding on the Parties to the extent permissible under applicable law.

### VII. FINAL ORDER AND JUDGMENT APPROVING SETTLEMENT AND DISMISSING CLAIMS OF SETTLEMENT CLASS MEMBERS WITH PREJUDICE; RELEASE OF CLAIMS BY SETTLEMENT CLASS MEMBERS

#### A. Entry of Final Order and Judgment

Upon Court approval of this Agreement, an Order substantially in the form attached as Exhibit I ("Final Order") and judgment substantially in the form attached as Exhibit J ("Judgment") shall be entered dismissing the claims of Plaintiff and of the ATTM Non-Subscriber Settlement Class Members against ATTM with prejudice. The Parties intend that such judgment and dismissal shall constitute final judgment on the merits to which the principles of *res judicata* shall apply.

#### B. Release of Claims

1.      As of the Effective Date of this Agreement, Releasing Persons hereby fully and irrevocably release and forever discharge Released Persons from any and all liabilities, claims, cross-claims, causes of action, rights, actions, suits, debts, liens, contracts, agreements, damages, costs, attorneys' fees, losses, expenses, obligations, judgments or demands, of whatever kind, source or character whether arising under any federal or state law (including but not limited to the California Unfair Competition Law, Business and Professions Code § 17200, *et seq.*, the California Consumers Legal Remedies Act, Civil Code § 1750, *et seq.*, and consumer and other statutory and common law claims), whether known or unknown, existing or potential, or suspected or unsuspected, and whether raised by claim, counterclaim, setoff, or otherwise, including any known or unknown claims, which they have or may claim now or in the future to have, that were or could have been alleged or asserted against any of the Released Persons related to or regarding the Actions including but not limited to the availability of the Unlimited Plan, the ability to sign up for the Unlimited Plan or the ability to switch in or out of the Unlimited Plan, and any alleged misrepresentation, omission or failure to disclose

15

concerning the availability of the Unlimited Plan, the ability to sign up for the Unlimited Plan or the ability to switch in or out of the Unlimited Plan ("Released Claims").

2.      Plaintiff, on behalf of himself and all ATTM Non-Subscriber Settlement Class Members, covenants and agrees that the Releasing Persons shall not hereafter initiate, or cooperate in the filing or prosecution of, any suit, action, or proceeding in any forum that asserts any Released Claim against any Released Persons.

3.      Plaintiff, on behalf of himself and all ATTM Non-Subscriber Settlement Class Members, hereby waives any and all provisions, rights, and benefits conferred by section 1542 of the California Civil Code or any comparable statutory or common law provision of any other jurisdiction. Section 1542 reads as follows:

> Certain Claims Not Affected By General Release:
> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Although the releases granted under this Agreement are not general releases, Plaintiff, on behalf of himself and of all ATTM Non-Subscriber Settlement Class Members, nonetheless expressly acknowledges that Plaintiff and the ATTM Non-Subscriber Settlement Class Members are waiving the protections of section 1542 and of any comparable statutory or common law provision of any other jurisdiction.

4.      As of the Effective Date, by operation of entry of Judgment, the Released Parties shall be deemed to have fully released and forever discharged Plaintiff, all other Class Members and Class Counsel from any and all claims of abuse of process, malicious prosecution, or any other claims arising out of the initiation, prosecution or resolution of the Actions, including, but not limited to,

claims for attorneys' fees, costs of suit or sanctions of any kind, or any claims arising out of the allocation or distribution of any of the consideration distributed pursuant to this Settlement.

       5.     Notwithstanding the entry of Judgment, this Court shall retain jurisdiction of the action until such time as the Court determines that the Settlement is fully consummated according to the terms and conditions of this Agreement.

## VIII.  ATTM'S DENIAL OF LIABILITY; AGREEMENT AS DEFENSE IN FUTURE PROCEEDINGS.

      A.     ATTM has indicated its intent vigorously to contest each and every claim in the action, and continues vigorously to deny all of the material allegations in the action.  ATTM enters into this Agreement without in any way acknowledging any fault, liability, or wrongdoing of any kind.  ATTM nonetheless has concluded that it is in its best interests that the action be settled on the terms and conditions set forth herein in light of the expense that would be necessary to defend the action, the benefits of disposing of protracted and complex litigation, and the desire of ATTM to conduct its business unhampered by the distractions of continued litigation.

      B.     This Agreement, whether or not consummated, and any communications exchanged or actions taken pursuant to or during the negotiation of this Agreement are for settlement purposes only.  Neither the fact of nor the contents of this Agreement or its exhibits, nor any communications exchanged nor actions taken pursuant to or during the negotiation of this Agreement, shall constitute, be construed as, or be admissible in evidence as an admission of the validity of any claim asserted or fact alleged in the Complaint or of any wrongdoing, fault, violation of law or liability of any kind on the part of ATTM.

      C.     This Agreement and all negotiations, correspondence and communications leading up to its execution shall be deemed to be within the protection of Rule 408 of the Federal Rules of Evidence and any analogous rules or

principles.  Neither this Agreement, nor any terms, conditions, contents or provisions or exhibits, nor any negotiations, correspondence or communications leading up to the execution of this Agreement, shall constitute a precedent or be admissible for any purpose in any proceeding; provided, however, that this Agreement shall be admissible in any proceeding related to the approval of this Agreement, to enforce any of its terms and conditions, to support or defend this Agreement in an appeal from an order granting or denying the Final Approval Order, or to enforce or assert a claim or defense of *res judicata*, collateral estoppel, claim preclusion, issue preclusion, settlement, release, merger and bar, or any similar claim or defense against Plaintiff, any ATTM Non-Subscriber Settlement Class Member, or any third party.

D.     To the extent permitted by law, the Agreement may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding that may be instituted, prosecuted, or attempted for Released Claims as defined herein.

## IX.   PLAINTIFFS' CLAIMS AND THE BENEFITS OF SETTLEMENT

A.     Before commencing this action and during settlement negotiations, Class Counsel conducted an examination and evaluation of the relevant law and facts, including information provided by Defendants, to assess the merits of Plaintiff's claims and potential claims and to determine how best to serve the interests of the ATTM Non-Subscriber Settlement Class.  Class Counsel and the Class Representative believe that the claims asserted in the Complaint have merit.

B.     However, Class Counsel and the Class Representative, on behalf of the ATTM Non-Subscriber Settlement Class, have agreed to settle this action pursuant to the provisions of this Agreement after considering, among other things:  (a) the benefits to the ATTM Non-Subscriber Settlement Class Members under the Settlement; (b) the attendant risks and uncertainty of litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such

litigation; and (c) the desirability of consummating this Settlement to provide effective timely relief to Plaintiff and the ATTM Non-Subscriber Settlement Class Members.

C.    In consideration of all of these circumstances, Class Counsel and the Class Representative have concluded that the proposed settlement set forth in this Agreement is fair, adequate, reasonable, and in the best interests of the ATTM Non-Subscriber Settlement Class.

## X.    ADMINISTRATIVE AND IMPLEMENTATION MATTERS

### A.    **Effective Date of the Agreement**

The "Effective Date" of this Agreement shall be the first day after which all of the following events and conditions of this Agreement have been met or have occurred:

1.    All of the Parties and their counsel have executed this Agreement;

2.    The Court has conditionally certified the ATTM Non-Subscriber Settlement Class, preliminarily approved the settlement embodied in this Agreement, and provided for approved notice;

3.    Following the final date for putative ATTM Non-Subscriber Settlement Class Members to exclude themselves from the ATTM Non-Subscriber Settlement Class pursuant to Section V.K above, and no less than seven (7) days prior to the Final Approval Hearing, the Settlement Administrator has verified in writing or via e-mail to the Parties that fewer than ten percent of the potential ATTM Non-Subscriber Class Members identified on the Dual Notice List have submitted timely and valid requests to exclude themselves; provided however, that if this condition is not met, ATTM shall have the option to give written notice to Class Counsel waiving this condition and stating that ATTM intends to proceed with the settlement set forth in this Agreement;

4.     The Court has entered a Final Order finally approving the settlement substantially in the form attached hereto as Exhibit I and has entered Judgment substantially in the form attached hereto as Exhibit J; and

5.     The Judgment has become "final" in that the time for appeal of, or writ as to, the Judgment has expired or, if any such appeal and/or petition for review is taken and the settlement is affirmed, the time period during which further petition for hearing, appeal, or writ of certiorari can be taken has expired.  If the Judgment is set aside, materially modified, or overturned by the trial court or on appeal, and is not fully reinstated on further appeal, the Judgment shall not become "final" as contemplated by this subsection.

B.     **Settlement Claims Administration.**

1.     The Settlement Administrator shall receive both online and mailed Claim Forms on behalf of ATTM.

2.     ATTM, through the Settlement Administrator, shall have the right to verify the accuracy of information submitted during the claims process to ensure that claimants are ATTM Non-Subscriber Settlement Class Members and have submitted valid claims.

3.     For any ATTM Non-Subscriber Settlement Class Member who submits a Claim Form determined by the Settlement Administrator to be defective or incomplete, the Settlement Administrator shall mail a notice directly to such ATTM Non-Subscriber Settlement Class Member notifying them of the missing information and/or deficiencies and providing them with an opportunity to cure (the "Cure Notice").  ATTM Non-Subscriber Settlement Class Members shall have a 45-day period to cure defective or incomplete claims, which shall run from the date of mailing of the Cure Notice to the ATTM Non-Subscriber Settlement Class Member.  The 45-day cure period may extend after the end of the period for submission of Claim Forms so long as the original Claim Form was timely

submitted.  ATTM Non-Subscriber Settlement Class Members shall have only one opportunity to cure.

4.      The Settlement Administrator shall have the right to reject any claims that are deemed to be fraudulent or invalid or any claims that are deemed to be defective or incomplete after the ATTM Non-Subscriber Settlement Class Member has been provided an opportunity to cure pursuant to Section X.B.3 above. For all rejected claims, the Settlement Administrator will provide Class Counsel either with copies of the relevant Claim Form, Cure Notice, and any correspondence or other documents submitted by the claimant in response to a Cure Notice, or with a list of rejected claims (including the ATTM Non-Subscriber Settlement Class Member's name, address, and telephone number and the reason for rejection).  If the Settlement Administrator provides a list rather than copies of the Claim Forms, Cure Notices, and other documents, Class Counsel shall have a reasonable opportunity to inspect originals or copies of the relevant Claim Forms, Cure Notices, and other documents.  Counsel for the Parties will first attempt to resolve any disputes concerning rejected claims informally between themselves. The Court shall retain jurisdiction to resolve any disputes concerning rejected claims for which counsel cannot reach an agreement.

5.      By no later than thirty (30) days after the Effective Date, the Settlement Administrator shall send notice to all ATTM Non-Subscriber Settlement Class Members who submit valid claims, informing them that their claims have been approved and providing instructions regarding how to sign up for the Settlement 5GB Data Plan.  Such notices shall be emailed or mailed to the addresses provided in the Claim Forms.

## X.      MISCELLANEOUS PROVISIONS

### A.      **Publicity**

The parties and their counsel agree that they will not issue any press release or solicit any media inquiries or make any public comments or announcements

concerning the settlement of this Action in accordance with this Agreement, except that the parties may issue a joint press release, agreed to by Class Counsel and counsel for ATTM, in the event there is a media inquiry.  In all events, neither Plaintiff nor Class Counsel will disparage ATTM or any of their affiliated entities with respect to the subject matter of this Action or the settlement.  If a party is required by a valid, enforceable subpoena or government information request for non-public information about the Settlement, such Party shall provide reasonable prior notice to the other Party to allow the other Party to seek to prevent such disclosure.  A party may also provide necessary and accurate information about the Settlement to its shareholders or other persons or entities as required by securities laws or other applicable laws or regulations.

B.    **Extensions Of Time**

Unless otherwise ordered by the Court herein, the Parties may jointly agree to reasonable extensions of time to carry out any of the provisions of this Agreement.

C.    **No Pending Actions**

Each of the Parties represents and warrants that he or it is not aware of any other lawsuits or administrative proceedings regarding data plans for the iPad 3G, other than the cases that are consolidated in this Action.

D.    **Integration**

This Agreement, including all exhibits, constitutes a single, integrated written contract expressing the entire agreement of the Parties relative to the subject matter herein. No covenants, agreements, representations, or warranties of any kind whatsoever have been made by any Party hereto, other than those expressly set forth in this Agreement or attached as an Exhibit to this Agreement.  The Agreement supersedes all prior agreements and understandings among the Parties with respect to the settlement of the action.

E.    **Governing Law**

This Agreement shall be construed in accordance with, and be governed by, the laws of the State of California, without regard to laws applicable to choice of law.

F.    **Gender and Plurals**

As used in this Agreement, the masculine, feminine, or neuter gender, and the singular or plural number, shall each be deemed to include the others whenever the context so indicates.

G.    **Survival of Warranties and Representations**

The warranties and representations of this Agreement are deemed to survive the date of execution hereof.

H.    **Representative Capacity.**

Each person executing this Agreement in a representative capacity represents and warrants that they are empowered and duly authorized to do so.

I.    **No Assignment**

Each Party represents, covenants, and warrants that he or it has not directly or indirectly assigned, transferred, encumbered or purported to assign, transfer, or encumber any portion of any liability, claim, demand, cause of action or rights that he or it herein releases.

J.    **Binding on Assigns**

This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, trustees, executors, successors and assigns.

K.    **Captions**

Titles or captions contained in this Agreement are inserted as a matter of convenience and reference, and in no way define, limit, extend or describe the scope of this Agreement or any provision hereof.  Each term of this Agreement is contractual and not merely recital.

L.    **Construction**

The Parties agree that the terms and conditions of this Agreement are the result of lengthy, intensive, and arm's-length negotiations between the Parties and that this Agreement shall not be construed in favor of or against any Party by reason of the extent to which any Party, or his or its counsel, participated in the drafting of this Agreement, or any part thereof.

M.   **No Collateral Attack**

This Agreement shall not be subject to collateral attack by any ATTM Non-Subscriber Class Members or their representatives any time on or after the Effective Date.  Such prohibited collateral attacks shall include, but shall not be limited to, claims that a Class Member's claim was improperly denied (other than as expressly provided for in section X.B above regarding the claim approval process) and/or that a Class Member failed to receive timely notice of the Settlement.

N.   **Counterparts**

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, even though all Parties do not sign the same counterparts.

O.   **Cooperation of Parties**

The Parties to this Agreement agree to prepare and execute all documents, to seek Court approvals, to defend Court approvals, and to do all things reasonably necessary to complete the settlement described in this Agreement.

P.   **Execution Voluntary**

This Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them. The Parties represent and warrant to each other that: (a) they have carefully read and fully understand the provisions of this Agreement and have relied on their own judgment and the advice and representation of legal counsel of their own choosing; and (b) no statement or representation by the other Party, or his or its agents, employees, officers, directors or legal representatives influenced or induced them to execute

this Agreement. Each of the Parties, including through counsel, has cooperated in the drafting and preparation of this Agreement and has been advised by counsel regarding the terms, effects, and consequences of this Agreement.  The Parties acknowledge, agree and specifically warrant to each other that they have read this Agreement and have received legal advice with respect to the advisability of entering into this Settlement, and fully understand its legal effect.

Q. **Terms and Conditions Not Superseded**

Except as expressly provided herein, nothing in this Agreement abrogates, supersedes, modifies, or qualifies in any way any of the contractual terms and conditions applicable in the ordinary course to the relationship between ATTM and its customers, or to the services provided by ATTM and purchased by its customers.

R. **Settlement Conditioned on Certain Matters**

This entire Agreement is contingent upon the Parties reaching agreement on, and the Court granting approval to, the contents of the Notice and Claim Form(s) ancillary hereto.

S. **Notices**

1. All Notices to Class Counsel provided for herein shall be sent by e-mail or facsimile to: Roger N. Heller, Lieff, Cabraser, Heimann & Bernstein, LLP, 275 Battery Street, 29th Floor, San Francisco, California 94111-3339, facsimile number (415) 956-1008, rheller@lchb.com, with a hard copy sent by overnight mail.

2. All Notices to ATTM provided for herein shall be sent by e-mail or facsimile to Kathleen Taylor Sooy, Crowell & Moring LLP, 1001 Pennsylvania Avenue, NW, Washington, DC, 20004, facsimile number (202) 628-5116, ksooy@crowell.com, with a hard copy sent by overnight mail.

3. The notice recipients and addresses designated above may be changed by written notice pursuant to this Section.

4.      Upon the request of any of the Parties, the Parties agree to promptly provide each other with copies of objections, requests for exclusion, or other filings received as a result of the Class Notice.

T.      **Modification and Amendment**

Except as provided in Section II.B.4, this Agreement may be amended or modified only by a written instrument signed by the Parties' counsel and approved by the Court.

U.      **Continuing Jurisdiction**

The United States District Court for the Northern District of California shall retain jurisdiction over the Parties and all such disputes regarding the Actions and the Settlement.

Dated:      9/11/13      , 2013      AT&T Mobility, LLC

By: _____

Title: Senior Vice-President


Dated:      _____, 2013      JOE HANNA

_____

Joe Hanna

4.     Upon the request of any of the Parties, the Parties agree to promptly provide each other with copies of objections, requests for exclusion, or other filings received as a result of the Class Notice.

T.     **Modification and Amendment**

Except as provided in Section II.B.4, this Agreement may be amended or modified only by a written instrument signed by the Parties' counsel and approved by the Court.

U.     **Continuing Jurisdiction**

The United States District Court for the Northern District of California shall retain jurisdiction over the Parties and all such disputes regarding the Actions and the Settlement.

Dated: _____, 2013     AT&T Mobility, LLC

By: _____

Title: _____

Dated: September 10th, 2013     JOE HANNA

Joe Hanna

APPROVED AS TO FORM:

Dated:  Sept. 11 , 2013        By: _____
                                    Michael W. Sobol
                                    Roger N. Heller
                                    LIEFF CABRASER HEIMANN &
                                    BERNSTEIN, LLP

                                    *Attorneys for Plaintiff Joe Hanna and
                                    for the Proposed ATTM Non-Subscriber
                                    Settlement Class*


Dated:  _____ , 2013     By: _____
                                    Kathleen Taylor Sooy
                                    Joel D. Smith
                                    1001 Pennsylvania Avenue, NW
                                    CROWELL & MORING, LLP

                                    *Attorneys for Defendant AT&T Mobility,*
                                    *LLC*


1083463.1

27

APPROVED AS TO FORM:

Dated: _____, 2013     By: _____
                                 Michael W. Sobol
                                 Roger N. Heller
                                 LIEFF CABRASER HEIMANN &
                                 BERNSTEIN, LLP

                                 *Attorneys for Plaintiff Joe Hanna and*
                                 *for the Proposed ATTM Non-Subscriber*
                                 *Settlement Class*

Dated: ____9/11____, 2013     By: _____
                                 Kathleen Taylor Sooy
                                 Joel D. Smith
                                 1001 Pennsylvania Avenue, NW
                                 CROWELL & MORING, LLP

                                 *Attorneys for Defendant AT&T Mobility,*
                             *LLC*

1083463.1

27

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         NORTHERN DISTRICT OF CALIFORNIA

10                              SAN JOSE DIVISION

11

12   In re Apple and AT&T iPad Unlimited Data Plan       Case No. 5:10-cv-02553 RMW
     Litigation

13                                                        CLASS ACTION

14
                         ALL CONSOLIDATED
15                       ACTIONS

16

17

18

19                                **EXHIBIT A**

20             **NOTICE OF PENDENCY AND PROPOSED
                 SETTLEMENTS OF CLASS ACTION**

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA

# If you purchased or ordered an iPad with WiFi + 3G on or before June 7, 2010, you could be entitled to $40 cash from Apple, and other benefits from AT&T, under class action settlements.

*The United States District Court, Northern District of California, authorized this notice. This is not a solicitation from a lawyer. You are not being sued.*

**The Settlements**

- Two settlements have been reached in class action lawsuits. The first settlement, with Apple, will provide a $40 cash payment. The second settlement, with AT&T, will provide a 5GB AT&T data plan for $30/month for up to one year, which is a $20/month discount from the current rate (the "Data Plan Benefit").

- To qualify for either the $40 cash or the Data Plan Benefit, you must have purchased or ordered an iPad 3G in the United States on or before June 7, 2010. In addition, to qualify for the Data Plan Benefit, you must <u>not</u> have signed up for any AT&T 3G data plan for that iPad. You must submit a valid Claim Form to receive benefits.

- Your legal rights are affected whether you act or don't act. Please read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| SUBMIT CLAIMS | The only way to get the $40 cash payment or the Data Plan Benefit. |
| EXCLUDE YOURSELF | Get no payment or benefit. This is the only option that allows you ever to be part of any other lawsuit against Apple or AT&T about the issues in this case. You may exclude yourself from one or both of the settlements. See section 14 for details. |
| OBJECT | Write the Court about why you don't like one or both of the settlements. See section 19 for details. |
| GO TO A HEARING | Ask to speak in Court about the settlements. See section 23 for details. |
| DO NOTHING | Get no payment or benefit. Give up rights. |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the settlements. All benefits will be provided only after any appeals are resolved. Please be patient.

sf-3325883

| WHAT THIS NOTICE CONTAINS |
| --- |

**BASIC INFORMATION** .................................................................................................. 1

1.   What is this notice? ................................................................................................. 1
2.   What is this lawsuit about? ..................................................................................... 1
3.   Why is this a class action? ...................................................................................... 1
4.   Why are there settlements? ..................................................................................... 1

**WHO IS IN THE SETTLEMENTS** ......................................................................... 1

5.   How do I know if I am part of the settlements? ..................................................... 2
6.   Are there exceptions to being included? ................................................................. 2
7.   If I no longer own my iPad 3G, am I still included? ............................................... 2
8.   I'm still not sure if I am included. .......................................................................... 2

**THE SETTLEMENT BENEFITS—WHAT YOU GET** ....................................... 2

9.    What benefits do the settlements provide? ............................................................. 2
10.   What are the requirements to receive the $40 cash payment? ............................... 3
11.   What are the requirements to receive the Data Plan Benefit? ................................ 3

**HOW YOU GET BENEFITS—SUBMITTING A CLAIM FORM** .................. 3

12.   How do I submit a claim? ....................................................................................... 3
13.   When would I receive my benefits? ....................................................................... 4

**EXCLUDING YOURSELF FROM THE SETTLEMENTS** ............................... 4

14.   How do I opt out of the settlements? ..................................................................... 4
15.   If I don't exclude myself, can I sue Apple or AT&T for the same thing
      later? ...................................................................................................................... 4
16.   If I exclude myself, can I get benefits from these settlements? ............................. 4

**THE LAWYERS REPRESENTING YOU** ............................................................. 5

17.   Do I have a lawyer in this case? ............................................................................. 5
18.   How will the lawyers be paid? ............................................................................... 5

**OBJECTING TO THE SETTLEMENTS** ............................................................... 5

19.   How can I object to the settlements and/or Class Counsel's fee and expense
      request? .................................................................................................................. 5
20.   What's the difference between objecting and excluding? ....................................... 6

**THE COURT'S FAIRNESS HEARING** ................................................................. 6

21.   When and where will the Court decide whether to approve the settlements? ........ 6
22.   Do I have to come to the hearing? .......................................................................... 6
23.   May I speak at the hearing? .................................................................................... 6

**IF YOU DO NOTHING** ............................................................................................ 7

24.   What happens if I do nothing at all? ....................................................................... 7

**GETTING MORE INFORMATION** ...................................................................... 7

25.   Are there more details about the settlements? ....................................................... 7
26.   How do I get more information? ............................................................................. 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**BASIC INFORMATION**

2

| **1.** | **What is this notice?** |

3

4

The purpose of this notice is to provide you with information about two proposed settlements in class action lawsuits, and about your options, before the Court decides whether to approve the settlements.

5

6

This notice explains the lawsuits, the settlements, your legal rights, what benefits are available, who is eligible for them, and how to get them.

7

8

9

The Court in charge of the case is the United States District Court for the Northern District of California, and the case is known as *In re Apple and AT&T iPad Unlimited Data Plan Litigation*, Case No. 5:10-cv-02553-RMW.  The people who sued are called Plaintiffs, and the companies they sued, Apple Inc. and AT&T Mobility LLC, are called Defendants.

10

| **2.** | **What is this lawsuit about?** |

11

12

13

14

The lawsuits claimed that customers who purchased or ordered iPad 3Gs on or before June 7, 2010 were not provided with access to an "unlimited" data plan in the manner originally advertised by Apple and AT&T.  The Complaint filed in this case, available at www._____.com, contains more detail, including a list of the legal claims alleged.  Apple and AT&T deny all allegations and are entering into these settlements to avoid burdensome and costly litigation.  The settlements are not an admission of wrongdoing.

15

| **3.** | **Why is this a class action?** |

16

17

In a class action, one or more people, called class representatives, sue on behalf of people who have similar claims.  All these people are a "Class" or "Class Members."  One court resolves the issues for all Class Members, except for those who exclude themselves from the Class.

18

19

20

In this case, there are two classes:  the "Apple Class," with alleged claims against Apple, and the "AT&T Subclass," with alleged claims against AT&T.  The Class Representatives for the Apple Class are Adam Weisblatt, Joe Hanna, David Turk, Colette Osetek, and Aaron Friedman.  The Class Representative for the AT&T Subclass is Joe Hanna.

21

| **4.** | **Why are there settlements?** |

22

23

24

The Court did not decide in favor of the Plaintiffs or the Defendants.  Instead, the parties have agreed to settle the case.  That way, they avoid the cost of a trial, and the people affected will get compensation.  The Class Representatives and their attorneys (called "Class Counsel") believe that the settlements are in the best interests of the Class Members.

25

**WHO IS IN THE SETTLEMENTS**

26

To see if you are eligible for benefits, you first have to decide if you are an Apple Class Member, an AT&T Subclass Member, or both.

27

28

**5.        How do I know if I am part of the settlements?**

The Court has decided that everyone who fits the following description is an "Apple Class Member":  All United States residents who purchased or ordered an Apple iPad with 3G capability (iPad 3G) in the United States on or before June 7, 2010.

The Court has decided that everyone who fits the following description is an "AT&T Subclass Member":  All persons in the United States who purchased or ordered an Apple iPad 3G in the United States on or before June 7, 2010 **and** who did not sign up for or purchase any AT&T data plan for that iPad 3G at any time.

**6.        Are there exceptions to being included?**

The Apple Class does *not* include Apple; any entity in which Apple has a controlling interest; Apple's directors, officers, and employees; Apple's legal representatives, successors, and assigns; and wholesalers, resellers, retailers and distributors.  The AT&T Subclass does *not* include Apple; ATTM; any entity in which ATTM or Apple has a controlling interest; ATTM and Apple's directors and officers; Apple's employees; and ATTM and Apple's legal representatives, successors, and assigns.  Also excluded are all persons who validly request exclusion (see section 14 below).

**7.        If I no longer own my iPad 3G, am I still included?**

Yes.  You may still claim the $40 cash payment from Apple if you meet the other eligibility requirements.  You may still claim the AT&T Data Plan Benefit if you meet the eligibility requirements and affirm on the Claim Form that you no longer have the iPad 3G that you purchased or ordered on or before June 7, 2010; you may use the Data Plan Benefit for a later-generation iPad that you identify on the Claim Form.

**8.        I'm still not sure if I am included.**

If you are still not sure whether you are included, you can visit the website, www._____.com, for more information.

**THE SETTLEMENT BENEFITS—WHAT YOU GET**

**9.        What benefits do the settlements provide?**

**Cash Payment**:  Apple will provide a $40 cash payment to Apple Class Members who meet the requirements described in section 10 below.  There is a limit of one $40 cash payment per iPad 3G.

**Data Plan Benefit**:  AT&T will provide a "Data Plan Benefit" to AT&T Subclass Members who meet the requirements described in section 11 below.  Under the Data Plan Benefit, eligible AT&T Subclass Members will be able to sign up for an AT&T 5GB iPad data plan for a discounted monthly rate of $30/month for up to one year (which is a discount of $20/month from the current $50/month rate).  If AT&T lowers the price of its 5GB iPad data plan, a discount of $20/month will still be provided.  There is a limit of one Data Plan Benefit per qualifying iPad 3G.  The Data Plan Benefit may be used for the iPad 3G that you

purchased or ordered on or before June 7, 2010 or, if you no longer have that iPad 3G, it may be used for a later-generation iPad that you identify on the Claim Form.  If an AT&T Subclass Member cancels the Data Plan Benefit or otherwise changes his plan before the end of the twelve-month period, the Data Plan Benefit will no longer be available to that AT&T Subclass Member.

| **10.** | **What are the requirements to receive the $40 cash payment?** |

To receive the $40 cash payment from Apple, you must: (a) be a United States resident who purchased or ordered an iPad 3G in the United States on or before June 7, 2010; and (b) submit a valid Claim Form.  For information about how to submit a Claim Form, see section 12 below.

| **11.** | **What are the requirements to receive the Data Plan Benefit?** |

To be eligible for the Data Plan Benefit, you must: (a) be a United States resident who purchased or ordered an iPad 3G in the United States on or before June 7, 2010 **and** have not signed up for any AT&T 3G data plan for that iPad 3G at any time; and (b) submit a valid Claim Form.  For information about how to submit a Claim Form, see section 12 below.

### HOW YOU GET BENEFITS—SUBMITTING A CLAIM FORM

| **12.** | **How do I submit a claim?** |

To receive the $40 cash payment from Apple, the Data Plan Benefit from AT&T, or both, you must submit a valid Claim Form.  As part of the Claim Form, you will be required to affirm that the ability to switch in and out of the AT&T "unlimited" data plan was a factor in your decision to purchase an iPad 3G. Only eligible persons will receive benefits.  Claim Forms can be submitted online or by mail, as described in this section.

Submitting a Claim Form online:  If you received an email notice of this settlement, and you still have that email, you can fill out and submit a Claim Form online (at no cost to you) by following the appropriate link in the email for submitting claims.  If you received a notice of this settlement by postcard, and you still have that postcard, you can fill out and submit a Claim Form online (at no cost to you) by visiting the web address listed in the postcard for submitting claims.  Otherwise, you can also visit www._____.com to submit a Claim Form online (at no cost to you).

Submitting a Claim Form by mail:  If you prefer, you may download and print a Claim Form by visiting www._____.com, fill it out, and mail it (at your own expense) to the Settlement Administrator at [address].  You may also request a hard copy Claim Form by calling 1-888-XXX-XXXX, fill it out, and mail it (at your own expense) to the Settlement Administrator at the mailing address provided in this paragraph.

You must read the instructions carefully and fill out the Claim Form as directed in the instructions.  If you submit a Claim Form by mail you will need to sign the Claim Form.

**Deadline for submitting Claim Forms**:  **Claim Forms submitted online must be submitted by no later than [date].  Claim Forms submitted by mail must be postmarked**

**by no later than [date].  If you fail to submit a Claim Form by the deadline, your claim will be rejected, and you will be deemed to have waived all rights to receive benefits.**  To request a reminder notice before the deadline, go to [www._____.com].

| 13. | When would I receive my benefits? |
|---|---|

The Court will hold a hearing on [date] at 9:00 a.m., to decide whether to approve the settlements.  If the Court approves the settlements, and after any appeals process is completed, eligible Apple Class Members will be sent cash payments, and eligible AT&T Subclass Members will be sent instructions for how to redeem the Data Plan Benefit.  The appeal process can take time, perhaps more than a year.  Please be patient.

## EXCLUDING YOURSELF FROM THE SETTLEMENTS

If you don't want to receive benefits from the settlements, but you want to preserve any right you may have to sue or continue to sue the Defendants about the legal issues in this case, then you must take steps to exclude yourself from one or both of the settlements (sometimes called "opting out").  Read on for details.

| 14. | How do I opt out of the settlements? |
|---|---|

You can exclude yourself (or "opt out") of one or both of the settlements.  To exclude yourself, you must send a letter that clearly states your intent to exclude yourself from the settlement with Apple, the settlement with AT&T, or both settlements.  Be sure to include: your name; your address; your telephone number; whether you want to exclude yourself from the settlement with Apple, the settlement with AT&T, or both settlements; your signature; and reference the case name *In re Apple and AT&T iPad Unlimited Data Plan Litigation*, Case No. 5:10-cv-02553-RMW.  To be valid, you must mail your exclusion request postmarked no later than **[date]**, to: [**Settlement Administrator.**]

You can't exclude yourself on the phone or by fax or e-mail.  If you ask to be excluded from the settlement with Apple, you will not receive any cash payment and you cannot object to the settlement with Apple, but you preserve any right you may have to sue (or continue to sue) Apple about the legal issues in this case.  If you ask to be excluded from the settlement with AT&T, you will not receive the Data Plan Benefit and you cannot object to the settlement with AT&T, but you preserve any right you may have to sue (or continue to sue) AT&T about the legal issues in this case.

| 15. | If I don't exclude myself, can I sue Apple or AT&T for the same thing later? |
|---|---|

No.  Unless you exclude yourself from the settlement with Apple, you give up any right you may have to sue Apple about the legal issues in this case.  If you are within the AT&T Subclass definition (see section 5 above), unless you exclude yourself from the settlement with AT&T, you give up any right you may have to sue AT&T about the legal issues in this case.

**16.     If I exclude myself, can I get benefits from these settlements?**

No.  If you exclude yourself from the settlement with Apple, you may not receive any cash payment.  If you exclude yourself from the settlement with AT&T, you may not receive the Data Plan Benefit.

## THE LAWYERS REPRESENTING YOU

**17.     Do I have a lawyer in this case?**

You are represented in this case by the law firms of Lieff Cabraser Heimann & Bernstein LLP, The Weston Firm, Schubert Jonckheer & Kolbe LLP, Casey, Gerry, Schenk, Francavilla, Blatt & Penfield LLP, and Hiden, Rott & Oertle, LLP.  Together, these lawyers are called Class Counsel.  You will not be charged for these lawyers.  If you want to be represented by your own lawyer, you may hire one at your own expense.

**18.     How will the lawyers be paid?**

Class Counsel will ask the Court for attorneys' fees and expenses of up to $1,750,000, and will also request service awards in the amount of $1,000 each for the five Class Representatives to compensate them for their efforts in this case.  A copy of Class Counsel's application for attorneys' fees and expenses will be posted on the case website (www._____.com) when it is filed.  The Court will determine the proper amount of attorneys' fees and expenses to award Class Counsel and the proper amount of service awards for the Class Representatives.   Apple and AT&T will pay the amounts awarded by the Court in addition to the cash and benefits to the Class.

## OBJECTING TO THE SETTLEMENTS

You can tell the Court that you don't agree with the settlements or some part of them.

**19.     How can I object to the settlements and/or Class Counsel's fee and expense request?**

If you're an Apple Class Member and don't exclude yourself, you can object to the Apple settlement if you don't like any part of it.  If you're an AT&T Subclass Member and don't exclude yourself, you can object to the AT&T settlement if you don't like any part of it.  You can also object to Class Counsel's request for attorneys' fees and expenses and/or to the service awards for the Class Representatives.

The Court will consider your views.  To object, you must send a letter saying that you object to the settlement(s), Class Counsel's request for attorneys' fees and expenses, and/or the requested service awards for the Class Representatives in *In re Apple and AT&T iPad Unlimited Data Plan Litigation*, Case No. 5:10-cv-02553-RMW.  To be valid, your objection must include: (a) your name, address, and telephone number; (b) your signature; (c) a statement that you are a member of the Apple Class and/or the AT&T Subclass and an explanation of the basis upon which you claim to be a member of the Apple Class and/or the AT&T Subclass; (d) all grounds for your objection; and (e) the identity of all counsel, if any,

who represent you.  The objection and any supporting papers must be mailed to the following two addressees, postmarked no later than **[date]**:

| COURT | SETTLEMENT ADMINISTRATOR |
|---|---|
| Clerk of the Court<br>United States District Court<br>San Jose Division<br>280 South 1st Street<br>San Jose, CA 95113 | [ADDRESS] |

### 20.    What's the difference between objecting and excluding?

Objecting is simply telling the Court that you don't like something about the settlement(s), the request for attorneys' fees and expenses, and/or the request for service awards.  Excluding yourself is telling the Court that you don't want to be part of the settlement(s).  If you exclude yourself from a settlement, you cannot object to that settlement.

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the settlements.  You may attend, and you may ask to speak, but you don't have to.

### 21.    When and where will the Court decide whether to approve the settlements?

The Court will hold a Fairness Hearing at 9:00 a.m. on [date], at the United States District Court for the Northern District of California, San Jose Division, Courtroom 6 (4th Floor) located at 280 South 1st Street, San Jose, California, 95113.  At this hearing the Court will consider whether the settlements are fair, reasonable, and adequate.  If there are objections, the Court will consider them.  The Court will listen to people who have asked to speak at the hearing.  The Court may also consider how much to award Class Counsel and the amount of service awards for the Class Representatives.  After the hearing, the Court will decide whether to approve the settlements.  We do not know how long these decisions will take.

### 22.    Do I have to come to the hearing?

No.  Class Counsel will answer questions that the Court may have.  But, you are welcome to come at your own expense.  If you send an objection, you don't have to come to Court to talk about it.  As long as your written objection was mailed on time and meets the other criteria described in section 19 above, the Court will consider it.  You may also pay your own lawyer to attend, but it's not necessary.

### 23.    May I speak at the hearing?

You may ask the Court for permission to speak at the Fairness Hearing.  To do so, you must send a letter saying that you intend to appear and speak at the Fairness Hearing in "*In re Apple and AT&T iPad Unlimited Data Plan Litigation*, Case No. 5:10-cv-02553-RMW."  Be sure to include the case name and number, your name, address, and telephone number, your signature, and the identity of any lawyers, if any, who will appear on your behalf.  Your letter

of intent to appear and speak must be mailed to the Clerk of the Court and the Settlement Administrator, at the addresses listed in section 19 above, postmarked no later than **[date]**. You cannot speak at the Fairness Hearing if you exclude yourself from the settlements.

## IF YOU DO NOTHING

**24.     What happens if I do nothing at all?**

If you do nothing, you will not receive a cash payment or Data Plan Benefit. If you don't exclude yourself from the Apple settlement, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against Apple about the legal issues in this case. If you don't exclude yourself from the AT&T settlement, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against AT&T about the legal issues in this case.

## GETTING MORE INFORMATION

**25.     Are there more details about the settlements?**

This notice summarizes the proposed settlements.  More details are in the Settlement Agreements, copies of which are available at www.____.com.  Also, copies of the Settlement Agreements and the other documents relating to the case are on file at the United States District Court for the Northern District of California, San Jose Division, and may be examined and copied at any time during regular office hours at the Office of the Clerk, 280 South 1st Street, San Jose, California, 95113.

**26.     How do I get more information?**

You can visit www._____.com, where you will find answers to common questions about the settlements, the Claim Form, a copy of the Complaint in this case, copies of the Settlement Agreements, plus other information.   **Questions may not be directed to the Court.**

Date: _____.

1

2

3

4

5

6

7

8                           NORTHERN DISTRICT OF CALIFORNIA

9                               SAN JOSE DIVISION

10

11   In re Apple and AT&T iPad Unlimited Data Plan          Case No.    5:10-cv-02553 RMW
     Litigation,
12                                                          **CLASS ACTION**

13

14                          ALL CONSOLIDATED
                            ACTIONS
15

16

17

18                              **EXHIBIT B**

19              **DUAL POSTCARD NOTICE OF SETTLEMENT**

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LEGAL NOTICE**

# If you purchased or ordered an iPad with WiFi + 3G on or before June 7, 2010, you could be entitled to $40 cash from Apple, and other benefits from AT&T, under class action settlements.

**The Court authorized this notice. This is not a solicitation from a lawyer. You are not being sued. This notice may affect your legal rights. Please read it carefully.**

**For more information, visit www._____.com or call 1-800_____.**

## Your Personal Claim Number is _____.

You may be entitled to a $40 cash payment from Apple, and other benefits from AT&T, under two settlements in class action lawsuits titled *In re Apple and AT&T iPad Unlimited Data Plan Litigation*. The lawsuits claimed that iPad 3G purchasers were not provided with access to an "unlimited" data plan in the manner originally advertised by Apple and AT&T. Apple and AT&T deny all allegations. The settlement is not an admission of wrongdoing.

**WHO'S AFFECTED?**

You're an "Apple Class Member" if you are a United States resident who purchased or ordered an iPad 3G in the United States on or before June 7, 2010. You're an "AT&T Subclass Member" if you also did not sign up for any AT&T data plan for that iPad at any time.

**WHAT CAN YOU GET FROM THE SETTLEMENTS?**

Apple will provide a $40 cash payment to eligible Apple Class Members. AT&T will provide a "Data Plan Benefit" to eligible AT&T Subclass Members. The Data Plan Benefit provides an AT&T 5GB iPad data plan for $30/month for up to one year, which is a $20/month discount from the current monthly rate.

**HOW DO YOU RECEIVE BENEFITS?**

You must submit a valid Claim Form and meet the eligibility requirements of the settlements. The Claim Form will require you to affirm that the ability to switch in and out of the "unlimited" data plan was a factor in your decision to purchase an iPad 3G. You can submit a Claim Form online by visiting **[claim**

**form specific address]**. Or you can also request a Claim Form by calling 1-888-____. **The Personal Claim Number above will assist in making your claim.** You may submit claims for the Cash Benefit, the Data Plan Benefit, or both. Only eligible persons will receive benefits.

**IMPORTANT DEADLINES**

**You must submit your Claim Form on or before [date] or you will lose your right to obtain these benefits.**

**WHAT ARE YOUR OTHER OPTIONS?**

If you don't want to make a claim and you don't want to be legally bound by the settlement and judgment with Apple, with AT&T, or both, you must send a written request postmarked no later than **[date]**. If you do not exclude yourself, you may object to one or both of the settlements or Class Counsel's fee application. Objections must be received by [date]. The Court will hold a hearing on [date] at 9:00 a.m. to consider whether to approve (1) the settlements; (2) attorneys' fees and expenses for Class Counsel of up to $1,750,000; and (3) service awards of up to $1,000 for each of the five class representatives. You may appear at the hearing, but you don't have to. You will be represented by Class Counsel or you may hire your own attorney at your expense. **For a detailed notice with more information about the settlements, including how to exclude yourself or object, or to see Class Counsel's fee application when it is filed, go to www._____.com or call toll free 1-888-_____.**

1

2

3

4

5

6

7

8

NORTHERN DISTRICT OF CALIFORNIA

9

SAN JOSE DIVISION

10

11

In re Apple and AT&T iPad Unlimited Data Plan Litigation,

Case No.    5:10-cv-02553 RMW

12

**CLASS ACTION**

13

14

ALL CONSOLIDATED ACTIONS

15

16

17

18

**EXHIBIT C**

19

**DUAL SUMMARY NOTICE OF SETTLEMENT**

20

21

22

23

24

25

26

27

28

1

2 <u>LEGAL NOTICE</u>

3
# If you purchased or ordered an iPad with WiFi + 3G
4
# on or before June 7, 2010, you could be entitled to $40
5
# cash from Apple, and other benefits from AT&T,
6
# under class action settlements.

7
**The Court authorized this notice. This is not a solicitation from a lawyer.  You are not being sued.  This notice may affect your legal rights.  Please read it carefully.**
8

9
**For more information, visit www._____.com or call 1-800_____.**

10
## Your Personal Claim Number is _____.

11
You may be entitled to a $40 cash payment from Apple, and other benefits from AT&T, under two
12 settlements that have been reached in class action lawsuits titled ***In re Apple and AT&T iPad Unlimited***
13 ***Data Plan Litigation***.  The United States District Court for the Northern District of California
14 authorized this notice.  The Court will have a hearing to consider whether to approve the settlements so that
15 the benefits may be provided.

16 **WHO'S AFFECTED?**

17 You're an "Apple Class Member" if you are a United States resident who purchased or ordered an iPad 3G
18 in the United States on or before June 7, 2010. You're an "AT&T Subclass Member" if you also did
19 not sign up for any AT&T data plan for that iPad at any time.

20 **WHAT'S THIS CASE ABOUT?**

21
The lawsuits claimed that iPad 3G purchasers were
22 not provided with access to an "unlimited" data plan in the manner originally advertised by Apple and
23 AT&T.  Apple and AT&T deny all allegations and are entering into these settlements to avoid burdensome
24 and costly litigation.  The settlements are not an admission of wrongdoing.

25 **WHAT CAN YOU GET FROM THE SETTLEMENTS?**

26 Apple will provide a $40 cash payment to all Apple Class Members who submit a valid Claim Form.
27 AT&T will provide a "Data Plan Benefit" to AT&T Subclass Members who **did not** sign up for an AT&T
28 3G data plan for their iPad at any time and who submit a valid Claim Form.  The Data Plan Benefit
provides an AT&T 5GB iPad data plan for $30/month

for up to one year, which is a $20/month discount from the current monthly rate; if the monthly rate of the 5GB iPad data plan changes, a discount of $20/month will still be provided.

**HOW DO YOU RECEIVE BENEFITS?**

You must submit a valid Claim Form.  The Claim Form will require you to affirm that the ability to switch in and out of the "unlimited" data plan was a factor in your decision to purchase an iPad 3G.

You can submit a Claim Form online by following **this link**.  Or you can also request a Claim Form by calling 1-888-____.  **The Personal Claim Number above will assist in making your claim.**  You may submit claims for the Cash Benefit, the Data Plan Benefit, or both.  Only eligible persons will receive benefits.

**IMPORTANT DEADLINES**

**You must submit your Claim Form on or before [date] or you will lose your right to obtain these benefits.**  If you wish to receive a reminder notice before the deadline, click here or go to [www._____.com].

**WHAT ARE YOUR OTHER OPTIONS?**

If you don't want to make a claim and you don't want to be legally bound by the settlement with Apple, the settlement with AT&T, or both settlements, you must send a written request postmarked no later than [date].  If you don't timely exclude yourself, you will not be able to sue, or continue to sue, the defendant in that settlement about the legal claims in this case and will be bound by any judgment.  If you exclude

1

yourself, you will not be eligible to receive benefits under that settlement.

If you do not exclude yourself, you may object to one or both of the settlements or Class Counsel's fee application. Objections must be received by [date]. The detailed notice (available by calling 1-800-___ or at www._____.com) describes how to exclude yourself or object. The Court will hold a hearing in this case (*In re Apple and AT&T iPad Unlimited Data Plan Litigation*, Case No. 5:10-02553-RMW) on [date] at 9:00 a.m. to consider whether to approve (1) the settlements; (2) attorneys' fees and expenses for Class Counsel of up to $1,750,000; and (3) service awards of up to $1,000 for each of the five class

representatives who represented the class in this case. You may appear at the hearing, but you don't have to. To obtain a detailed notice and Claim Form, or to review Class Counsel's fee application once it is filed, go to www._____.com or call toll free 1-888-_____.

**WHO REPRESENTS YOU?**

The Court has appointed Class Counsel to represent the Class. The law firms appointed as Class Counsel are listed in the detailed notice, available by calling 1-800-___ or at www._____.com. You may hire your own attorney, but you will have to pay that attorney.

1
2
3
4
5
6
7

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| In re Apple and AT&T iPad Unlimited Data Plan Litigation, | Case No.    5:10-cv-02553 RMW |
|---|---|
| | **CLASS ACTION** |
| ALL CONSOLIDATED ACTIONS | |

**EXHIBIT D**

**PUBLISHED NOTICE OF SETTLEMENT**

1
2
3

**LEGAL NOTICE**

# If you purchased or ordered an iPad with WiFi + 3G on or before June 7, 2010, you could be entitled to cash and other benefits under class action settlements.

**The Court authorized this notice. This is not a solicitation from a lawyer.  You are not being sued.  This notice may affect your legal rights.  Please read it carefully.**

**For more information, visit www._____.com or call 1-800_____.**

You may be entitled to a cash payment from Apple and other benefits from AT&T under two settlements that have been reached in class action lawsuits titled *In re Apple and AT&T iPad Unlimited Data Plan Litigation*.  The United States District Court for the Northern District of California authorized this notice.  The Court will have a hearing to consider whether to approve the settlements so that the benefits may be provided.

**WHO'S AFFECTED?**

You're an "Apple Class Member" if you are a United States resident who purchased or ordered an iPad 3G in the United States on or before June 7, 2010.  You're an "AT&T Subclass Member" if you also did not sign up for an AT&T data plan for that iPad at any time.

**WHAT'S THIS CASE ABOUT?**

The lawsuits claimed that iPad 3G purchasers were not provided with access to an "unlimited" data plan in the manner originally advertised by Apple and AT&T.  Apple and AT&T deny all allegations and are entering into these settlements to avoid burdensome and costly litigation.  The settlements are not an admission of wrongdoing.

**WHAT CAN YOU GET FROM THE SETTLEMENTS?**

Apple will provide a $40 cash payment to all Apple Class Members who submit a valid Claim Form.  In addition, AT&T will provide a "Data Plan Benefit" to AT&T Subclass Members who **did not** sign up for an AT&T 3G data plan for their iPad at any time and who submit a valid Claim Form.  The Data Plan Benefit provides an AT&T 5GB iPad data plan for $30/month for up to one year, which is a $20/month

discount from the current monthly rate; if the monthly rate of the 5GB iPad data plan changes, a discount of $20/month will still be provided.

**HOW DO YOU RECEIVE BENEFITS?**

You must submit a valid Claim Form.  The Claim Form will require you to affirm that the ability to switch in and out of the "unlimited" data plan was a factor in your decision to purchase an iPad 3G.  Go to www._____.com or call 1-888-____ to obtain the Claim Form and detailed instructions. You may submit claims for the Cash Benefit, the Data Plan Benefit, or both.  Only eligible persons will receive benefits.

**IMPORTANT DEADLINES**

**You must submit your Claim Form on or before [date] or you will lose your right to obtain these benefits.**  If you wish to receive a reminder notice before the deadline, go to [www._____.com].

**WHAT ARE YOUR OTHER OPTIONS?**

If you don't want to make a claim and you don't want to be legally bound by the settlement with Apple, the settlement with AT&T, or both settlements, you must send a written request postmarked no later than [date]. If you don't timely exclude yourself, you will not be able to sue, or continue to sue, the defendant in that settlement about the legal claims in this case and will be bound by any judgment.  If you exclude yourself, you will not be eligible to receive benefits under that settlement.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2   If you do not exclude yourself, you may object to one
    or both of the settlements or Class Counsel's fee

3   application. Objections must be received by **[date]**.
    The detailed notice (available by calling 1-800-___ or

4   at www._____.com) describes how to exclude
    yourself or object. The Court will hold a hearing in

5   this case (*In re Apple and AT&T iPad Unlimited
    Data Plan Litigation*, **Case No. 5:10-cv-02553-
    RMW**) on [date] at 9:00 a.m. to consider whether to

6   approve (1) the settlements; (2) attorneys' fees and
    expenses for Class Counsel of up to $1,750,000; and

7   (3) service awards of up to $1,000 for each of the five
    class representatives who represented the class in this

8   case. You may appear at the hearing, but you don't
    have to. To obtain a detailed notice and Claim Form,

9   or to review Class Counsel's fee application once it is
    filed, go to www._____.com or call toll free 1-888-

10  _____

11  **WHO REPRESENTS YOU?**

12  The Court has appointed Class Counsel to represent
    the Class. The law firms appointed as Class Counsel

13  are listed in the detailed notice, available by calling 1-
    800-___ or at www._____.com. You may hire your

14  own attorney, but you will have to pay that attorney.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re Apple and AT&T iPad Unlimited Data Plan Litigation | Case No. 5:10-cv-02553 RMW |
| | CLASS ACTION |
| ALL CONSOLIDATED ACTIONS | |

**EXHIBIT E**

**CLAIM FORM FOR DIRECT NOTICE RECIPIENTS (DUAL)**

# CLAIM FORM

You only need to fill out this one Claim Form whether you are claiming the $40 cash payment from Apple, the Data Plan Benefit from AT&T, or both benefits.  See below for further instructions.


## A.    CLAIMANT INFORMATION  (All Claims)

You **must** complete every part of this Section to get benefits.  The information you provide will be treated as confidential.  The $40 cash payment will be sent to the street address you provide; instructions for redeeming the Data Plan Benefit will be sent to the e-mail address you provide.

Name (Full name required):    (First)                (Last) _____

Address: _____

City: _____

State: _____

Zip Code: _____

E-mail (required for Data Plan Benefit; optional for $40 cash payment): _____

►Personal Claim Number (required): ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐
(If your Personal Claim Number is not automatically filled in, please refer to the email or postcard notice that you received regarding this settlement.  It will list your Personal Claim Number.)


## B.    CLAIM FOR CASH PAYMENT

You **must** complete this Section by checking the box to claim the $40 cash payment from Apple:

☐    The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

## C.   **CLAIM FOR DATA PLAN BENEFIT**

### 1.   **Section C1**

You **must** complete this Section, by checking **both boxes**, to claim the Data Plan Benefit from AT&T.

☐   The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

☐   I have not signed up for or purchased an AT&T data plan at any time for the iPad 3G that I purchased on or before June 7, 2010.

### 2.   **Section C2**

Only complete this Section (by checking the box and entering the requested information) if you no longer have the iPad 3G that you purchased or ordered on or before June 7, 2010 and you want to use the Data Plan Benefit for a later-generation iPad that you now have.

☐   I no longer have the iPad 3G that I purchased or ordered on or before June 7, 2010, but currently own a later-generation iPad with the following serial number and IMEI, and would like to use the Data Plan Benefit for this iPad:

Serial number ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ (fill in)

IMEI number ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ (fill in)

(To determine the serial number of your iPad, look on the back of your iPad or go to "About" in your Settings menu.  To determine the IMEI number of your iPad, go to "About" in your Settings menu.)

## D.   **CERTIFICATION  (All Claims)**

You **must** check the box below for your claim to be valid:

☐   I attest that the information I have provided in this Claim Form is true and correct to the best of my knowledge and belief.

### **[SUBMIT BUTTON]**

**REMINDER**:  If you don't submit your completed Claim Form on or before **[date]**, your claim will be rejected.

### INSTRUCTIONS FOR CLAIM FORM

1. READ THESE INSTRUCTIONS CAREFULLY.  IF YOU FAIL TO FOLLOW THESE INSTRUCTIONS, YOU MAY LOSE CERTAIN BENEFITS TO WHICH YOU MIGHT OTHERWISE BE ENTITLED.

2. **What cash benefits are provided for in the settlement with Apple?**
   The settlement with Apple will provide a $40 cash payment if you submit a valid Claim Form and meet the eligibility requirements set out in the full notice.  You are limited to one $40 cash payment per iPad 3G.

3. **What benefits are provided for in the settlement with AT&T?**
   The settlement with AT&T will provide a "Data Plan Benefit" if you submit a valid Claim Form and meet the eligibility requirements set out in the full notice.  If you are eligible for the Data Plan Benefit, you will be able to sign up for an AT&T 5GB iPad data plan for a discounted monthly rate of $30/month for up to one year (a discount of $20/month from the regular $50/month rate).  To the extent AT&T lowers the prices of its 5GB iPad data plan, a discount of $20/month will still be provided.  There is a limit of one Data Plan Benefit per qualifying iPad 3G.

4. **How do I submit a claim?**
   To make a claim for the $40 cash payment, the Data Plan Benefit, or both, complete and submit this Claim Form.  You can submit your Claim Form online, at no charge, by clicking [the SUBMIT BUTTON] above.

   If you prefer, you may also download and print a Claim Form by visiting **www._____.com**, fill it out, and mail it (at your own expense) to:  [CLAIMS ADMINISTRATOR].  You can also call **1-888-XXX-XXXX** to request a Claim Form.

   To be valid, your Claim Form must be completely and accurately filled out and must include all required information.  Only eligible persons will receive benefits.  If your Claim Form is incomplete, untimely, or contains false information, it may be rejected by the Claims Administrator.

5. **What is the deadline for submitting a claim?**
   You must submit your Claim Form by no later than **[date]**.  If you fail to submit your Claim Form by the deadline, your claim will be rejected, and you will be deemed to have waived all rights to receive benefits under these settlements.

6. **Where can I get more information?**
   For more information or if you have any questions about completing this Claim Form, please visit **www._____.com.**

   Unless you request exclusion from the Apple Class or AT&T Subclass (as explained in the detailed notice available at www._____.com), you will be bound by the Settlement Agreements and Releases and the Final Judgment even if you do not submit the Claim Form.

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re Apple and AT&T iPad Unlimited Data Plan Litigation | Case No. 5:10-cv-02553 RMW |
| | CLASS ACTION |
| ALL   CONSOLIDATED ACTIONS | |

**EXHIBIT F**

**CLAIM FORM FOR INDIRECT NOTICE RECIPIENTS (ONLINE CLAIMS)**

# CLAIM FORM

You only need to fill out this one Claim Form whether you are claiming the $40 cash payment from Apple, the Data Plan Benefit from AT&T, or both benefits.  See below for further instructions.

## A.     __CLAIMANT INFORMATION__  (All Claims)

You **must** complete every part of this Section to get benefits.  The information you provide will be treated as confidential.  The $40 cash payment will be sent to the street address you provide; instructions for redeeming the Data Plan Benefit will be sent to the e-mail address you provide.

Name (Full name required):    (First)                    (Last)

Address:

City:

State:

Zip Code:

E-mail (required for Data Plan Benefit; optional for $40 cash payment):

▶ iPad Serial Number: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐

(Please enter the serial number for the iPad 3G that you purchased or ordered on or before June 7, 2010.  If you purchased or ordered multiple iPad 3Gs on or before June 7, 2010, you must fill out and submit a separate Claim Form for each iPad for which you wish to make a claim.   To determine the serial number of your iPad, look on the back of your iPad or go to "About" in your Settings menu.  If you no longer own your iPad, you can verify your serial number by going to [hyperlink].)

## B.     __CLAIM FOR CASH PAYMENT__

You **must** complete this Section, by checking the box, if you want to claim the $40 cash payment from Apple:

☐       The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

C.    **CLAIM FOR DATA PLAN BENEFIT**

    1.    **Section C1**

You **must** complete this Section, by checking **both boxes**, if you want to claim the <u>Data Plan Benefit</u> from AT&T.

☐    The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

☐    I have not signed up for or purchased an AT&T data plan at any time for the iPad 3G that I purchased on or before June 7, 2010.

    2.    **Section C2**

Only complete this Section (by checking the box and entering the requested information) if you no longer have the iPad 3G that you purchased or ordered on or before June 7, 2010 and you want to use the <u>Data Plan Benefit</u> for a later-generation iPad that you now have.

☐    I no longer have the iPad 3G that I purchased or ordered on or before June 7, 2010, but currently own a later-generation iPad with the following serial number and IMEI, and would like to use the Data Plan Benefit for this iPad:

Serial number ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐☐ (fill in)

IMEI number ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐☐ (fill in)

(To determine the serial number of your iPad, look on the back of your iPad or go to "About" in your Settings menu.  To determine the IMEI number of your iPad, go to "About" in your Settings menu.)

D.    **CERTIFICATION  (All Claims)**

You **must** check the box below for your claim to be valid:

☐    I attest that the information I have provided in this Claim Form is true and correct to the best of my knowledge and belief.

**[SUBMIT BUTTON]**

**REMINDER**:  If you don't submit your Claim Form on or before **[date]**, your claim will be rejected.

**INSTRUCTIONS FOR CLAIM FORM**

1.  READ THESE INSTRUCTIONS CAREFULLY.  IF YOU FAIL TO FOLLOW THESE INSTRUCTIONS, YOU MAY LOSE CERTAIN BENEFITS TO WHICH YOU MIGHT OTHERWISE BE ENTITLED.

2.  **What cash benefits are provided for in the settlement with Apple?**
    The settlement with Apple will provide a $40 cash payment if you submit a valid Claim Form and meet the eligibility requirements set out in the full notice.  You are limited to one $40 cash payment per iPad 3G.

3.  **What benefits are provided for in the settlement with AT&T?**
    The settlement with AT&T will provide a "Data Plan Benefit" if you submit a valid Claim Form and meet the eligibility requirements set out in the full notice.  If you are eligible for the Data Plan Benefit, you will be able to sign up for an AT&T 5GB iPad data plan for a discounted monthly rate of $30/month for up to one year (a discount of $20/month from the regular $50/month rate).  To the extent AT&T lowers the prices of its 5GB iPad data plan, a discount of $20/month will still be provided.  There is a limit of one Data Plan Benefit per qualifying iPad 3G.

4.  **How do I submit a claim?**
    To make a claim for the $40 cash payment, the Data Plan Benefit, or both, complete and submit this Claim Form.  You can submit your Claim Form online, at no charge, by clicking [the SUBMIT BUTTON] above.

    If you prefer, you may also download and print a Claim Form by visiting **www._____.com**, fill it out, and mail it (at your own expense) to:  [CLAIMS ADMINISTRATOR].  You can also call **1-888-XXX-XXXX** to request a Claim Form.

    To be valid, your Claim Form must be completely and accurately filled out and must include all required information.  Only eligible persons will receive benefits.  If your Claim Form is incomplete, untimely, or contains false information, it may be rejected by the Claims Administrator.

5.  **What is the deadline for submitting a claim?**
    You must submit your Claim Form by no later than **[date]**.  If you fail to submit your Claim Form by the deadline, your claim will be rejected, and you will be deemed to have waived all rights to receive benefits under these settlements.

6.  **Where can I get more information?**
    For more information or if you have any questions about completing this Claim Form, please visit **www._____.com.**

    Unless you request exclusion from the Apple Class or AT&T Subclass (as explained in the detailed notice available at www._____.com), you will be bound by the Settlement Agreements and Releases and the Final Judgment even if you do not submit the Claim Form.

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re Apple and AT&T iPad Unlimited Data Plan Litigation<br><br><br><br>ALL    CONSOLIDATED ACTIONS | Case No. 5:10-cv-02553 RMW<br><br>CLASS ACTION |

**EXHIBIT G**

**CLAIM FORM FOR INDIRECT NOTICE RECIPIENTS (MAILED CLAIMS)**

# CLAIM FORM

You only need to use this one Claim Form whether you are claiming the $40 cash payment from Apple, the Data Plan Benefit from AT&T, or both benefits.  See below for further instructions.

## A.    **CLAIMANT INFORMATION**  (All Claims)

You **must** complete every part of this Section to get benefits.  The information you provide will be treated as confidential.  The $40 cash payment will be sent to the name and street address you provide; instructions for redeeming the Data Plan Benefit will be sent to the e-mail address you provide.

Name (Full name required):   (First)                    (Last)

Address:

City:

State:

Zip Code:

E-mail (required for Data Plan Benefit; optional for $40 cash payment):

▶iPad Serial Number: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐

(Please enter the serial number for the iPad 3G that you purchased or ordered on or before June 7, 2010.  If you purchased or ordered multiple iPad 3Gs on or before June 7, 2010, you must fill out and submit a separate Claim Form for each iPad for which you wish to make a claim.  To determine the serial number of your iPad, look on the back of your iPad or go to "About" in your Settings menu.  If you no longer own your iPad, you can verify your serial number by going to [hyperlink].)

## B.    **CLAIM FOR CASH PAYMENT**

You **must** complete this Section, by checking the box, if you want to claim the $40 cash payment from Apple:

☐    The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

### C.     <u>CLAIM FOR DATA PLAN BENEFIT</u>

#### 1.     <u>Section C1</u>

You **must** complete this Section, by checking **both boxes**, if you want to claim the <u>Data Plan Benefit</u> from AT&T.

☐     The ability to switch in and out of the "unlimited" data plan was a factor in my decision to purchase an iPad 3G.

☐     I have not signed up for or purchased an AT&T data plan at any time for the iPad 3G that I purchased on or before June 7, 2010.

#### 2.     <u>Section C2</u>

Only complete this Section (by checking the box and entering the requested information) if you no longer have the iPad 3G that you purchased or ordered on or before June 7, 2010 and you want to use the <u>Data Plan Benefit</u> for a later-generation iPad that you now have.

☐     I no longer have the iPad 3G that I purchased or ordered on or before June 7, 2010, but currently own a later-generation iPad with the following serial number and IMEI, and would like to use the Data Plan Benefit for this iPad:

Serial number ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ (fill in)

IMEI number ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ (fill in)

(To determine the serial number of your iPad, look on the back of your iPad or go to "About" in your Settings menu.  To determine the IMEI number of your iPad, go to "About" in your Settings menu.)

### D.     CERTIFICATION  (All Claims)

You **must** check this box and sign below for your claim to be valid:

☐     I attest that the information I have provided in this Claim Form is true and correct to the best of my knowledge and belief.

_____     _____

**SIGNED**                             **DATE**

**REMINDER**:  If you don't send your Claim Form so that it is postmarked on or before **[date]**, your claim will be rejected.

sf-3325929

## INSTRUCTIONS FOR CLAIM FORM

1. READ THESE INSTRUCTIONS CAREFULLY.  IF YOU FAIL TO FOLLOW THESE INSTRUCTIONS, YOU MAY LOSE CERTAIN BENEFITS TO WHICH YOU MIGHT OTHERWISE BE ENTITLED.

2. **What cash benefits are provided for in the settlement with Apple?**
   The settlement with Apple will provide a $40 cash payment if you submit a valid Claim Form and meet the eligibility requirements set out in the full notice.  You are limited to one $40 cash payment per iPad 3G.

3. **What benefits are provided for in the settlement with AT&T?**
   The settlement with AT&T will provide a "Data Plan Benefit" if you submit a valid Claim Form and meet the eligibility requirements set out in the full notice.  If you are eligible for the Data Plan Benefit, you will be able to sign up for an AT&T 5GB iPad data plan for a discounted monthly rate of $30/month for up to one year (a discount of $20/month from the regular $50/month rate).  To the extent AT&T lowers the prices of its 5GB iPad data plan, a discount of $20/month will still be provided.  There is a limit of one Data Plan Benefit per qualifying iPad 3G.

4. **How do I submit a claim?**
   To make a claim for the $40 cash payment, the Data Plan Benefit, or both, complete this Claim Form and mail it (with necessary postage) to: [CLAIMS ADMINISTRATOR].

   If you would prefer, you can also complete and submit a Claim Form online, at no charge to you, by visiting www._____.com.

   To be valid, your Claim Form must be completely and accurately filled out and must include all required information.  Only eligible persons will receive benefits.   If your Claim Form is incomplete, untimely, or contains false information, it may be rejected by the Claims Administrator.

5. **What is the deadline for submitting a claim?**
   You must submit your Claim Form so that it is postmarked no later than **[date]**.  If you fail to submit your Claim Form by the deadline, your claim will be rejected, and you will be deemed to have waived all rights to receive benefits under these settlements.

6. **Where can I get more information?**
   For more information or if you have any questions about completing this Claim Form, please visit **www._____.com.**

   Unless you request exclusion from the Apple Class or AT&T Subclass (as explained in the detailed notice available at www._____.com), you will be bound by the Settlement Agreements and Releases and the Final Judgment even if you do not submit the Claim Form.

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         NORTHERN DISTRICT OF CALIFORNIA

10                               SAN JOSE DIVISION

11

12   In re Apple and AT&T iPad Unlimited Data Plan        Case No. 5:10-cv-02553 RMW
     Litigation

13                                                        CLASS ACTION

14
                       ALL CONSOLIDATED
15                     ACTIONS

16

17

18

19                              **EXHIBIT H**
20                   **[PROPOSED] PRELIMINARY APPROVAL ORDER**

21

22

23

24

25

26

27

28

sf-3173149

1

2          WHEREAS, this Court has reviewed the Stipulation of Settlement ("Agreement")

3   entered into by and among defendant AT&T Mobility LLC ("ATTM") and plaintiff Joe

4   Hanna, as an individual and as "Class Representative" (collectively the "Parties" in the

5   above-referenced "Action"), together with all exhibits thereto, the record in this Action,

6   and the arguments of counsel;

7          WHEREAS, this Court preliminarily finds, for the purposes of settlement only,

8   that the class alleged in the Action meets all the prerequisites of Federal Rules of Civil

9   Procedure Rule 23 for class certification, including numerosity, commonality, typicality,

10  ascertainability, predominance of common issues, superiority, and that the Class

11  Representative and Class Counsel are adequate representatives of the ATTM Non-

12  Subscriber Settlement Class;

13         IT IS HEREBY ORDERED AS FOLLOWS:

14         1.    Except as otherwise specifically provided, all terms and definitions used

15  herein have the same meanings as set forth in the Agreement.

16         2.    The Court has jurisdiction over the subject matter of the Action, the Class

17  Representative, the ATTM Non-Subscriber Settlement Class Members, and ATTM, and

18  venue is proper in this District.

19         3.    The proposed settlement set forth in the Agreement is hereby preliminarily

20  approved as being fair, reasonable, and adequate such that notice thereof should be given

21  to members of the ATTM Non-Subscriber Settlement Class (as defined in the following

22  paragraph).

23         4.    The Action is provisionally certified as a class action, for the purposes of

24  settlement only, pursuant to Rule 23(b)(3), which class (the "ATTM Non-Subscriber

25  Settlement Class") is defined as follows:

26                  All persons in the United States who purchased or ordered an
                    Apple iPad 3G on or before June 7, 2010 but who did not sign
27                  up for or purchase an ATTM data plan for that iPad 3G at any
                    time.  Excluded from this Class are Apple; ATTM; any entity in
28                  which ATTM or Apple has a controlling interest; ATTM and
                    Apple's directors and officers; Apple's employees; and ATTM
                    and Apple's legal representatives, successors, and assigns

1

1

2          5.      Certification of the ATTM Non-Subscriber Settlement Class shall be solely

3   for settlement purposes and without prejudice to the Parties in the event that the

4   Agreement is not finally approved by this Court or otherwise does not take effect.

5   Certification of the ATTM Non-Subscriber Settlement Class shall be vacated and shall

6   have no effect in the event that the Agreement is not finally approved by this Court or

7   otherwise does not take effect.

8          6.      Class Counsel and the Class Representative are hereby found to be and are

9   therefore appointed as adequate representatives of the ATTM Non-Subscriber Settlement

10  Class:  Michael W. Sobol and Roger N. Heller, Lieff Cabraser Heimann & Bernstein,

11  LLP, 275 Battery Street, 29th Floor, San Francisco, CA 94111.  Joe Hanna is hereby

12  appointed as Class Representative.

13         7.      The Court hereby appoints Kurtzman Carson Consultants LLC ("KCC" or

14  "Settlement Administrator") to serve as the Settlement Administrator, and directs KCC to

15  carry out all duties and responsibilities of the Settlement Administrator specified in the

16  Agreement.

17         8.      The Court finds that the forms of notice to the ATTM Non-Subscriber

18  Settlement Class regarding the pendency of the Action, this settlement, and Class

19  Counsel's fee and expense application, attached to the Agreement as Exhibits A through

20  D, and the methods for disseminating notice to members of the ATTM Non-Subscriber

21  Settlement Class in accordance with the terms of the Agreement and this Order,

22  constitute the best notice practicable under the circumstances and constitute valid, due,

23  and sufficient notice to all members of the ATTM Non-Subscriber Settlement Class,

24  complying fully with all requirements, including Federal Rule of Civil Procedure 23 and

25  due process.

26         9.      The Notice of Pendency and Proposed Settlements of Class Action ("Class

27  Notice"); the Dual Summary Notice of Settlement ("Dual Summary Notice); the Dual

28  Postcard Notice of Settlement ("Dual Postcard Notice"); and the Published Notice of

Settlement ("Published Notice"), which are attached to the Agreement as Exhibits A-D,

sf-3173149

1

2    respectively, are hereby approved as to form.  The Claim Forms, attached to the

3    Agreement as Exhibits E-G, are hereby approved as to form.

4         10.    Defendant Apple Inc. ("Apple") shall, in connection with a separate

5    settlement in this Action between Apple and plaintiffs, provide the Settlement

6    Administrator with known, reasonably available e-mail and street addresses, serial

7    numbers, and IMEI numbers for the Apple Class Members (as that term is defined in the

8    Apple settlement) based upon Apple's customer records regarding those iPad 3G

9    purchases and orders falling within the Apple Settlement Class definition (as that term is

10   defined in the Apple agreement).  Apple shall transmit this information to the Settlement

11   Administrator by no later than 10 (ten) business days after entry of this Order.  Within the

12   same time frame, Apple shall also transmit to ATTM the IMEI numbers for the potential

13   Apple Class Members (as that term is defined in the Apple settlement).  To the extent

14   feasible, ATTM shall identify for the Settlement Administrator any persons potentially

15   within the ATTM Non-Subscriber Settlement Class.  Those persons potentially within the

16   ATTM Non-Subscriber Settlement Class shall be put on a Dual Notice List.

17        11.    The deadline ("Notice Date") for initially mailing and emailing notice, and

18   for publishing notice, pursuant to the terms of the Agreement, shall be _____, 2013.

19   Backup mailed notice, pursuant to the terms of the Agreement and this Order, or other

20   remailing of notice shall not affect or delay the Notice Date.

21        12.    By no later than the first date on which notice is mailed, e-mailed or

22   published, the Settlement Administrator shall establish and maintain a toll-free telephone

23   number ("Toll-Free Number") which Class Members may call to request copies of the

24   Class Notice and Claim Form.  The Settlement Administrator shall further establish and

25   maintain a settlement website, at the address www._____.com ("Settlement Website"),

26   where ATTM Non-Subscriber Settlement Class Members may submit online Claim

27   Forms, and which shall include, without limitation, the Class Notice, a downloadable

28   Claim Form, copies of the Complaint and the Agreement, Frequently Asked Questions,

     and the Toll-Free Number.

sf-3173149

1

2      13.    By no later than the Notice Date, the Settlement Administrator shall e-mail

3   the Dual Summary Notice to those Class Members for whom an e-mail address is

4   included in the Dual Notice List.

5      14.    By no later than the Notice Date, the Settlement Administrator shall send,

6   via first-class mail postage pre-paid, the Dual Postcard Notice to those Class Members

7   for whom an e-mail address is not included, and a mailing address is included, in the

8   Dual Notice List.  All mailing addresses used for mailing the Dual Postcard Notice shall

9   be updated by the Settlement Administrator through the United States Postal Service's

10  National Change of Address database.

11     15.    For those Class Members for whom e-mail Dual Summary Notice is

12  returned undeliverable, the Settlement Administrator shall mail the Dual Postcard Notice

13  to such Class Members to the extent a mailing address is included in the Dual Notice

14  List.  For mailed Dual Postcard Notices that are returned with forwarding address

15  information, the Settlement Administrator shall re-mail the Dual Postcard Notice once to

16  the new address indicated.

17     16.    By no later than the Notice Date, ATTM, together with Apple, shall cause

18  the Published Notice to be published once in *Macworld* and once on a different date in

19  *USA Today*.  The Published Notice in *Macworld* shall not be less than 1/4 of a page in

20  size.  The Published Notice in *USA Today* shall not be less than 1/8 of a page in size.

21     17.    ATTM Non-Subscriber Settlement Class Members who so request shall

22  receive a reminder e-mail notice from the Settlement Administrator.

23     18.    ATTM Non-Subscriber Settlement Class Members shall have the option of

24  submitting claims using one of the following methods:

25          a.    ATTM Non-Subscriber Settlement Class Members may submit a

26  Claim Form electronically through the Settlement Website.  The Dual Summary Notices

27  emailed to ATTM Non-Subscriber Settlement Class Members shall contain a hyperlink to the

28  appropriate online Claim Form.  The Dual Postcard Notices mailed to ATTM Non-

4

1

2    Subscriber Settlement Class Members shall contain the web address for the appropriate

3    online Claim Form.

4              b.       ATTM Non-Subscriber Settlement Class Members may submit a

5    Claim Form by mail at their own expense.  The Settlement Website shall include a

6    downloadable, printable Claim Form, and ATTM Non-Subscriber Settlement Class Members

7    may obtain a hard copy Claim Form from the Settlement Administrator.

8        19.    ATTM Non-Subscriber Settlement Class Members who wish to claim the

9    Settlement Data Plan Benefit must submit their Claim Form within ninety (90) days from

10   the Notice Date.  Claim Forms submitted by mail must be postmarked by no later than

11   ninety (90) days from the Notice Date.

12       20.    Any person or entity falling within the ATTM Non-Subscriber Settlement

13   Class definition who seeks to be excluded from the ATTM Non-Subscriber Settlement

14   Class must send a request by first class mail, postmarked on or before [45 days after the

15   Notice Date], to the Settlement Administrator at the address indicated in the Class Notice.

16       21.    Any person or entity falling within the ATTM Non-Subscriber Settlement

17   Class definition who does not submit a valid and timely request for exclusion will be

18   bound by the Final Judgment dismissing the Action on the merits and with prejudice.

19       22.    Any ATTM Non-Subscriber Settlement Class Member who does not submit

20   a valid and timely request for exclusion may object to, or comment on, the Agreement

21   and/or Class Counsels' application for attorneys' fees and expenses.  To be considered,

22   an objection must be in writing, must be mailed to the Clerk of the Court and the

23   Settlement Administrator, at the addresses indicated in the Class Notice, postmarked no

24   later than [45 days after the Notice Date], and must include:  (a) the ATTM Non-

25   Subscriber Settlement Class Member's name, address, and telephone number, (b) the

26   ATTM Non-Subscriber Settlement Class Member's signature; (c) a statement that the

27   objecting person is a member of the ATTM Non-Subscriber Settlement Class and an

28   explanation of the basis upon which they claim to be a member of the ATTM Non-

     Subscriber Settlement Class; (d) all grounds for the objection; and (e) the identify of all

sf-3173149

counsel, if any, who represent the ATTM Non-Subscriber Settlement Class Member. Class Counsel shall file their application for attorneys' fees and costs in advance of the deadline for mailing objections.  Once it is filed, Class Counsels' application for attorneys' fees and costs shall be posted on the Settlement Website.

23.    A hearing (the "Final Approval Hearing") shall be held by the Court on _____, 20__, at _____ _.m., to consider and determine whether the requirements for certification of the ATTM Non-Subscriber Settlement Class have been met and whether the proposed settlement of the Action on the terms set forth in the Agreement should be approved as fair, reasonable, adequate, and in the best interests of the ATTM Non-Subscriber Settlement Class Members; whether Class Counsels' fee and expense application should be approved; and whether the Final Judgment approving the settlement and dismissing the Action on the merits and with prejudice against the Class Representative and all ATTM Non-Subscriber Settlement Class Members should be entered.

24.    The Final Approval Hearing may, from time to time and without further notice to the ATTM Non-Subscriber Settlement Class, be continued or adjourned by Order of the Court.  If the Final Approval Hearing is so continued or adjourned, the new date and time shall be posted on the Settlement Website.

25.    Before or at the Final Approval Hearing, the Court shall be provided with a declaration from the Settlement Administrator, confirming that the notice program approved herein has been implemented and setting forth a complete list of all persons and entities who submitted timely and valid requests for exclusion from the ATTM Non-Subscriber Settlement Class.

26.    By no later than _____ the Parties shall file any motions in support of final approval of the Agreement.  By no later than _____, Class Counsel shall file their application for attorneys' fees and expenses.  By no later than [14 days after the deadline for objections], the Parties shall file any additional papers in support of final

6

sf-3173149

approval of the Agreement; responses to objections; and/or replies in support of Class Counsels' application for attorneys' fees and expenses.

27.   Upon entry of this Order, and until further Order of the Court, all proceedings in the Action, except those proceedings in furtherance of obtaining final approval of the settlements, shall be stayed.  Until further Order of the Court, Class Members shall be barred from commencing or prosecuting any action or proceeding in any court or tribunal against the Released Parties asserting Released Claims.

28.   Counsel for the Parties are hereby authorized to utilize all reasonable procedures in connection with the administration of the Agreement which are not materially inconsistent with either this Order or the terms of the Agreement.

IT IS SO ORDERED.

Dated: _____, 2013

_____
RONALD M. WHYTE
United States District Judge

sf-3173149

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT

8

NORTHERN DISTRICT OF CALIFORNIA

9

SAN JOSE DIVISION

10

11

| | |
|---|---|
| In re Apple and AT&T iPad Unlimited Data Plan Litigation | Case No. 5:10-cv-02553 RMW |
| | CLASS ACTION |
| ALL CONSOLIDATED ACTIONS | |

12

13

14

15

16

17

18

19

**EXHIBIT I**

20

**[PROPOSED] FINAL APPROVAL ORDER**

21

22

23

24

25

26

27

28

1    This matter came on for hearing on _____, 201__.  The Court has considered

2 the Stipulation of Settlement ("Agreement") entered into by and among defendant AT&T

3 Mobility LLC ("ATTM"), plaintiff Joe Hanna, as an individual and as "Class

4 Representative" (collectively the "Parties" in the above-referenced "Action"), together

5 with all exhibits thereto, all oral and/or written objections and comments received

6 regarding the Agreement, the arguments and authorities presented by the Parties and their

7 counsel, and the record in the Action, and good cause appearing,

8    IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

9    1. All terms and definitions used herein have the same meanings as set forth in

10 the Agreement.

11    2. The Court has jurisdiction over the subject matter of the Action, the Class

12 Representative, the ATTM Non-Subscriber Settlement Class Members, and ATTM, and

13 venue is proper in this District.

14    3. The Court finds that the notice to the ATTM Non-Subscriber Settlement

15 Class of the pendency of this Action, this settlement, and Class Counsels' application for

16 attorneys' fees and expenses, as provided for in the Agreement and by Order of this

17 Court, has been implemented and constituted the best notice practicable under the

18 circumstances to all persons and entities within the definition of the ATTM Non-

19 Subscriber Settlement Class, and fully complied with all requirements, including Federal

20 Rule of Civil Procedure 23 and due process.

21    4. The Court approves the settlement as set forth in the Agreement and finds

22 that the settlement is in all respects fair, reasonable, adequate, and just to, and in the best

23 interests of, the ATTM Non-Subscriber Settlement Class Members, and further finds as

24 follows:

25    a. [Findings required by *Churchill Village LLC v. General Electric Corp.*,

26 361 F.3d 566, 575 (9th Cir. 2004).]

27    b. [Findings required by *Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935

28 (9th Cir. 2011).].

1    5.    The Court has considered and hereby overrules all objections to the

2    settlement [add specific findings regarding objections].

3    6.    Pursuant to Rule 23(c), the ATTM Non-Subscriber Settlement Class as

4    finally certified shall be defined as follows:

> All persons in the United States who purchased or ordered an
> Apple iPad 3G on or before June 7, 2010 but who did not sign
> up for or purchase an ATTM data plan for that iPad 3G at any
> time.  Excluded from this Class are Apple; ATTM; any entity in
> which ATTM or Apple has a controlling interest; ATTM and
> Apple's directors and officers; Apple's employees; and ATTM
> and Apple's legal representatives, successors, and assigns

9    7.    Excluded from the ATTM Non-Subscriber Settlement Class are persons and

10   entities who submitted timely and valid requests for exclusion pursuant to section V.K of

11   the Agreement and this Court's [Preliminary Approval Order], as determined by the

12   Settlement Administrator.  A list of persons and entities who validly and timely requested

13   exclusion is on file with this Court.

14   8.    The Parties and the Settlement Administrator shall, in good faith, implement

15   and administer the process of verifying, processing and honoring claims pursuant to the

16   terms set forth in the Agreement.

17   9.    In connection with this settlement, the Court adjudges that the payment of

18   attorneys' fees and expenses in the total amount of $_____ to Class Counsel is

19   fair, reasonable and justified under the circumstances of this case—given, *inter alia*, the

20   relief achieved for the Class Members, the time and effort devoted by Class Counsel, the

21   complexity of the legal and factual issues involved, and the contingent nature of the fee—

22   and that said attorneys' fees and expenses shall be paid to Class Counsel pursuant to the

23   terms of the Agreement.  The Court will issue a separate memorandum regarding the

24   award of attorneys' fees and expenses to Class Counsel.

25   10.   As of the Effective Date, the Class Representative and all ATTM Non-

26   Subscriber Settlement Class Members shall be forever barred from bringing or

27   prosecuting, in any capacity, any action or proceeding that involves or asserts any of the

28

1   Released Claims against any Released Person and shall conclusively be deemed to have

2   released and forever discharged the Released Persons from all Released Claims.

3         11.    The Class Representative and all ATTM Non-Subscriber Settlement Class

4   Members shall, as of the Effective Date, conclusively be deemed to have acknowledged

5   that the Released Claims may include claims, rights, demands, causes of action,

6   liabilities, or suits that are not known or suspected to exist as of the Effective Date.  The

7   Class Representative and all ATTM Non-Subscriber Settlement Class Members

8   nonetheless release all such Released Claims against the Released Persons.  Further, as of

9   the Effective Date, the Class Representative and all ATTM Non-Subscriber Settlement

10  Class Members shall be deemed to have waived any and all protections, rights and

11  benefits of California Civil Code section 1542 and any comparable statutory or common

12  law provision of any other jurisdiction.

13        12.    The benefits and payments described in the Agreement are the only

14  consideration, fees, and expenses ATTM or the Released Persons shall be obligated to

15  give to the Class Representative, ATTM Non-Subscriber Settlement Class Members, and

16  Class Counsel in connection with the Agreement and the payment of attorneys' fees and

17  expenses.

18        13.    All claims asserted against ATTM in the Action are settled and dismissed

19  on the merits and with prejudice as to the Class Representative and all ATTM Non-

20  Subscriber Settlement Class Members.  Notwithstanding the foregoing, this Order does

21  not dismiss any claims that have been or may be asserted in the future by any persons or

22  entities who have validly and timely requested exclusion from the ATTM Non-

23  Subscriber Settlement Class as provided for in section V.K of the Agreement.

24        14.    Notwithstanding the dismissal of the claims asserted against ATTM in the

25  Action, ATTM shall not claim and may not be awarded any costs, attorneys' fees, or

26  expenses.  ATTM shall not sue the Class Representative, Class Counsel, or the Class

27  Members for malicious prosecution or abuse of process based on the filing of the Action.

28

15.     Without affecting the finality of the Judgment in any way, the Court reserves exclusive and continuing jurisdiction over the Action, the Class Representative, the ATTM Non-Subscriber Settlement Class Members, and ATTM for the purposes of supervising the implementation, enforcement, construction, and interpretation of the Agreement, this Order, and the Judgment.

16.     The Agreement and this Order are not admissions of liability or fault by ATTM or the Released Persons, or a finding of the validity of any claims in the Action or of any wrongdoing or violation of law by ATTM or the Released Persons.  The Agreement and settlement are not a concession by the Parties, and to the extent permitted by law, neither this Judgment, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be offered as evidence or received in evidence in any pending or future civil, criminal, or administrative action or proceeding to establish any liability of, or admission by ATTM, the Released Persons, or any of them.  Notwithstanding the foregoing, nothing in this Order shall be interpreted to prohibit the use of this Order or the Judgment in a proceeding to consummate or enforce the Agreement or Judgment, or to defend against the assertion of Released Claims in any other proceeding, or as otherwise required by law.  All other relief not expressly granted to the ATTM Non-Subscriber Settlement Class Members is denied.

17.     Counsel for the Parties are hereby authorized to utilize all reasonable procedures in connection with the administration of the Agreement which are not materially inconsistent with either this Order or the terms of the Agreement.

IT IS SO ORDERED.

Dated: _____

_____

RONALD M. WHYTE
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re Apple and AT&T iPad Unlimited Data Plan Litigation | Case No. 5:10-cv-02553 RMW |
| | CLASS ACTION |
| ALL CONSOLIDATED ACTIONS | |

**EXHIBIT J**

**[PROPOSED] JUDGMENT**

1        Judgment is hereby entered consistent with the Court's [Final Approval Order],

2   dated _____, 201__ (the "Final Approval Order").  This document constitutes a

3   judgment and a separate document for purposes of Federal Rule of Civil Procedure 58(a).

4

    JUDGMENT APPROVED AS TO FORM BY:

5

6

    Dated: _____, 201_

7

8                                          _____
                                          RONALD M. WHYTE
                                     United States District Judge

9

10

11

    JUDGMENT ENTERED:  _____, 201_

12

    By:  CLERK OF THE UNITED STATES DISTRICT COURT

13  FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHBIT C

# Lieff
# Cabraser
# Heimann&
# Bernstein
Attorneys at Law

| | |
|---|---|
| 275 Battery Street, 29th Floor | 250 Hudson Street, 8th Floor |
| San Francisco, CA  94111-3339 | New York, NY 10013-1413 |
| Telephone:  415.956.1000 | Telephone:  212.355.9500 |
| Facsimile:  415.956.1008 | Facsimile:  212.355.9592 |

One Nashville Place
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219-2415
Telephone: 615.313.9000
Facsimile: 615.313.9965

Email: mail@lchb.com
Website: www.lieffcabraser.com

***FIRM PROFILE:***

Lieff Cabraser Heimann & Bernstein, LLP, is a sixty-plus attorney, AV-rated law firm founded in 1972 with offices in San Francisco, New York and Nashville.  We have a diversified practice, successfully representing plaintiffs in the fields of personal injury and mass torts, securities and financial fraud, employment discrimination and unlawful employment practices, product defect, antitrust and intellectual property, consumer protection, environmental and toxic exposure, False Claims Act, and human rights.  Our clients include individuals, classes or groups of persons, businesses, and public and private entities.

Lieff Cabraser has served as court-appointed Plaintiffs' Lead or Class Counsel in state and federal coordinated, multi-district, and complex litigation throughout the United States.  With co-counsel, we have represented clients across the globe in cases filed in American courts.

Lieff Cabraser is among the largest firms in the United States that only represent plaintiffs.  Described by *The American Lawyer* as "one of the nation's premier plaintiffs' firms," Lieff Cabraser enjoys a national reputation for professional integrity and the successful prosecution of our clients' claims.  We possess sophisticated legal skills and the financial resources necessary for the handling of large, complex cases, and for litigating against some of the nation's largest corporations.  We take great pride in the leadership roles our firm plays in

1043044.1

many of this country's major cases, including those resulting in landmark decisions and precedent-setting rulings.

Lieff Cabraser has litigated and resolved thousands of individual lawsuits and hundreds of class and group actions, including some of the most important civil cases in the United States over the past three decades. We have assisted our clients recover over $85 billion in verdicts and settlements. Fifteen cases were resolved for over $1 billion; another 30 cases resulted in verdicts or settlements in excess of $100 million.

In the 2012 edition of its annual list of the top plaintiffs' law firms, *The National Law Journal* again selected Lieff Cabraser. In compiling the list, *The National Law Journal* examines recent verdicts and settlements and looked for firms "representing the best qualities of the plaintiffs' bar and that demonstrated unusual dedication and creativity." Lieff Cabraser is one of only two plaintiffs' law firms in the United States to receive this honor for the last ten years.

For the past two years, *U.S. News* and *Best Lawyers* have selected Lieff Cabraser as a national "Law Firm of the Year." For 2011-2012, we were recognized in the category of Mass Torts Litigation/Class Actions – Plaintiffs. For 2013, the publications selected our firm as the nation's premier law firm in the category of Employment Law – Individuals. *U.S. News* and *Best Lawyers* ranked firms nationally in 80 different practice areas based on extensive client feedback and evaluations from 70,000 lawyers nationwide. Only one law firm in each practice area receives the "Law Firm of the Year" designation.

## *CASE PROFILES:*

### I. <u>Personal Injury and Products Liability Litigation</u>

#### A. **Current Cases**

1. ***In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation***, MDL No. 2151 (C.D. Cal.). Elizabeth J. Cabraser serves as Co-Lead Counsel for the plaintiffs in the Toyota injury cases in federal court and our firm represents individuals and families of loved ones nationwide who died in Toyota sudden acceleration accidents. Plaintiffs charge that Toyota knew of numerous complaints that its vehicles accelerated suddenly and could not be stopped by proper application of the brake pedal. Plaintiffs further charge that Toyota breached its duty to manufacture and sell safe automobiles by failing to incorporate within its vehicles a brake override system and other readily available safeguards that could have prevented sudden unintended acceleration. In 2010, U.S. District Court Judge James V. Selna denied Toyota's motion to dismiss the lawsuits. Discovery remains ongoing and cases are being selected and prepared for trial.

2.    ***Injury and Death Lawsuits Involving Wrongful Driver Conduct and Defective Tires, Transmissions, Cars and/or Vehicle Parts (Seat Belts, Roof Crush, Defective seats, and Other Defects).*** Lieff Cabraser has an active practice prosecuting claims for clients injured, or the families of loved ones who have died, by wrongful driver conduct and by unsafe and defective vehicles, tires, restraint systems, seats, and other automotive equipment. We represent clients in actions involving fatalities and serious injuries from tire and transmission failures as well as rollover accidents (and defective roofs, belts, seat back and other parts) as well as defective transmissions and/or shifter gates that cause vehicles to self-shift from park or false park into reverse. Our attorneys have received awards and recognition from *California Lawyer* magazine (Lawyer of the Year Award), the Consumer Attorneys of California, and the San Francisco Trial Lawyers Association for their dedication to their clients and outstanding success in vehicle injury cases.

3.    ***Actos Litigation.*** Lieff Cabraser represents patients who have developed bladder or prostate cancer linked to the prescription drug pioglitazone, sold under the brand name Actos by the Japan-based Takeda Pharmaceutical Company, Ltd. Actos is prescribed for patients with Type 2 Diabetes. In April 2012, Canadian health authorities reported that diabetes patients prescribed Actos for over a year had double the risk of bladder cancer compared to diabetes patients not taking Actos.

4.    ***DePuy Artificial Hip Implants Litigation***. Lieff Cabraser represents patients nationwide who received the ASR XL Acetabular and ASR Hip Resurfacing systems manufactured by DePuy Orthopedics, a unit of Johnson & Johnson. In 2010, DePuy Orthopedics announced the recall of its all-metal ASR hip implants, which were implanted in 40,000 patients from August 2005 through August 2010. The complaints allege that DePuy Orthopedics was aware its ASR hip implants were failing at a high rate, yet continued to manufacture and sell the device. In January 2011, in *In re DePuy Orthopaedics, Inc. ASR Hip Implant Products*, MDL No. 2197, the Court overseeing all DePuy recall lawsuits in federal court appointed Lieff Cabraser attorney Wendy R. Fleishman to the Plaintiffs' Steering Committee for the organization and coordination of the litigation. In July 2011, in the coordinated proceedings in California state court, the Court appointed Lieff Cabraser attorney Robert J. Nelson to serve on the Plaintiffs' Steering Committee. We also represent patients whose DePuy Pinnacle artificial hip with the metal insert, called the Ultamet metal liner, has prematurely failed.

5.    ***Fen-Phen ("Diet Drugs") Litigation.*** Since the recall was announced in 1997, Lieff Cabraser has represented individuals who suffered injuries from the "Fen-Phen" diet drugs fenfluramine (sold as

Pondimin) and/or dexfenfluramine (sold as Redux).  We served as counsel for the plaintiff that filed the first nationwide class action lawsuit against the diet drug manufacturers alleging that they had failed to adequately warn physicians and consumers of the risks associated with the drugs.  In *In re Diet Drugs (Phentermine / Fenfluramine / Dexfenfluramine) Products Liability Litigation*, MDL No. 1203 (E.D. Pa.), the Court appointed Elizabeth J. Cabraser to the Plaintiffs' Management Committee which organized and directed the Fen-Phen diet drugs litigation filed across the nation in federal courts.  In August 2000, the Court approved a $4.75 billion settlement offering both medical monitoring relief for persons exposed to the drug and compensation for persons with qualifying damage.  We represented over  2,000  persons that suffered valvular heart disease, pulmonary hypertension or other problems (such as needing echocardiogram screening for damage) due to  and/or following exposure to Fen-Phen and obtained more than $300 million in total for clients in individual cases and/or claims.  We continue to represent persons that suffered valvular heart disease due to Fen-Phen and received compensation under the Diet Drugs Settlement who now require heart value surgery.  These persons may be eligible to submit a new claim and receive additional compensation under the settlement.

6.     ***Stryker Metal Hip Implant Litigation.***  Lieff Cabraser represents hip replacement patients nationwide who received the recalled Stryker Rejuvenate and ABG II modular hip implant systems.  These patients have suffered tissue damage and have high metal particle levels in their blood stream.  For many patients, the Stryker hip implant failed necessitating painful revision surgery to extract and replace the artificial hip.

7.     ***Medtronic Infuse Litigation.***  Lieff Cabraser represents patients who have suffered serious injuries from the off-label use of the Infuse bone graft, manufactured by Medtronic Inc.  The Food and Drug Administration has approved Infuse for only one type of spine surgery, the anterior lumbar fusion.  Many patients, however, received an off-label use of Infuse were never informed of the off-label nature of the surgery.  Serious complications associated with Infuse include uncontrolled bone growth and chronic pain from nerve injuries.

8.     ***Mirena Litigation.***  A widely-used, plastic intrauterine device (IUD) that releases a hormone into the uterus to prevent pregnancy, Mirena is manufactured by Bayer Healthcare Pharmaceuticals.  Lieff Cabraser represents patients who have suffered serious injuries linked to the IUD.  These injuries include uterine perforation (the IUD tears through the cervix or the wall of the uterus), ectopic pregnancy (when the embryo implants outside the uterine cavity), pelvic infections and pelvic inflammatory disease, and thrombosis (blood clots).

9.      ***Simply Thick Litigation.***  Lieff Cabraser represents parents whose infants have died or suffered life-threatening injuries linked to Simply Thick, a thickening agent added to the feeding regimen of premature infants with difficulties swallowing.  Earlier versions of the product have been linked to necrotizing enterocolitis (NEC), a life-threatening condition characterized by the inflammation and death of intestinal tissue.

10.     ***SSRI Antidepressant Drugs and Birth Defects Litigation.***  Lieff Cabraser represents the parents of infants with birth defects whose mothers were prescribed antidepressant drugs during their pregnancy. The usage of these drugs during pregnancy has been linked to multiple types of birth defects, including, neonatal abstinence syndrome from experiencing withdrawal of the drug and persistent pulmonary hypertension of the newborn (PPHN).

11.     ***Vaginal Mesh Litigation.***  Vaginal mesh is a polypropylene material implanted as a treatment for pelvic organ prolapse or stress urinary incontinence.  Gynecare Transvaginal products, manufactured and sold by Johnson & Johnson, as well as mesh products made by Boston Scientific, AMS, Bard, Caldera, and Coloplast, have been linked to serious side effects including erosion into the vaginal wall or other organs, infection, internal organ damage, and urinary problems.

12.     ***Wright Medical Hip Litigation.***  The Profemur-Z system manufactured by Wright Medical Technology consists of three separate components:  a femoral head, a modular neck, and a femoral stem.  Prior to 2009, Profemur-Z hip system included a titanium modular neck adapter and stem which was implanted in 10,000 patients.  Lieff Cabraser represents patients whose Profemur-Z hip implant has fractured, requiring a second hip replacement surgery.

13.     ***Yaz and Yasmin Litigation***.  Lieff Cabraser represents women prescribed Yasmin and Yaz oral contraceptives who suffered blood clots, deep vein thrombosis, strokes, and heart attacks, as well as the families of loved ones who died suddenly while taking these medications.  The complaints allege that Bayer, the manufacturer of Yaz and Yasmin, failed to adequately warn patients and physicians of the increased risk of serious adverse effects from Yasmin and Yaz.  The complaints also charge that these oral contraceptives posed a greater risk of serious side effects than other widely available birth control drugs.

**B.      Successes**

1.      ***Multi-State Tobacco Litigation***.  Lieff Cabraser represented the Attorneys General of Massachusetts, Louisiana and Illinois, several additional states, and 21 cities and counties in California, in litigation

against Philip Morris, R.J. Reynolds and other cigarette manufacturers. The suits were part of the landmark $206 billion settlement announced in November 1998 between the tobacco industry and the states' attorneys general.  The states, cities and counties sought both to recover the public costs of treating smoking-related diseases and require the tobacco industry to undertake extensive modifications of its marketing and promotion activities in order to reduce teenage smoking.  In California alone, Lieff Cabraser's clients were awarded an estimated $12.5 billion to be paid over the next 25 years.

2.  ***In re Vioxx Products Liability Litigation***, MDL No. 1657 (E.D. La.). Lieff Cabraser represented patients who suffered heart attacks or strokes, and the families of loved ones who died, after having been prescribed the arthritis and pain medication Vioxx. In individual personal injury lawsuits against Merck, the manufacturer of Vioxx, our clients allege that Merck falsely promoted the safety of Vioxx and failed to disclose the full range of the drug's dangerous side effects.  In April 2005, in the federal multidistrict litigation, the Court appointed Elizabeth J. Cabraser to the Plaintiffs' Steering Committee, which has the responsibility of conducting all pretrial discovery of Vioxx cases in Federal court and pursuing all settlement options with Merck.  In August 2006, Lieff Cabraser was co-counsel in *Barnett v. Merck*, which was tried in the federal Court in New Orleans.  Lieff Cabraser attorneys Don Arbitblit and Jennifer Gross participated in the trial, working closely with attorneys Mark Robinson and Andy Birchfield. The jury reached a verdict in favor of Mr. Barnett, finding that Vioxx caused his heart attack, and that Merck's conduct justified an award of punitive damages.  In November 2007, Merck announced it had entered into an agreement with the executive committee of the Plaintiffs' Steering Committee as well as representatives of plaintiffs' counsel in state coordinated proceedings.  Merck paid $4.85 billion into a settlement fund for qualifying claims.

3.  ***In re Silicone Gel Breast Implants Products Liability Litigation***, MDL No. 926 (N.D. Ala.).  Lieff Cabraser served on the Plaintiffs' Steering Committee and was one of five members of the negotiating committee which achieved a $4.25 billion global settlement with certain defendants of the action.  This was renegotiated in 1995, and is referred to as the Revised Settlement Program ("RSP").  Over 100,000 recipients have received initial payments, reimbursement for the explanation expenses and/or long term benefits.

4.  ***Sulzer Hip and Knee Prosthesis Liability Litigation.***  In December 2000, Sulzer Orthopedics, Inc., announced the recall of approximately 30,000 units of its Inter-Op Acetabular Shell Hip Implant, followed in May 2001 with a notification of failures of its Natural Knee II Tibial Baseplate Knee Implant.  In coordinated litigation in California

state court, *In re Hip Replacement Cases*, JCCP 4165, Lieff Cabraser served as Court-appointed Plaintiffs' Liaison Counsel and Co-Lead Counsel.  In the federal litigation, *In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation*, MDL No. 1410, Lieff Cabraser played a significant role in negotiating a revised global settlement of the litigation valued at more than $1 billion.  The revised settlement, approved by the Court in May 2002, provided patients with defective implants almost twice the cash payment as under an initial settlement.  On behalf of our clients, Lieff Cabraser objected to the initial settlement.

5.      ***Aeroflot-Russian International Airlines Airbus Disaster***. Lieff Cabraser represented the families of passengers who were on Aeroflot-Russian International Airlines Flight SU593 that crashed in Siberia on March 23, 1994. The plane was en route from Moscow to Hong Kong. All passengers on board died.

According to a transcript of the cockpit voice recorder, the pilot's two children entered the cockpit during the flight and took turns flying the plane. The autopilot apparently was inadvertently turned off during this time, and the pilot was unable to remove his son from the captain's seat in time to avert the plane's fatal dive.

Lieff Cabraser, alongside French co-counsel, filed suit in France, where Airbus, the plane's manufacturer, was headquartered. The families Lieff Cabraser represented obtained substantial economic recoveries in settlement of the action.

6.      ***Air Algerie Boeing 737 Crash***. Together with French co-counsel, Lieff Cabraser represented the families of several passengers who died in the March 6, 2003 crash of a Boeing 737 airplane operated by Air Algerie. The aircraft crashed soon after takeoff from the Algerian city of Tamanrasset, after one of the engines failed. All but one of the 97 passengers were killed, along with six crew members. The families represented by Lieff Cabraser obtained economic recoveries in a settlement of the case.

7.      ***In re Bextra/Celebrex Marketing Sales Practices and Products Liability Litigation***, MDL No. 1699 (N.D. Cal.).  Lieff Cabraser served as Plaintiffs' Liaison Counsel and Elizabeth J. Cabraser chaired the Plaintiffs' Steering Committee (PSC) charged with overseeing all personal injury and consumer litigation in Federal courts nationwide arising out of the sale and marketing of the COX-2 inhibitors Bextra and Celebrex, manufactured by Pfizer, Inc. and its predecessor companies Pharmacia Corporation and G.D. Searle, Inc.

Under the global resolution of the multidistrict tort and consumer litigation announced in October 2008, Pfizer paid over $800 million to

claimants, including over $750 million to resolve death and injury claims.

In a report adopted by the Court on common benefit work performed by the PSC, the Special Master stated:

> [L]eading counsel from both sides, and the attorneys from the PSC who actively participated in this litigation, demonstrated the utmost skill and professionalism in dealing with numerous complex legal and factual issues. The briefing presented to the Special Master, and also to the Court, and the development of evidence by both sides was exemplary. The Special Master particularly wishes to recognize that leading counsel for both sides worked extremely hard to minimize disputes, and when they arose, to make sure that they were raised with a minimum of rancor and a maximum of candor before the Special Master and Court.

8. ***Comair CRJ-100 Commuter Flight Crash in Lexington, Kentucky***. A Bombardier CRJ-100 commuter plane operated by Comair, Inc., a subsidiary of Delta Air Lines, crashed on August 27, 2006 shortly after takeoff at Blue Grass Airport in Lexington, Kentucky, killing 47 passengers and two crew members. The aircraft attempted to take off from the wrong runway. The families represented by Lieff Cabraser obtained substantial economic recoveries in a settlement of the case.

9. ***Gol Airlines Flight 1907 Amazon Crash***. Lieff Cabraser served as Plaintiffs' Liaison Counsel and represents over twenty families whose loved ones died in the Gol Airlines Flight 1907 crash. On September 29, 2006, a brand-new Boeing 737-800 operated by Brazilian air carrier Gol plunged into the Amazon jungle after colliding with a smaller plane owned by the American company ExcelAire Service, Inc. None of the 149 passengers and six crew members on board the Gol flight survived the accident.

The complaint charged that the pilots of the ExcelAire jet were flying at an incorrect altitude at the time of the collision, failed to operate the jet's transponder and radio equipment properly, and failed to maintain communication with Brazilian air traffic control in violation of international civil aviation standards. If the pilots of the ExcelAire aircraft had followed these standards, plaintiffs charge that the collision would not have occurred.

At the time of the collision, the ExcelAire aircraft's transponder manufactured by Honeywell was not functioning. A transponder

transmits a plane's altitude and operates its automatic anti-collision system. The complaint charged that Honeywell shares responsibility for the tragedy because it defectively designed the transponder on the ExcelAire jet, and failed to warn of dangers resulting from foreseeable uses of the transponder. The cases settled after they were sent to Brazil for prosecution.

10.    ***In re Guidant Implantable Defibrillators Products Liability Litigation***, MDL No. 1708.  Lieff Cabraser serves on the Plaintiffs' Lead Counsel Committee in litigation in federal court arising out of the recall of Guidant cardiac defibrillators implanted in patients because of potential malfunctions in the devices.  At the time of the recall, Guidant admitted it was aware of 43 reports of device failures, and two patient deaths.  Guidant subsequently acknowledged that the actual rate of failure may be higher than the reported rate and that the number of associated deaths may be underreported since implantable cardio-defibrillators are not routinely evaluated after death.  In January 2008, the parties reached a global settlement of the action.  Guidant's settlements of defibrillator-related claims will total $240 million.

11.    ***Helios Airways Flight 522 Athens, Greece Crash***. On August 14, 2005, a Boeing 737 operating as Helios Airways flight 522 crashed north of Athens, Greece, resulting in the deaths of all passengers and crew. The aircraft was heading from Larnaca, Cyprus to Athens International Airport when ground controllers lost contact with the pilots, who had radioed in to report problems with the air conditioning system. Press reports about the official investigation indicate that a single switch for the pressurization system on the plane was not properly set by the pilots, and eventually both were rendered unconscious, along with most of the passengers and cabin crew.

Lieff Cabraser represented the families of several victims, and filed complaints alleging that a series of design defects in the Boeing 737-300 contributed to the pilots' failure to understand the nature of the problems they were facing. Foremost among those defects was a confusing pressurization warning "horn" which uses the same sound that alerts pilots to improper takeoff and landing configurations. The families represented by Lieff Cabraser obtained substantial economic recoveries in a settlement of the case.

12.    ***In re Copley Pharmaceutical, Inc., "Albuterol" Products Liability Litigation***, MDL No. 1013 (D. Wyo.).  Lieff Cabraser served on the Plaintiffs' Steering Committee in a class action lawsuit against Copley Pharmaceutical, which manufactured Albuterol, a bronchodilator prescription pharmaceutical.  Albuterol was the subject of a nationwide recall in January 1994 after a microorganism was found to have

contaminated the solution, allegedly causing numerous injuries including bronchial infections, pneumonia, respiratory distress and, in some cases, death. In October 1994, the district court certified a nationwide class on liability issues. *In re Copley Pharmaceutical*, 161 F.R.D. 456 (D. Wyo. 1995). In November 1995, the district court approved a $150 million settlement of the litigation.

13. ***Legend Single Engine "Turbine Legend" Kit Plane Crash***. On November 19, 2005, a single engine "Turbine Legend" kit plane operated by its owner crashed shortly after takeoff from a private airstrip in Tucson, Arizona, killing both the owner/pilot and a passenger. Witnesses report that the aircraft left the narrow runway during the takeoff roll and although the pilot managed to get the plane airborne, it rolled to the left and crashed.

Lieff Cabraser investigated the liability of the pilot and others, including the manufacturer of the kit and the operator of the airport from which the plane took off. The runway was 16 feet narrower than the minimum width recommended by the Federal Aviation Administration. Lieff Cabraser represented the widow of the passenger, and the case was settled on favorable, confidential terms.

14. ***Lockheed F-104 Fighter Crashes***. In the late 1960s and extending into the early 1970s, the United States sold F-104 Star Fighter jets to the German Air Force that were manufactured by Lockheed Aircraft Corporation in California. Although the F-104 Star Fighter was designed for high-altitude fighter combat, it was used in Germany and other European countries for low-level bombing and attack training missions.

Consequently, the aircraft had an extremely high crash rate, with over 300 pilots killed. Commencing in 1971, the law firm of Belli Ashe Ellison Choulos & Lieff filed hundreds of lawsuits for wrongful death and other claims on behalf of the widows and surviving children of the pilots.

Robert Lieff continued to prosecute the cases after the formation of our firm. In 1974, the lawsuits were settled with Lockheed on terms favorable to the plaintiffs. This litigation helped establish the principle that citizens of foreign countries could assert claims in United States courts and obtain substantial recoveries against an American manufacturer, based upon airplane accidents or crashes occurring outside the United States.

15. ***Manhattan Tourist Helicopter Crash***. On June 14, 2005, a Bell 206 helicopter operated by Helicopter Flight Services, Inc. fell into the East River shortly after taking off for a tourist flight over New York City. The pilot and six passengers were immersed upside-down in the water as the

helicopter overturned. Lieff Cabraser represented a passenger on the helicopter and the case was settled on favorable, confidential terms.

16. ***Mraz v. DaimlerChrysler***, No. BC 332487 (Cal. Supr. Ct.).  In March 2007, the jury returned a $54.4 million verdict, including $50 million in punitive damages, against DaimlerChrysler for intentionally failing to cure a known defect in millions of its vehicles that led to the death of Richard Mraz, a young father.  Mr. Mraz suffered fatal head injuries when the 1992 Dodge Dakota pickup truck he had been driving at his work site ran him over after he exited the vehicle believing it was in park.  The jury found that a defect in the Dodge Dakota's automatic transmission, called a park-to-reverse defect, played a substantial factor in Mr. Mraz's death and that DaimlerChrysler was negligent in the design of the vehicle for failing to warn of the defect and then for failing to adequately recall or retrofit the vehicle.

For their outstanding service to their clients in *Mraz* and advancing the rights of all persons injured by defective products, Lieff Cabraser partners Robert J. Nelson, the lead trial counsel, received the 2008 California Lawyer of the Year (CLAY) Award in the field of personal injury law, and were also selected as finalists for attorney of the year by the Consumer Attorneys of California and the San Francisco Trial Lawyers Association.

In March 2008, a Louisiana-state jury found DaimlerChrysler liable for the death of infant Collin Guillot and injuries to his parents Juli and August Guillot and their then 3-year-old daughter, Madison.  The jury returned a unanimous verdict of $5,080,000 in compensatory damages.  The jury found that a defect in the Jeep Grand Cherokee's transmission, called a park-to-reverse defect, played a substantial factor in Collin Guillot's death and the severe injuries suffered by Mr. and Mrs. Guillot and their daughter.  Lieff Cabraser served as co-counsel in the trial.

17. ***In re Telectronics Pacing Systems Inc., Accufix Atrial "J" Leads Products Liability Litigation***, MDL No. 1057 (S.D. Ohio).  Lieff Cabraser served on the court-appointed Plaintiffs' Steering Committee in a nationwide products liability action alleging that defendants placed into the stream of commerce defective pacemaker leads.  In April 1997, the district court re-certified a nationwide class of "J" Lead implantees with subclasses for the claims of medical monitoring, negligence and strict product liability.  A summary jury trial utilizing jury instructions and interrogatories designed by Lieff Cabraser occurred in February 1998.  A partial settlement was approved thereafter by the district court but reversed by the Court of Appeals.  In March 2001, the district court approved a renewed settlement that included a $58 million fund to satisfy all past, present and future claims by patients for their medical care, injuries, or damages arising from the lead.

18.    ***United Airlines Boeing 747 Disaster***. Lieff Cabraser served as Plaintiffs' Liaison Counsel on behalf of the passengers and families of passengers injured and killed in the United Airlines Boeing 747 cargo door catastrophe near Honolulu, Hawaii on February 24, 1989. Lieff Cabraser organized the litigation of the case, which included claims brought against United Airlines and The Boeing Company.

Among our work, we developed a statistical system for settling the passengers' and families' damages claims with certain defendants, and coordinated the prosecution of successful individual damages trials for wrongful death against the non-settling defendants.

19.    ***U.S. Army Blackhawk Helicopter Tower Collision***. Lieff Cabraser represented the family of a pilot who died in the November 29, 2004 crash of a U.S. Army Black Hawk Helicopter. The Black Hawk was flying during the early morning hours at an altitude of approximately 500 feet when it hit cables supporting a 1,700 foot-tall television tower, and subsequently crashed 30 miles south of Waco, Texas, killing both pilots and five passengers, all in active Army service. The tower warning lights required by government regulations were inoperative. The case was resolved through a successful, confidential settlement.

20.    ***In re Zimmer Durom Cup Product Liability Litigation***, MDL No. 2158. Lieff Cabraser served as Co-Liaison Counsel for patients nationwide injured by the defective Durom Cup manufactured by Zimmer Holdings. First sold in the U.S. in 2006, Zimmer marketed its 'metal-on-metal' Durom Cup implant as providing a greater range of motion and less wear than traditional hip replacement components.  In July 2008, Zimmer announced the suspension of Durom sales.  The complaints charged that the Durom cup was defective and led to the premature failure of the implant.  In 2011 and 2012, the patients represented by Lieff Cabraser settled their cases with Zimmer on favorable, confidential terms.

21.    ***Flash Airlines Boeing 737 Air Disaster***. Lieff Cabraser represented the families of 122 of the victims of the January 3, 2004 Flash Airlines disaster. All of the 148 passengers and crew were killed when the Flash Airlines charter flight plunged into the Red Sea off the coast of Egypt. The passengers on board included entire families, mainly from France, who had been vacationing during the winter holidays at the sea resort of Sharm el Sheikh.

Lieff Cabraser represented these families alongside European solicitors. The aircraft, a Boeing 737-300 manufactured in 1992 in the United States, was owned by an aircraft leasing company in Los Angeles, and operated pursuant to a lease agreement by an Egyptian charter carrier, Flash

Airlines. The case asserted that the air disaster was the result of mechanical failure. In 2009, settlements were achieved for all families.

22.  ***Advanced Medical Optics Complete MoisturePlus Litigation***. Lieff Cabraser represented consumers nationwide in personal injury lawsuits filed against Advanced Medical Optics arising out of the May 2007 recall of AMO's Complete MoisturePlus Multi-Purpose Contact Lens Solution.  The product was recalled due to reports of a link between a rare, but serious eye infection, *Acanthamoeba keratitis*, caused by a parasite and use of AMO's contact lens solution.  Though AMO promoted Complete MoisturePlus Multi-Purpose as "effective against the introduction of common ocular microorganisms," the complaints charged that AMO's lens solution was ineffective and vastly inferior to other multipurpose solutions on the market.  In many cases, patients were forced to undergo painful corneal transplant surgery to save their vision and some have lost all or part of their vision permanently.  The patients represented by Lieff Cabraser resolved their cases with AMO on favorable, confidential terms.

23.  ***Luisi v. Medtronic,*** No. 07 CV 4250 (D. Minn.).  Lieff Cabraser represented over seven hundred heart patients nationwide who were implanted with recalled Sprint Fidelis defibrillator leads manufactured by Medtronic Inc.  Plaintiffs charge that Medtronic has misrepresented the safety of the Sprint Fidelis leads and a defect in the device triggered their receiving massive, unnecessary electrical shocks.  On October 14, 2010, Medtronic announced that it has entered into an agreement to settle the litigation, subject to certain conditions.  As of January 2013, the majority of claims have been paid through the Settlement Administration Process.

24.  ***Blood Factor VIII And Factor IX Litigation.***  Working with counsel in Asia, Europe, Central and South America and the Middle East, Lieff Cabraser represented over 1,500 hemophiliacs worldwide, or their survivors and estates, who contracted HIV and/or Hepatitis C (HCV), and Americans with hemophilia who contracted HCV, from contaminated and defective blood factor products produced by American pharmaceutical companies.  In 2004, Lieff Cabraser was appointed Plaintiffs' Lead Counsel of the "second generation" Blood Factor MDL litigation presided over by Judge Grady in the Northern District of Illinois.  The case was resolved through a global settlement signed in 2009.

25.  ***In Re Yamaha Motor Corp. Rhino ATV Products Liability Litigation,*** MDL No. 2016 (W.D. Ky.)  Lieff Cabraser served as Plaintiffs' Lead Counsel in the litigation in federal court and Co-Lead Counsel in coordinated California state court litigation arising out of serious injuries and deaths in rollover accidents involving the Yamaha Rhino.  The complaints charged that the Yamaha Rhino contained

numerous design flaws, including the failure to equip the vehicles with side doors, which resulted in repeated broken or crushed legs, ankles or feet for riders.   Plaintiffs alleged also that the Yamaha Rhino was unstable due to a narrow track width and high center of gravity leading to rollover accidents that killed and/or injured scores of persons across the nation.  On behalf of victims and families of victims and along with the Center for Auto Safety, and the San Francisco Trauma Foundation, Lieff Cabraser advocated for numerous safety changes  to the Rhino in reports submitted to the U.S. Consumer Product Safety Commission (CPSC).  On March 31, 2009, the CPSC, in cooperation with Yamaha Motor Corp. U.S.A., announced a free repair program for all Rhino 450, 660, and 700 models to improve safety, including  the addition of spacers and removal of a rear only anti-sway bar.

26.     ***In re ReNu With MoistureLoc Contact Lens Solution Products Liability Litigation***, MDL No. 1785 (D. S.C.).  Lieff Cabraser served on the Plaintiffs' Executive Committee in federal court litigation arising out of Bausch & Lomb's 2006 recall of its ReNu with MoistureLoc contact lens solution.  Consumers who developed *Fusarium keratitis*, a rare and dangerous fungal eye infection, as well as other serious eye infections, alleged the lens solution was defective.  Some consumers were forced to undergo painful corneal transplant surgery to save their vision; others lost all or part of their vision permanently.  The litigation was resolved under favorable, confidential settlements with Bausch & Lomb.

27.     ***In re Baycol Products Litigation***, MDL No. 1431 (D. Minn.).  Baycol was one of a group of drugs called statins, intended to reduce cholesterol.  In August 2001, Bayer A.G. and Bayer Corporation, the manufacturers of Baycol, withdrew the drug from the worldwide market based upon reports that Baycol was associated with serious side effects and linked to the deaths of over 100 patients worldwide.  In the federal multi-district litigation, Lieff Cabraser served as a member of the Plaintiffs' Steering Committee (PSC) and the Executive Committee of the PSC.  In addition, Lieff Cabraser represented approximately 200 Baycol patients who have suffered injuries or family members of patients who died allegedly as a result of ingesting Baycol.  In these cases, our clients reached confidential favorable settlements with Bayer.

## II.   Securities and Financial Fraud

### A.   Current Cases

1.     ***Schwab S&P 500 Index Fund, et al. v. Bank of America Corp., et al.***, No. 11-cv- 07779 PKC (S.D. N.Y.).  Lieff Cabraser represents fourteen mutual funds of The Charles Schwab Corporation in an independent securities action against Bank of America Corporation. The action seeks recovery of losses that these funds incurred as a result of

Bank of America's alleged misrepresentations and concealment of material facts in connection with its acquisition of Merrill Lynch & Co., Inc. Specifically, Bank of America failed to inform its shareholders, before the December 5, 2008 vote on the Bank of America-Merrill Lynch merger, of Merrill Lynch's tremendous fourth quarter 2008 losses, as well as its plans to give billions of dollars in performance bonuses to Merrill Lynch employees despite those losses.  The complaint was filed in the Northern District of California and transferred to the MDL proceeding in the Southern District of New York. Discovery is complete and the case is awaiting trial.

2. ***The Charles Schwab Corp. v. BNP Paribas Sec. Corp***., No. CGC-10-501610 (Cal. Super. Ct.); ***The Charles Schwab Corp. v. J.P. Morgan Sec., Inc.***, No. CGC-10-503206 (Cal. Super. Ct.); ***The Charles Schwab Corp. v. J.P. Morgan Sec., Inc.***, No. CGC-10-503207 (Cal. Super. Ct.); and ***The Charles Schwab Corp. v. Banc of America Sec. LLC***, No. CGC-10-501151 (Cal. Super. Ct.).  Lieff Cabraser represents The Charles Schwab Corporation ("Schwab") in four separate individual securities actions against certain issuers and sellers of mortgage-backed securities for materially misrepresenting the quality of the loans underlying the securities.  Schwab's subsidiary, Charles Schwab Bank, N.A., suffered significant damages by purchasing the securities in reliance on defendants' misstatements.

3. ***In re Bank of New York Mellon Corp. Foreign Exchange Transactions Litigation***, Case No.  MD-12-2335-LAK (S.D.N.Y.). Lieff Cabraser is one of three firms serving on the Plaintiffs' Executive Committee in consolidated litigation against The Bank of New York Mellon Corporation ("BNY Mellon") and its predecessors and subsidiaries, in which plaintiffs allege that defendants charged custodial customers fictitious foreign currency exchange ("FX") rates in connection with the purchase and sale of foreign securities. The actions allege that for the past decade, defendants consistently incorporated hidden and excessive mark-ups or mark-downs relative to the actual FX rates applicable at the times of the trades conducted for defendants' custodial FX clients, and that defendants allegedly kept for themselves, as an unlawful profit, the difference between the false and actual price for each FX transaction. In addition to serving on Plaintiffs' Executive Committee, Lieff Cabraser is also co-lead class counsel for a proposed nationwide class of affected custodial customers of BNY Mellon, including public pension funds, ERISA funds, and other public and private institutions. Prior to the cases being transferred and consolidated in the Southern District of New York, Lieff Cabraser defeated, in its entirety, BNY Mellon's motion to dismiss claims brought on behalf of ERISA and other funds under California's and New York's consumer protection laws. Additional clients and proposed class representatives in the consolidated litigation,

in which discovery is currently proceeding, include the Ohio Police & Fire Pension Fund and the School Employees Retirement System of Ohio.

4.  ***In re Diamond Foods, Inc., Securities Litigation,*** No. 11-cv-05386-WHA (N.D. Cal.).  Lieff Cabraser serves as local counsel for Lead Plaintiff and public retirement system Mississippi PERS in class action lawsuit against Diamond Foods on behalf of all investors who traded shares in the company from October 5, 2010 through February 8, 2012.  The complaint charges the Diamond Foods and certain senior executives knowingly understated the cost of the walnuts Diamond Foods purchased in order to inflate artificially the price of the company's common stock.  In May 2013, the Court certified the class, and trial in the case is scheduled for January 2014.

5.  ***Arkansas Teacher Retirement System v. State Street Corp.***, No. 11cv10230 (MLW) (D. Mass.).  Lieff Cabraser is co-counsel for a proposed nationwide class of institutional clients of State Street, including public pension funds, who allege that defendants charged class members fictitious FX rates in connection with the purchase and sale of foreign securities.  The complaint charges that for the past decade, defendants consistently incorporated hidden and excessive mark-ups or mark-downs relative to the actual FX rates applicable at the times of the trades conducted for defendants' custodial FX clients.  Defendants allegedly kept for themselves, as an unlawful profit, the difference between the false and actual price for each FX transaction.  Plaintiffs seek recovery under Massachusetts' Consumer Protection Law and common law tort and contract theories.  Motions to dismiss have been fully briefed.  Lieff Cabraser is also actively involved in counseling other state pension and ERISA funds with respect to their potential exposure to FX manipulation by custodial service providers.

6.  ***Schwab S&P 500 Index Fund, et al. v. Pfizer***, No. 12-cv-8543 (S.D.N.Y.).  Lieff Cabraser represents 14 funds of The Charles Schwab Corporation in an independent securities action against Pfizer Inc. and current and former senior Pfizer executives.  The action seeks recovery of damages sustained in connection with the defendants' alleged fraudulent misrepresentations and omissions regarding the safety of Celebrex and Bextra, two of Pfizer's pain-relieving drugs.  As a result of the alleged fraud, the Schwab funds suffered significant losses in connection with their purchases of Pfizer common stock on the New York Stock Exchange between October 31, 2000 and October 19, 2005.

7.  ***DiNapoli, et al. v. Bank of America Corp.***, No. 10 CV 5563 (S.D. N.Y.).  Lieff Cabraser, together with co-counsel, represents the New York State Common Retirement Fund, the New York State Teachers' Retirement System, and the Public Employees' Retirement Association of

Colorado in an independent securities action against Bank of America Corporation. The action seeks recovery of losses that these retirement funds incurred as a result of Bank of America's alleged misrepresentations and concealment of material facts in connection with its acquisition of Merrill Lynch & Co., Inc. Specifically, Bank of America failed to inform its shareholders, before the December 5, 2008 vote on the Bank of America-Merrill Lynch merger, of Merrill Lynch's tremendous fourth quarter 2008 losses, as well as its plans to give billions of dollars in performance bonuses to Merrill Lynch employees despite those losses.  Bank of America has answered the complaint, discovery is complete, and the case is awaiting trial.

8.  ***In re A-Power Energy Generation Systems, Ltd. Securities Litigation***, No. 2:11-ml-2302-GW- (CWx) (C.D. Cal.). Lieff Cabraser serves as Court-appointed Lead Counsel for Lead Plaintiff in this securities class action that charges defendants with materially misrepresenting A-Power Energy Generation Systems, Ltd.'s financial results and business prospects in violation of the antifraud provisions of the Securities Exchange Act of 1934.  The Court will hear an unopposed motion for preliminary approval of a settlement for $3.675 million on January 7, 2013.

**B.    Successes**

1.  ***In re First Capital Holdings Corp. Financial Products Securities Litigation***, MDL No. 901 (C.D. Cal.).  Lieff Cabraser served as Co-Lead Counsel in a class action brought to recover damages sustained by policyholders of First Capital Life Insurance Company and Fidelity Bankers Life Insurance Company policyholders resulting from the insurance companies' allegedly fraudulent or reckless investment and financial practices, and the manipulation of the companies' financial statements.  This policyholder settlement generated over $1 billion in restored life insurance policies. The  settlement was approved by both federal and state courts in parallel proceedings and then affirmed by the Ninth Circuit on appeal.

2.  ***In re Broadcom Corporation Derivative Litigation***, No. CV 06-3252-R (C.D. Cal.).  Lieff Cabraser served as Court-appointed Lead Counsel in a shareholders derivative action arising out of stock options backdating in Broadcom securities.  The complaint alleged that defendants intentionally manipulated their stock option grant dates between 1998 and 2003 at the expense of Broadcom and Broadcom shareholders. By making it seem as if stock option grants occurred on dates when Broadcom stock was trading at a comparatively low per share price, stock option grant recipients were able to exercise their stock option grants at exercise prices that were lower than the fair market value of

Broadcom stock on the day the options were actually granted.  In December 2009, U.S. District Judge Manuel L. Real granted final approval to a partial settlement in which Broadcom Corporation's insurance carriers paid $118 million to Broadcom.  The settlement released certain individual director and officer defendants covered by Broadcom's directors' and officers' policy.

Plaintiffs' counsel continued to pursue claims against William J. Ruehle, Broadcom's former Chief Financial Officer, Henry T. Nicholas, III, Broadcom's co-founder and former Chief Executive Officer, and Henry Samueli, Broadcom's co-founder and former Chief Technology Officer.  In May 2011, the Court approved a settlement with these defendants.  The settlement provided substantial consideration to Broadcom, consisting of the receipt of cash and cancelled options from Dr. Nicholas and Dr. Samueli totaling $53 million in value, plus the release of a claim by Mr. Ruehle, which sought damages in excess of $26 million.

Coupled with the earlier $118 million partial settlement, the total recovery in the derivative action was $197 million, which constitutes the third-largest settlement ever in a derivative action involving stock options backdating.

3.   ***In re Scorpion Technologies Securities Litigation I***, No. C-93-20333-EAI (N.D. Cal.); ***Dietrich v. Bauer***, No. C-95-7051-RWS (S.D.N.Y.); ***Claghorn v. Edsaco***, No. 98-3039-SI (N.D. Cal.).  Lieff Cabraser served as Lead Counsel in class action suits arising out of an alleged fraudulent scheme by Scorpion Technologies, Inc., certain of its officers, accountants, underwriters and business affiliates to inflate the company's earnings through reporting fictitious sales.  In Scorpion I, the Court found plaintiffs had presented sufficient evidence of liability under Federal securities acts against the accounting firm Grant Thornton for the case to proceed to trial.  In re Scorpion Techs., 1996 U.S. Dist. LEXIS 22294 (N.D. Cal. Mar. 27, 1996).  In 1988, the court approved a $5.5 million settlement with Grant Thornton.  In 2000, the Court approved a $950,000 settlement with Credit Suisse First Boston Corporation.  In April 2002, a federal jury in San Francisco, California returned a $170.7 million verdict against Edsaco Ltd.  The jury found that Edsaco aided Scorpion in setting up phony European companies as part of a scheme in which Scorpion reported fictitious sales of its software to these companies, thereby inflating its earnings.  Included in the jury verdict, one of the largest verdicts in the U.S. in 2002, was $165 million in punitive damages.  Richard M. Heimann conducted the trial for plaintiffs.

On June 14, 2002, U.S. District Court Judge Susan Illston commented on Lieff Cabraser's representation:  "[C]ounsel for the plaintiffs did a very good job in a very tough situation of achieving an excellent recovery for

the class here.  You were opposed by extremely capable lawyers.  It was an uphill battle.  There were some complicated questions, and then there was the tricky issue of actually collecting anything in the end.  I think based on the efforts that were made here that it was an excellent result for the class. . .  [T]he recovery that was achieved for the class in this second trial is remarkable, almost a hundred percent."

4.   **Merrill Lynch Fundamental Growth Fund and Merrill Lynch Global Value Fund  v. McKesson HBOC,** No. 02-405792 (Cal. Supr. Ct.).  Lieff Cabraser served as counsel for two Merrill Lynch sponsored mutual funds in a private lawsuit alleging that a massive accounting fraud occurred at HBOC & Company ("HBOC") before and following its 1999 acquisition by McKesson Corporation ("McKesson").  The funds charged that defendants, including the former CFO of McKesson HBOC, the name McKesson adopted after acquiring HBOC, artificially inflated the price of securities in McKesson HBOC, through misrepresentations and omissions concerning the financial condition of HBOC, resulting in approximately $135 million in losses for plaintiffs.  In a significant discovery ruling in 2004, the California Court of Appeal held that defendants waived the attorney-client and work product privileges in regard to an audit committee report and interview memoranda prepared in anticipation of shareholder lawsuits by disclosing the information to the U.S. Attorney and SEC.  *McKesson HBOC, Inc. v. Supr. Court*, 115 Cal. App. 4th 1229 (2004).  Lieff Cabraser's clients recovered approximately $145 million, representing nearly 104% of damages suffered by the funds.  This amount was approximately $115-120 million more than the Merrill Lynch funds would have recovered had they participated in the federal class action settlement.

5.   **Informix/Illustra Securities Litigation**, No. C-97-1289-CRB (N.D. Cal.).  Lieff Cabraser represented Richard H. Williams, the former Chief Executive Officer and President of Illustra Information Technologies, Inc. ("Illustra"), and a class of Illustra shareholders in a class action suit on behalf of all former Illustra securities holders who tendered their Illustra preferred or common stock, stock warrants or stock options in exchange for securities of Informix Corporation ("Informix") in connection with Informix's 1996 purchase of Illustra.  Pursuant to that acquisition, Illustra stockholders received Informix securities representing approximately 10% of the value of the combined company.  The complaint alleged claims for common law fraud and violations of Federal securities law arising out of the acquisition.  In October 1999, U.S. District Judge Charles E. Breyer approved a global settlement of the litigation for $136 million, constituting one of the largest settlements ever involving a high technology company alleged to have committed securities fraud.  Our clients, the Illustra shareholders, received approximately 30% of the net settlement fund.

6. ***In re Qwest Communications International Securities and "ERISA" Litigation (No. II),*** No. 06-cv-17880-REB-PAC (MDL No. 1788) (D. Colo.).  Lieff Cabraser represented the New York State Common Retirement Fund, Fire and Police Pension Association of Colorado, Denver Employees' Retirement Plan, San Francisco Employees' Retirement System, and over thirty BlackRock managed mutual funds in individual securities fraud actions ("opt out" cases) against Qwest Communications International, Inc., Philip F. Anschutz, former co-chairman of the Qwest board of directors,  and other senior executives at Qwest.  In each action, the plaintiffs charged defendants with massively overstating Qwest's publicly-reported growth, revenues, earnings, and earnings per share from 1999 through 2002.  The cases were filed in the wake of a $400 million settlement of a securities fraud class action against Qwest  that was announced in  early 2006.  The cases brought by Lieff Cabraser's clients settled in October 2007 for recoveries totaling more than $85 million, or more than 13 times what the clients would have received had they remained in the class.

7. ***In re AXA Rosenberg Investor Litigation***, No. CV 11-00536 JSW (N.D. Cal).  Lieff Cabraser served as Co-Lead Counsel for a class of institutional investors, ERISA-covered plans, and other investors in quantitative funds managed by AXA Rosenberg Group, LLC and its affiliates ("AXA"). Plaintiffs alleged that AXA breached its fiduciary duties and violated ERISA by failing to discover a material computer error that existed in its system for years, and then failing to remedy it for months after its eventual discovery in 2009. By the time AXA disclosed the error in 2010, investors had suffered losses and paid substantial investment management fees to AXA. After briefing motions to dismiss and working with experts to analyze data obtained from AXA relating to the impact of the error, we reached a $65 million settlement with AXA that the Court approved in April 2012.

8. ***In re National Century Financial Enterprises, Inc. Investment Litigation***, MDL No. 1565 (S.D. Ohio).  Lieff Cabraser served as outside counsel for the New York City Employees' Retirement System, Teachers' Retirement System for the City of New York, New York City Police Pension Fund, and New York City Fire Department Pension Fund in this multidistrict litigation arising from fraud in connection with NCFE's issuance of notes backed by healthcare receivables.  The New York City Pension Funds recovered more than 70% of their $89 million in losses, primarily through settlements achieved in the federal litigation and another NCFE-matter brought on their behalf by Lieff Cabraser.

9. ***BlackRock Global Allocation Fund v. Tyco International Ltd., et al.***, No. 2:08-cv-519 (D. N.J.); ***Nuveen Balanced Municipal and Stock Fund v. Tyco International Ltd., et al.***, No. 2:08-cv-518 (D.

N.J.).  Lieff Cabraser represented multiple funds of the investment firms BlackRock Inc. and Nuveen Asset Management in separate, direct securities fraud actions against Tyco International Ltd., Tyco Electronics Ltd., Covidien Ltd, Covidien (U.S.), L. Dennis Kozlowski, Mark H. Swartz, and Frank E. Walsh, Jr.  Plaintiffs alleged that defendants engaged in a massive criminal enterprise that combined the theft of corporate assets with fraudulent accounting entries that concealed Tyco's financial condition from investors.  As a result, plaintiffs purchased Tyco common stock and other Tyco securities at artificially inflated prices and suffered losses upon disclosures revealing Tyco's true financial condition and defendants' misconduct.  In 2009, the parties settled the claims against the corporate defendants (Tyco International Ltd., Tyco Electronics Ltd., Covidien Ltd., and Covidien (U.S.).  The litigation concluded in 2010.  The total settlement proceeds paid by all defendants were in excess of $57 million.

10.   **Kofuku Bank and Namihaya Bank v. Republic New York Securities Corp.**, No. 00 CIV 3298 (S.D.N.Y.); and **Kita Hyogo Shinyo-Kumiai v. Republic New York Securities Corp.**, No. 00 CIV 4114 (S.D.N.Y.).  Lieff Cabraser represented Kofuku Bank, Namihaya Bank and Kita Hyogo Shinyo-Kumiai (a credit union) in individual lawsuits against, among others, Martin A. Armstrong and HSBC, Inc., the successor-in-interest to Republic New York Corporation, Republic New York Bank and Republic New York Securities Corporation for alleged violations of federal securities and racketeering laws.  Through a group of interconnected companies owned and controlled by Armstrong—the Princeton Companies—Armstrong and the Republic Companies promoted and sold promissory notes, known as the "Princeton Notes," to more than eighty of the largest companies and financial institutions in Japan.  Lieff Cabraser's lawsuits, as well as the lawsuits of dozens of other Princeton Note investors, alleged that the Princeton and Republic Companies made fraudulent misrepresentations and non-disclosures in connection with the promotion and sale of Princeton Notes, and that investors' moneys were commingled and misused to the benefit of Armstrong, the Princeton Companies and the Republic Companies.  In December 2001, the claims of our clients and those of the other Princeton Note investors were settled.  As part of the settlement, our clients recovered more than $50 million, which represented 100% of the value of their principal investments less money they received in interest or other payments.

11.   **Alaska State Department of Revenue v. America Online**, No. 1JU-04-503 (Alaska Supr. Ct.).  In December 2006, a $50 million settlement was reached in a securities fraud action brought by the Alaska State Department of Revenue, Alaska State Pension Investment Board and Alaska Permanent Fund Corporation against defendants America Online, Inc. ("AOL"), Time Warner Inc. (formerly known as AOL Time

Warner ("AOLTW")), Historic TW Inc.  When the action was filed, the Alaska Attorney General estimated total losses at $70 million.  The recovery on behalf of Alaska was approximately 50 times what the state would have received as a member of the class in the federal securities class action settlement.  The lawsuit, filed in 2004 in Alaska State Court, alleged that defendants misrepresented advertising revenues and growth of AOL and AOLTW along with the number of AOL subscribers, which artificially inflated the stock price of AOL and AOLTW to the detriment of Alaska State funds.

The Alaska Department of Law retained Lieff Cabraser to lead the litigation efforts under its direction.  "We appreciate the diligence and expertise of our counsel in achieving an outstanding resolution of the case," said Mark Morones, spokesperson for the Department of Law, following announcement of the settlement.

12.   **Allocco v. Gardner**, No. GIC 806450 (Cal. Supr. Ct.).  Lieff Cabraser represents Lawrence L. Garlick, the co-founder and former Chief Executive Officer of Remedy Corporation and 24 other former senior executives and directors of Remedy Corporation in a private (non-class) securities fraud lawsuit against Stephen P. Gardner, the former Chief Executive Officer of Peregrine Systems, Inc., John J. Moores, Peregrine's former Chairman of the Board, Matthew C. Gless, Peregrine's former Chief Financial Officer, Peregrine's accounting firm Arthur Andersen and certain entities that entered into fraudulent transactions with Peregrine. The lawsuit, filed in California state court, arises out of Peregrine's August 2001 acquisition of Remedy.  Plaintiffs charge that they were induced to exchange their Remedy stock for Peregrine stock on the basis of false and misleading representations made by defendants.  Within months of the Remedy acquisition, Peregrine began to reveal to the public that it had grossly overstated its revenue during the years 2000-2002, and eventually restated more than $500 million in revenues.

After successfully defeating demurrers brought by defendants, including third parties who were customers of Peregrine who aided and abetted Peregrine's accounting fraud under California common law, plaintiffs reached a series of settlements.  The settling defendants included Arthur Andersen, all of the director defendants, three officer defendants and the third party customer defendants KPMG, British Telecom, Fujitsu, Software Spectrum and Bindview.  The total amount received in settlements is approximately $45 million.

13.   **In re Cablevision Systems Corp. Shareholder Derivative Litigation**, No. 06-cv-4130-DGT-AKT (E.D.N.Y.).  Lieff Cabraser served as Co-Lead Counsel in a shareholders' derivative action against the board of directors and numerous officers of Cablevision.  The suit alleged that

defendants intentionally manipulated stock option grant dates to Cablevision employees between 1997 and 2002 in order to enrich certain officer and director defendants at the expense of Cablevision and Cablevision shareholders. According to the complaint, Defendants made it appear as if stock options were granted earlier than they actually were in order to maximize the value of the grants. In September 2008, the Court granted final approval to a $34.4 million settlement of the action. Over $24 million of the settlement was contributed directly by individual defendants who either received backdated options or participated in the backdating activity.

14. ***In re Media Vision Technology Securities Litigation***, No. CV-94-1015 (N.D. Cal.). Lieff Cabraser served as Co-Lead Counsel in a class action lawsuit which alleged that certain Media Vision's officers, outside directors, accountants and underwriters engaged in a fraudulent scheme to inflate the company's earnings and issued false and misleading public statements about the company's finances, earnings and profits. By 1998, the Court had approved several partial settlements with many of Media Vision's officers and directors, accountants and underwriters which totaled $31 million. The settlement proceeds have been distributed to eligible class members. The evidence that Lieff Cabraser developed in the civil case led prosecutors to commence an investigation and ultimately file criminal charges against Media Vision's former Chief Executive Officer and Chief Financial Officer. The civil action against Media Vision's CEO and CFO was stayed pending the criminal proceedings against them. In the criminal proceedings, the CEO pled guilty on several counts, and the CFO was convicted at trial. In October, 2003, the Court granted Plaintiffs' motions for summary judgment and entered a judgment in favor of the class against the two defendants in the amount of $188 million.

15. ***In re California Micro Devices Securities Litigation***, No. C-94-2817-VRW (N.D. Cal.). Lieff Cabraser served as Liaison Counsel for the Colorado Public Employees' Retirement Association and the California State Teachers' Retirement System, and the class they represented. Prior to 2001, the Court approved $19 million in settlements. In May 2001, the Court approved an additional settlement of $12 million, which, combined with the earlier settlements, provided class members an almost complete return on their losses. The settlement with the company included multi-million dollar contributions by the former Chairman of the Board and Chief Executive Officer.

Commenting in 2001 on Lieff Cabraser's work in *Cal Micro Devices*, U.S. District Court Judge Vaughn R. Walker stated, "It is highly unusual for a class action in the securities area to recover anywhere close to the percentage of loss that has been recovered here, and counsel and the lead plaintiffs have done an admirable job in bringing about this most

satisfactory conclusion of the litigation."  One year later, in a related proceeding and in response to the statement that the class had received nearly a 100% recovery, Judge Walker observed, "That's pretty remarkable.  In these cases, 25 cents on the dollar is considered to be a magnificent recovery, and this is [almost] a hundred percent."

16.     ***In re Network Associates, Inc. Securities Litigation***, No. C-99-1729-WHA (N.D. Cal.).  Following a competitive bidding process, the Court appointed Lieff Cabraser as Lead Counsel for the Lead Plaintiff and the class of investors.  The complaint alleged that Network Associates improperly accounted for acquisitions in order to inflate its stock price. In May 2001, the Court granted approval to a $30 million settlement.

In reviewing the *Network Associates* settlement, U.S. District Court Judge William H. Alsup observed, "[T]he class was well served at a good price by excellent counsel . . .  We have class counsel who's one of the foremost law firms in the country in both securities law and class actions. And they have a very excellent reputation for the conduct of these kinds of cases . . ."

17.     ***In re FPI/Agretech Securities Litigation***, MDL No. 763 (D. Haw., Real, J.).  We served as Lead Class Counsel for investors defrauded in a "Ponzi-like" limited partnership investment scheme. The Court approved $15 million in partial, pretrial settlements. At trial, the jury returned a $24 million verdict, which included $10 million in punitive damages, against non-settling defendant Arthur Young & Co. for its knowing complicity and active and substantial assistance in the marketing and sale of the worthless limited partnership offerings. The appellate court affirmed the compensatory damages award and remanded the case for a retrial on punitive damages. In 1994, the Court approved a $17 million settlement with Ernst & Young, the successor to Arthur Young & Co.

18.     ***Nguyen v. FundAmerica***, No. C-90-2090 MHP (N.D. Cal., Patel, J.), 1990 Fed. Sec. L. Rep. (CCH) ¶¶ 95,497, 95,498 (N.D. Cal. 1990).  Lieff Cabraser served as Plaintiffs' Class Counsel in this securities/RICO/tort action seeking an injunction against alleged unfair "pyramid" marketing practices and compensation to participants.  The District Court certified a nationwide class for injunctive relief and damages on a mandatory basis and enjoined fraudulent overseas transfers of assets.  The Bankruptcy Court permitted class proof of claims. Lieff Cabraser obtained dual District Court and Bankruptcy Court approval of settlements distributing over $13 million in FundAmerica assets to class members.

19.     ***In re Brooks Automation, Inc. Securities Litigation***, No. 06 CA 11068 (D. Mass.).  Lieff Cabraser served as Court-Appointed Lead Counsel for Lead Plaintiff the Los Angeles County Employees Retirement

Association and co-plaintiff Sacramento County Employees' Retirement System in a class action lawsuit on behalf of purchasers of Brooks Automation securities.  Plaintiffs charged that Brooks Automation, its senior corporate officers and directors violated federal securities laws by backdating company stock options over a six-year period, and failed to disclose the scheme in publicly filed financial statements.  Subsequent to Lieff Cabraser's filing of a consolidated amended complaint in this action, both the Securities and Exchange Commission and the United States Department of Justice filed complaints against the Company's former C.E.O., Robert Therrien, related to the same alleged practices.  In October 2008, the Court approved a $7.75 million settlement of the action.

20.     ***DiNapoli v. Merrill Lynch & Co.***, No. 10-cv-5562 (S.D. N.Y.).  Lieff Cabraser, together with co-counsel, represented Thomas P. DiNapoli, Comptroller of the State of New York, in his capacity as trustee of the New York State Common Retirement Fund ("NYSCRF") in an individual securities action against Merrill Lynch for allegedly failing to adequately disclose its losses arising from its exposure to subprime mortgages and other securities, in violation of federal securities laws.   The case was successfully resolved in 2011.

21.     ***Albert v. Alex. Brown Management Services; Baker v. Alex. Brown Management Services*** (Del. Ch. Ct.).  In May 2004, on behalf of investors in two investment funds controlled, managed and operated by Deutsche Bank and advised by DC Investment Partners, Lieff Cabraser filed lawsuits for alleged fraudulent conduct that resulted in an aggregate loss of hundreds of millions of dollars.  The suits named as defendants Deutsche Bank and its subsidiaries Alex. Brown Management Services and Deutsche Bank Securities, members of the funds' management committee, as well as DC Investments Partners and two of its principals.  Among the plaintiff-investors were 70 high net worth individuals.  In the fall of 2006, the cases settled by confidential agreement.

## III.   Employment Discrimination and Unfair Employment Practices

### A.     Current Cases

1.     ***Chen-Oster v. Goldman Sachs***, No. 10-6950 (S.D.N.Y.).  Lieff Cabraser serves as Co-Lead Counsel for plaintiffs in a gender discrimination class action lawsuit against Goldman Sachs.  The complaint alleges that Goldman Sachs has engaged in systemic and pervasive discrimination against its female professional employees in violation of Title VII of the Civil Rights Act of 1964 and the New York City Human Rights Law.  The complaint charges that, among other things, Goldman Sachs pays its female professionals less than similarly situated males, disproportionately promotes men over equally or more qualified women, and offers better business opportunities and professional support

to its male professionals.  The Court denied defendant's motion to strike class allegations and discovery  is ongoing.

2.   ***Calibuso v. Bank of America Corporation, Merrill Lynch & Co.***, No. CV10-1413 (E.D. N.Y.).  Lieff Cabraser serves as Co-Lead Counsel for current and former female Financial Advisors who allege that Bank of America and Merrill Lynch engaged in a pattern and practice of gender discrimination with respect to business opportunities and compensation. The complaint charges that these violations are systemic, based upon company-wide policies and practices.  The Court denied defendants' motions to dismiss the case and discovery is ongoing.

3.   ***Vedachalam v. Tata Consultancy Services, LTD.***, C 06-0963 CW (N.D. Cal.).  Lieff Cabraser serves as Co-Lead Counsel for thousands of foreign nationals sent by the Indian conglomerate Tata to work in the U.S. The complaint charges that Tata unjustly enriched itself by requiring all of its non-U.S.-citizen employees to endorse and sign over their federal and state tax refund checks to Tata.  The suit also alleges other violations of California and federal law, including that Tata did not pay its non-U.S.-citizen employees the amount promised to those employees before they came to the U.S.  In 2007 and again in 2008, the District Court denied Tata's motions to compel arbitration of Plaintiffs' claims in India.  The Court held that no arbitration agreement existed because the documents purportedly requiring arbitration in India applied one set of rules to the Plaintiffs and another set to Tata.  In 2009, the Ninth Circuit Court of Appeals affirmed this decision.  In July 2011, the District Court denied in part Tata's motion for summary judgment, allowing Plaintiffs' legal claims for breach of contract and certain violations of California wage laws to go forward.  In 2012, the District Court found the plaintiffs satisfied the legal requirements for a class action and certified two classes. In July 2013, the District Court granted final approval of a $29.75 million settlement of the case.

4.   ***Ellis v. Costco Wholesale Corp.***, No. 04-03341-EMC (N.D. Cal.). Female employees represented by Lieff Cabraser and co-counsel charge that Costco discriminates against women in promotions to management positions.  In January 2007, the Court certified a class consisting of  over 750 current and former female Costco employees nationwide who have been denied promotion to General Manager or Assistant Manager since January 3, 2002.  Costco appealed.  In September 2011, the U.S. Court of Appeals for the Ninth Circuit remanded the case to the district court to make class certification findings consistent with the U.S. Supreme Court's ruling in *Wal-Mart v. Dukes,* 131 S.Ct. 2541 (2011).  In September 2012, U.S. District Court Judge Edward M. Chen granted plaintiffs' motion for class certification and certified two classes of  over 1,250 current and former female Costco employees, one for injunctive relief and the other

for monetary relief.  The case is scheduled to proceed to trial in January 2014.

5.   ***Benedict v. Hewlett-Packard Company***, No. C13-0119 (N.D. Cal.).  Lieff Cabraser represents a former Hewlett-Packard ("HP") technical support employee who filed a nationwide class action lawsuit charging that HP failed to pay him and other former and current technical support employees for all overtime hours worked in violation of the federal Fair Labor Standards Act and California law.  HP employs several thousand technical support workers.  The complaint charges that HP has a common practice of misclassifying its technical support workers as exempt and refusing to pay them overtime.

6.   ***Zaborowski v. MHN Government Services***, No. 12-CV-05109-SI (N.D. Cal.)  Lieff Cabraser represents current and former Military and Family Life Consultants ("MFLCs") in a class action lawsuit against MHN Government Services, Inc., ("MHN") and Managed Health Network, Inc., seeking overtime pay under the federal Fair Labor Standards Act and state laws.  The complaint charges that MHN has misclassified the MFLCs as independent contractors and as "exempt" from overtime and failed to pay them overtime pay for hours worked over 40 per week.

7.   ***Tatum v. R.J. Reynolds Tobacco Company***, No. 1:02-cv-00373-NCT (M.D. N.C.).  Lieff Cabraser serves as Co-Lead Trial Counsel in this class action on behalf of over 3,500 employees of R.J. Reynolds Tobacco Company ("RJR") brought under the Employment Retirement Income Security Act (ERISA).  Plaintiffs allege that RJR breached its duty of prudence in administering the employee 401(k) retirement plan.  The 6-week bench trial occurred in January-February 2010 and December 2010, and post-trial briefing concluded in February 2011.  In February 2013, the District Court issued a decision in favor of RJR.  Plaintiffs have appealed the decision.

**B.   Successes**

1.   ***Butler v. Home Depot***, No. C94-4335 SI (N.D. Cal.).  Lieff Cabraser and co-counsel represented a class of approximately 25,000 female employees and applicants for employment with Home Depot's West Coast Division who alleged gender discrimination in connection with hiring, promotions, pay, job assignment, and other terms and conditions of employment.  The class was certified in January 1995.  In January 1998, the court approved a $87.5 million settlement of the action that included comprehensive injunctive relief over the term of a five-year Consent Decree.  Under the terms of the settlement, Home Depot modified its hiring, promotion, and compensation practices to ensure that interested and qualified women were hired for, and promoted to, sales and management positions.

On January 14, 1998, U.S. District Judge Susan Illston commented that the settlement provides "a very significant monetary payment to the class members for which I think they should be grateful to their counsel. . . . Even more significant is the injunctive relief that's provided for . . ."  By 2003, the injunctive relief had created thousands of new job opportunities in sales and management positions at Home Depot, generating the equivalent of over approximately $100 million per year in wages for female employees.

In 2002, Judge Illston stated that the injunctive relief has been a "win/win . . . for everyone, because . . . the way the Decree has been implemented has been very successful and it is good for the company as well as the company's employees."

2.   ***Rosenburg v. IBM,*** No. C 06-0430 PJH (N.D. Cal.).  In July 2007, the Court granted final approval to a $65 million settlement of a class action suit by current and former technical support workers for IBM seeking unpaid overtime.  The settlement constitutes a record amount in litigation seeking overtime compensation for employees in the computer industry.  Plaintiffs alleged that IBM illegally misclassified its employees who install or maintain computer hardware or software as "exempt" from the overtime pay requirements of federal and state labor laws.

3.   ***Satchell v. FedEx Express***, No. C 03-2659 SI; C 03-2878 SI (N.D. Cal.).  In 2007, the Court granted final approval to a $54.9 million settlement of the race discrimination class action lawsuit by African American and Latino employees of FedEx Express.  The settlement requires FedEx to reform its promotion, discipline, and pay practices.  Under the settlement, FedEx will implement multiple steps to promote equal employment opportunities, including making its performance evaluation process less discretionary, discarding use of the "Basic Skills Test" as a prerequisite to promotion into certain desirable positions, and changing employment policies to demonstrate that its revised practices do not continue to foster racial discrimination.  The settlement, covering 20,000 hourly employees and operations managers who have worked in the western region of FedEx Express since October 1999, was approved by the Court in August 2007.

4.   ***Gonzalez v. Abercrombie & Fitch Stores***, No. C03-2817 SI (N.D. Cal.).  In April 2005, the Court approved a settlement, valued at approximately $50 million, which requires the retail clothing giant Abercrombie & Fitch to provide monetary benefits of $40 million to the class of Latino, African American, Asian American and female applicants and employees who charged the company with discrimination.  The settlement included a six-year period of injunctive relief requiring the

company to institute a wide range of policies and programs to promote diversity among its workforce and to prevent discrimination based on race or gender.  Lieff Cabraser served as Lead Class Counsel and prosecuted the case with a number of co-counsel firms, including the Mexican American Legal Defense and Education Fund, the Asian Pacific American Legal Center and the NAACP Legal Defense and Educational Fund, Inc.

5.    ***Giles v. Allstate***, JCCP Nos. 2984 and 2985.  Lieff Cabraser represented a class of Allstate insurance agents seeking reimbursement of out-of-pocket costs.  The action settled for approximately $40 million.

6.    ***Frank v. United Airlines***, No. C-92-0692 MJJ (N.D. Cal.).  Lieff Cabraser and co-counsel obtained a $36.5 million settlement in February 2004 for a class of female flight attendants who were required to weigh less than comparable male flight attendants.  Former U.S. District Court Judge Charles B. Renfrew (ret.), who served as a mediator in the case, stated, "As a participant in the settlement negotiations, I am familiar with and know the reputation, experience and skills of lawyers involved.  They are dedicated, hardworking and able counsel who have represented their clients very effectively."  U.S. District Judge Martin J. Jenkins, in granting final approval to the settlement, found "that the results achieved here could be nothing less than described as exceptional," and that the settlement "was obtained through the efforts of outstanding counsel."

7.    ***Barnett v. Wal-Mart***, No. 01-2-24553-SNKT (Wash.).  On July 21, 2009, the Court gave final approval to a settlement valued at up to $35 million on behalf of workers in Washington State who alleged they were deprived of meal and rest breaks and forced to work off-the-clock at Wal-Mart stores and Sam's Clubs.  In addition to monetary relief, the settlement provided injunctive relief benefiting all employees.  Wal-Mart was required to undertake measures to prevent wage and hour violations at its 50 stores and clubs in Washington, measures that included the use of new technologies and compliance tools.

Plaintiffs filed their complaint in 2001.  Three years later, the Court certified a class of approximately 40,000 current and former Wal-Mart employees.  The eight years of litigation were intense and adversarial.  Wal-Mart, currently the world's third largest corporation, vigorously denied liability and spared no expense in defending itself.

This lawsuit and similar actions filed against Wal-Mart across America served to reform the pay procedures and employment practices for Wal-Mart's 1.4 million employees nationwide.  In a press release announcing the Court's approval of the settlement, Wal-Mart spokesperson Daphne Moore stated, "This lawsuit was filed years ago and the allegations are not

representative of the company we are today." Lieff Cabraser served as court-appointed Co-Lead Class Counsel.

8. ***Amochaev. v. Citigroup Global Markets, d/b/a Smith Barney***, No. C 05-1298 PJH (N.D. Cal.). On August 13, 2008, the Court granted final approval to a settlement of the gender discrimination case against Smith Barney. Lieff Cabraser represented Female Financial Advisors who charged that Smith Barney, the retail brokerage unit of Citigroup, discriminated against them in account distributions, business leads, referral business, partnership opportunities, and other terms of employment. The Court approved a four-year settlement agreement that provides for comprehensive injunctive relief and significant monetary relief of $33 million for the 2,411 members of the Settlement Class. The comprehensive injunctive relief provided under the settlement is designed to increase business opportunities and promote equality in compensation for female brokers.

9. ***Giannetto v. Computer Sciences Corporation***, No. 03-CV-8201 (C.D. Cal.). In one of the largest overtime pay dispute settlements ever in the information technology industry, the Court approved a $24 million settlement with Computer Sciences Corporation in 2005. Plaintiffs charged that the global conglomerate had a common practice of refusing to pay overtime compensation to its technical support workers involved in the installation and maintenance of computer hardware and software in violation of the Fair Labor Standards Act, California's Unfair Competition Law, and the wage and hour laws of 13 states.

10. ***Church v. Consolidated Freightways***, No. C90-2290 DLJ (N.D. Cal.). Lieff Cabraser was the Lead Court-appointed Class Counsel in this class action on behalf of the exempt employees of Emery Air Freight, a freight forwarding company acquired by Consolidated Freightways in 1989. On behalf of the employee class, Lieff Cabraser prosecuted claims for violation of the Employee Retirement Income Security Act, the securities laws, and the Age Discrimination in Employment Act. The case settled in 1993 for $13.5 million.

11. ***Gerlach v. Wells Fargo & Co.,*** No. C 05-0585 CW (N.D. Cal.). In January 2007, the Court granted final approval to a $12.8 million settlement of a class action suit by current and former business systems employees of Wells Fargo seeking unpaid overtime. Plaintiffs alleged that Wells Fargo illegally misclassified those employees, who maintained and updated Wells Fargo's business tools according to others' instructions, as "exempt" from the overtime pay requirements of federal and state labor laws.

12. ***Buccellato v. AT&T Operations***, No. C10-00463-LHK (N.D. Cal.). Lieff Cabraser represented a group of current and former AT&T technical

support workers who alleged that AT&T misclassified them as exempt and failed to pay them for all overtime hours worked, in violation of federal and state overtime pay laws.  In June 2011, the Court approved a $12.5 million collective and class action settlement.

13.    ***Buttram v. UPS***, No. C-97-01590 MJJ (N.D. Cal.).  Lieff Cabraser and several co-counsel represented a class of approximately 14,000 African-American part-time hourly employees of UPS's Pacific and Northwest Regions alleging race discrimination in promotions and job advancement.  In 1999, the Court approved a $12.14 million settlement of the action.  Under the injunctive relief portion of the settlement, among other things, Class Counsel continues to monitor the promotions of African-American part-time hourly employees to part-time supervisor and full-time package car driver.

14.    ***Goddard, et al. v. Longs Drug Stores Corporation, et al.***, No. RG04141291 (Cal. Supr. Ct.).  Store managers and assistant store managers of Longs Drugs charged that the company misclassified them as exempt from overtime wages.  Managers regularly worked in excess of 8 hours per day and 40 hours per week without compensation for their overtime hours.  Following mediation, in 2005, Longs Drugs agreed to settle the claims for a total of $11 million.  Over 1,000 current and former Longs Drugs managers and assistant managers were eligible for compensation under the settlement, over 98% of the class submitted claims.

15.    ***Trotter v. Perdue Farms***, No. C 99-893-RRM (JJF) (MPT) (D. Del.).  Lieff Cabraser represented a class of chicken processing employees of Perdue Farms, Inc., one of the nation's largest poultry processors, for wage and hour violations.  The suit challenged Perdue's failure to compensate its assembly line employees for putting on, taking off, and cleaning protective and sanitary equipment in violation of the Fair Labor Standards Act, various state wage and hour laws, and the Employee Retirement Income Security Act.  Under a settlement approved by the Court in 2002, Perdue paid $10 million for wages lost by its chicken processing employees and attorneys' fees and costs.  The settlement was in addition to a $10 million settlement of a suit brought by the Department of Labor in the wake of Lieff Cabraser's lawsuit.

16.    ***Gottlieb v. SBC Communications***, No. CV-00-04139 AHM (MANx) (C.D. Cal.).  With co-counsel, Lieff Cabraser represented current and former employees of SBC and Pacific Telesis Group ("PTG") who participated in AirTouch Stock Funds, which were at one time part of PTG's salaried and non-salaried savings plans.  After acquiring  PTG, SBC sold AirTouch, which PTG had owned, and caused the AirTouch Stock Funds that were included in the PTG employees' savings plans to be

liquidated.  Plaintiffs alleged that in eliminating the AirTouch Stock Funds, and in allegedly failing to adequately communicate with employees about the liquidation, SBC breached its duties to 401k plan participants under the Employee Retirement Income Security Act.  In 2002, the Court granted final approval to a $10 million settlement.

17.     ***In Re Farmers Insurance Exchange Claims Representatives' Overtime Pay Litigation***, MDL No. 1439 (D. Ore.).  Lieff Cabraser and co-counsel represented claims representatives of Farmers' Insurance Exchange seeking unpaid overtime.  Lieff Cabraser won a liability phase trial on a classwide basis, and then litigated damages on an individual basis before a special master.  The judgment was partially upheld on appeal.  In August 2010, the Court approved an $8 million settlement.

18.     ***Zuckman v. Allied Group***, No. 02-5800 SI (N.D. Cal.).  In September 2004, the Court approved a settlement with Allied Group and Nationwide Mutual Insurance Company of $8 million plus Allied/Nationwide's share of payroll taxes on amounts treated as wages, providing plaintiffs a 100% recovery on their claims. Plaintiffs, claims representatives of Allied / Nationwide, alleged that the company misclassified them as exempt employees and failed to pay them and other claims representatives in California overtime wages for hours they worked in excess of eight hours or forty hours per week.  In approving the settlement, U.S. District Court Judge Susan Illston commended counsel for their "really good lawyering" and stated that they did "a splendid job on this" case.

19.     ***Thomas v. California State Automobile Association***, No. CH217752 (Cal. Supr. Ct.).  With co-counsel, Lieff Cabraser represented 1,200 current and former field claims adjusters who worked for the California State Automobile Association ("CSAA").  Plaintiffs alleged that CSAA improperly classified their employees as exempt, therefore denying them overtime pay for overtime worked.  In May 2002, the Court approved an $8 million settlement of the case.

20.     ***Higazi v. Cadence Design Systems,*** No. C 07-2813 JW (N.D. Cal.).  In July 2008, the Court granted final approval to a $7.664 million settlement of a class action suit by current and former technical support workers for Cadence seeking unpaid overtime.  Plaintiffs alleged that Cadence illegally misclassified its employees who install, maintain, or support computer hardware or software as "exempt" from the overtime pay requirements of federal and state labor laws.

21.     ***Sandoval v. Mountain Center, Inc., et al.,***  No. 03CC00280 (Cal. Supr. Ct.).  Cable installers in California charged that defendants owed them overtime wages, as well as damages for missed meal and rest breaks and reimbursement for expenses incurred on the job.  In 2005, the Court

approved a $7.2 million settlement of the litigation, which was distributed to the cable installers who submitted claims.

22. ***Lewis v. Wells Fargo***, No. 08-cv-2670 CW (N.D. Cal.).  Lieff Cabraser served as Lead Counsel on behalf of approximately 330 I/T workers who alleged that Wells Fargo had a common practice of misclassifying them as exempt and failing to pay them for all overtime hours worked in violation of federal and state overtime pay laws.  In April 2011, the Court granted collective action certification of the FLSA claims and approved a $6.72 million settlement of the action.

23. ***Kahn v. Denny's***, No. BC177254 (Cal. Supr. Ct.).  Lieff Cabraser brought a lawsuit alleging that Denny's failed to pay overtime wages to its General Managers and Managers who worked at company-owned restaurants in California.  The Court approved a $4 million settlement of the case in 2000.

24. ***Wynne v. McCormick & Schmick's Seafood Restaurants***, No. C 06-3153 CW (N.D. Cal.).  In August 2008, the Court granted final approval to a settlement valued at $2.1 million, including substantial injunctive relief, for a class of African American restaurant-level hourly employees.  The consent decree created hiring benchmarks to increase the number of African Americans employed in front of the house jobs (*e.g.*, server, bartender, host/hostess, waiter/waitress, and cocktail server), a registration of interest program to minimize discrimination in promotions, improved complaint procedures, and monitoring and enforcement mechanisms.

25. ***Sherrill v. Premera Blue Cross***, No. 2:10-cv-00590-TSZ (W.D. Wash.). In April 2010, a technical worker at Premera Blue Cross filed a lawsuit against Premera seeking overtime pay from its misclassification of technical support workers as exempt.  In June 2011, the Court approved a collective and class action settlement of $1.45 million.

26. ***Holloway v. Best Buy,*** No. C05-5056 PJH (N.D. Cal.).  Lieff Cabraser, with co-counsel, represented a class of current employees of Best Buy that alleged Best Buy stores nationwide discriminated against women, African Americans, and Latinos.  The complaint charged that these employees were assigned to less desirable positions and denied promotions, and that class members who attained managerial positions were paid less than white males.  In November 2011, the Court approved a settlement of the class action in which Best Buy agreed to changes to its personnel policies and procedures that will enhance the equal employment opportunities of the tens of thousands of women, African Americans, and Latinos employed by Best Buy nationwide.

27. ***Lyon v. TMP Worldwide***, No. 993096 (Cal. Supr. Ct.).  Lieff Cabraser served as Class Counsel for a class of certain non-supervisory employees in an advertising firm.  The settlement, approved in 2000, provided almost a 100% recovery to class members.  The suit alleged that TMP failed to pay overtime wages to these employees.

Lieff Cabraser attorneys have had experience representing employees in additional cases, including cases involving race, gender, and age discrimination, ERISA, breach of contract claims, wage/hour claims and other violations of the law.  For example, as described in the antitrust section of the resume, Lieff Cabraser serves as plaintiffs' Interim Co-Lead Counsel in a consolidated class action charging that Adobe Systems Inc., Apple Inc., Google Inc., Intel Corporation, Intuit Inc., Lucasfilm Ltd., and Pixar violated antitrust laws by conspiring to suppress the pay of technical, creative, and other salaried employees.

We also represent employees who "blow the whistle" on wrongdoing by their company.  Our lawyers are dedicated to protecting employees who have been treated unfairly and preventing retaliation against them for challenging illegal practices.  These cases are described in the False Claims Act section of the resume.

Lieff Cabraser attorneys frequently write amici briefs on cutting-edge legal issues involving employment law.  We are currently investigating charges of race, gender and/or age discrimination, and wage/hour violations against several companies.

*U.S. News* and *Best Lawyers* selected Lieff Cabraser as a 2013 national "Law Firm of the Year" in the category of Employment Law – Individuals.  *U.S. News* and *Best Lawyers* ranked firms nationally in 80 different practice areas based on extensive client feedback and evaluations from 70,000 lawyers nationwide.  Only one law firm in the U.S. in each practice area receives the "Law Firm of the Year" designation.

*Benchmark Plaintiff*, a guide to the nation's leading plaintiffs' firms, has ranked our employment practice group a Tier 1 national ranking, its highest ranking.  The *Legal 500* guide to the U.S. legal profession has also recognized Lieff Cabraser as having one of the leading plaintiffs' employment practices in the nation for the past three years.  The legal weekly *The Recorder* selected our employment group as one of the top plaintiffs' employment practice groups in the San Francisco Bay Area.

Kelly M. Dermody chairs the firm's employment practice group and leads the firm's employment cases.  The *Daily Journal* has recognized her as one of the top 100 attorneys in California, top labor and employment lawyers in California, and top women litigators in California.  *Best Lawyers* and *Super Lawyers* have repeatedly recognized Ms. Dermody as one of top lawyers in San Francisco and Northern California.  In 2007, *California Lawyer* magazine awarded Ms. Dermody its prestigious California Lawyer Attorney of the Year (CLAY) Award.

## IV.  **Consumer Protection**

### A.  **Current Cases**

1. ***Gutierrez v. Wells Fargo Bank***, No. C 07-05923 WHA (N.D. Cal.).  Following a two week bench class action trial, U.S. District Court Judge William Alsup in August 2010 issued a 90-page opinion holding that

Wells Fargo violated California law by improperly and illegally assessing overdraft fees on its California customers and ordered $203 million in restitution to the certified class. Instead of posting each transaction chronologically, the evidence presented at trial showed that Wells Fargo deducted the largest charges first, drawing down available balances more rapidly and triggering a higher volume of overdraft fees.

Wells Fargo appealed. In December 2012, the appellate court issued an opinion upholding and reversing portions of Judge Alsup's order, and remanded the case to the district court for further proceedings. In May 2013, Judge Alsup reinstated the $203 million judgment against Wells Fargo.

For his outstanding work as Lead Trial Counsel and the significance of the case, *California Lawyer* magazine recognized Richard M. Heimann with a California Lawyer of the Year (CLAY) Award. In addition, the Consumer Attorneys of California selected Mr. Heimann and Michael W. Sobol as Finalists for the Consumer Attorney of the Year Award for their success in the case.

2. ***In re Checking Account Overdraft Litigation***, MDL No. 2036 (S.D. Fl.). Lieff Cabraser serves on the plaintiffs' executive committee and is the lead plaintiffs' law firm prosecuting the case against Bank of America in Multi-District Litigation against the nation's major banks for the collection of excessive overdraft fees. The lawsuits charge that the banks entered charges debiting customer's accounts from the "largest to the smallest" for the purpose of maximizing the number of times they could assess their customers overdraft fees. In March 2010, the Court denied defendants' motions to dismiss the complaints.

In November 2011, the Court granted final approval to a $410 million settlement of the case against Bank of America. In approving the settlement, U.S. District Court Judge James Lawrence King stated, "This is a marvelous result for the members of the class." Judge King added, "[B]ut for the high level of dedication, ability and massive and incredible hard work by the Class attorneys . . . I do not believe the Class would have ever seen . . . a penny."

In September 2012, the Court granted final approval to a $35 million of the case against Union Bank. In approving the settlement, Judge King complimented plaintiffs' counsel for their outstanding work and effort in resolving the case: "The description of plaintiffs' counsel, which is a necessary part of the settlement, is, if anything, understated. In my observation of the diligence and professional activity, it's superb. I know of no other class action case anywhere in the country in the last couple of decades that's been handled as efficiently as this one has, which is a tribute to the lawyers."

3.      ***Payment Protection Credit Card Litigation.***  Lieff Cabraser, with co-counsel, represents consumers in a series of federal court cases against some of the nation's largest credit card issuers, challenging the imposition of charges for so-called "payment protection" or "credit protection" programs.  Plaintiffs allege that the credit card companies make promises that under these "payment protection programs," payment of credit card debt will be suspended or canceled if borrowers experience major life events such as unemployment or disability.  However, plaintiffs allege that the credit card issuers impose "payment protection" on consumers without consent or deceptively market it to them, and exacerbate the misconduct through unfair benefits administration practices. Lieff Cabraser has reached settlements with a number of banks including Discover (final approval granted), HSBC (final approval granted; on appeal), and Bank of America (final approval granted), with settlements totaling more than $50 million plus certain practice changes.

4.      ***ING Bank Rate Renew Cases***, Case No. 11-154-LPS (D. Del.).  Lieff Cabraser represents borrowers in class action lawsuits charging that ING Direct breached its promise to allow them to refinance their mortgages for a flat fee.  From October 2005 through April 2009, ING promoted a $500 or $750 flat-rate refinancing fee called "Rate Renew" as a benefit of choosing ING for mortgages over competitors.  Beginning in May 2009, however, ING began charging a higher fee of a full monthly mortgage payment for refinancing using "Rate Renew," despite ING's earlier and lower advertised price.  As a result, the complaint alleges that many borrowers paid more to refinance their loans using "Rate Renew" than they should have, or were denied the opportunity to refinance their loan even though the borrowers met the terms and conditions of ING's original "Rate Renew" offer.  In August 2012, the Court certified a class of consumers in ten states who purchased or retained an ING mortgage from October 2005 through April 2009.  A second case on behalf of California consumers was filed in December 2012.

5.      ***Dover v. British Airways***, Case No. 1:12-cv-05567 (E.D. NY).  Lieff Cabraser represents participants in British Airways' ("BA") frequent flyer program, known as Executive Club, in a breach of contract class action lawsuit.  BA imposes a "fuel surcharge," sometimes in excess of $500, on Executive Club reward tickets.  Plaintiffs allege that the "fuel surcharge" is in no way based upon the price of fuel.  Plaintiffs further allege that the contract governing the Executive Club program permits BA to impose charges only when based on a fee or charge imposed by a regulatory authority, and no jurisdiction to which BA flies imposes a fuel surcharge on commercial airlines or on commercial airline passengers.

6.      ***Moore v. Verizon Communications***, No. 09-cv-01823-SBA (N.D. Cal.); ***Nwabueze v. AT&T***, No. 09-cv-1529 SI (N.D. Cal.); ***Terry v.***

*Pacific Bell Telephone Co.*, No. RG 09 488326 (Alameda County Sup. Ct.).  Lieff Cabraser, with co-counsel, represents nationwide classes of landline telephone customers subjected to the deceptive business practice known as "cramming."  In this practice, a telephone company bills customers for unauthorized third-party charges assessed by billing aggregators on behalf of third-party providers.  A U.S. Senate committee has estimated that Verizon, AT&T, and Qwest place 300 million such charges on customer bills each year (amounting to $2 billion in charges), many of which are unauthorized.  Various sources estimate that 90-99% of third-party charges are unauthorized.  Both Courts have granted preliminary approval of settlements that allow customers to receive 100% refunds for all unauthorized charges from 2005 to the present, plus extensive injunctive relief to prevent cramming in the future.  The *Nwabueze* and *Terry* cases are ongoing.

7.   *James v. UMG Recordings, Inc.*, No. CV-11-1613 (N.D. CAL); *Zombie v. UMG Recordings, Inc.*, No. CV-11-2431 (N.D. CAL).  Lieff Cabraser and its co-counsel represent music recording artists in a proposed class action against Universal Music Group.  Plaintiffs allege that Universal failed to pay the recording artists full royalty income earned from customers' purchases of digitally downloaded music from vendors such as Apple iTunes.  The complaint alleges that Universal licenses plaintiffs' music to digital download providers, but in its accounting of the royalties plaintiffs have earned, treats such licenses as "records sold" because royalty rate for "records sold" is lower than the royalty rate for licenses.  Plaintiffs legal claims include breach of contract and violation of California unfair competition laws.  In November 2011 the court denied defendant's motion to dismiss plaintiffs' unfair competition law claims.

8.   *White v. Experian Information Solutions*, No. 05-CV-1070 DOC (C.D. Cal.).  In 2005, plaintiffs filed nationwide class action lawsuits on behalf of 750,000 claimants against the nation's three largest repositories of consumer credit information, Experian Information Solutions, Inc., Trans Union, LLC, and Equifax Information Services, LLC.  The complaints charged that defendants violated the Fair Credit Reporting Act ("FCRA") by recklessly failing to follow reasonable procedures to ensure the accurate reporting of debts discharged in bankruptcy and by refusing to adequately investigate consumer disputes regarding the status of discharged accounts.  In April 2008, the District Court approved a partial settlement of the action that established an historic injunction.  This settlement required defendants comply with detailed procedures for the retroactive correction and updating of consumers' credit file information concerning discharged debt (affecting one million consumers who had filed for bankruptcy dating back to 2003), as well as new procedures to ensure that debts subject to future discharge orders will be similarly

treated.  As noted by the District Court, "Prior to the injunctive relief order entered in the instant case, however, no verdict or reported decision had ever required Defendants to implement procedures to cross-check data between their furnishers and their public record providers."  In 2011, the District Court approved a $45 million settlement of the class claims for monetary relief.  In April 2013, the Court of Appeals for the Ninth Circuit reversed the order approving the monetary settlement and remanded the case for further proceedings.

9.   ***In re Neurontin Marketing and Sales Practices Litigation***, No. 04-CV-10739-PBS (D. Mass.).  Lieff Cabraser serves on the Plaintiffs' Steering Committee in multidistrict litigation arising out of the sale and marketing of the prescription drug Neurontin, manufactured by Parke-Davis, a division of Warner-Lambert Company, which was later acquired by Pfizer, Inc.  Lieff Cabraser served as co-counsel to Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals ("Kaiser") in Kaiser's trial against Pfizer in the litigation.  On March 25, 2010, a federal court jury determined that Pfizer Inc. violated a federal antiracketeering law by promoting its drug Neurontin for unapproved uses and found Pfizer must pay Kaiser damages up to $142 million.  At trial, Kaiser presented evidence that Pfizer knowingly marketed Neurontin for unapproved uses without proof that it was effective.  Kaiser said it was misled into believing neuropathic pain**,** migraines, and bipolar disorder were among the conditions that could be treated effectively with Neurontin, which was approved by the FDA as an adjunctive therapy to treat epilepsy and later for post-herpetic neuralgia, a specific type of neuropathic pain.  On November 3, 2010, the Court issued Findings of Fact and Conclusions of Law on Kaiser's claims arising under the California Unfair Competition Law, finding Pfizer liable and ordering that it pay restitution to Kaiser of approximately $95 million.  On April 3, 2013, the First Circuit Court of Appeals affirmed both the jury's and the district court's verdicts.

10.  ***Healy v. Chesapeake Appalachia***, No. 1:10cv00023 (W.D. Va.);  ***Hale v. CNX Gas***, No. 1:10cv00059 (W.D. Va.); ***Estate of Holman v. Noble Energy***, No. 03 CV 9 (Dist. Ct., Co.); ***Droegemueller v. Petroleum Development Corporation***, No. 07 CV 2508 JLK (D. Co.); ***Anderson v. Merit Energy Co.***, No. 07 CV 00916 LTB (D. Co.); ***Holman v. Petro-Canada Resources*** (USA), No. 07 CV 416 (Dist. Ct., Co.).  Lieff Cabraser serves as Co-Lead Counsel in several cases pending in federal court in Virginia, in which plaintiffs allege that certain natural gas companies improperly underpaid gas royalties to the owners of the gas.  In one case that recently settled, the plaintiffs recovered approximately 95% of the damages they suffered.  Lieff Cabraser also achieved settlements on behalf of natural gas royalty owners in five other class actions outside Virginia.  Those settlements -- in which class members recovered between 70% and 100%

of their damages, excluding interest -- were valued at more than $160 million.

11.   ***Adkins v. Morgan Stanley, No. 12 CV 7667 (S.D.N.Y.).***  Five African-American residents from Detroit, Michigan, joined by Michigan Legal Services, have brought a class action lawsuit against Morgan Stanley for discrimination in violation of the Fair Housing Act and other civil rights laws.  The plaintiffs charge that Morgan Stanley actively ensured the proliferation of high-cost mortgage loans with specific risk factors in order to bundle and sell mortgage-backed securities to investors.  The lawsuit is the first to seek to hold a bank in the secondary market accountable for the adverse racial impact of such policies and conduct. Plaintiffs seek certification of the case as a class action for as many as 6,000 African-Americans homeowners in the Detroit area who may have suffered similar discrimination.  Lieff Cabraser serves as plaintiffs' counsel with the American Civil Liberties Union, the ACLU of Michigan, and the National Consumer Law Center.

## B.   Successes

1.   ***Kline v. The Progressive Corporation***, Circuit No. 02-L-6 (Circuit Court of the First Judicial Circuit, Johnson County, Illinois).  Lieff Cabraser served as settlement class counsel in a nationwide consumer class action challenging Progressive Corporation's private passenger automobile insurance sales practices.  Plaintiffs alleged that the Progressive Corporation wrongfully concealed from class members the availability of lower priced insurance for which they qualified.  In 2002, the Court approved a settlement valued at approximately $450 million, which included both cash and equitable relief.  The claims program, implemented upon a nationwide mail and publication notice program, was completed in 2003.

2.   ***Catholic Healthcare West Cases***, JCCP No. 4453 (Cal. Supr. Ct.). Plaintiff alleged that Catholic Healthcare West ("CHW") charged uninsured patients excessive fees for treatment and services, at rates far higher than the rates charged to patients with private insurance or on Medicare.  In January 2007, the Court approved a settlement that provides discounts, refunds and other benefits for CHW patients valued at $423 million.  The settlement requires that CHW lower its charges and end price discrimination against all uninsured patients, maintain generous charity case policies allowing low-income and uninsured patients to receive free or heavily discounted care, and protect uninsured patients from unfair collections practices.  Lieff Cabraser served as Lead Counsel in the coordinated action.

3.   ***Sutter Health Uninsured Pricing Cases***, JCCP No. 4388 (Cal. Supr. Ct.).  Plaintiffs alleged that they and a Class of uninsured patients treated

at Sutter hospitals were charged substantially more than patients with private or public insurance, and many times above the cost of providing their treatment.  In December 2006, the Court granted final approval to a comprehensive and groundbreaking settlement of the action.  As part of the settlement, Class members will be entitled to make a claim for refunds or deductions of between 25% to 45% from their prior hospital bills, at an estimated total value of $276 million.  For the next three years, Sutter will maintain discounted pricing policies for uninsureds that will make Sutter's pricing for uninsureds comparable to or better than the pricing for patients with private insurance.  In addition, Sutter agreed to maintain more compassionate collections policies that will protect uninsureds who fall behind in their payments.  Lieff Cabraser served as Lead Counsel in the coordinated action.

4.      ***Citigroup Loan Cases***, JCCP No. 4197 (San Francisco Supr. Ct., Cal.).  In 2003, the Court approved a settlement that provided approximately $240 million in relief to former Associates' customers across America.  Prior to its acquisition in November 2000, Associates First Financial, referred to as The Associates, was one of the nation's largest "subprime" lenders.  Lieff Cabraser represented former customers of The Associates charging that the company added unwanted and unnecessary insurance products onto mortgage loans and engaged in improper loan refinancing practices.  Lieff Cabraser served as nationwide Plaintiffs' Co-Liaison Counsel.

5.      ***Thompson v. WFS Financial.***, No. 3-02-0570 (M.D. Tenn.); ***Pakeman v. American Honda Finance Corporation***, No. 3-02-0490 (M.D. Tenn.); ***Herra v. Toyota Motor Credit Corporation***, No. CGC 03-419 230 (San Francisco Supr. Ct.).  Lieff Cabraser with co-counsel litigated against several of the largest automobile finance companies in the country to compensate victims of—and stop future instances of—racial discrimination in the setting of interest rates in automobile finance contracts.  The litigation led to substantial changes in the way Toyota Motor Credit Corporation ("TMCC"), American Honda Finance Corporation ("American Honda") and WFS Financial, Inc. sell automobile finance contracts, limiting the discrimination that can occur.

In approving the settlement in *Thompson v. WFS Financial*, the Court recognized the "innovative" and "remarkable settlement" achieved on behalf of the nationwide class.  In 2006 in *Herra v. Toyota Motor Credit Corporation*, the Court granted final approval to a nationwide class action settlement on behalf of all African-American and Hispanic customers of TMCC who entered into retail installment contracts that were assigned to TMCC from 1999 to 2006.  The monetary benefit to the class was estimated to be between $159-$174 million.

6.      ***In re John Muir Uninsured Healthcare Cases***, JCCP No. 4494
(Cal. Supr. Ct.).  Lieff Cabraser represented nearly 53,000 uninsured
patients who received care at John Muir hospitals and outpatient centers
and were charged inflated prices and then subject to overly aggressive
collection practices when they failed to pay.  On November 19, 2008, the
Court approved a final settlement of the *John Muir* litigation.  John Muir
agreed to provide refunds or bill adjustments of 40-50% to uninsured
patients that received medical care at John Muir over a six year period,
bringing their charges to the level of patients with private insurance, at a
value of $115 million.  No claims were required, so every class member
received a refund or bill adjustment.  Furthermore, John Muir was
required to (1) maintain charity care policies to give substantial
discounts—up to 100%—to low income, uninsured patients who meet
certain income requirements; (2) maintain an Uninsured Patient
Discount Policy to give discounts to all uninsured patients, regardless of
income, so that they pay rates no greater than those paid by patients with
private insurance; (3) enhance communications to uninsured patients so
they are better advised about John Muir's pricing discounts, financial
assistance, and financial counseling services; and (4) limit the practices
for collecting payments from uninsured patients.

7.      ***Providian Credit Card Cases***, JCCP No. 4085 (San Francisco Supr.
Ct.).  Lieff Cabraser served as Co-Lead Counsel for a certified national
Settlement Class of Providian credit cardholders who alleged that
Providian had engaged in widespread misconduct by charging
cardholders unlawful, excessive interest and late charges, and by
promoting and selling to cardholders "add-on products" promising
illusory benefits and services.  In November 2001, the Court granted final
approval to a $105 million settlement of the case, which also required
Providian to implement substantial changes in its business practices.  The
$105 million settlement, combined with an earlier settlement by
Providian with Federal and state agencies, represents the largest
settlement ever by a U.S. credit card company in a consumer protection
case.

8.      ***In re Chase Bank USA, N.A. "Check Loan" Contract Litigation***,
MDL No. 2032 (N.D. Cal.).  Lieff Cabraser served as Plaintiffs' Liaison
Counsel and on the Plaintiffs' Executive Committee in Multi-District
Litigation ("MDL") charging that Chase Bank violated the implied
covenant of good faith and fair dealing by unilaterally modifying the
terms of fixed rate loans.  The MDL was established in 2009 to coordinate
more than two dozen cases that were filed in the wake of the conduct at
issue.  The nationwide, certified class consisted of more than 1 million
Chase cardholders who, in 2008 and 2009, had their monthly minimum
payment requirements unilaterally increased by Chase by more than
150%.  Plaintiffs alleged that Chase made this change, in part, to induce

cardholders to give up their promised fixed APRs in order to avoid the unprecedented minimum payment hike.  In November 2012, the Court approved a $100 million settlement of the case.

9. ***In re Synthroid Marketing Litigation***, MDL No. 1182 (N.D. Ill.). Lieff Cabraser served as Co-Lead Counsel for the purchasers of the thyroid medication Synthroid in litigation against Knoll Pharmaceutical, the manufacturer of Synthroid.  The lawsuits charged that Knoll misled physicians and patients into keeping patients on Synthroid despite knowing that less costly, but equally effective drugs, were available.  In 2000, the District Court gave final approval to a $87.4 million settlement with Knoll and its parent company, BASF Corporation, on behalf of a class of all consumers who purchased Synthroid at any time from 1990 to 1999. In 2001, the Court of Appeals upheld the order approving the settlement and remanded the case for further proceedings.  264 F.3d 712 (7th Cir. 2001).  The settlement proceeds were distributed in 2003.

10. ***R.M. Galicia v. Franklin; Franklin v. Scripps Health***, No. IC 859468 (San Diego Supr. Ct., Cal.).  Lieff Cabraser served as Lead Class Counsel in a certified class action lawsuit on behalf of 60,750 uninsured patients who alleged that the Scripps Health hospital system imposed excessive fees and charges for medical treatment.  The class action originated in July 2006, when uninsured patient Phillip Franklin filed a class action cross-complaint against Scripps Health after Scripps sued Mr. Franklin through a collection agency.  Mr. Franklin alleged that he, like all other uninsured patients of Scripps Health, was charged unreasonable and unconscionable rates for his medical treatment.  In June 2008, the Court granted final approval to a settlement of the action which includes refunds or discounts of 35% off of medical bills, collectively worth $73 million.  The settlement also requires Scripps Health to modify its pricing and collections practices by (1) following an Uninsured Patient Discount Policy, which includes automatic discounts from billed charges for Hospital Services; (2) following a Charity Care Policy, which provides uninsured patients who meet certain income tests with discounts on Health Services up to 100% free care, and provides for charity discounts under other special circumstances; (3) informing uninsured patients about the availability and terms of the above financial assistance policies; and (4) restricting certain collections practices and actively monitoring outside collection agents.  The prospective future discounts are worth many millions more in savings to uninsureds over the next four years.

11. ***In re Lawn Mower Engine Horsepower Marketing and Sales Practices Litigation***, MDL No. 1999 (E.D. Wi.). Lieff Cabraser served as co-counsel for consumers that alleged manufacturers of certain gasoline-powered lawn mowers misrepresented, and significantly

overstated, the horsepower of the product. As the price for lawn mowers is linked to the horsepower of the engine -- the higher the horsepower, the more expensive the lawn mower -- defendants' alleged misconduct caused consumers to purchase expensive lawn mowers that provided lower horsepower than advertised. In August 2010, the Court approved a $65 million settlement of the action.

12. ***Strugano v. Nextel Communications***, No. BC 288359 (Los Angeles Supr. Crt). In May 2006, the Los Angeles Superior Court granted final approval to a class action settlement on behalf of all California customers of Nextel from January 1, 1999 through December 31, 2002, for compensation for the harm caused by Nextel's alleged unilateral (1) addition of a $1.15 monthly service fee and/or (2) change from second-by-second billing to minute-by-minute billing, which caused "overage" charges (*i.e.*, for exceeding their allotted cellular plan minutes). The total benefit conferred by the Settlement directly to Class Members was between approximately $13.5 million and $55.5 million, depending on which benefit Class Members selected.

13. ***Curry v. Fairbanks Capital Corporation***, No. 03-10895-DPW (D. Mass.). In 2004, the Court approved a $55 million settlement of a class action lawsuit against Fairbanks Capital Corporation arising out of charges against Fairbanks of misconduct in servicing its customers' mortgage loans. The settlement also required substantial changes in Fairbanks' business practices and established a default resolution program to limit the imposition of fees and foreclosure proceedings against Fairbanks' customers. Lieff Cabraser served as nationwide Co-Lead Counsel for the homeowners.

14. ***California Title Insurance Industry Litigation.*** Lieff Cabraser, in coordination with parallel litigation brought by the Attorney General, reached settlements in 2003 and 2004 with the leading title insurance companies in California, resulting in historic industry-wide changes to the practice of providing escrow services in real estate closings. The settlements brought a total of $50 million in restitution to California consumers, including cash payments. In the lawsuits, plaintiffs alleged, among other things, that the title companies received interest payments on customer escrow funds that were never reimbursed to their customers. The defendant companies include Lawyers' Title, Commonwealth Land Title, Stewart Title of California, First American Title, Fidelity National Title, and Chicago Title.

15. **Vytorin/Zetia Marketing, Sales Practices & Products Liability Litigation**, MDL No. 1938 (D. N.J.). Lieff Cabraser served on the Executive Committee of the Plaintiffs' Steering Committee representing plaintiffs alleging that Merck/Schering-Plough Pharmaceuticals falsely

marketed anti-cholesterol drugs Vytorin and Zetia as being more effective than other anti-cholesterol drugs. Plaintiffs further alleged that Merck/Schering-Plough Pharmaceuticals sold Vytorin and Zetia at higher prices than other anti-cholesterol medication when they were no more effective than other drugs. In 2010, the Court approved a $41.5 million settlement for consumers who bought Vytorin or Zetia between November 2002 and February 2010.

16.   ***Morris v. AT&T Wireless Services***, No. C-04-1997-MJP (W.D. Wash.). Lieff Cabraser served as class counsel for a nationwide settlement class of cell phone customers subjected to an end-of-billing cycle cancellation policy implemented by AT&T Wireless in 2003 and alleged to have breached customers' service agreements. In May 2006, the New Jersey Superior Court granted final approval to a class settlement that guarantees delivery to the class of $40 million in benefits. Class members received cash-equivalent calling cards automatically, and had the option of redeeming them for cash. Lieff Cabraser had been prosecuting the class claims in the Western District of Washington when a settlement in New Jersey state court was announced. Lieff Cabraser objected to that settlement as inadequate because it would have only provided $1.5 million in benefits without a cash option, and the court agreed, declining to approve it. Thereafter, Lieff Cabraser negotiated the new settlement providing $40 million to the class, and the settlement was approved.

17.   ***Berger v. Property I.D. Corporation***, No. CV 05-5373-GHK (C.D. Cal.). In January 2009, the Court granted final approval to a $39.4 million settlement with several of the nation's largest real estate brokerages, including companies doing business as Coldwell Banker, Century 21, and ERA Real Estate, and California franchisors for RE/MAX and Prudential California Realty, in an action under the Real Estate Settlement Procedures Act on behalf of California home sellers. Plaintiffs charged that the brokers and Property I.D. Corporation set up straw companies as a way to disguise kickbacks for referring their California clients' natural hazard disclosure report business to Property I.D. (the report is required to sell a home in California). Under the settlement, hundreds of thousands of California home sellers were eligible to receive a full refund of the cost of their report, typically about $100.

18.   ***In re Tri-State Crematory Litigation***, MDL No. 1467 (N.D. Ga.). In March 2004, Lieff Cabraser delivered opening statements and began testimony in a class action by families whose loved ones were improperly cremated and desecrated by Tri-State Crematory in Noble, Georgia. The families also asserted claims against the funeral homes that delivered the decedents to Tri-State Crematory for failing to ensure that the crematory performed cremations in the manner required under the law and by

human decency.  One week into trial, settlements with the remaining funeral home defendants were reached and brought the settlement total to approximately $37 million.  Trial on the class members' claims against the operators of crematory began in August 2004.  Soon thereafter, these defendants entered into a $80 million settlement with plaintiffs.  As part of the settlement, all buildings on the Tri-State property were razed.  The property will remain in a trust so that it will be preserved in peace and dignity as a secluded memorial to those whose remains were mistreated, and to prevent crematory operations or other inappropriate activities from ever taking place there.  Earlier in the litigation, the Court granted plaintiffs' motion for class certification in a published order.  215 F.R.D. 660 (2003).

19.    ***In re American Family Enterprises***, MDL No. 1235 (D. N.J.).  Lieff Cabraser served as Co-Lead Counsel for a nationwide class of persons who received any sweepstakes materials sent under the name "American Family Publishers."  The class action lawsuit alleged that defendants deceived consumers into purchasing magazine subscriptions and merchandise in the belief that such purchases were necessary to win an American Family Publishers' sweepstakes prize or enhanced their chances of winning a sweepstakes prize.  In September 2000, the Court granted final approval of a $33 million settlement of the class action.  In April 2001, over 63,000 class members received refunds averaging over $500 each, representing 92% of their eligible purchases.  In addition, American Family Publishers agreed to make significant changes to the way it conducts the sweepstakes.

20.    ***Cincotta v. California Emergency Physicians Medical Group,*** No. 07359096 (Cal. Supr. Ct.).  Lieff Cabraser served as class counsel for nearly 100,000 uninsured patients that alleged they were charged excessive and unfair rates for emergency room service across 55 hospitals throughout California.  The settlement, approved on October 31, 2008, provided complete debt elimination, 100% cancellation of the bill, to uninsured patients treated by California Emergency Physicians Medical Group during the 4-year class period.  These benefits were valued at $27 million.  No claims were required, so all of these bills were cancelled.  In addition, the settlement required California Emergency Physicians Medical Group prospectively to (1) maintain certain discount policies for all charity care patients; (2) inform patients of the available discounts by enhanced communications; and (3) limit significantly the type of collections practices available for collecting from charity care patients.

21.    **In re Ameriquest Mortgage Co. Mortgage Lending Practices Litigation**, MDL No. 1715.  Lieff Cabraser served as Co-Lead Counsel for borrowers who alleged that Ameriquest engaged in a predatory lending

scheme based on the sale of loans with illegal and undisclosed fees and terms. In August 2010, the Court approved a $22 million settlement.

22. ***Yarrington v. Solvay Pharmaceuticals***, No. 09-CV-2261 (D. Minn.). In March 2010, the Court granted final approval to a $16.5 million settlement with Solvay Pharmaceuticals, one of the country's leading pharmaceutical companies. Lieff Cabraser served as Co-Lead Counsel, representing a class of persons who purchased Estratest—a hormone replacement drug. The class action lawsuit alleged that Solvay deceptively marketed and advertised Estratest as an FDA-approved drug when in fact Estratest was not FDA-approved for any use. Under the settlement, consumers obtained partial refunds for up to 30% of the purchase price paid of Estratest. In addition, $8.9 million of the settlement was allocated to fund programs and activities devoted to promoting women's health and well-being at health organizations, medical schools, and charities throughout the nation.

23. ***Reverse Mortgage Cases***, JCCP No. 4061 (San Mateo County Supr. Ct., Cal.). Transamerica Corporation, through its subsidiary Transamerica Homefirst, Inc., sold "reverse mortgages" marketed under the trade name "Lifetime." The Lifetime reverse mortgages were sold exclusively to seniors, *i.e.*, persons 65 years or older. Lieff Cabraser, with co-counsel, filed suit on behalf of seniors alleging that the terms of the reverse mortgages were unfair, and that borrowers were misled as to the loan terms, including the existence and amount of certain charges and fees. In 2003, the Court granted final approval to an $8 million settlement of the action.

24. ***Brazil v. Dell***, No. C-07-01700 RMW (N.D. Cal.). Lieff Cabraser served as Class Counsel representing a certified class of online consumers in California who purchased certain Dell computers based on the advertisement of an instant-off (or "slash-through") discount. The complaint challenged Dell's pervasive use of "slash-through" reference prices in its online marketing. Plaintiffs alleged that these "slash-through" reference prices were interpreted by consumers as representing Dell's former or regular sales prices, and that such reference prices (and corresponding representations of "savings") were false because Dell rarely, if ever, sold its products at such prices. In October 2011, the Court approved a settlement that provided a $50 payment to each class member who submitted a timely and valid claim. In addition, in response to the lawsuit, Dell changed its methodology for consumer online advertising, eliminating the use of "slash-through" references prices.

25. ***In re Ocwen Federal Bank FSB Mortgage Servicing Litigation***, MDL No. 1604 (N.D. Ill.). Lieff Cabraser serves as Co-Lead Plaintiffs' Counsel in a nationwide class action against Ocwen Financial

Corporation, Ocwen Federal Bank FSB, and their affiliates ("Ocwen"). This lawsuit arises out of charges against Ocwen of misconduct in servicing its customers' mortgage loans and in its provision of certain related services, including debt collection and foreclosure services.  On January 10, 2011, the Court granted preliminary approval of a nationwide settlement that provides monetary relief, cash-equivalent benefits, and injunctive relief.  Final approval was granted to the settlement on July 6, 2011.

## V.    Antitrust/Trade Regulation/Intellectual Property

### A.    Current Cases

1.    ***In re High-Tech Employee Antitrust Litigation***, No. 11 CV 2509 (N.D. Cal.).  Lieff Cabraser serves as plaintiffs' Interim Co-Lead Counsel in a consolidated class action charging that Adobe Systems Inc., Apple Inc., Google Inc., Intel Corporation, Intuit Inc., Lucasfilm Ltd., and Pixar violated antitrust laws by conspiring to suppress the pay of technical, creative, and other salaried employees.  The complaint alleges that the conspiracy among defendants consisted of (1) agreements not to actively recruit each other's employees; (2) agreements to provide notification when making an offer to another's employee (without the knowledge or consent of that employee); and (3) agreements to cap pay packages offered to prospective employees at the initial offer.  Plaintiffs have moved for class certification.

2.    ***Charles Schwab Bank, N.A. v. Bank of America Corp.***, No. 11 CV 4187 (N.D. Cal.).  Lieff Cabraser represents The Charles Schwab Corporation and its affiliates Charles Schwab Bank, N.A., and Charles Schwab & Co., Inc., which manages the investments of the Charles Schwab Bank, N.A., (collectively "Schwab") in a lawsuit against Bank of America Corporation, Credit Suisse Group AG, J.P. Morgan Chase & Co., Citibank, Inc., and additional banks for allegedly manipulating the London Interbank Offered Rate ("LIBOR").  The complaint alleges that beginning in 2007, the defendants conspired to understate their true costs of borrowing, causing the calculation of LIBOR to be set artificially low.  As a result, Schwab received less than its rightful rates of return on its investments.  The complaint asserts claims under federal antitrust and securities laws, the federal Racketeer Influenced and Corrupt Organizations Act, and the statutory and common law of California.

3.    ***Cipro Cases I and II***, JCCP Nos. 4154 and 4220 (Cal. Supr. Ct.).  Lieff Cabraser represents California consumers who purchased the widely prescribed antibiotic Cipro, and third party payors who reimbursed for California purchases, in a class action lawsuit charging that Bayer Corporation unlawfully restrained competition from generic drug manufacturers.  The complaint also names Barr Laboratories and other

generic drug companies as defendants.  Between 1997 and 2003, Bayer paid its would-be generic drug competitors nearly $400 million to refrain from selling more affordable versions of Cipro.  As a result, consumers were forced to pay inflated prices for the drug -- frequently prescribed to treat urinary tract, prostate, abdominal, and other infections.  In June 2013, plaintiffs agreed to a $74 million settlement with Bayer.  Should the Superior Court approve the settlement, it would resolve the case in part. Plaintiffs will continue to prosecute the action against the generic drug company defendants after the Bayer settlement proceedings have concluded.

4.  ***In re Lithium Ion Batteries Antitrust Litigation,*** MDL No. 2420. Lieff Cabraser serves as Interim Co-Lead Indirect Purchaser Counsel representing consumers in a class action filed against Sony, Panasonic, Hitachi, LG Chem, Samsung, and Sanyo for allegedly conspiring to fix and raise the prices of lithium-ion rechargeable batteries in violation of U.S. antitrust law from 2002 to 2011.  The defendants are the world's leading manufacturers of lithium-ion rechargeable batteries, which provide power for a wide variety of consumer electronic products.  As a result of the defendants' alleged anticompetitive and unlawful conduct, consumers across America paid artificially inflated prices for lithium-ion rechargeable batteries.

5.  ***In re Municipal Derivatives Litigation***, MDL No. 1950 (S.D.N.Y.).   Lieff Cabraser represents the City of Oakland, the County of Alameda, City of Fresno, Fresno County Financing Authority, and East Bay Delta Housing and Finance Agency in a class action lawsuit brought on behalf of themselves and California entities that purchased guaranteed investment contracts, swaps, and other municipal derivatives products from Bank of America, N.A.,  JP Morgan Chase & Co., Piper Jaffray & Co., Societe Generale SA, UBS AG, and other banks, brokers and financial institutions. The complaint charges that defendants conspired to give cities, counties, school districts, and other governmental agencies artificially low bids for guaranteed investment contracts, swaps, and other municipal derivatives products, which are used by public entities use to earn interest on bond proceeds. The complaint charges that defendants met secretly to discuss prices, customers, and markets of municipal derivatives sold in the U.S. and elsewhere; intentionally created the false appearance of competition by engaging in sham auctions in which the results were pre-determined or agreed not to bid on contracts; and covertly shared their unjust profits with losing bidders to maintain the conspiracy.  In April 2010, the Court denied defendants' motions to dismiss.

6.  ***Haley Paint Co. v. E.I. Dupont De Nemours and Co. et al.***, No. 10-cv-00318-RDB (N.D. Md.).  Lieff Cabraser represents direct

purchasers of titanium dioxide in a nationwide class action lawsuit.  Plaintiffs charge that defendants conspired to fix, raise, and maintain the price of titanium dioxide in the United States.  The complaint alleges defendants coordinated increases in the prices for titanium dioxide despite declining demand, decreasing raw material costs, and industry overcapacity.  In March 2011, the Court denied defendants' motions to dismiss the action.  In July 2013, the class counsel and defendant Huntsman International informed the Court that they have reached a settlement.  The action continues to proceed against the other defendants.

7.   ***Marchbanks Truck Service v. Comdata Network***, No. 07-cv-01078 (E.D. Pa.).   Lieff Cabraser is co-lead counsel for this consolidated class action.  The lawsuit charges that Comdata, and its parent company Ceridian, colluded with major truck stop chains to undermine the ability of rival fleet card issuers to challenge Comdata's monopoly in the fleet card market.  Plaintiffs allege that this illegal conduct harmed the proposed class of independent truck stops by forcing them to pay millions of dollars in excessive fees to Comdata.  Plaintiffs seek treble damages for the overcharges they and the proposed class paid, and an injunction to prevent ongoing anticompetitive conduct.

## B.   Successes

1.   ***Natural Gas Antitrust Cases***, JCCP Nos. 4221, 4224, 4226 & 4228 (Cal. Supr. Ct.).  In 2003, the Court approved a landmark of $1.1 billion settlement in class action litigation against El Paso Natural Gas Co. for manipulating the market for natural gas pipeline transmission capacity into California.  Lieff Cabraser served as Plaintiffs' Co-Lead Counsel and Co-Liaison Counsel in the *Natural Gas Antitrust Cases I-IV*.

In June 2007, the Court granted final approval to a $67.39 million settlement of a series of class action lawsuits brought by California business and residential consumers of natural gas against a group of natural gas suppliers, Reliant Energy Services, Inc., Duke Energy Trading and Marketing LLC, CMS Energy Resources Management Company, and Aquila Merchant Services, Inc.

Plaintiffs charged defendants with manipulating the price of natural gas in California during the California energy crisis of 2000-2001 by a variety of means, including falsely reporting the prices and quantities of natural gas transactions to trade publications, which compiled daily and monthly natural gas price indices; prearranged wash trading; and, in the case of Reliant, "churning" on the Enron Online electronic trading platform, which was facilitated by a secret netting agreement between Reliant and Enron.

The 2007 settlement followed a settlement reached in 2006 for $92 million partial settlement with Coral Energy Resources, L.P.; Dynegy Inc. and affiliates; EnCana Corporation; WD Energy Services, Inc.; and The Williams Companies, Inc. and affiliates.

2.   ***Wholesale Electricity Antitrust Cases I & II***, JCCP Nos. 4204 & 4205 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel in the private class action litigation against Duke Energy Trading & Marketing, Reliant Energy, and The Williams Companies for claims that the companies manipulated California's wholesale electricity markets during the California energy crisis of 2000-2001.  Extending the landmark victories for California residential and business consumers of electricity, in September 2004, plaintiffs reached a $206 million settlement with Duke Energy Trading & Marketing, and in August 2005, plaintiffs reached a $460 million settlement with Reliant Energy, settling claims that the companies manipulated California's wholesale electricity markets during the California energy crisis of 2000-01.  Lieff Cabraser earlier entered into a settlement for over $400 million with The Williams Companies.

3.   ***In re Brand Name Prescription Drugs***, MDL No. 997 (N.D. Ill.).  Lieff Cabraser served as Class Counsel for a class of tens of thousands of retail pharmacies against the leading pharmaceutical manufacturers and wholesalers of brand name prescription drugs for alleged price-fixing from 1989 to 1995 in violation of the federal antitrust laws.  Plaintiffs charged that defendants engaged in price discrimination against retail pharmacies by denying them discounts provided to hospitals, health maintenance organizations, and nursing homes.  In 1996 and 1998, the Court approved settlements with certain manufacturers totaling $723 million.

4.   ***Microsoft Private Antitrust Litigation.***  Representing businesses and consumers, Lieff Cabraser prosecuted multiple private antitrust cases against Microsoft Corporation in state courts across the country, including Florida, New York, North Carolina, and Tennessee.  Plaintiffs alleged that Microsoft had engaged in anticompetitive conduct, violated state deceptive and unfair business practices statutes, and overcharged businesses and consumers for Windows operating system software and for certain software applications, including Microsoft Word and Microsoft Office.  In August 2006, the New York Supreme Court granted final approval to a settlement that made available up to $350 million in benefits for New York businesses and consumers.  In August 2004, the Court in the North Carolina action granted final approval to a settlement valued at over $89 million.  In June 2004, the Court in the Tennessee action granted final approval to a $64 million settlement.  In November 2003, in the Florida Microsoft litigation, the Court granted final approval

to a $202 million settlement, one of the largest antitrust settlements in Florida history.  Lieff Cabraser served as Co-Lead Counsel in the New York, North Carolina and Tennessee cases, and held leadership roles in the Florida case.

5.  ***In re TFT-LCD (Flat Panel) Antitrust Litigation***, MDL No. 1827 (N.D. Cal.).  Lieff Cabraser served as court-appointed Co-Lead Counsel for direct purchasers in litigation against the world's leading manufacturers of Thin Film Transistor Liquid Crystal Displays.  TFT-LCDs are used in flat-panel televisions as well as computer monitors, laptop computers, mobile phones, personal digital assistants, and other devices.  Plaintiffs charged that defendants conspired to raise and fix the prices of TFT-LCD panels and certain products containing those panels for over a decade, resulting in overcharges to purchasers of those panels and products.  In March 2010, the Court certified two nationwide classes of persons and entities that directly purchased TFT-LCDs from January 1, 1999 through December 31, 2006, one class of panel purchasers, and one class of class of buyers of laptop computers, computer monitors, and televisions that contained TFT-LCDs.  Over the course of the litigation, the classes reached settlements with all defendants except Toshiba.  The case against Toshiba proceeded to trial.  In July 2012, the jury found that Toshiba participated in the price-fixing conspiracy.  The case was subsequently settled, bringing the total settlements in the litigation to over $470 million.  For his outstanding work in the precedent-setting litigation, *California Lawyer* recognized Richard M. Heimann with a 2013 California Lawyer of the Year award.

6.  ***Sullivan v. DB Investments***, No. 04-02819 (D. N.J.).  Lieff Cabraser served as Class Counsel for consumers who purchased diamonds from 1994 through March 31, 2006, in a class action lawsuit against the De Beers group of companies.  Plaintiffs charged that De Beers conspired to monopolize the sale of rough diamonds in the U.S.  In May 2008, the District Court approved a $295 million settlement for purchasers of diamonds and diamond jewelry, including $130 million to consumers.  The settlement also barred De Beers from continuing its illegal business practices and required De Beers to submit to the jurisdiction of the Court to enforce the settlement.   In December 2011, the Third Circuit Court of Appeals affirmed the district court's order approving the settlement.  667 F.3d 273 (3rd Cir. 2011).

For sixty years, De Beers has flaunted U.S. antitrust laws.  In 1999, De Beers' Chairman Nicholas Oppenheimer stated that De Beers "likes to think of itself as the world's . . . longest-running monopoly.  [We seek] to manage the diamond market, to control supply, to manage prices and to act collusively with our partners in the business."  The hard-fought litigation spanned several years and nations.  Despite the tremendous resources available to the U.S. Department of Justice and state attorney generals, it was only through the determination of plaintiffs' counsel that

De Beers was finally brought to justice and the rights of consumers were vindicated. Lieff Cabraser attorneys played key roles in negotiating the settlement and defending it on appeal. Discussing the DeBeers case, *The National Law Journal* noted that Lieff Cabraser was "among the plaintiffs' firms that weren't afraid to take on one of the business world's great white whales."

7.    ***In re Linerboard Antitrust Litigation***, MDL No. 1261 (E.D. Pa.). Lieff Cabraser served as Class Counsel on behalf of a class of direct purchasers of linerboard. The Court approved a settlement totaling $202 million.

8.    ***Azizian v. Federated Department Stores,*** No. 3:03 CV 03359 SBA (N.D. Cal.). In March 2005, the Court granted final approval to a settlement that Lieff Cabraser and co-counsel reached with numerous department store cosmetics manufacturers and retailers. The settlement is valued at $175 million and includes significant injunctive relief, for the benefit of a nationwide class of consumers of department store cosmetics. The complaint alleged the manufacturers and retailers violated antitrust law by engaging in anticompetitive practices to prevent discounting of department store cosmetics.

9.    ***Pharmaceutical Cases I, II, and III***, JCCP Nos. 2969, 2971 & 2972 (Cal. Supr. Ct.). Lieff Cabraser served as Co-Lead Counsel and Co-Liaison Counsel representing a certified class of indirect purchasers (consumers) on claims against the major pharmaceutical manufacturers for violations of the Cartwright Act and the Unfair Competition Act. The class alleged that defendants unlawfully fixed discriminatory prices on prescription drugs to retail pharmacists in comparison with the prices charged to certain favored purchasers, including HMOs and mail order houses. In April 1999, the Court approved a settlement providing $148 million in free, brand-name prescription drugs to health agencies that served California's poor and uninsured. In October 2001, the Court approved a settlement with the remaining defendants in the case, which provided an additional $23 million in free, brand-name prescription drugs to these agencies.

10.   ***In re Lupron Marketing and Sales Practices Litigation***, MDL No. 1430 (D. Mass.). In May 2005, the Court granted final approval to a settlement of a class action lawsuit by patients, insurance companies and health and welfare benefit plans that paid for Lupron, a prescription drug used to treat prostate cancer, endometriosis and precocious puberty. The settlement requires the defendants, Abbott Laboratories, Takeda Pharmaceutical Company Limited, and TAP Pharmaceuticals, to pay $150 million, inclusive of costs and fees, to persons or entities who paid for Lupron from January 1, 1985 through March 31, 2005. Plaintiffs charged that the defendants conspired to overstate the drug's average

wholesale price ("AWP"), which resulted in plaintiffs paying more for Lupron than they should have paid.  Lieff Cabraser served as Co-Lead Plaintiffs' Counsel.

11.     ***California Vitamins Cases***, JCCP No. 4076 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Liaison Counsel and Co-Chairman of the Plaintiffs' Executive Committee on behalf of a class of California indirect vitamin purchasers in every level of the chain of distribution.  In January 2002, the Court granted final approval of a $96 million settlement with certain vitamin manufacturers in a class action alleging that these and other manufacturers engaged in price fixing of particular vitamins.  In December 2006, the Court granted final approval to over $8.8 million in additional settlements.

12.     ***In re Buspirone Antitrust Litigation***, MDL No. 1413 (S.D. N.Y.).  In November 2003, Lieff Cabraser obtained a $90 million cash settlement for individual consumers, consumer organizations, and third party payers that purchased BuSpar, a drug prescribed to alleviate symptoms of anxiety.  Plaintiffs alleged that Bristol-Myers Squibb Co. (BMS), Danbury Pharmacal, Inc., Watson Pharmaceuticals, Inc. and Watson Pharma, Inc. entered into an unlawful agreement in restraint of trade under which BMS paid a potential generic manufacturer of BuSpar to drop its challenge to BMS' patent and refrain from entering the market.  Lieff Cabraser served as Plaintiffs' Co-Lead Counsel.

13.     ***In re Travel Agency Commission Antitrust Litigation***, MDL No. 1058 (D. Minn.).  Lieff Cabraser served as Co-Lead Counsel for a certified class of U.S. travel agents on claims against the major U.S. air carriers, who allegedly violated the federal antitrust laws by fixing the commissions paid to travel agents.  In 1997, the Court approved an $82 million settlement.

14.     ***In re Commercial Explosives Antitrust Litigation***, MDL No. 1093 (D. Utah).  Lieff Cabraser served as Class Counsel on behalf of direct purchasers of explosives used in mining operations.  In 1998, the Court approved a $77 million settlement of the litigation.

15.     ***In re Toys 'R' Us Antitrust Litigation***, MDL No. 1211 (E.D. N.Y.).  Lieff Cabraser served as Co-Lead Counsel representing a class of direct purchasers (consumers) who alleged that Toys 'R' Us conspired with the major toy manufacturers to boycott certain discount retailers in order to restrict competition and inflate toy prices.  In February 2000, the Court approved a settlement of cash and product of over $56 million.

16.     ***Meijer v. Abbott Laboratories***, Case No. C 07-5985 CW (N.D. Cal.).  Lieff Cabraser served as co-counsel for the group of retailers charging that Abbott Laboratories monopolized the market for AIDS medicines used in

conjunction with Abbott's prescription drug Norvir.  These drugs, known as Protease Inhibitors, have enabled patients with HIV to fight off the disease and live longer.  In January 2011, the Court denied Abbott's motion for summary judgment on plaintiffs' monopolization claim. Trial commenced in February 2011.  After opening statements and the presentation of four witnesses and evidence to the jury, plaintiffs and Abbott Laboratories entered into a $52 million settlement.  The Court granted final approval to the settlement in August 2011.

17.     ***In re Carpet Antitrust Litigation***, MDL No. 1075 (N.D. Ga.).  Lieff Cabraser served as Class Counsel and a member of the trial team for a class of direct purchasers of twenty-ounce level loop polypropylene carpet.  Plaintiffs, distributors of polypropylene carpet, alleged that Defendants, seven manufacturers of polypropylene carpet, conspired to fix the prices of polypropylene carpet by agreeing to eliminate discounts and charge inflated prices on the carpet.  In 2001, the Court approved a $50 million settlement of the case.

18.     ***In re High Pressure Laminates Antitrust Litigation***, MDL No. 1368 (S.D. N.Y.).  Lieff Cabraser served as Trial Counsel on behalf of a class of direct purchasers of high pressure laminates.  The case in 2006 was tried to a jury verdict.  The case settled for over $40 million.

19.     ***Schwartz v. National Football League***, No. 97-CV-5184 (E.D. Pa.).  Lieff Cabraser served as counsel for individuals who purchased the "NFL Sunday Ticket" package of private satellite transmissions in litigation against the National Football League for allegedly violating the Sherman Act by limiting the distribution of television broadcasts of NFL games by satellite transmission to one package.  In August 2001, the Court approved of a class action settlement that included: (1) the requirement that defendants provide an additional weekly satellite television package known as Single Sunday Ticket for the 2001 NFL football season, under certain circumstances for one more season, and at the defendants' discretion thereafter; (2) a $7.5 million settlement fund to be distributed to class members; (3) merchandise coupons entitling class members to discounts at the NFL's Internet store which the parties value at approximately $3 million; and (4) $2.3 million to pay for administering the settlement fund and notifying class members.

20.     ***In re Lasik/PRK Antitrust Litigation***, No. CV 772894 (Cal. Supr. Ct.).  Lieff Cabraser served as a member of Plaintiffs' Executive Committee in class actions brought on behalf of persons who underwent Lasik/PRK eye surgery.  Plaintiffs alleged that defendants, the manufacturers of the laser system used for the laser vision correction surgery, manipulated fees charged to ophthalmologists and others who performed the surgery, and that the overcharges were passed onto

consumers who paid for laser vision correction surgery.  In December 2001, the Court approved a $12.5 million settlement of the litigation.

21. ***Quantegy Recording Solutions, LLC, et al. v. Toda Kogyo Corp., et al.,*** No. C-02-1611 (PJH).  In August 2006 and January 2009, the Court approved the final settlements in antitrust litigation against manufacturers, producers, and distributors of magnetic iron oxide ("MIO").  MIO is used in the manufacture of audiotape, videotape, and data storage tape.  Plaintiffs alleged that defendants violated federal antitrust laws by conspiring to fix, maintain, and stabilize the prices and to allocate the worldwide markets for MIO from 1991 to October 12, 2005.  The value of all settlements reached in the litigation was $6.35 million.  Lieff Cabraser served as Plaintiffs' Co-Lead Counsel.

22. ***In re Static Random Access Memory (SRAM) Antitrust Litigation***, MDL No. 1819 (N.D. Cal.).  Plaintiffs allege that from November 1, 1996 through December 31, 2006, the defendant manufacturers conspired to fix and maintain artificially high prices for SRAM, a type of memory used in many products, including smartphones and computers.  Lieff Cabraser served as one of three members of the Steering Committee for consumers and other indirect purchasers of SRAM. In February 2008, U.S. District Court Judge Claudia Wilken denied most aspects of defendants' motions to dismiss plaintiffs' complaints.  In November 2009, the Court certified a nationwide class seeking injunctive relief and twenty-seven state classes seeking damages.  In  2010, the Court granted final approval of a first set of settlements.   In October 2011, the Court granted final approval of settlements with the remaining defendants.

23. ***Carbon Fiber Cases I, II, III***, JCCP Nos. 4212, 4216 & 4222 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Liaison Counsel on behalf of indirect purchasers of carbon fiber.  Plaintiffs alleged that defendants illegally conspired to raise prices of carbon fiber.  Settlements have been reached with all of the defendants.

24. ***Methionine Cases I and II***, JCCP Nos. 4090 & 4096 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel on behalf of indirect purchasers of methionine, an amino acid used primarily as a poultry and swine feed additive to enhance growth and production.  Plaintiffs alleged that the companies illegally conspired to raise methionine prices to super-competitive levels.  The case settled.

25. ***McIntosh v. Monsanto***, No. 4:01CV65RSW (E.D. Mo.).  Lieff Cabraser served as Co-Lead Counsel in a class action lawsuit against Monsanto Company and others alleging that a conspiracy to fix prices on genetically modified Roundup Ready soybean seeds and Yieldgard corn seeds.  The case settled.

26. ***Tortola Restaurants v. Minnesota Mining and Manufacturing***, No. 314281 (Cal. Supr. Ct)  Lieff Cabraser served as Co-Lead Counsel on behalf of indirect purchasers of Scotch-brand invisible and transparent tape.  Plaintiffs alleged that defendant 3M conspired with certain retailers to monopolize the sale of Scotch-brand tape in California.  The case was resolved as part of a nationwide settlement that Lieff Cabraser negotiated, along with co-counsel.

27. ***In re Compact Disc Antitrust Litigation***, MDL No. 1216 (C.D. Cal.).  Lieff Cabraser served as Co-Lead Counsel for the direct purchasers of compact discs on claims that the producers fixed the price of CDs in violation of the federal antitrust laws.

28. ***In re Electrical Carbon Products Antitrust Litigation***, MDL No. 1514 (D.N.J.).  Lieff Cabraser represented the City and County of San Francisco and a class of direct purchasers of carbon brushes and carbon collectors on claims that producers fixed the price of carbon brushes and carbon collectors in violation of the Sherman Act.

## VI.   Economic Injury Product Defects

### A.   Current Cases

1. ***Front-Loading Washer Products Liability Litigation***.  Lieff Cabraser represents consumers in multiple states who have filed separate class action lawsuits against Whirlpool, Sears and LG Corporations.  The complaints charge that certain front-loading automatic washers manufactured by these companies are defectively designed and that the design defects create foul odors from mold and mildew that permeate washing machines and customers' homes.  Many class members have spent money for repairs and on other purported remedies. As the complaints allege, none of these remedies eliminates the problem.

2. ***Honda Window Defective Window Litigation.***  Case No. 2:21-cv-01142-SVW-PLA (C.D. CA).  Lieff Cabraser represents consumers in a class action lawsuit filed against Honda Motor Company, Inc. for manufacturing and selling vehicles with allegedly defective window regulator mechanisms. Windows in these vehicles allegedly can, without warning, drop into the door frame and break or become permanently stuck in the fully-open position.

The experience of one Honda Element owner, as set forth in the complaint, exemplifies the problem: The driver's side window in his vehicle slid down suddenly while he was driving on a smooth road. A few months later, the window on the passenger side of the vehicle also slid down into the door and would not move back up.  The owner incurred more than $300 in repair costs, which Honda refused to pay for.  In June

2013, the Court granted in part and denied in part defendants' motion to dismiss the case. The Court allowed core claims in the lawsuit to remain, and discovery in the action is ongoing.

**B.    Successes**

1.    ***In re Mercedes-Benz Tele-Aid Contract Litigation***, MDL No. 1914 (D. N.J.). Lieff Cabraser represented owners and lessees of Mercedes-Benz cars and SUVs equipped with the Tele-Aid system, an emergency response system which links subscribers to road-side assistance operators by using a combination of global positioning and cellular technology. In 2002, the Federal Communications Commission issued a rule, effective 2008, eliminating the requirement that wireless phone carriers provide analog-based networks. The Tele-Aid system offered by Mercedes-Benz relied on analog signals. Plaintiffs charged that Mercedes-Benz committed fraud in promoting and selling the Tele-Aid system without disclosing to buyers of certain model years that the Tele-Aid system as installed would become obsolete in 2008.

In an April 2009 published order, the Court certified a nationwide class of all persons or entities in the U.S. who purchased or leased a Mercedes-Benz vehicle equipped with an analog-only Tele Aid system after August 8, 2002, and (1) subscribed to Tele Aid service until being informed that such service would be discontinued at the end of 2007, or (2) purchased an upgrade to digital equipment. In September 2011, the Court approved a settlement that provided class members between a $650 check or a $750 to $1,300 certificate toward the purchase or lease of new Mercedes-Benz vehicle, depending upon whether or not they paid for an upgrade of the analog Tele Aid system and whether they still owned their vehicle. In approving the settlement, U.S. District Court Judge Dickinson R. Debevoise stated, "I want to thank counsel for the . . . very effective and good work . . . . It was carried out with vigor, integrity and aggressiveness with never going beyond the maxims of the Court."

2.    ***McLennan v. LG Electronics USA***, No. 2:10-cv-03604 (D. N.J.). Lieff Cabraser represented consumers that alleged several LG refrigerator models had a faulty design that caused the interior lights to remain on even when the refrigerator doors were closed (identified as the "light issue"), resulting in overheating and food spoilage. In March 2012, the Court granted final approval to a settlement of the nationwide class action lawsuit. The settlement provides that LG reimburse class members for all out-of-pocket costs (parts and labor) to repair the light issue prior to the mailing of the class notice and extends the warranty with respect to the light issue for 10 years from the date of the original retail purchase of the refrigerator. The extended warranty covers in-home refrigerator repair performed by LG and, in some cases, the cost of a replacement

refrigerator.  In approving the settlement, U.S. District Court Judge William J. Martini stated, "The Settlement in this case provides for both the complete reimbursement of out-of-pocket expenses for repairs fixing the Light Issue, as well as a warranty for ten years from the date of refrigerator purchase. It would be hard to imagine a better recovery for the Class had the litigation gone to trial. Because Class members will essentially receive all of the relief to which they would have been entitled after a successful trial, this factor weighs heavily in favor of settlement."

3.   ***Grays Harbor Adventist Christian School v. Carrier Corporation***, No. 05-05437 (W.D. Wash.).  In April 2008, the Court approved a nationwide settlement for current and past owners of high-efficiency furnaces manufactured and sold by Carrier Corporation and equipped with polypropylene-laminated condensing heat exchangers ("CHXs").  Carrier sold the furnaces under the Carrier, Bryant, Day & Night and Payne brand-names.  Plaintiffs alleged that starting in 1989 Carrier began manufacturing and selling high efficiency condensing furnaces manufactured with a secondary CHX made of inferior materials.  Plaintiffs alleged that as a result, the CHXs, which Carrier warranted and consumers expected to last for 20 years, failed prematurely.  The settlement provides an enhanced 20-year warranty of free service and free parts for consumers whose furnaces have not yet failed.  The settlement also offers a cash reimbursement for consumers who already paid to repair or replace the CHX in their high-efficiency Carrier furnaces.

An estimated three million or more consumers in the U.S. and Canada purchased the furnaces covered under the settlement.  Plaintiffs valued the settlement to consumers at over $300 million based upon the combined value of the cash reimbursement and the estimated cost of an enhanced warranty of this nature.

4.   ***Carideo v. Dell***, No. C06-1772 JLR (W.D. Wash.).  Lieff Cabraser represented consumers who owned Dell Inspiron notebook computer model numbers 1150, 5100, or 5160.  The class action lawsuit complaint charged that the notebooks suffered premature failure of their cooling system, power supply system, and/or motherboards.  In December 2010, the Court approved a settlement which provided class members that paid Dell for certain repairs to their Inspiron notebook computer a reimbursement of all or a portion of the cost of the repairs.

5.   ***Cartwright v. Viking Industries***, No. 2:07-cv-2159 FCD (E.D. Cal.) Lieff Cabraser represented California homeowners in a class action lawsuit which alleged that over one million Series 3000 windows produced and distributed by Viking between 1989 and 1999 were defective.  The plaintiffs charged that the windows were not watertight and allowed for water to penetrate the surrounding sheetrock, drywall,

paint or wallpaper.  Under the terms of a settlement approved by the Court in August 2010, all class members who submitted valid claims were entitled to receive as much as $500 per affected property.

6. ***Pelletz v. Advanced Environmental Recycling Technologies*** (W.D. Wash.).  Lieff Cabraser served as Co-Lead Counsel in a case alleging that ChoiceDek decking materials, manufactured by AERT, developed persistent and untreatable mold spotting throughout their surface.  In a published opinion in January 2009, the Court approved a settlement that provided affected consumers with free and discounted deck treatments, mold inhibitor applications, and product replacement and reimbursement.

7. ***Create-A-Card v. Intuit***, No. C07-6452 WHA (N.D. Cal.).  Lieff Cabraser, with co-counsel, represented business users of QuickBooks Pro for accounting that lost their QuickBooks data and other files due to faulty software code sent by Intuit, the producer of QuickBooks.  In September 2009, the Court granted final approval to a settlement that provided all class members who filed a valid claim with a free software upgrade and compensation for certain data-recovery costs.  Commenting on the settlement and the work of Lieff Cabraser on September 17, 2009, U.S. District Court Judge William H. Alsup stated, "I want to come back to something that I observed in this case firsthand for a long time now.  I think you've done an excellent job in the case as class counsel and the class has been well represented having you and your firm in the case."

8. ***Weekend Warrior Trailer Cases***, JCCP No. 4455 (Cal. Supr. Ct.).  Lieff Cabraser, with co-counsel, represented owners of Weekend Warrior trailers manufactured between 1998 and 2006 that were equipped with frames manufactured, assembled, or supplied by Zieman Manufacturing Company.  The trailers, commonly referred to as "toy haulers," were used to transport outdoor recreational equipment such as motorcycles and all-terrain vehicles.  Plaintiffs charged that Weekend Warrior and Zieman knew of design and performance problems, including bent frames, detached siding, and warped forward cargo areas, with the trailers, and concealed the defects from consumers.  In February 2008, the Court approved a $5.5 million settlement of the action that provided for the repair and/or reimbursement of the trailers.  In approving the settlement, California Superior Court Judge Thierry P. Colaw stated that class counsel were "some of the best" and "there was an overwhelming positive reaction to the settlement" among class members.

9. ***Lundell v. Dell***, No. C05-03970 (N.D. Cal.).  Lieff Cabraser served as Lead Class Counsel for consumers who experienced power problems with the Dell Inspiron 5150 notebook.  In December 2006, the Court granted final approval to a settlement of the class action which extended the one-

year limited warranty on the notebook for a set of repairs related to the power system.  In addition, class members that paid Dell or a third party for repair of the power system of their notebook were entitled to a 100% cash refund from Dell.

10. ***Kan v. Toshiba American Information Systems***, No. BC327273 (Los Angeles Super. Ct.).  Lieff Cabraser served as Co-Lead Counsel for a class of all end-user persons or entities who purchased or otherwise acquired in the United States, for their own use and not for resale, a new Toshiba Satellite Pro 6100 Series notebook.  Consumers alleged a series of defects were present in the notebook.  In 2006, the Court approved a settlement that extended the warranty for all Satellite Pro 6100 notebooks, provided cash compensation for certain repairs, and reimbursed class members for certain out-of-warranty repair expenses.

11. ***Foothill/DeAnza Community College District v. Northwest Pipe Company***, No. C-00-20749 (N.D. Cal.).  In June 2004, the court approved the creation of a settlement fund of up to $14.5 million for property owners nationwide with Poz-Lok fire sprinkler piping that fails.  Since 1990, Poz-Lok pipes and pipe fittings were sold in the U.S. as part of fire suppression systems for use in residential and commercial buildings.  After leaks in Poz-Lok pipes caused damage to its DeAnza Campus Center building, Foothill/DeAnza Community College District in California retained Lieff Cabraser to file a class action lawsuit against the manufacturers of Poz-Lok.  The college district charged that Poz-Lok pipe had manufacturing and design defects that resulted in the premature corrosion and failure of the product.  Under the settlement, owners whose Poz-Lok pipes are leaking today, or over the next 15 years, may file a claim for compensation.

12. ***Toshiba Laptop Screen Flicker Settlement.***  Lieff Cabraser negotiated a settlement with Toshiba America Information Systems, Inc. ("TAIS") to provide relief for owners of certain Toshiba Satellite 1800 Series, Satellite Pro 4600 and Tecra 8100 personal notebook computers whose screens flickered, dimmed or went blank due to an issue with the FL Inverter Board component.  In 2004 under the terms of the Settlement, owners of affected computers who paid to have the FL Inverter issue repaired by either TAIS or an authorized TAIS service provider recovered the cost of that repair, up to $300 for the Satellite 1800 Series and the Satellite Pro 4600 personal computers, or $400 for the Tecra 8100 personal computers.  TAIS also agreed to extend the affected computers' warranties for the FL Inverter issue by 18 months.

13. ***McManus v. Fleetwood Enterprises, Inc.***, No. SA-99-CA-464-FB (W.D. Tex.).  Lieff Cabraser served as Class Counsel on behalf of original owners of 1994-2000 model year Fleetwood Class A and Class C motor

homes.  In 2003, the Court approved a settlement that resolved lawsuits pending in Texas and California about braking while towing with 1994 Fleetwood Class A and Class C motor homes.  The lawsuits alleged that Fleetwood misrepresented the towing capabilities of new motor homes it sold, and claimed that Fleetwood should have told buyers that a supplemental braking system is needed to stop safely while towing heavy items, such as a vehicle or trailer.  The settlement paid $250 to people who bought a supplemental braking system for Fleetwood motor homes that they bought new.

14.  ***Richison v. American Cemwood Corp.***, No. 005532 (San Joaquin Supr. Ct., Cal.).  Lieff Cabraser served as Co-Lead Class Counsel for an estimated nationwide class of 30,000 owners of homes and other structures on which defective Cemwood Shakes were installed.  In November 2003, the Court granted final approval to a $75 million Phase 2 settlement in the American Cemwood roofing shakes national class action litigation.  This amount was in addition to a $65 million partial settlement approved by the Court in May 2000, and brought the litigation to a conclusion.

15.  ***ABS Pipe Litigation***, JCCP No. 3126 (Contra Costa County Supr. Ct., Cal.).  Lieff Cabraser served as Lead Class Counsel on behalf of property owners whose ABS plumbing pipe was allegedly defective and caused property damage by leaking.  Six separate class actions were filed in California against five different ABS pipe manufacturers, numerous developers of homes containing the ABS pipe, as well as the resin supplier and the entity charged with ensuring the integrity of the product.  Between 1998 and 2001, we achieved 12 separate settlements in the class actions and related individual lawsuits for approximately $78 million.

Commenting on the work of Lieff Cabraser and co-counsel in the case, California Superior Court (now appellate) Judge Mark B. Simons stated on May 14, 1998: "The attorneys who were involved in the resolution of the case certainly entered the case with impressive reputations and did nothing in the course of their work on this case to diminish these reputations, but underlined, in my opinion, how well deserved those reputations are."

16.  ***Williams v. Weyerhaeuser***, No. 995787 (San Francisco Supr. Ct.).  Lieff Cabraser served as Class Counsel on behalf of a nationwide class of hundreds of thousands or millions of owners of homes and other structures with defective Weyerhaeuser hardboard siding.  A California-wide class was certified for all purposes in February 1999, and withstood writ review by both the California Court of Appeal and Supreme Court of California.  In 2000, the Court granted final approval to a nationwide settlement of the case which provides class members with compensation

for their damaged siding, based on the cost of replacing or, in some instances, repairing, damaged siding.  The settlement has no cap, and requires Weyerhaeuser to pay all timely, qualified claims over a nine year period.  The claims program is underway and paying claims.

17. ***Naef v. Masonite***, No. CV-94-4033 (Mobile County Circuit Ct., Ala.).  Lieff Cabraser served as Co-Lead Class Counsel on behalf of a nationwide Class of an estimated 4 million homeowners with allegedly defective hardboard siding manufactured and sold by Masonite Corporation, a subsidiary of International Paper, installed on their homes. The Court certified the class in November 1995, and the Alabama Supreme Court twice denied extraordinary writs seeking to decertify the Class, including in *Ex Parte Masonite*, 681 So. 2d 1068 (Ala. 1996).  A month-long jury trial in 1996 established the factual predicate that Masonite hardboard siding was defective under the laws of most states.  The case settled on the eve of a second class-wide trial, and in 1998, the Court approved a settlement.  Under a claims program established by the settlement that ran through 2008, class members with failing Masonite hardboard siding installed and incorporated in their property between January 1, 1980 and January 15, 1998 were entitled to make claims, have their homes evaluated by independent inspectors, and receive cash payments for damaged siding.  Combined with settlements involving other alleged defective home building products sold by Masonite, the total cash paid to homeowners exceeded $1 billion.

18. ***In re General Motors Corp. Pick-Up Fuel Tank Products Liability Litigation***, MDL No. 961 (E.D. Pa.).  Lieff Cabraser served as court-appointed Co-Lead Class Counsel representing a class of 4.7 million plaintiffs who owned 1973-1987 GM C/K pickup trucks with allegedly defective gas tanks.  The Consolidated Complaint asserted claims under the Lanham Act, the Magnuson-Moss Act, state consumer protection statutes, and common law.  In 1995, the Third Circuit vacated the District Court settlement approval order and remanded the matter to the District Court for further proceedings.  In July 1996, a new nationwide class action was certified for purposes of an enhanced settlement program valued at a minimum of $600 million, plus funding for independent fuel system safety research projects.  The Court granted final approval of the settlement in November 1996.

19. ***In re Louisiana-Pacific Inner-Seal Siding Litigation***, No. C-95-879-JO (D. Ore.).  Lieff Cabraser served as Co-Lead Class Counsel on behalf of a nationwide class of homeowners with defective exterior siding on their homes.  Plaintiffs asserted claims for breach of warranty, fraud, negligence, and violation of consumer protection statutes.  In 1996, U.S. District Judge Robert E. Jones entered an Order, Final Judgment and Decree granting final approval to a nationwide settlement requiring

Louisiana-Pacific to provide funding up to $475 million to pay for inspection of homes and repair and replacement of failing siding over the next seven years.

20.   ***In re Intel Pentium Processor Litigation***, No. CV 745729 (Santa Clara Supr. Ct., Cal.).  Lieff Cabraser served as one of two court appointed Co-Lead Class Counsel, and negotiated a settlement, approved by the Court in June 1995, involving both injunctive relief and damages having an economic value of approximately $1 billion.  The chip replacement program has been implemented, and is ongoing.

21.   ***Cox v. Shell***, No. 18,844 (Obion County Chancery Ct., Tenn.).  Lieff Cabraser served as Class Counsel on behalf of a nationwide class of approximately 6 million owners of property equipped with defective polybutylene plumbing systems and yard service lines.  In November 1995, the Court approved a settlement involving an initial commitment by Defendants of $950 million in compensation for past and future expenses incurred as a result of pipe leaks, and to provide replacement pipes to eligible claimants.  The deadline for filing claims expired in 2009.

22.   ***Hanlon v. Chrysler Corp.***, No. C-95-2010-CAL (N.D. Cal.).  In 1995, the district court approved a $200+ million settlement enforcing Chrysler's comprehensive minivan rear latch replacement program, and to correct alleged safety problems with Chrysler's pre-1995 designs.  As part of the settlement, Chrysler agreed to replace the rear latches with redesigned latches.  The settlement was affirmed on appeal by the Ninth Circuit in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (1998).

23.   ***Gross v. Mobil***, No. C 95-1237-SI (N.D. Cal.).  Lieff Cabraser served as Plaintiffs' Class Counsel in this nationwide action involving an estimated 2,500 aircraft engine owners whose engines were affected by Mobil AV-1, an aircraft engine oil.  Plaintiffs alleged claims for strict liability, negligence, misrepresentation, violation of consumer protection statutes, and for injunctive relief.  Plaintiffs obtained a preliminary injunction requiring Defendant Mobil Corporation to provide notice to all potential class members of the risks associated with past use of Defendants' aircraft engine oil.  In addition, Plaintiffs negotiated a proposed Settlement, granted final approval by the Court in November 1995, valued at over $12.5 million, under which all Class Members were eligible to participate in an engine inspection and repair program, and receive compensation for past repairs and for the loss of use of their aircraft associated with damage caused by Mobil AV-1.

## VII.   Environmental and Toxic Exposures

### A.   Current Cases

1.   ***In Re Oil Spill  by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico***, MDL No. 2179 (E.D. La.).  Lieff Cabraser serves on the Court-appointed Plaintiffs' Steering Committee ("PSC") and with co-counsel represents fishermen, property owners, business owners, wage earners, and other harmed parties in class action litigation against BP, Transocean, Halliburton, and other defendants involved in the Deepwater Horizon oil rig blowout and resulting oil spill in the Gulf of Mexico on April 20, 2010.  The Master Complaints allege that the defendants were insouciant in addressing the operations of the well and the oil rig, ignored warning signs of the impending disaster, and failed to employ and/or follow proper safety measures, worker safety laws, and environmental protection laws in favor of cost-cutting measures.

The Court has approved two class action settlements with BP that will fully compensate hundreds of thousands of victims of the tragedy. The settlements resolve the majority of private economic loss, property damage, and medical injury claims stemming from the Deepwater Horizon Oil Spill, and hold BP fully accountable to individuals and businesses harmed by the spill.  Under the settlements, there is no dollar limit on the amount BP will pay. BP must fully satisfy all qualified claims. To date businesses and individuals that suffered economic losses or property damage have received over $2.8 billion through the class action settlement program.

2.   ***Kingston, Tennessee TVA Coal Ash Spill Litigation***, No. 3:09-cv-09 (E.D. Tenn.).  On December 22, 2008, more than a billion gallons of coal ash spilled when a dike burst on a retention pond at the Kingston Fossil Plant operated by the Tennessee Valley Authority (TVA) in Roane County, Tennessee.  Coal ash is the toxic byproduct of burning coal.  The catastrophic failure is the largest environmental disaster involving a spill of coal ash in United States history.   Lieff Cabraser represents impacted property owners and businesses.  In March 2010, the Court denied in major part TVA's motion to dismiss the litigation.  In the Fall of 2011, the Court conducted a three week bench trial limited to the question of whether TVA was liable for releasing the coal ash into the river system.  The issues of individual causation and damages were reserved for later proceedings.  On August 23, 2012, U.S. District Court Judge Thomas Varlan found in favor of plaintiffs on their claims of negligence, trespass, and private nuisance.

3.   ***In re Imprelis Herbicide Marketing, Sales Practices and Products Liability Litigation***, MDL No. 2284 (E.D. Pa.).  We served as Interim Co-Lead Counsel for homeowners, golf course companies and

other property owners in a nationwide class action lawsuit against E.I. du Pont de Nemours & Company ("DuPont"), charging that its herbicide Imprelis caused widespread death among trees and other non-targeted vegetation across the country.  The complaint charges that DuPont failed to disclose the risks Imprelis posed to trees, even when applied as directed, and failed to provide instructions for the safe application of Imprelis. In 2013, the Court has granted preliminary approval to a settlement of the action.

## B.   Successes

1.   ***In re Exxon Valdez Oil Spill Litigation***, No. 3:89-cv-0095 HRH (D. Al.).  The *Exxon Valdez* ran aground on March 24, 1989, spilling 11 million gallons of oil into Prince William Sound.  Lieff Cabraser served as one of the court-appointed Plaintiffs' Class Counsel.  The class consisted of fisherman and others whose livelihoods were gravely affected by the disaster.  In addition, Lieff Cabraser served on the Class Trial Team that tried the case before a jury in federal court in 1994.  The jury returned an award of $5 billion in punitive damages.

In 2001, the Ninth Circuit Court of Appeals ruled that the original $5 billion punitive damages verdict was excessive.  In 2002, U.S. District Court Judge H. Russell Holland reinstated the award at $4 billion.  Judge Holland stated that, "Exxon officials knew that carrying huge volumes of crude oil through Prince William sound was a dangerous business, yet they knowingly permitted a relapsed alcoholic to direct the operation of the *Exxon Valdez* through Prince William Sound."  In 2003, the Ninth Circuit again directed Judge Holland to reconsider the punitive damages award under United States Supreme Court punitive damages guidelines.  In January 2004, Judge Holland issued his order finding that Supreme Court authority did not change the Court's earlier analysis.

In December 2006, the Ninth Circuit Court of Appeals issued its ruling, setting the punitive damages award at $2.5 billion.  Subsequently, the U.S. Supreme Court further reduced the punitive damages award to $507.5 million, an amount equal to the compensatory damages.  With interest, the total award to the plaintiff class was $1.515 billion.

2.   ***In re GCC Richmond Works Cases***, JCCP No. 2906 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Liaison Counsel and Lead Class Counsel in coordinated litigation arising out of the release on July 26, 1993, of a massive toxic sulfuric acid cloud which injured an estimated 50,000 residents of Richmond, California.  The Coordination Trial Court granted final approval to a $180 million class settlement for exposed residents.

3.    ***In re Unocal Refinery Litigation***, No. C 94-04141 (Cal. Supr. Ct.). Lieff Cabraser served as one of two Co-Lead Class Counsel and on the Plaintiffs' Steering Committee in this action against Union Oil Company of California ("Unocal") arising from a series of toxic releases from Unocal's San Francisco refinery in Rodeo, California.  The action was settled in 1997 on behalf of approximately 10,000 individuals for $80 million.

4.    ***West v. G&H Seed Co., Aventis CropSciences USA, LLP***, No. 99-C-4984-A (La. State Ct.).  With co-counsel, Lieff Cabraser represented a class of 1,500 Louisiana crawfish farmers.  The farmers sued Bayer CropScience LP claiming the pesticide ICON killed their crawfish and caused economic ruin.  In 2004, the Court approved a $45 million settlement.  The settlement was reached after the parties had presented nearly a month's worth of evidence at trial and were on the verge of making closing arguments to the jury.

5.    ***In re Sacramento River Spill Cases I and II***, JCCP Nos. 2617 & 2620 (Cal. Supr. Ct.).  On July 14, 1991, a Southern Pacific train tanker car derailed in northern California, spilling 19,000 gallons of a toxic pesticide, metam sodium, into the Sacramento River near the town of Dunsmir.  The metam sodium mixed thoroughly with the river water and had a devastating effect on the river and surrounding ecosystem.  In addition, many residents living along the river became ill with symptoms that included headaches, shortness of breath, and vomiting.  Lieff Cabraser served as Court-appointed Plaintiffs' Liaison Counsel and Lead Class Counsel, and chaired the Plaintiffs' Litigation Committee in coordinated proceedings that included all of the lawsuits arising out of this toxic spill.  Settlement proceeds of approximately $16 million were distributed pursuant to Court approval of a plan of allocation to four certified plaintiff classes: personal injury, business loss, property damage/diminution, and evacuation.

6.    ***Craft v. Vanderbilt University***, Civ. No. 3-94-0090 (M.D. Tenn.). Lieff Cabraser served as Lead Counsel of a certified class of over 800 pregnant women and their children who were intentionally fed radioactive iron without their consent while receiving prenatal care at defendant Vanderbilt's hospital in the 1940s.  The facts surrounding the administration of radioactive iron to the pregnant women and their children *in utero* came to light as a result of Energy Secretary Hazel O'Leary's 1993 disclosures of government-sponsored human radiation experimentation during the Cold War.  Defendants' attempts to dismiss the claims and decertify the class were unsuccessful.  The case was settled in July 1998 for a total of $10.3 million and a formal apology from Vanderbilt.

7.    ***Kentucky Coal Sludge Litigation***, No. 00-CI-00245 (Cmmw. Ky.). On October 11, 2000, near Inez, Kentucky, a coal sludge storage facility ruptured, spilling 300 million gallons of coal sludge (a wet mixture produced by the treatment and cleaning of coal) into waterways in the region and contaminating hundreds of properties.  This was one of the worst environmental disasters in the Southeastern United States.  With co-counsel, Lieff Cabraser represented over 400 clients in property damage claims, including claims for diminution in the value of their homes and properties.  In April 2003, the parties reached a confidential settlement agreement on favorable terms to the plaintiffs.

8.    ***Toms River Childhood Cancer Incidents***, No. L-10445-01 MT (Sup. Ct. NJ).  With co-counsel, Lieff Cabraser represented 69 families in Toms River, New Jersey, each with a child having cancer, that claimed the cancers were caused by environmental contamination in the Toms River area.  Commencing in 1998, the parties—the 69 families, Ciba Specialty Chemicals, Union Carbide and United Water Resources, Inc., a water distributor in the area—participated in an unique alternative dispute resolution process, which lead to a fair and efficient consideration of the factual and scientific issues in the matter.  In December 2001, under the supervision of a mediator, a confidential settlement favorable to the families was reached.

## VIII.   False Claims Act

### A.    Current Cases

1.    ***State of California ex rel. Associates Against FX Insider Trading v. State Street Corp.***, No. 34-2008-00008457 (Sacramento Supr. Ct., Cal.) ("***State Street I***").  Lieff Cabraser serves as co-counsel for the whistleblowers in this action against State Street Corporation which serves as the contractual custodian for over 40% of public pension funds in the United States.  As the contractual custodian, State Street is responsible for undertaking the foreign currency exchange (FX) transactions necessary to facilitate a customer's purchases or sales of foreign securities.  The complaint charges that State Street violated the California False Claims Act by systematically manipulating the timing of its execution and reporting of FX trades in order to enrich itself, at the expense of California custodial public pension fund clients, including the California Public Employees' Retirement System and the California State Teachers' Retirement System.  The California Attorney General intervened in the case in October 2009. The case is in the discovery stage after the trial court denied State Street's demurrer.

2.    ***State of California ex rel. Rockville Recovery Associates v. Multiplan***, No. 34-2010-00079432 (Sacramento Supr. Ct., Cal.).  Lieff Cabraser represents whistleblower Rockville Recovery Associates in a *qui*

*tam* suit for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Insurance Code § 1871.7.  The Act is designed to prevent fraud against insurers and, by extension, their policyholders.  The complaint alleges that Sutter hospitals throughout California submit fraudulent bills for anesthesia services to insurers and other payors.

In May 2011, the Court permitted the California Insurance Commissioner to join the litigation against Sutter.  Having survived no less than three demurrers and two motions to strike, the case is now in discovery with a trial date in July 2013.

3.   ***In re Bank of New York Mellon Corporation False Claims Act Foreign Exchange Litigation***, No. C-11-05683 (N.D. Cal.).  Lieff Cabraser serves as co-counsel for plaintiff and relator FX Analytics in a *qui tam* suit filed on behalf of the Los Angeles County Employees' Retirement Association Fund ("LACERA") and nine other California municipal and county pension funds against The Bank of New York Mellon Corporation ("BNY Mellon") and its predecessors and subsidiaries, for alleged violations of the California False Claims Act and breach of contract and fiduciary duty.  The complaint charges that defendants created and carried out a fraudulent scheme, for over a decade, in which they charged plaintiffs fictitious foreign currency exchange ("FX") rates in connection with the purchase and sale of foreign securities.  The complaint further alleges that defendants consistently incorporated hidden and excessive mark-ups or mark-downs relative to the actual FX rates applicable at the times of the trades conducted for defendants' custodial FX clients.  Defendants allegedly kept for themselves, as an unlawful profit, the difference between the false and actual price for each FX transaction. LACERA and several other funds intervened in the case in late 2011. The case is now pending in MDL 2335 in the Southern District of New York.

**B.    Successes**

1.   ***United States ex rel. Mary Hendow and Julie Albertson v. University of Phoenix***, No. 2:03-cv-00457-GEB-DAD (E.D. Cal.).  Lieff Cabraser obtained a record whistleblower settlement against the University of Phoenix that charged the university had violated the incentive compensation ban of the Higher Education Act (HEA) by providing improper incentive pay to its recruiters.  The HEA prohibits colleges and universities whose students receive federal financial aid from paying their recruiters based on the number of students enrolled, which creates a risk of encouraging recruitment of unqualified students who, Congress has determined, are more likely to default on their loans.  High student loan default rates not only result in wasted federal funds, but the

students who receive these loans and default are burdened for years with tremendous debt without the benefit of a college degree.

The complaint alleged that the University of Phoenix defrauded the U.S. Department of Education by obtaining federal student loan and Pell Grant monies from the federal government based on false statements of compliance with HEA.  In December 2009, the parties announced a $78.5 million settlement.  The settlement constitutes the second-largest settlement ever in a False Claims Act case in which the federal government declined to intervene in the action and largest settlement ever involving the Department of Education.   The University of Phoenix case led to the Obama Administration passing new regulations that took away the so-called "safe harbor" provisions that for-profit universities relied on to justify their alleged recruitment misconduct.  For his outstanding work as Lead Counsel and the significance of the case, *California Lawyer* magazine recognized Lieff Cabraser attorney Robert J. Nelson with a California Lawyer of the Year (CLAY) Award.

2. ***United States ex rel. Dye v. ATK Launch Systems***, No. 1:06CV39TS (D. Utah).  Lieff Cabraser served as co-counsel for a whistleblower who alleged that ATK Launch Systems knowingly sold defective and potentially dangerous illumination flares to the United States military in violation of the federal False Claims Act.  The specialized flares were used in nighttime combat, covert missions, and search and rescue operations.  A key design specification set by the Defense Department was that these highly flammable and dangerous items ignite only under certain conditions.  The complaint alleged that the ATK flares at issue could ignite when dropped from a height of less than 10 feet – and, according to ATK's own analysis, from as little as 11.6 inches – notwithstanding contractual specifications that they be capable of withstanding such a drop.  In April 2012, the parties reached a settlement valued at $37 million.

3. ***United States ex rel. Mauro Vosilla and Steven Rossow v. Avaya, Inc.***, Case No. Case No.  CV04-8763 PA JTLx (C.D. Cal.).  Lieff Cabraser represented whistleblower in litigation alleging that defendants Avaya, Lucent Technologies, and AT&T violated the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended, and the False Claims Acts of California and several other states.  The complaint alleged that defendants charged governmental agencies for the lease, rental, and post-warranty maintenance of telephone communications systems and services that the governmental agencies no longer possessed and/or were no longer maintained by defendants.  In November 2010, the parties entered into a $21.75 million settlement of the litigation.

IX.   **International and Human Rights Litigation**

A.   **Successes**

1.   ***Holocaust Cases***.  Lieff Cabraser was one of the leading firms that prosecuted claims by Holocaust survivors and the heirs of Holocaust survivors and victims against banks and private manufacturers and other corporations who enslaved and/or looted the assets of Jews and other minority groups persecuted by the Nazi Regime during the Second World War era.  We serve as Settlement Class Counsel in the case against the Swiss banks that the Court approved a U.S. $1.25 billion settlement in July 2000.  Lieff Cabraser donated its attorneys' fees in the Swiss Banks case, in the amount of $1.5 million, to endow a Human Rights clinical chair at Columbia University Law School.  We were also active in slave labor and property litigation against German and Austrian defendants, and Nazi-era banking litigation against French banks.  In connection therewith, Lieff Cabraser participated in multi-national negotiations that led to Executive Agreements establishing an additional approximately U.S. $5 billion in funds for survivors and victims of Nazi persecution.  Our website provides links to the websites of settlement and claims administrators in these cases.

Commenting on the work of Lieff Cabraser and co-counsel in the litigation against private German corporations, entitled *In re Holocaust Era German Industry, Bank & Insurance Litigation* (MDL No. 1337), U.S. District Court Judge William G. Bassler stated on November 13, 2002:

> Up until this litigation, as far as I can tell, perhaps with some minor exceptions, the claims of slave and forced labor fell on deaf ears.  You can say what you want to say about class actions and about attorneys, but the fact of the matter is, there was no attention to this very, very large group of people by Germany, or by German industry until these cases were filed. . . .  What has been accomplished here with the efforts of the plaintiffs' attorneys and defense counsel is quite incredible. . . .  I want to thank counsel for the assistance in bringing us to where we are today.  Cases don't get settled just by litigants.  It can only be settled by competent, patient attorneys.

2.   ***Cruz v. U.S., Estados Unidos Mexicanos, Wells Fargo Bank, et al.***, No. 01-0892-CRB (N.D. Cal.).  Working with co-counsel, Lieff Cabraser succeeded in correcting an injustice that dated back 60 years.  The case was brought on behalf of Mexican workers and laborers, known as Braceros ("strong arms"), who came from Mexico to the United States

pursuant to bilateral agreements from 1942 through 1946 to aid American farms and industries hurt by employee shortages during World War II in the agricultural, railroad, and other industries.  As part of the Braceros program, employers held back 10% of the workers' wages, which were to be transferred via United States and Mexican banks to savings accounts for each Bracero.  The Braceros were never reimbursed for the portion of their wages placed in the forced savings accounts.

Despite significant obstacles including the aging and passing away of many Braceros, statutes of limitation hurdles, and strong defenses to claims under contract and international law, plaintiffs prevailed in a settlement in February 2009.  Under the settlement, the Mexican government provided a payment to Braceros, or their surviving spouses or children, in the amount of approximately $3,500 (USD).  In approving the settlement on February 23, 2009, U.S. District Court Judge Charles Breyer stated:

> I've never seen such litigation in eleven years on the bench that was more difficult than this one.  It was enormously challenging. . . .   It had all sorts of issues . . . that complicated it:  foreign law, constitutional law, contract law, [and] statute of limitations. . . .   Notwithstanding all of these issues that kept surfacing . . . over the years, the plaintiffs persisted.  I actually expected, to tell you the truth, at some point that the plaintiffs would just give up because it was so hard, but they never did.  They never did.  And, in fact, they achieved a settlement of the case, which I find remarkable under all of these circumstances.

**FIRM BIOGRAPHY:**

**PARTNERS**

*ELIZABETH J. CABRASER*, Admitted to practice in California, 1978; U.S. Supreme Court, 1996; U.S. Tax Court, 1979; California Supreme Court, 1978; U.S. District Court, Northern District of California, 1978; U.S. District Court, Eastern District of California, 1979; U.S. District Court, Central District of California and Southern District of California, 1992; U.S. District Court, Eastern District of Michigan, 2005; U.S. Court of Appeals, First Circuit, 2011; U.S. Court of Appeals, Second Circuit, 2009; U.S. Court of Appeals, Third Circuit, 1994; U.S. Court of Appeals, Fifth Circuit, 1992; U.S. Court of Appeals, Sixth Circuit, 1992; U.S. Court of Appeals, Seventh Circuit, 2001; U.S. Court of Appeals, Ninth Circuit, 1979; U.S. Court of Appeals, Tenth Circuit, 1992; U.S. Court of Appeals, Eleventh Circuit, 1992; U.S. District Court, District of Hawaii, 1986.  *Education*:  Boalt Hall School of Law, University of California (J.D., 1978); University of California at Berkeley (A.B., 1975).  *Awards and Honors*:  "Lawyer of the Year," *Best Lawyers*, recognized in the category of Product Liability Litigation - Plaintiffs for

San Francisco, 2014; Legal 500 recommended lawyer, *LegalEase*, 2013; AV Preeminent Peer Review Rated, Martindale-Hubbell; "Outstanding Achievement Award," *Chambers USA*, 2012; "Litigation Star," *Benchmark Plaintiff* (ranked as one of the nation's top litigators for civil rights/human rights, mass torts/product liability, and securities) 2011-2012; "California Litigation Star," *Benchmark Plaintiff* (ranked as one of California's leading litigators in antitrust, employment/labor law, environmental litigation, False Claims Act, and personal injury) 2011-2012; *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*San Francisco's Best Lawyers*," 2005-2014; "Lawdragon 500 Leading Lawyers in America," *Lawdragon*, 2005-2011; "Margaret Brent Women Lawyers of Achievement Award," American Bar Association Commission on Women in the Profession, 2010; "Top 100 Attorneys in California," *Daily Journal*, 2002-2007, 2010-2012; "Top California Women Litigators," *Daily Journal*, 2007, 2010, 2012-2013; "Top 10 Northern California Super Lawyer," *Super Lawyers*, 2011-2013; "Northern California Super Lawyer," *Super Lawyers*, 2004-2013; "Top 100 Northern California Super Lawyers," *Super Lawyers*, 2005-2013; "Top 50 Female Northern California Super Lawyers," *Super Lawyers*, 2005-2013; "Edward Pollock Award," Consumer Attorneys of California, 2008; "Lawdragon 500 Leading Plaintiffs' Lawyers," *Lawdragon*, Winter 2007; "50 Most Influential Women Lawyers in America," *The National Law Journal*, 1998 & 2007; "Award For Public Interest Excellence," University of San Francisco School of Law Public Interest Law Foundation, 2007; "Top 75 Women Litigators," *Daily Journal*, 2005-2006; "Lawdragon 500 Leading Litigators in America," *Lawdragon*, 2006; "Distinguished Leadership Award," Legal Community Against Violence, 2006; "Women of Achievement Award," Legal Momentum (formerly the NOW Legal Defense & Education Fund), 2006; "100 Most Influential Lawyers in America," *The National Law Journal*, 1997, 2000, 2006, & 2013; "Top 30 Securities Litigator," *Daily Journal*, 2005; "Top 50 Women Litigators," *Daily Journal*, 2004; "Citation Award," University of California, Berkeley Boalt Hall, 2003; "Distinguished Jurisprudence Award," Anti-Defamation League, 2002; "Top 30 Women Litigators," *California Daily Journal*, 2002; "Top Ten Women Litigators," *The National Law Journal*, 2001; "Matthew O. Tobriner Public Service Award," Legal Aid Society, 2000; "California Law Business Top 100 Lawyers," *California Daily Journal*, 1998-2000; "California Lawyer of the Year (CLAY)," *California Lawyer*, 1998; "Presidential Award of Merit," Consumer Attorneys of California, 1998; "Public Justice Achievement Award," Public Justice, 1997. *Publications & Presentations*: "Due Process Pre-Empted: Stealth Preemption As a Consequence of Agency Capture" (2009); "Just Choose: The Jurisprudential Necessity to Select a Single Governing Law for Mass Claims Arising from Nationally Marketed Consumer Goods and Services," *Roger Williams University Law Review* (Winter 2009); "California Class Action Classics," Consumer Attorneys of California (January/February Forum 2009); Co-Author with Joy A. Kruse, Bruce Leppla, "Selective Waiver: Recent Developments in the Ninth Circuit and California," (pts. 1 & 2), *Securities Litigation Report* (West Legalworks May & June 2005); "The Manageable Nationwide Class: A Choice-of-Law Legacy of Phillips Petroleum Co. v. Shutts," *University of Missouri- Kansas City Law Review*, Volume 74, Number 3, Spring 2006; Co-Author with Fabrice N. Vincent, "Class Actions Fairness Act of 2005," *California Litigation*, Vol. 18, No. 3 (2005); Editor-in-Chief, *California Class Actions Practice and Procedures* (2003); "A Plaintiffs' Perspective On The Effect of State Farm v. Campbell On Punitive Damages in Mass Torts" (May 2003); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," *Survey of State Class Action Law*, updated and re-published in *5 Newberg on Class Actions* (ABA 2001-2004); Co-Author, "Mass But Not (Necessarily) Class: Emerging Aggregation

Alternatives Under the Federal Rules," *ABA 8th Annual National Institute on Class Actions*, New York (Oct. 15, 2004), New Orleans (Oct. 29, 2004); Co-Author, "2004 ABA Toxicology Monograph-California State Law," (January 2004); "Human Rights Violations as Mass Torts: Compensation as a Proxy for Justice in the United States Civil Litigation System"; Co-Author with Fabrice N. Vincent, "Ethics and Admissibility: Failure to Disclose Conflicts of Interest in and/or Funding of Scientific Studies and/or Data May Warrant Evidentiary Exclusions," *Mealey's December Emerging Drugs Reporter* (December 2002); Co-Author with Fabrice N. Vincent, "The Shareholder Strikes Back: Varied Approaches to Civil Litigation Claims Are Available to Help Make Shareholders Whole," *Mealey's Emerging Securities Litigation Reporter* (September 2002); Coordinating Editor and Co-Author of California section of the *ABA State Class Action Survey* (2001-2002); "Unfinished Business: Reaching the Due Process Limits of Punitive Damages in Tobacco Litigation Through Unitary Classwide Adjudication," *36 Wake Forest Law Review 979* (Winter 2001); "Symposium: Enforcing the Social Contract through Representative Litigation," *33 Connecticut Law Review 1239* (Summer 2001); "Equity for the Victims, Equity for the Transgressor: The Classwide Treatment of Punitive Damages Claims," *74 Tulane Law Review 2005* (June 2000); "Class Action Trends and Developments After Amchem and Ortiz," in *Civil Practice and Litigation Techniques in Federal and State Courts* (ALI-ABA Course of Study 1999); Contributor/Editor, *Moore's Federal Practice* (1999); Co-Author, "Preliminary Issues Regarding Forum Selection, Jurisdiction, and Choice of Law in Class Actions," (December 1999); "Life After Amchem: The Class Struggle Continues," *31 Loyola Law Review 373* (1998); "Recent Developments in Nationwide Products Liability Litigation: The Phenomenon of Non-Injury Products Cases, the Impact of Amchem and the Trend Toward State Court Adjudication," *Products Liability* (ABA February 1998); Contributor/Editor, *California Causes of Action* (1998); "Beyond Bifurcation: Multi-Phase Structure in Mass Tort Class Actions," *Class Actions & Derivative Suits* (Spring 1997); "The Road Not Taken: Thoughts on the Fifth Circuit's Decertification of the Castano Class," *SB24 ALI-ABA 433* (1996); "Getting the Word Out: Pre-Certification Notice to Class Members Under Rule 23(d)(2)," *Class Actions & Derivative Suits Newsletter* (October 1995); "Mass Tort Class Action Settlements*," 24 CTLA Forum 11* (January-February 1994); "Do You Know the Way from San Jose? The Evolution of Environmental and Toxic Nuisance Class Actions," *Class Actions & Derivative Suits* (Spring 1994); "An Oracle of Change? Realizing the Potential of Emerging Fee Award Methodologies for Enhancing The Role and Control of Investors in Derivative and Class Action Suits," *Principles of Corporate Governance* (ALI October 1994); "How To Streamline Complex Litigation: Tailor a Case Management Order to Your Controversy," *21 The Brief 12* (ABA/TIPS Summer 1992); "The Applicability of the Fraud-On-The-Market Theory to Undeveloped Markets: When Fraud Creates the Market," *12 Class Action Reports 402* (1989); "Mandatory Certification of Settlement Classes," *10 Class Action Reports 151* (1987). *Member*: American Academy of Arts and Sciences (Fellow); American Association for Justice (Fight for Justice Campaign; Women Trial Lawyers Caucus; California State Liaison); American Bar Association [Committee on Mass Torts, Past Co-Chair; Committee on Class Actions and Derivative Suits; Tort and Insurance Practice Section (TIPS); Rules & Procedures Committee, Past Vice-Chair; Civil Procedure & Evidence News Letter, Contributor; Business Law Section]; American Law Institute (Council; International Jurisdiction and Judgments and Aggregate Litigation Projects, Advisor); Association of Business Trial Lawyers; Bar Association of San Francisco (Past President, Securities Litigation Section; Board of Directors, 1997-1998; Judiciary Committee); Bar Association of the Fifth Federal Circuit; Bay

Area Lawyers for Individual Freedom; California Constitution Revision Commission (1993-1996); California Women Lawyers; Consumer Attorneys of California; Federal Bar Association (Northern District of California Chapter); Federal Civil Rules Advisory Committee (Appointed by Supreme Court, 2011); National Center for State Courts Mass Tort Conference Planning Committee; Ninth Circuit Judicial Conference; Northern District of California Civil Justice Reform Act (Advisory Committee; Advisory Committee on Professional Conduct); Public Justice Foundation; Queen's Bench; State Bar of California.

**RICHARD M. HEIMANN**, Admitted to practice in Pennsylvania, 1972; District of Columbia, 1974; California, 1975; U.S. District Court, Northern District of California, 1975; U.S. Court of Appeals, Ninth Circuit, 1975; U.S. Supreme Court, 1980; U.S. Court of Appeals, Second Circuit, 1980; U.S. District Court, District of Hawaii, 1986; New York, 2000. *Education*: Georgetown University (J.D., 1972); *Georgetown Law Journal*, 1971-72; University of Florida (B.S.B.A., with honors, 1969). *Employment*: Mr. Heimann served as Deputy District Attorney and Acting Assistant District Attorney for Tulare County, California, 1974-75, and as an Assistant Public Defender in Philadelphia, Pennsylvania, 1972-74. As a private civil law attorney, Mr. Heimann has tried over 30 civil jury cases, including complex cases such as the successful *FPI/Agretech* and *Edsaco* securities class action trials. In April 2002 in the *Edsaco* case, a federal jury in San Francisco, California returned a $170.7 million verdict against Edsaco Ltd., which included $165 million in punitive damages. *Awards & Honors*: "Top 100 Northern California Super Lawyers," *Super Lawyers,* 2013; Legal 500 recommended lawyer, *LegalEase*, 2013; AV Preeminent Peer Review Rated, Martindale-Hubbell; "California Litigation Star," *Benchmark Plaintiff* (ranked as one of California's leading litigators in antitrust, personal injury and securities law); *Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*San Francisco's Best Lawyers*," 2007-2014; "Consumer Attorney of the Year Finalist," Consumer Attorneys of California, 2011; California Lawyer of the Year (CLAY) Award, California Lawyer, 2011, 2013; "Lawdragon Finalist," Lawdragon, 2009-2011; "Top 100 Attorneys in California," Daily Journal, 2010-2011; "Top Attorneys In Securities Law," Super Lawyers Corporate Counsel Edition, 2010, 2012; "Northern California Super Lawyer," Super Lawyers, 2004-2013. *Publications & Presentations:* Securities Law Roundtable, *California Lawyer* (March 2013); Securities Law Roundtable, *California Lawyer* (September 2010); Securities Law Roundtable*, California Lawyer* (March 2009); Securities Law Roundtable, *California Lawyer* (April 2008); Securities Law Roundtable, *California Lawyer* (April 2007); Co-Author, "Preliminary Issues Regarding Forum Selection, Jurisdiction, and Choice of Law in Class Actions" (December 1999). *Member*: State Bar of California; Bar Association of San Francisco.

**WILLIAM BERNSTEIN**, Admitted to practice in California, 1975; U.S. Court of Appeals, Ninth Circuit, 1987; U.S. District Court, Northern District of California, 1975; New York and U.S. Supreme Court, 1985; U.S. District Court, Central and Eastern Districts of California, 1991; U.S. District Court, Southern District of California, 1992; U.S. Court of Appeals, Third Circuit, 2008. *Education*: University of San Francisco (J.D., 1975); *San Francisco Law Review*, 1974-75; University of Pennsylvania (B.A., general honors, 1972). *Community Service*: Adjunct Professor of Law, University of San Francisco, Settlement Law, 2006-present; Judge Pro Tem for San Francisco Superior Court, 2000-present; Marin Municipal Court, 1984; Discovery Referee for the Marin Superior Court, 1984-89; Arbitrator for the Superior Court of Marin, 1984-1990. *Awards & Honors*: AV Preeminent Peer Review Rated,

Martindale-Hubbell; *Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*San Francisco's Best Lawyers*," 2013-2014; "California Litigation Star," *Benchmark Plaintiff* (ranked as one of California's leading litigators in antitrust law); "Lawdragon Finalist," *Lawdragon*, 2009-2011; "Northern California Super Lawyer," *Super Lawyers*, 2004-2013; "Top Attorneys In Antitrust Law," *Super Lawyers Corporate Counsel Edition*, 2010, 2012; Princeton Premier Registry, Business Leaders and Professionals, 2008-2009; "Top 100 Trial Lawyers in California," American Trial Lawyers Association, 2008; *Who's Who Legal*, 2007; Unsung Hero Award, Appleseed, 2006. *Publications & Presentations*: "The Rise and Fall of Enron's One-To-Many Trading Platform," American Bar Association Antitrust Law Section, Annual Spring Meeting (2005); Co-Author with Donald C. Arbitblit, "Effective Use of Class Action Procedures in California Toxic Tort Litigation," *Hastings West-Northwest Journal of Environmental and Toxic Torts Law and Policy*, No. 3 (Spring 1996). *Member*: Bar Association of San Francisco; Marin County Bar Association (Admin. of Justice Committee, 1988); State Bar of California.

**DONALD C. ARBITBLIT**, Admitted to practice in Vermont, 1979; California and U.S. District Court, Northern District of California, 1986. *Education*: Boalt Hall School of Law, University of California (J.D., 1979); Order of the Coif; Tufts University (B.S., *magna cum laude*, 1974). *Awards and Honors:* Legal 500 recommended lawyer, *LegalEase*, 2013; *The Best Lawyers in America,* based on peer and blue ribbon panel review, selected for list of *"San Francisco's Best Lawyers,"* 2012-2014; AV Preeminent Peer Review Rated, Martindale-Hubbell; "*Lawdragon* Finalist," *Lawdragon*, 2009-2011; "Northern California Super Lawyers," *Super Lawyers*, 2004, 2006-2008. *Publications & Presentations*: Co-Author with Wendy Fleishman, "The Risky Business of Off-Label Use," *Trial* (March 2005); "Comment on Joiner: Decision on the Daubert Test of Admissibility of Expert Testimony," *6 Mealey's Emerging Toxic Torts*, No. 18 (December 1997); Co-author with William Bernstein, "Effective Use of Class Action Procedures in California Toxic Tort Litigation," *3 Hastings West-Northwest Journal of Environmental Law and Policy*, No. 3 (Spring 1996); "The Plight of American Citizens Injured by Transboundary River Pollution," *8 Ecology Law Quarterly*, No. 2 (1979). *Appointments*: Co-Chair, California JCCP Yaz Science Committee, 2010-Present; Member of the Federal Court-appointed Science Executive Committee, and Chair of the Epidemiology/Clinical Trials Subcommittee, *In re Vioxx Products Liability Litigation*, MDL No. 1657 (E.D. La.); Member of the Federal Court-appointed Science and Expert Witness Committees in *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, MDL No. 1203 (E.D. Pa.), *In re Baycol Products Litigation,* MDL No. 1431 (D. Minn.) and *Rezulin Products Liability Litigation*, MDL No. 1348 (S.D.N.Y.). *Member*: State Bar of California; Bar Association of San Francisco.

**STEVEN E. FINEMAN,** Managing Partner. Admitted to practice in California, 1989; U.S. District Court, Northern, Eastern and Central Districts of California and U.S. Court of Appeals, Ninth Circuit, 1995; U.S. Court of Appeals, Fifth Circuit, 1996; New York, U.S. District Court, Eastern and Southern Districts of New York, U.S. District Court, District of Colorado, 2006; U.S. Court of Appeals, Second Circuit and U.S. Supreme Court, 1997; U.S. District Court for the District of Columbia, 1997. *Education*: University of California, Hastings College of the Law (J.D., 1988); University of California, San Diego (B.A., 1985); Stirling University, Scotland (English Literature and Political Science, 1983-84). *Awards & Honors*:

*The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*The New York Area's Best Lawyers*," 2005-2014; Member, *Best Lawyers* Advisory Board, a select group of U.S. and international law firm leaders and general counsel, 2011-2012; "Lawdragon Finalist," *Lawdragon*, 2009-present; "New York Super Lawyers," *Super Lawyers*, 2006-2013; "Top Attorneys In Securities Law," *Super Lawyers Business Edition*, 2008-present; Consultant to the Office of Attorney General, State of New York, in connection with an industry-wide investigation and settlement concerning health insurers' use of the "Ingenix database" to determine usual and customary rates for out-of-network services, April 2008-February 2009; "100 Managing Partners You Need to Know," *Lawdragon*, 2008; "40 under 40," selected as one of the country's most successful litigators under the age of 40, *The National Law Journal*, 2002. *Publications & Presentations*: Global Justice Forum, Presented by Robert L. Lieff – Moderator of Financial Fraud Litigation Panel and Participant on Financing of Litigation Panel (October 4, 2011, Columbia Law School, New York, New York); The Canadian Institute, The 12th Annual Forum on Class Actions – Panel Member, *Key U.S. and Cross-Border Trends: Northbound Impacts and Must-Have Requirements* (September 21, 2011, Toronto, Ontario, Canada); Co-Author with Michael J. Miarmi, "The *Basics* of Obtaining Class Certification in Securities Fraud Cases: U.S. Supreme Court Clarifies Standard, Rejecting Fifth Circuit's 'Loss Causation' Requirement," *Bloomberg Law Reports* (July 5, 2011); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Representing Plaintiffs in Large-Scale Litigation (March 2, 2011, Stanford, California); Stanford University Law School — Panel Member, Symposium on the Future of the Legal Profession, (March 1, 2011, Stanford, California); Stanford University Law School, Member, Advisory Forum, Center of the Legal Profession (2011-Present); 4th Annual International Conference on the Globalization of Collective Litigation — Panel Member, Funding Issues: Public versus Private Financing (December 10, 2010, Florida International University College of Law, Miami, Florida); "Bill of Particulars, A Review of Developments in New York State Trial Law," Column, *The Supreme Court's Decisions in Iqbol and Twombly Threaten Access to Federal Courts* (Winter 2010); American Constitution Society for Law and Policy, Access to Justice in Federal Courts — Panel Member, The Iqbal and Twombly Cases (January 21, 2010, New York, New York); American Bar Association, Section of Litigation, The 13th Annual National Institute on Class Actions — Panel Member, Hydrogen Peroxide Will Clear It Up Right Away: Developments in the Law of Class Certification (November 20, 2009, Washington, D.C.); Global Justice Forum, Presented by Robert L. Lieff and Lieff, Cabraser, Heimann & Bernstein, LLP — Conference Co-Host and Moderator of Mediation/Arbitration Panel (October 16, 2009, Columbia Law School, New York, New York); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Foreign Claimants in U.S. Courts/U.S. Lawyers in Foreign Courts (April 6, 2009, Stanford, California); Consultant to the Office of Attorney General, State of New York, in connection with an industry-wide investigation and settlement concerning health insurers' use of the "Ingenix database" to determine usual and customary rates for out-of-network services, April 2008-February 2009; Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Foreign Claimants in U.S. Courts/U.S. Lawyers in Foreign Courts (April 16, 2008, Stanford, California); Benjamin N. Cardozo Law School, The American Constitution Society for Law & Policy, and Public Justice, Co-Organizer of conference and Master of Ceremonies for conference, Justice and the Role of Class Actions (March 28, 2008, New York, New York); Stanford University Law School and The Centre for Socio-Legal Studies, Oxford University, Conference on The Globalization of

Class Actions, Panel Member, Resolution of Class and Mass Actions (December 13 and 14, 2007, Oxford, England); Editorial Board and Columnist, "Federal Practice for the State Court Practitioner," New York State Trial Lawyers Association's "Bill of Particulars," (2005-present); "Bill of Particulars, A Review of Developments in New York State Trial Law," *Federal Multidistrict Litigation Practice* (Fall 2007); "Bill of Particulars, A Review of Developments in New York State Trial Law," *Pleading a Federal Court Complaint* (Summer 2007); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Foreign Claimants in U.S. Courts (April 17, 2007, Palo Alto, California); "Bill of Particulars, A Review of Developments in New York State Law," *Initiating Litigation and Electronic Filing in Federal Court* (Spring 2007); "Bill of Particulars, A Review of Developments in New York State Trial Law," Column, *Federal Court Jurisdiction: Getting to Federal Court By Choice or Removal* (Winter 2007); American Constitution Society for Law and Policy, 2006 National Convention, Panel Member, Finding the Balance: Federal Preemption of State Law (June 16, 2006, Washington, D.C.); Global Justice Forum, Presented by Lieff, Cabraser, Heimann & Bernstein, LLP — Conference Moderator and Panel Member on Securities Litigation (May 19, 2006, Paris, France); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Foreign Claimants in U.S. Court (April 25, 2006, Stanford, California); Global Justice Forum, Presented by Lieff, Cabraser, Heimann & Bernstein, LLP — Conference Moderator and Speaker and Papers, The Basics of Federal Multidistrict Litigation: How Disbursed Claims are Centralized in U.S. Practice and Basic Principles of Securities Actions for Institutional Investors (May 20, 2005, London, England); New York State Trial Lawyers Institute, Federal Practice for State Practitioners, Speaker and Paper, *Federal Multidistrict Litigation Practice*, (March 30, 2005, New York, New York), published in "Bill of Particulars, A Review of Developments in New York State Trial Law" (Spring 2005); Stanford University Law School, The Stanford Center on Conflict and Negotiation, Interdisciplinary Seminar on Conflict and Dispute Resolution, Guest Lecturer, In Search of "Global Settlements": Resolving Class Actions and Mass Torts with Finality (March 16, 2004, Stanford, California); Lexis/Nexis, Mealey's Publications and Conferences Group, Wall Street Forum: Mass Tort Litigation, Co-Chair of Event (July 15, 2003, New York, New York); Northstar Conferences, The Class Action Litigation Summit, Panel Member on Class Actions in the Securities Industry, and Paper, Practical Considerations for Investors' Counsel - Getting the Case (June 27, 2003, Washington, D.C.); The Manhattan Institute, Center for Legal Policy, Forum Commentator on Presentation by John H. Beisner, Magnet Courts: If You Build Them, Claims Will Come (April 22, 2003, New York, New York); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's Courses on Complex Litigation, Selecting The Forum For a Complex Case — Strategic Choices Between Federal And State Jurisdictions, and Alternative Dispute Resolution ADR In Mass Tort Litigation, (March 4, 2003, Stanford, California); American Bar Association, Tort and Insurance Practice Section, Emerging Issues Committee, Member of Focus Group on Emerging Issues in Tort and Insurance Practice (coordinated event with New York University Law School and University of Connecticut Law School, August 27, 2002, New York, New York); Duke University and University of Geneva, "Debates Over Group Litigation in Comparative Perspective," Panel Member on Mass Torts and Products Liability (July 21-22, 2000, Geneva, Switzerland); *New York Law Journal*, Article, Consumer Protection Class Actions Have Important Position, Applying New York's Statutory Scheme (November 23, 1998); Leader Publications, Litigation Strategist, "Fen-Phen," Articles, *The Admissibility of Scientific Evidence in Fen-Phen Litigation and Daubert Developments:*

*Something For Plaintiffs*, Defense Counsel (June 1998, New York, New York); "Consumer Protection Class Actions Have Important Position, Applying New York's Statutory Scheme," New York Law Journal (November 23, 1998); The Defense Research Institute and Trial Lawyer Association, Toxic Torts and Environmental Law Seminar, Article and Lecture, A Plaintiffs' Counsels' Perspective: What's the Next Horizon? (April 30, 1998, New York, New York); Lexis/Nexis, Mealey's Publications and Conference Group, Mealey's Tobacco Conference: Settlement and Beyond 1998, Article and Lecture, The Expanding Litigation (February 21, 1998, Washington, D.C.); New York State Bar Association, Expert Testimony in Federal Court After Daubert and New Federal Rule 26, Article and Lecture, Breast Implant Litigation: Plaintiffs' Perspective on the Daubert Principles (May 23, 1997, New York, New York); Plaintiff Toxic Tort Advisory Council, Lexis/Nexis, Mealey's Publications and Conferences Group (January 2002-2005). *Member*: American Association for Justice; American Bar Association; American Constitution Society; Association of the Bar of the City of New York; Bar Association of the District of Columbia; Civil Justice Foundation (Board of Trustees, 2004-present); Fight for Justice Campaign; Human Rights First; National Association of Shareholder and Consumer Attorneys (Executive Committee, 2009-present); New York State Bar Association; New York State Trial Lawyers Association (Board of Directors, 2001-2004); New York State Trial Lawyers Association's "Bill of Particulars" (Editorial Board and Columnist, "Federal Practice for the State Court Practitioner," 2005-present); Plaintiff Toxic Tort Advisory Council (Lexis/Nexis, Mealey's Publications and Conferences Group, 2002-2005); Public Justice Foundation (President, 2011-2012; Executive Committee, July 2006-present; Board of Directors, July 2002-present); Co-Chair, Major Donors/Special Gifts Committee, July 2009-present; Class Action Preservation Project Committee, July 2005-present); State Bar of California; Supreme Court Historical Society.

**ROBERT J. NELSON**, Admitted to practice in California, 1987; U.S. District Court, Central District of California, 1987; U.S. District Court, Northern District of California, 1988; U.S. Court of Appeals, Ninth Circuit, 1988; U.S. Court of Appeals, Sixth Circuit, 1995; District of Columbia, 1998; New York, 1999; U.S. District Court, Eastern District of New York, Southern District of New York, 2001; U.S. District Court, Eastern District of California, 2006; U.S. District Court, Northern District of Ohio; U.S. District Court, Southern District of Ohio; U.S. District Court, Middle District of Tennessee. *Education*: New York University School of Law (J.D., 1987): Order of the Coif, Articles Editor, *New York University Law Review*; Root-Tilden-Kern Scholarship Program. Cornell University (A.B., *cum laude* 1982): Member, Phi Beta Kappa; College Scholar Honors Program. London School of Economics (General Course, 1980-81): Graded First. *Employment:* Judicial Clerk to Judge Stephen Reinhardt, U.S. Court of Appeals, Ninth Circuit, 1987-88; Assistant Federal Public Defender, Northern District of California, 1988-93; Legal Research and Writing Instructor, University of California-Hastings College of the Law, 1989-91 (Part-time position). *Awards & Honors*: Legal 500 recommended lawyer, *LegalEase*, 2013; "Litigation Star," *Benchmark Plaintiff* (ranked as one of the nation's top litigators for mass torts/product liability), 2012; "California Litigation Star," *Benchmark Plaintiff* (ranked as one of California's leading litigators in environmental litigation, False Claims Act, personal injury, and securities), 2012; *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*San Francisco's Best Lawyers*," 2012-2014; "Lawdragon Finalist," *Lawdragon*, 2009-2011; "California Lawyer Attorney of the Year (CLAY)" Award, *California Lawyer*, 2008, 2010; "Consumer Attorney of the Year Finalist," Consumer Attorneys of California, 2007, 2010; "Northern California Super Lawyer," *Super

*Lawyers*, 2004-2013; "San Francisco Trial Lawyer of the Year Finalist," San Francisco Trial Lawyers' Association, 2007. *Publications:* False Claims Roundtable, California Lawyer (January 2013); False Claims Roundtable, California Lawyer (April 2012); False Claims Roundtable, California Lawyer (June 2011); False Claims Roundtable, *California Lawyer* (June 2010); Product Liability Roundtable, *California Lawyer* (March 2010); Product Liability Roundtable, *California Lawyer* (July 2009); "Class Action Treatment of Punitive Damages Issues after *Philip Morris v. Williams*:  We Can Get There from Here," 2 Charleston Law Review 2 (Spring 2008) (with Elizabeth J. Cabraser); Product Liability Roundtable, California Lawyer (December 2007); Contributing Author, California Class Actions Practice and Procedures (Elizabeth J. Cabraser editor in chief, 2003); "The Importance of Privilege Logs," The Practical Litigator, Vol. II, No. 2 (March 2000) (ALI-ABA Publication); "To Infer or Not to Infer a Discriminatory Purpose: Rethinking Equal Protection Doctrine," 61 New York University Law Review 334 (1986). *Member*:  State Bar of California; District of Columbia Bar Association; New York Bar Association; American Bar Association; Fight for Justice Campaign; Bar Association of San Francisco; Consumer Attorneys of California; American Association for Justice; San Francisco Trial Lawyers Association.

**KELLY M. DERMODY**, Admitted to practice in California (1994); U.S. Supreme Court (2013); U.S. District Court, Northern District of California (1995); U.S. District Court, Central District of California; U.S. District Court, Eastern District of California (2012); U.S. Court of Appeals for the First Circuit (2012); U.S. Court of Appeals for the Second Circuit (2010); U.S. Court of Appeals for the Third Circuit (2001); U.S. Court of Appeals for the Fourth Circuit (2008); U.S. Court of Appeals for the Sixth Circuit (2008); U.S. Court of Appeals for the Seventh Circuit (2006); U.S. Court of Appeals for the Ninth Circuit (2007); U.S. District Court of Colorado (2007).  *Education*:  Boalt Hall School of Law, University of California, Berkeley (J.D. 1993); Moot Court Executive Board (1992-1993); Articles Editor, *Industrial Relations Law Journal/Berkeley Journal of Employment and Labor Law* (1991-1992); Harvard University (A.B. *magna cum laude*, 1990), Senior Class Ames Memorial Public Service Award.  *Employment*: Law Clerk to Chief Judge John T. Nixon, U.S. District Court, Middle District of Tennessee, 1993-1994; Adjunct Professor of Law, Golden Gate University School of Law, Employment Law (Spring 2001).  *Awards & Honors:* "Lawyer of the Year," *Best Lawyers*, recognized in the category of Employment Law – Individuals for San Francisco, 2014; Legal 500 recommended lawyer, *LegalEase*, 2013; "Top 100 Attorneys in California, *Daily Journal*, 212; "Top 75 Labor and Employment Attorneys in California," *Daily Journal*, 2011-2013; "Top California Women Litigators," *Daily Journal*, 2007, 2010, 2012-2013; AV Preeminent Peer Review Rated, Martindale-Hubbell; "Litigation Star," *Benchmark Plaintiff* (ranked as one of the nation's top litigators for plaintiffs' employment/labor law); "California Litigation Star," *Benchmark Plaintiff* (ranked as one of California's leading litigators in consumer protection and employment/labor law); *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*San Francisco's Best Lawyers*," 2010-2014; "Northern California Super Lawyer," *Super Lawyers*, 2004-2013; "Women of Achievement Award," Legal Momentum (formerly the NOW Legal Defense & Education Fund), 2011; "Top 50 Female Northern California Super Lawyers," *Super Lawyers*, 2007-2013; "Top 100 Northern California Super Lawyers," *Super Lawyers*, 2007, 2009, 2011, 2013; "Lawdragon 500 Leading Lawyers in America," *Lawdragon*, 2010-2011; "Florence K. Murray Award," National Association of Women Judges, 2010 (for influencing women to pursue legal careers, opening doors for women attorneys, and advancing opportunities for women within the legal profession); "Irish Legal 100" Finalist, *The Irish Voice*,

2010; "Lawdragon Finalist," *Lawdragon*, 2007-2009; "Community Service Award," Bay Area Lawyers for Individual Freedom, 2008; "Community Justice Award," Centro Legal de la Raza, 2008; "Award of Merit," Bar Association of San Francisco, 2007; "California Lawyer Attorney of the Year (CLAY) Award," *California Lawyer*, 2007; "Lawdragon 500 Leading Plaintiffs' Lawyers," *Lawdragon*, Winter 2007; "Trial Lawyer of the Year Finalist," Public Justice Foundation, 2007; California's "Top 20 Lawyers Under 40," *Daily Journal*, 2006; "Consumer Attorney of the Year" Finalist, Consumer Attorneys of California, 2006; "Living the Dream Partner," Lawyers' Committee for Civil Rights of the San Francisco Bay Area, 2005; "Top Bay Area Employment Attorney*," The Recorder*, 2004. *Publications & Presentations*: "Class Actions: Latest Developments in Litigating and Settling Employment Discrimination Class Actions" American Bar Association Labor and Employment Section Equal Employment Opportunity Committee (Mid-Year Meeting 2001); "A Road Map to Discovery in Employment Discrimination and Wage/Hour Class Actions," with James M. Finberg, Glasser Legal Works Seminar (2000); "Employment Discrimination Class Actions in the Wake of *Allison v. Citgo Petroleum Corp*. and Fed.R.Civ.P. 23(f)," Federal Bar Association Convention (1999); Co-Author with James Finberg, "Discovery in Employment Discrimination Class Actions," *Litigation and Settlement of Complex Class Actions* (Glasser Legal Works 1998). *Member*: American Bar Association; Labor and Employment Law Section (Governing Council, 2009-present; Co-Chair, Section Conference, 2008-2009; Vice-Chair, Section Conference, 2007-2008; Co-Chair, Committee on Equal Opportunity in the Legal Profession, 2006-2007; Co-Chair Committee on Equal Employment Opportunity); Bar Association of San Francisco (Immediate Past President, 2012-present; Board of Directors, 2005-present; President, 2011-2012; President-Elect, 2010-2011; Treasurer, 2009-2010; Secretary, 2008-2009; Litigation Section: Executive Committee, 2002-2005); Northern District of California Lawyer Representative to the Ninth Circuit Judicial Conference (2007-2010); Lawyers' Committee for Civil Rights of the San Francisco Bay Area (Board of Directors, 1998-2005; Secretary, 1999-2003; Co-Chair, 2003-2005); National Center for Lesbian Rights (Board of Directors, 2002-2008; Co-Chair, 2005-2006); National Association of Women Judges (Independence of the Judiciary Co-Chair, 2011-present; Resource Board, 2005-present; Co-Chair, 2009-2011); Carver Healthy Environments and Response to Trauma in Schools ("HEARTS") Project (Steering Committee, 2007-present); Pride Law Fund (Board of Directors, 1995-2002; Secretary, 1995-1997; Chairperson, 1997-2002); Pride Law Fund (Board of Directors, 1995-2002; Secretary, 1995-1997; Chairperson, 1997-2002); Equal Rights Advocates (Litigation Committee, 2000-2002); National Employment Lawyers Association; Consumer Attorneys of California; Bay Area Lawyers for Individual Freedom; Public Justice Foundation; State Bar of California.

**JONATHAN D. SELBIN**, Admitted to practice in California; District of Columbia; New York; U.S. Court of Appeals, Third Circuit; U.S. Court of Appeals, Fifth Circuit; U.S. Court of Appeals, Sixth Circuit; U.S. Court of Appeals, Seventh Circuit; U.S. Court of Appeals, Ninth Circuit; U.S. Court of Appeals, Eleventh Circuit; U.S. District Court, Northern District of California; U.S. District Court, Central District of California; U.S. District Court, Northern District of Illinois; U.S. District Court, Southern District of New York; U.S. District Court, Eastern District of New York; U.S. District Court, Eastern District of Michigan; U.S. District Court, Northern District of Florida; U.S. Supreme Court. *Education*: Harvard Law School (J.D., *magna cum laude*, 1993); University of Michigan (B.A., *summa cum laude*, 1989). *Employment*: Law Clerk to Judge Marilyn Hall Patel, U.S. District Court, Northern District of California, 1993-95. *Awards & Honors*: *The Best Lawyers in America*, based on peer and blue ribbon panel

review, selected for list of "*The New York Area's Best Lawyers*," 2013; "New York Super Lawyers," *Super Lawyers*, 2006-2013; "*Lawdragon* Finalist," *Lawdragon*, 2009. *Publications & Presentations*: On Class Actions (2009); Contributing Author, "Ninth Circuit Reshapes California Consumer-Protection Law," American Bar Association (July 2012); Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor-in-chief, 2003); "Bashers Beware:  The Continuing Constitutionality of Hate Crimes Statutes After R.A.V.," 72 *Oregon Law Review* 157 (Spring, 1993). *Member*: American Association for Justice; American Bar Association; District of Columbia Bar Association; New York Advisory Board, Alliance for Justice; New York State Bar Association; New York State Trial Lawyers Association; State Bar of California.

**MICHAEL W. SOBOL**, Admitted to practice in Massachusetts, 1989; California, 1998; United States District Court, District of Massachusetts, 1990; U.S. District Court, Northern District of California, 2001; U.S. District Court, Central District of California, 2005; U.S. Court of Appeals for the Ninth Circuit (2009); U.S. Court of Appeals for the Eleventh Circuit (2012). *Education*: Boston University (J.D., 1989); Hobart College (B.A., *cum laude*, 1983). *Prior Employment*: Lecturer in Law, Boston University School of Law, 1995-1997. *Awards & Honors:* "Top 100 Northern California Super Lawyers," *Super Lawyers*, 2013; "Top 100 Attorneys in California," *Daily Journal*, 2012; *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*San Francisco's Best Lawyers*," 2013-2014; "California Litigation Star," *Benchmark Plaintiff* (ranked as one of California's leading litigators in consumer law), 2012; "Trial Lawyer of the Year Finalist," Public Justice, 2012; "Northern California Super Lawyer," *Super Lawyers*, 2012-2013; "Consumer Attorney of the Year Finalist," Consumer Attorneys of California, 2011; "*Lawdragon* Finalist," *Lawdragon*, 2009. *Publications & Presentations*: Panelist, National Consumer Law Center's 15th Annual Consumer Rights Litigation Conference, Class Action Symposium; Panelist, Continuing Education of the Bar (C.E.B.) Seminar on Unfair Business Practices—California's Business and Professions Code Section 17200 and Beyond; Columnist, *On Class Actions*, Association of Business Trial Lawyers, 2005 to present; *The Fall of Class Action Waivers* (2005); *The Rise of Issue Class Certification* (2006); *Proposition 64's Unintended Consequences* (2007); *The Reach of Statutory Damages* (2008). *Member*:  State Bar of California; Bar Association of San Francisco; Consumer Attorneys of California, Board of Governors, (2007-2008, 2009-2010); National Association of Consumer Advocates.

**FABRICE N. VINCENT**, Admitted to practice in California, 1992; U.S. District Court, Northern District of California, Central District of California, Eastern District of California, Ninth Circuit Court of Appeals, 1992. *Education*: Cornell Law School (J.D., *cum laude*, 1992); University of California at Berkeley (B.A., 1989). *Awards & Honors:* "Outstanding Subcommittee Chair for the Class Actions & Derivative Suits," *ABA Section of Litigation*, 2013; *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*San Francisco's Best Lawyers*," 2012-2014; "Northern California Super Lawyer," *Super Lawyers*, 2006–2013. *Publications & Presentations*: Lead Author, *Citizen Report on Utility Terrain Vehicle (UTV) Hazards and Urgent Need to Improve Safety and Performance Standards; and Request for Urgent Efforts To Increase Yamaha Rhino Safety and Avoid Needless New Catastrophic Injuries, Amputations and Deaths*, Lieff Cabraser Heimann & Bernstein, LLP (2009); Co-Author with Elizabeth J. Cabraser, "Class Actions Fairness Act of 2005," *California Litigation,* Vol. 18, No. 3 (2005); Co-Editor, *California Class Actions Practice*

*and Procedures* (2003-06); Co-Author, "Ethics and Admissibility: Failure to Disclose Conflicts of Interest in and/or Funding of Scientific Studies and/or Data May Warrant Evidentiary Exclusions," *Mealey's December Emerging Drugs Reporter* (December 2002); Co-author, "The Shareholder Strikes Back: Varied Approaches to Civil Litigation Claims Are Available to Help Make Shareholders Whole," *Mealey's Emerging Securities Litigation Reporter* (September 2002); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," *Survey of State Class Action Law* (ABA 2000-09), updated and re-published in 5 *Newberg on Class Actions* (2001-09); Coordinating Editor and Co-Author of California section of the ABA State Class Action Survey (2001-06); Co-Editor-In-Chief, *Fen-Phen Litigation Strategist* (Leader Publications 1998-2000); Author of "Off-Label Drug Promotion Permitted" (Oct. 1999); Co-Author, "The Future of Prescription Drug Products Liability Litigation in a Changing Marketplace," and "Six Courts Certify Medical Monitoring Claims for Class Treatment," 29 *Forum* 4 (Consumer Attorneys of California 1999); Co-Author, *Class Certification of Medical Monitoring Claims in Mass Tort Product Liability Litigation* (ALI-ABA Course of Study 1999); Co-Author, "How Class Proofs of Claim in Bankruptcy Can Help in Medical Monitoring Cases," (Leader Publications 1999); Author, "AHP Loses Key California Motion In Limine," (February 2000); Co-Author, Introduction, "Sanctioning Discovery Abuses in the Federal Court," (LRP Publications 2000); "With Final Approval, Diet Drug Class Action Settlement Avoids Problems That Doomed Asbestos Pact," (Leader Publications 2000); Author, "Special Master Rules Against SmithKline Beecham Privilege Log," (November 1999). *Member*: American Association for Justice; Association of Business Trial Lawyers; State Bar of California; Bar Association of San Francisco; American Bar Association; Fight for Justice Campaign; Association of Business Trial Lawyers; Society of Automotive Engineers.

**DAVID S. STELLINGS**, Admitted to practice in New York, 1994; New Jersey; 1994; U.S. District Court, Southern District of New York, 1994. *Education*: New York University School of Law (J.D., 1993); Editor, *Journal of International Law and Politics;* Cornell University (B.A., *cum laude*, 1990). *Awards & Honors*: "Trial Lawyer of the Year Finalist," Public Justice, 2012; "New York Metro Super Lawyer," *Super Lawyers*, 2012-2013; "*Lawdragon* Finalist, *Lawdragon*, 2009. *Member*: New York State Bar Association; New Jersey State Association; Bar Association of the City of New York; American Bar Association.

**ERIC B. FASTIFF,** Admitted to practice in California, 1996; District of Columbia, 1997; U.S. Courts of Appeals for the Third, Ninth and Federal Circuit; U.S. District Courts for the Northern, Southern, Eastern, and Central Districts of California, District of Columbia; U.S. District Court, Eastern District of Wisconsin; U.S. Court of Federal Claims. *Education*: Cornell Law School (J.D., 1995); Editor-in-Chief, *Cornell International Law Journal;* London School of Economics (M.Sc.(Econ.), 1991); Tufts University (B.A., *cum laude, magno cum honore in thesi*, 1990). *Employment*: Law Clerk to Hon. James T. Turner, U.S. Court of Federal Claims, 1995-1996; International Trade Specialist, Eastern Europe Business Information Center, U.S. Department of Commerce, 1992. *Awards & Honors*: Legal 500 recommended lawyer, *LegalEase*, 2013; *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*San Francisco's Best Lawyers*," 2013-2014; "Northern California Super Lawyer," *Super Lawyers*, 2010-2013; "Top Attorneys in Business Law," *Super Lawyers* Corporate Counsel Edition, 2012; "*Lawdragon* Finalist," *Lawdragon*, 2009. *Publications & Presentations*: General Editor, *California Class Actions Practice and Procedures*, (2003-2009); Coordinating Editor and Co-Author of California section of the *ABA State Class Action Survey*

(2003-2008); Author, "US Generic Drug Litigation Update," 1 *Journal of Generic Medicines* 212 (2004); Author, "The Proposed Hague Convention on the Recognition and Enforcement of Civil and Commercial Judgments: A Solution to Butch Reynolds's Jurisdiction and Enforcement Problems," 28 *Cornell International Law Journal* 469 (1995). *Member*: American Antitrust Institute (Advisory Board); State Bar of California; District of Columbia Bar Association; Bar Association of San Francisco; Bar of the U.S. Court of Federal Claims; Children's Day School (Board of Trustees); Editorial Board Member, *Journal of Generic Medicines*, 2003-present; Jewish Home for the Aged (Board of Trustees); Menorah Park (Board of Trustees); SF Works (Board of Trustees).

 **WENDY R. FLEISHMAN**, Admitted to practice in Pennsylvania, 1977; New York, 1992; U.S. District Court, District of Arizona; U.S. District Court, Eastern District of Wisconsin; U.S. District Court, Northern District of California. *Education*: University of Pennsylvania (Post-Baccalaureate Pre-Med, 1982); Temple University (J.D., 1977); Sarah Lawrence College (B.A., 1974). *Employment*: Skadden, Arps, Slate, Meagher & Flom LLP in New York (Counsel in the Mass Torts and Complex Litigation Department), 1993-2001; Fox, Rothschild O'Brien & Frankel (partner), 1988-93 (tried more than thirty civil, criminal, employment and jury trials, and AAA arbitrations, including toxic tort, medical malpractice and serious injury and wrongful death cases); Ballard Spahr Andrews & Ingersoll (associate), 1984-88 (tried more than thirty jury trials on behalf of the defense and the plaintiffs in civil personal injury and tort actions as well as employment—and construction—related matters); Assistant District Attorney in Philadelphia, PA, 1977-84 (in charge of and tried major homicide and sex crime cases). *Awards and Honors*: Legal 500 recommended lawyer, *LegalEase*, 2013; AV Preeminent Peer Review Rated, Martindale-Hubbell; "New York Super Lawyers," *Super Lawyers*, 2006-2013; Officer of New York State Trial Lawyers Association, 2010-present; New York State Academy of Trial Lawyers, 2011; "*Lawdragon* Finalist," *Lawdragon*, 2009. *Publications & Presentations*: "Where Do You Want To Be? Don't Get Left Behind, Creating a Vision for Your Practice," Minority Caucus and Women Trial Lawyers Caucus (July 22, 2013); Editor, Brown & Fleishman, "Proving and Defending Damage Claims: A Fifty-State Guide" (2007-2010); Co-Author with Donald Arbitblit, "The Risky Business of Off-Label Use," *Trial* (March 2005); Co-Author, "From the Defense Perspective," *Scientific Evidence, Chapter 6, Aspen Law Pub* (1999); Editor, *Trial Techniques Newsletter,* Tort and Insurance Practices Section, American Bar Association (1995-1996; 1993-1994); "How to Find, Understand, and Litigate Mass Torts," NYSTLA Mass Torts Seminar (April 2009); "Ethics of Fee Agreements in Mass Torts," AAJ Education Programs (July 2009). *Appointments*: Lead Counsel, Joint Coordinated California Litigation, *Amo Lens Solution Litigation*; Co-Liaison, *In re Zimmer Durom Cup Hip Implant Litigation*; Plaintiffs' Steering Committee, Depuy ASR Hip Implant Litigation; Liaison, NJ Ortho Evra Patch Product Liability Litigation; Co-Liaison, NJ Reglan Mass Tort Litigation; Co-Chair, Mealey's Drug & Medical Device Litigation Conference (2007); Executive Committee, *In re ReNu MoistureLoc Product Liability Litigation*, MDL; Discovery Chair, *In re Guidant Products Liability Litigation*; Co-Chair Science Committee, *In re Baycol MDL Litigation*; Pricing Committee, *In re Vioxx MDL Litigation*. *Member*: New York State Trial Lawyers Association (Treasurer, 2010-present; Board of Directors, 2004-Present); Association of the Bar of the City of New York (Product Liability Committee, 2007-present; Judiciary Committee, 2004-Present); American Bar Association (Annual Meeting, Torts & Insurance Practices Section, NYC, Affair Chair, 1997; Trial Techniques Committee, Torts and Insurance Practices, Chair-Elect, 1996); American Association for Justice (Board of Governors); Pennsylvania Bar

Association (Committee on Legal Ethics and Professionalism, 1993-Present; Committee on Attorney Advertising, 1993-Present; Vice-Chair, Task Force on Attorney Advertising, 1991-92); State Bar of New York; Federal Bar Association; Member, Gender and Race Bias Task Force of the Second Circuit, 1994-present; Deputy Counsel, Governor Cuomo's Screening Committee for New York State Judicial Candidates, 1993-94; New York Women's Bar Association; New York County Lawyers; Fight for Justice Campaign; PATLA; Philadelphia Bar Association (Member of Committee on Professionalism 1991-92).

**PAULINA do AMARAL**, Admitted to practice in New York, 1997; California, 1998; U.S. Court of Appeals, Ninth Circuit, 1999; U.S. District Court, Southern District of New York, 2004; U.S. District Court, Western District of Michigan, 2004; U.S. District Court, Eastern District of Michigan, 2007. *Education*: University of California Hastings College of Law (J.D., 1996); Executive Editor, *Hastings Constitutional Law Quarterly*; National Moot Court Competition Team, 1995; Moot Court Executive Board; University of Rochester (B.A., 1988). *Employment*: Law Clerk to Chief Judge Richard Alan Enslen, U.S. District Court, Western District of Michigan, 1996-98. *Awards & Honors:* Legal 500 recommended lawyer, *LegalEase*, 2013. *Member*: Association of the Bar of the City of New York, (2007-2010, Committee on the Judiciary); American Bar Association; State Bar of New York; State Bar of California; Bar Association of San Francisco; American Trial Lawyers Association; New York State Trial Lawyers Association.

**KATHRYN E. BARNETT**, Admitted to practice in Tennessee, 1992; Sixth Circuit Court of Appeals, 2000; Eleventh Circuit Court of Appeals, 2003; United States District Court, Eastern District Tennessee, 2005; United States District Court, Middle District of Tennessee, 1997; United States District Court, Western District of Tennessee, 2001. *Education*: Vanderbilt University School of Law (J.D., 1992); American Jurisprudence Awards: Torts I and Jurisprudence; Davidson College (B.A., with Honors in Philosophy, 1989), Dean Rusk Grant for International Studies. *Litigation Experience*: Ms. Barnett has tried over 20 civil and criminal trials, including complex and class action cases, as well as catastrophic personal injury cases. In 2013, Ms. Barnett represented a family at trial against two multi-billion dollar corporations in a wrongful death case, winning a $26 million jury verdict. In 2010, Ms. Barnett represented a business wronged by its former partner, winning an $8 million arbitration award against the wrongdoer. In March 2004 and in August 2004, Ms. Barnett served as Co-Lead trial counsel in the class action lawsuit of *In re Tri-State Crematory Litigation*, MDL No. 1467. The case was settled during the second week of trial. The settlements in the *Tri-State* litigation exceed $40 million. Ms. Barnett also served as lead counsel in a class action against the Georgia Farm Bureau regarding insurance coverage, which resulted in an $18 million settlement. In 2000, Ms. Barnett obtained a verdict of nearly $6 million on behalf of parents whose unborn fetus died tragically due to medical malpractice. *Employment*: Judicial Intern to Judge John T. Nixon, U.S. District Court, Middle District of Tennessee, Fall 1990; Assistant Public Defender, Davidson County, Tennessee, Sept. 1992-1995. *Awards & Honors*: *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*Nashville's Best Lawyers*," 2010-2014; "Mid-South Super Lawyer," *Super Lawyers*, 2006-2013; "Top 100 Tennessee Mid-South Super Lawyer," *Super Lawyers*, 2010-2012; "Top 50 Women Mid-South Super Lawyer," *Super Lawyers*, 2011-2012; "Nashville Lawyers In Charge," *Nashville Post*, 2010; "Best of the Bar," *Nashville Business Journal,* 2003, 2005-2010; "150 Best Lawyers in Tennessee," *Business Tennessee,* 2006-2009; "*Lawdragon* Finalist," *Lawdragon*, 2009-2011. *Publications &*

*Presentations*: "Introducing Evidence," Tennessee Bar Association (November 2012); "Legal Writing," Vanderbilt Law School (October 2012); "How Cultural Values Impact Contested Issues – Research and Findings," panelist, Nashville Bar Association (August 2011); "Products Liability Cases and the Tenn. Civil Justice Act of 2011," Tennessee Bar Association (June 2011); "Trial Practice – Experts," Tennessee Bar Association (March 2011); "The Basics of Class Action and MDL Litigation," Tennessee Bar Association (July 2009); "Advanced Federal Court Practice," Nashville Bar Association (March 2009); Guest speaker, "Medicine, Law and Society," Vanderbilt University (March 2009); "Annual Review: Medical Malpractice Update" Tennessee Association for Justice (Oct, Dec. 2008); "Civil Procedure and Evidence Update," Tennessee Trial Lawyers (Oct. and Nov. 2006); "Pre-Trial Skills: Thinking on Your Feet," National Business Institute (Nov. 2006); "Trial Practice Institute," Nashville Bar Association (Sept. 2005); "State Law Class Actions," American Bar Association, Business Law Section (April 2005); "Power Windows Can Kill," *Trial* (April 2005); "Auto Defect Cases," Tennessee Trial Lawyers (Feb. 2005);  "Limiting the Harmful Testimony of Experts on the Law," *Trial* (Jan. 2001); "Letting Focus Groups Work for You," *Trial* (April 1999); "Knocking Out Opposing Experts," Tennessee Trial Lawyers (October and November, 2004), Nashville Bar Association (July, 2004); "Trial Practice Tips: Powerful Trial Strategies for the Absolute Litigator," Nashville Bar Association (April, 2004); "Damages," Tennessee Trial Lawyers (Oct. and Nov. 2003); "Trying the Wrongful Death Case in Tennessee," National Business Institute (Aug. 2003); "Advanced Personal Injury," National Business Institute (July 2003); "Mass Torts," Tennessee Bar Association (July 2002); "Superior Depositions Strategies in Civil Trial Practice," National Business Institute (Jan. 2002, Dec.  1999); "Lawsuits Against the Nursing Home Industry," Tennessee Trial Lawyers (Feb. 2000); "How to Prepare for Mediation and other Practice Tips," Nashville Bar Association (Oct. 2000); "Tennessee Expert Witness," Lorman Education Services (July 2000); "Using Focus Groups to Get the Settlement or Verdict Your Client Deserves," Tennessee Trial Lawyers (Feb. 1999).  *Member*: Tennessee Bar Foundation (Fellow); Tennessee Judicial Conference, Bench/Bar Committee (Chair, 2009-2010); Tennessee Association for Justice (Vice-President for the Middle Section, 2011; Treasurer, 2010; Executive Committee, 2008-2009, Secretary, 2007-2009, Chair, Continuing Education Committee, 2004-2006, Board of Governors, 2002-2009); Nashville Bar Association (First Vice President, 2007; Board, 2005-2008); Harry Phillips American Inn of Courts, (Executive Committee, 2004-2013, Member, 2004-2013, 1997-1999); Nashville Bar Foundation (Fellow); Tennessee Justice Center, Inc. (Board of Directors, 2002-2005; Secretary-Treasurer, 2003-04); Nashville Lawyer's Association for Women (President, 2004-2005; President-elect, 2003-2004; Director, 2002-03; Treasurer, 2000-02; Nominating Committee, 2007; Board, 1998-2005); Davidson County, Tennessee Metropolitan Board of Equalization, 2000-04; Tennessee Bar Association; American Association of Trial Lawyers; American Association for Justice.

**JOY A. KRUSE**, Admitted to practice in Washington, D.C., 1984; California; U.S. Supreme Court; U.S. Courts of Appeals for the Ninth and Federal Circuits; U.S. District Courts for the Northern, and Eastern Districts of California; U.S. District Court for the Central District of California, 2006; U.S. District Court, District of Colorado, 2006; U.S. District Court, District of Wisconsin, 2001. *Education*:  Harvard Law School (J.D., 1984); Wellesley College (B.A., 1977). *Employment*:  Assistant Federal Public Defender, Northern District of California, 1992-96; Public Defender Service, Washington D.C., 1984-89. *Awards & Honors:* AV Preeminent Peer Review Rated, Martindale-Hubbell; *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*San Francisco's Best Lawyers*," 2013-2014;

"*Lawdragon* Finalist," *Lawdragon*, 2009. *Presentations & Publications*: Panelist, "Corporate Governance Litigation," PLI Securities Litigation & Enforcement Institute, San Francisco (October 15, 2009); Co-Author with Richard M. Heimann and Sharon M. Lee, "Post-*Tellabs* Treatment of Confidential Witnesses in Federal Securities Litigation," *Journal of Securities Law, Regulation, & Compliance* (Vol. 2, No. 3 June 2009); "*California Lawyer* Securities Law Roundtable" (October 2008); Co-Author with Elizabeth J. Cabraser, Bruce Leppla, "Selective Waiver:  Recent Developments in the Ninth Circuit and California," (pts. 1 & 2), *Securities Litigation Report* (West Legalworks May and June 2005). *Member*: Phi Beta Kappa; State Bar of California; Bar Association of San Francisco; Equal Rights Advocate (Member; Board of Directors); Northern District of California Practice Program Committee (Member; Board of Directors).

**RACHEL GEMAN**, Admitted to practice in New York, 1998; Southern and Eastern Districts of New York, 1999; U.S. District Court, Eastern District of Michigan, 2005; U.S. District Court of Colorado, 2007; U.S. Supreme Court. *Education*:  Columbia University School of Law (J.D. 1997); Stone Scholar; Equal Justice America Fellow; Human Rights Fellow; Editor, *Columbia Journal of Law and Social Problems*; Harvard University (A.B. *cum laude* 1993). *Employment*: Adjunct Professor, New York Law School; Special Advisor, United States Mission to the United Nations, 2000; Law Clerk to Judge Constance Baker Motley, U.S. District Court, Southern District of New York, 1997-98. *Awards & Honors*:  "Lawyer of the Year," *Best Lawyers*, recognized in the category of Employment Law – Individuals for San Francisco, 2014; "New York Super Lawyer," *Super Lawyers*, 2013; Legal 500 recommended lawyer, *LegalEase*, 2013; AV Preeminent Peer Review Rated, Martindale-Hubbell; *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*The New York Area's Best Lawyers*," 2011-2014; "Rising Star for New York," *Super Lawyers*, 2011; *Distinguished Honor Award*, United *States Department of State*, 2001. *Publications & Presentations*: Author, "Whistleblower Under Pressure," *Trial Magazine* (April 2013); Panelist, "Class Certification Strategies: Dukes in the Rear View Mirror," Impact Fund Class Action Conference (2013); Author & Panelist, "Who is an Employer Under the FLSA?," National Employment Lawyers Association Conference (2013); Panelist, "Fraud and Consumer Protection: Plaintiff and Defense Strategies", Current Issues in Pharmaceutical and Medical Device Litigation, ABA Section of Litigation (2012); Participant and Moderator, "Ask the EEOC:  Current Insights on Enforcement and Litigation," ABA Section of Labor and Employment Law (2011); Panelist, "Drafting Class Action Complaints," New York State Bar Association (2011); Participant and Moderator, "Ask the EEOC: Current Insights on Enforcement and Litigation," ABA Section of Labor and Employment Law (2011); *The New York Employee Advocate*, Co-Editor (2005-2009); Regular Contributor (2008-present); Moderator, "Hot Topics in Wage and Hour Class and Collective Actions," American Association for Justice Tele-Seminar (2010); Author & Panelist, "Class Action Considerations: Certification, Settlement, and More," American Conference Institute Advanced Forum (2009); Panelist, "Rights Without Remedies," American Constitutional Society National Convention, Revitalizing Our Democracy: Progress and Possibilities (2008); Panelist, Fair Measure: Toward Effective Attorney Evaluations, American Bar Association Annual Meeting (2008); Panelist, "Getting to Know You: Use and Misuse of Selection Devices for Hiring and Promotion" ABA Labor & Employment Section Annual Meeting (2008); Author, "'Don't I Think I Know You Already?': Excessive Subjective Decision-Making as an Improper Tool for Hiring and Promotion," ABA Labor & Employment Section Annual Meeting (2008); Author & Panelist, "Ethical Issues in Representing Workers in Wage & Hour Actions,"

Representing Workers in Individuals & Collective Actions under the FLSA (2007); Author & Panelist, "Evidence and Jury Instructions in FLSA Actions," Georgetown Law Center/ACL-ABA (2007); Author & Panelist, "Crucial Events in the 'Life' of an FLSA Collective Action: Filing Considerations and the Two-step 'Similarly-Situated' Analysis," National Employment Lawyers Association, Annual Convention (2006); Author & Panelist, "Time is Money, Except When It's Not: Compensable Time and the FLSA," National Employment Lawyers Association, Impact Litigation Conference (2005); Panelist, "Electronic Discovery," Federal Judicial Center & Institute of Judicial Administration, Workshop on Employment Law for Federal Judges (2005); "Image-Based Discrimination and the BFOQ Defense," *EEO Today: The Newsletter of the EEO Committee of the ABA's Section of Labor and Employment Law*, Vol. 9, Issue 1 (2004); "Fair Labor Standards Act Overtime Exemptions: Proposed Regulatory Changes," *New York State Bar Association Labor and Employment Newsletter* (2004); Chair & Panelist, "Current Topics in Fair Labor Standards Act Litigation," Conference, Association of the Bar of the City of New York (2003); Moderator, "Workforce Without Borders," ABA Section of Labor & Employment Law, EEOC Midwinter Meeting (2003). *Member*: American Bar Association Labor and Employment Law Section, Standing Committee on Equal Employment Opportunity (Co-Chair, 2009-present); Association of the Bar of the City of New York; National Employment Lawyers' Association/New York (Board Member); Public Justice Foundation.

**DANIEL P. CHIPLOCK**, Admitted to practice in New York, 2001; U.S. District Court, Southern District of New York, 2001; U.S. District Court, Eastern District of New York, 2001; U.S. District Court, District of Colorado, 2006; U.S. Court of Appeals for the Second Circuit (2009); U.S. Court of Appeals for the Sixth Circuit (2011); U.S. Supreme Court. *Education*: Stanford Law School (J.D., 2000); Article Review Board, *Stanford Environmental Law Journal*; Recipient, Keck Award for Public Service; Columbia University (B.A., *summa cum laude*, 1994); Phi Beta Kappa. *Member*: State Bar of New York; American Association for Justice; Fight for Justice Campaign; Public Justice; National Association of Shareholder and Consumer Attorneys (Executive Committee/Secretary); American Constitution Society for Law and Policy (Advocate's Circle).

**STEPHEN H. CASSIDY**, Admitted to practice in California, 1989; U.S. District Court, Northern District of California and U.S. Court of Appeals, Ninth Circuit, 1997. *Education*: Hastings College of the Law (J.D., *magna cum laude*, 1989); Associate Managing Editor, *Hastings International and Comparative Law Review*, 1988-1989; Order of the Coif; Member, Thurston Society; Recipient, American Jurisprudence Awards for Real Property, Evidence and American Legal History; Georgetown University (B.S.F.S., 1986). *Employment*: Law Clerk to Magistrate-Judge Joan S. Brennan, U.S. District, Northern District of California, 1989-90; Alameda County Public Defender's Office (1990-1991); Marin County Public Defender's Office (1991-1992); Motions Attorney, U.S. Court of Appeals, Ninth Circuit, 1992-94, 1996-97. *Awards & Honors:* AV Preeminent Peer Review Rated, Martindale-Hubbell. *Publications & Presentations*: TVA + Coal Ash, American Association for Justice, July 2013; "Magnetix Toy Injuries: A Failure to Inform Safety Regulators," OpEd News (2009); "Restoring Patient Rights and Promoting Safer Medical Device," OpEd News (2009); "Internet Marketing for Plaintiffs' Firms," CAOC Conference (May 2004); "Enhancing the Role of Law Firm Marketing Departments," LexisNexis Law Firm Marketers' Roundtable (November 2003); Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief,

2003); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," in *Survey of State Class Action Law* (ABA 2001); "The Newest Member of the Nuclear Club: Pakistan's Drive for a Nuclear Weapon's Capability," 12 *Hastings Int'l & Comp. L. Rev.* 679 (1989).  *Member*:  State Bar of California; Bar Association of San Francisco; American Bar Association (Litigation Section); Public Justice; Fight for Justice Campaign; Consumer Attorneys of California; San Francisco Trial Lawyers Association; Alameda Contra Costa Trial Lawyers' Association; American Association for Justice

 **ELIZABETH A. ALEXANDER,** Admitted to practice in Tennessee, 1998; U.S. Court of Appeals, Sixth Circuit, 2001; U.S. District Court, Middle District of Tennessee, 2000; U.S. District Court, Eastern District of Tennessee, 2002.  *Education*: Vanderbilt University Law School (J.D., 1998); President, Criminal Law Association; Moot Court Board Member; Vanderbilt University Honor Committee; Hollins College (B.A., 1993).  *Honors & Awards*: *Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*Nashville's Best Lawyers*," 2013-2014; "Top Attorneys In Environmental Law," *Super Lawyers* Corporate Counsel Edition, 2012; "Mid-South Super Lawyer," *Super Lawyers*, 2011-2013; National Trial Lawyer's Top 100 Trial Lawyers, 2011; "Rising Stars," *Super Lawyers*, 2008-2010; "*Lawdragon* 500 New Stars" and "*Lawdragon* 3000 Leading Plaintiffs' Lawyers in America," *Lawdragon*, 2006-2007.  *Publications & Presentations*: TVA + Coal Ash, American Association for Justice, July 2013; Editor, Tennessee Chapter of the *ABA Survey of State Class Action Law* (2003-2010); "Consumer Class Actions Against Financial Institutions," Lorman Education Services, July 2004; Panelist, National Consumer Law Center, Consumer Rights Litigation Conference, "Pleading Standards—the Impact of *Twombly* and *Iqbal* on Class Action Complaints."  *Prior Employment*: Associate, Dodson, Parker, Dinkins & Behm (2002-03); Associate, Wyatt, Tarrant & Combs (2000-2002); Law Clerk, Honorable Thomas A. Higgins, U.S. District Court for the Middle District of Tennessee (1998-2000).  *Member*: American Bar Association (Labor and Employment Law Section Equal Employment Opportunity Committee, Co-Chair, Basics Committee 2005-2006; Chair of Internal Marketing and Mentoring Committee 2006-2007); Lawyers' Association for Women (Director, 2003-2005); Nashville Bar Association (Board of Directors, Young Lawyers Division, Fellow); National Bar Association; National Employment Lawyers' Association; Tennessee Association for Justice (Board of Governors, 2012); Tennessee Bar Association.

 **MARK P. CHALOS**, Admitted to practice in Tennessee, 1998; U.S. Court of Appeals, Sixth Circuit, 1998; U.S. District Court, Middle District of Tennessee, 2000; U.S. District Court, Western District of Tennessee, 2002; U.S. District Court, Eastern District of Tennessee, 2006; U.S. District Court, Northern District of Florida, 2006; U.S. District Court, Northern District of California, 2007; U.S. Supreme Court, 2012.  *Education*:  Emory University School of Law (J.D., 1998); Dean's List; Award for Highest Grade, Admiralty Law; Research Editor, *Emory International Law Review*; Phi Delta Phi Legal Fraternity; Vanderbilt University (B.A., 1995).  *Honors & Awards*: *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*Nashville's Best Lawyers*," 2012-2014; "Mid-South Super Lawyer," *Super Lawyers*, 2011-2013; AV Peer Review Rated, Martindale-Hubbell; "Best of the Bar," *Nashville Business Journal*, 2008-2010; "Top 40 Under 40," *The Tennessean*, 2004; "Rising Stars," *Super Lawyers*, 2008-2010. *Publications & Presentations*: "Supreme Court Limits The Reach Of Alien Tort Statute In Kiobel," Legal Solutions Blog, April 2013; "The Rise of Bellwether Trials," Legal Solutions Blog, March 2013; "Amgen: The Supreme Court Refuses to Erect New

Class Action Bar," Legal Solutions Blog, March 2013; "Are International Wrongdoers Above the Law?," The Trial Lawyer Magazine, January 2013; "Kiobel v. Royal Dutch Petroleum: Supreme Court to Decide Role of US Courts Abroad," ABA Journal, January 2013. "Legislation Protects the Guilty [in Deadly Meningitis Outbreak]," Tennessean, December 2012; Litigating International Torts in United States Courts, 2012 ed., Thomson Reuters/West (2012); "Successfully Suing Foreign Manufacturers," TRIAL Magazine, November 2008; "Washington Regulators Versus American Juries: The United States Supreme Court Shifts the Balance in Riegel v. Medtronic," *Nashville Bar Journal*, 2008; "Washington Bureaucrats Taking Over American Justice System," *Tennessean.com* (December 2007); "The End of Meaningful Punitive Damages," *Nashville Bar Journal*, November 2001; "Is Civility Dead?" *Nashville Bar Journal*, October 2003; "The FCC: The Constitution, Censorship, and a Celebrity Breast," Nashville Bar Journal, April 2005.  *Member*:  American Association for Justice; American Bar Association; (Past-Chair, YLD Criminal & Juvenile Justice Committee; Tort Trial and Insurance Practice Section Professionalism Committee); First Center for the Visual Arts (Founding Member, Young Professionals Program); Harry Phillips American Inn of Court; Kappa Chapter of Kappa Sigma Fraternity Alumni Association (President); Metropolitan Nashville Arts Commission (Grant Review Panelist); Nashville Bar Association (YLD Board of Directors; Nashville Bar Association YLD Continuing Legal Education and Professional Development Director); Nashville Bar Journal (Editorial Board); Tennessee Association for Justice (Board of Directors, 2008-2011; Legislative Committee); Tennessee Bar Association (Continuing Legal Education Committee); Tennessee Trial Lawyers Association (Board of Directors); Historic Belcourt Theatre (Past Board Chair; Board of Directors); Nashville Cares (Board of Directors).

**KRISTEN LAW SAGAFI**, Admitted to practice in California (2002); U.S. District Court, Northern District of California (2002); U.S. District Court, Central District of California (2005); US District Court; Northern District of Florida (2009); U.S. Court of Appeals for the Eleventh Circuit (2010).  *Education*:  Boalt Hall School of Law, University of California, Berkeley (J.D. 2002); Executive Editor, *Ecology Law Quarterly*; Moot Court Advocacy Award; Moot Court Board; Hopi Appellate Clinic; Ohio Wesleyan University (B.A., *summa cum laude,* 1995); Presidential Scholar; Phi Beta Kappa.  *Litigation Experience:* Ms. Sagafi and Lieff Cabraser received recognition in *The National Law Journal's* Plaintiffs' Hot List for their outstanding success in *Grays Harbor Adventis Christian School v. Carrier Corp*. The case resulted in a settlement worth $300 million for consumers who had purchased certain Carrier furnaces that were allegedly made with inferior materials that caused them to fail prematurely.  *Honors & Awards*: "50 Lawyers on the Fast Track," *The Recorder*, 2012; "Northern California Rising Stars," *Super Lawyers*, 2009-2013. *Member*: Phi Beta Kappa; State Bar of California.

**JAHAN C. SAGAFI**, Admitted to practice in California, 2003; U.S. Court of Appeals for the Second Circuit, 2006; U.S. District Court, Central District of California; U.S. District Court, Northern District of California; U.S. Court of Appeals for the Ninth Circuit.  *Education*: Harvard Law School (J.D., 2001); Senior Editor, *Harvard Civil Rights-Civil Liberties Law Review* (1999-2001); President, Board of Student Advisers; Harvard College (B.A., *magna cum laude*, 1994).  *Employment*: Law Clerk to Judge William W Schwarzer, U.S. District Court, Northern District of California, 2001-02.  *Honors & Awards*: "Top 20 Under 40," *Daily Journal*, 2011; "Northern California Rising Stars," *Super Lawyers*, 2009-2011; "Community Justice Award," Centro Legal de la Raza, 2008. *Publications & Presentations:* Co-author with Richard B. Rosenthal, "Ten things every trial lawyer must know about appeals: A primer for success in

California's appellate courts," *Plaintiff* (December 2011). *Member*: American Constitution Society (Chair of Bay Area Lawyer Chapter 2009-2011); ACLU of Northern California (Board Member; Chair of the Legal Committee, 2010-2011; Vice Chair, 2010-2011; Executive Committee, 2009-2011); National Employment Lawyers' Association; Consumer Attorneys of California; American Bar Association; Bar Association of San Francisco (Member of Judiciary Committee, 2013-Present).

**KENT L. KLAUDT,** Admitted to practice in California, 1996; U.S. District Court, Northern District of California, 1997; U.S. District Court, Eastern District of California, 1998; U.S. District Court, Central District of California, 2007; California Supreme Court, 1996; U.S. Supreme Court, 2013; U.S. District Court, Eastern District of Wisconsin, 2013. *Education*: University of Minnesota Law School (J.D., 1996); Outside Articles Editor, *Journal of Law & Inequality: A Journal of Theory & Practice*; National Association of Public Interest Law (Summer Fellowship, 1995); University of Minnesota (B.A., 1991). *Employment*: BlueDog, Olson & Small, PLLP, 1995-96; Cartwright & Alexander, LLP, 1996-2001; The Cartwright Law Firm, Inc., 2001-2004. *Honors & Awards: Best Lawyers*, based on peer and blue ribbon panel review, selected for list of "San Francisco's Best Lawyers," 2014; National Association of Public Interest Law Summer Fellowship, 1995. *Publications & Presentations*: Outside Articles Editor, *Journal of Law and Inequality: A Journal of Theory and Practice;* "Hungary After the Revolution: Privatization, Economic Ideology, and the False Promise of the Free Market," 13 *Law & Inequality: A Journal of Theory & Practice* 301. *Member*: American Association for Justice; American Trial Lawyers Association; Consumer Attorneys of California; Public Justice; San Francisco Trial Lawyers Association; National Lawyers Guild; State Bar of California.

**JENNIFER GROSS**, Admitted to practice in California, 1994; U.S. District Court, Central District of California, 1994. *Education*: RAND Graduate School (M. Phil., 1997); University of Southern California (J.D., 1994); Emory University (B.A., 1991). *Publications & Presentations*: Co-Author, *Intelligence, Surveillance, and Reconnaissance Force Mix Study: Final Report* (RAND 2003); Co-Author, *Asbestos Litigation Costs and Compensation: An Interim Report* (RAND 2002); Co-Author, *Asbestos Litigation in the U.S.: A New Look at an Old Issue* (RAND 2001); Co-Author, *Class Action Dilemmas: Pursuing Public Goals for Private Gain* (RAND, 2000); Co-Author, *Potential Vulnerabilities of U.S. Air Force Information Systems* (RAND, 1999); Co-Author, "Preliminary Results of the RAND Study of Class Action Litigation," (RAND, 1997). *Member*: State Bar of California.

**LEXI J. HAZAM**, Admitted to practice in California, 2003; U.S. District Court, Northern District of California, 2003; U.S. Court of Appeals for the Seventh Circuit, 2006; US District Court, Southern District of CA, 2013; U.S. Court of Appeals for the Second Circuit; U.S. Court of Appeals for the Eighth Circuit. *Education*: Stanford University (B.A., 1995, M.A., 1996), Phi Beta Kappa; Boalt Hall School of Law, University of California, Berkeley (J.D., 2001) (*California Law Review; La Raza Law Journal* (Articles Editor); Berkeley Law Foundation Summer Grant for Public Service; Federal Practice Clinic; Hopi Appellate Clinic). *Employment*: Law Clerk, Mexican American Legal Defense and Education Fund, 1999; Law Clerk, Judge Henry H. Kennedy, Jr., U.S. District Court for the District of Columbia, 2001-2002; Associate, Lieff Cabraser Heimann & Bernstein, LLP, 2002-2006; Partner, Lieff Global LLP, 2006-2008. *Honors & Awards*: Legal 500 recommended lawyer, *LegalEase*, 2013; "Northern California Rising Stars," *Super Lawyers*, 2009-2011, 2013. *Member*: State Bar of California; American

Association for Justice; Consumer Attorneys of California; Bar Association of San Francisco; San Francisco Trial Lawyers Association.

**BRENDAN P. GLACKIN**, Admitted to practice in California, 1998; New York, 2000; U.S. District Court, Northern, Central, Eastern and Southern Districts of California, 2001; U.S. Court of Appeals for the Ninth Circuit, 2004; U.S. District Court, Southern District of New York, 2001; U.S. District Court, District of Colorado, 2001. *Education*: Harvard Law School (J.D., *cum laude*, 1998); University of Chicago (A.B., Phi Beta Kappa, 1995). *Employment*: Contra Costa Public Defender, 2005-2007; Boies, Schiller & Flexner, 2000-2005; Willkie Farr & Gallagher, 1999-2000; Law Clerk to Honorable William B. Shubb, U.S. District Court, Eastern District of California, 1998-1999. *Awards & Honors:* "Northern California Super Lawyer," *Super Lawyers,* 2013. *Member*: State Bar of California; BASF Antitrust Section, Executive Committee. *Seminars:* Ramifications of *American Needle, Inc. v. National Football League,* 2010; Antitrust Institute 2011: Developments & Hot Topics, 2011; Antitrust Trials: The View From the Trenches, 2013; Applying Settlement Offsets to Antitrust Judgments, ABA Spring Meetings, 2013; California Trial Advocacy, PLI, 2013; Building Trial Skills, NITA, 2013.

**DANIEL E. SELTZ**, Admitted to practice in New York, 2004; U.S. District Court, Southern District of New York; U.S. District Court, Eastern District of New York; U.S. Court of Appeals for the First Circuit; U.S. Court of Appeals for the Ninth Circuit. *Education*: New York University School of Law (J.D., 2003); *Review of Law and Social* Change, Managing Editor; Hiroshima University (Fulbright Fellow, 1997-98); Brown University (B.A., *magna cum laude*, Phi Beta Kappa, 1997). *Employment*: Law Clerk to Honorable John T. Nixon, U.S. District Court, Middle District of Tennessee, 2003-04. *Publications & Presentations*: Panelist, "Taking and Defending Depositions," New York City Bar, May 20, 2009; Contributing Author, *California Class Actions Practice & Procedures* (Elizabeth J. Cabraser, Editor-in-Chief, 2008); "Remembering the War and the Atomic Bombs: New Museums, New Approaches," in *Memory and the Impact of Political Transformation in Public Space* (Duke University Press, 2004), originally published in *Radical History Review*, Vol. 75 (1998); "Issue Advocacy in the 1998 Congressional Elections," with Jonathan S. Krasno (Urban Institute, 2001); *Buying Time: Television Advertising in the 1998 Congressional Elections*, with Jonathan S. Krasno (Brennan Center for Justice, 2000); "Going Negative," in *Playing Hardball*, with Kenneth Goldstein, Jonathan S. Krasno and Lee Bradford (Prentice-Hall, 2000). *Member*: American Association for Justice; State Bar of New York.

**TODD A. WALBURG**, Admitted to practice in California, 2001; U.S. District Court, Northern District of California, 2001; U.S. District Court, Eastern, Central and Southern Districts of California, 2006; U.S. Court of Appeals for the Ninth Circuit, 2001. *Education*: University of San Francisco School of Law (J.D. 1999); Founder and President, USF Student Chapter, Association of Trial Lawyers of America (1997-1999); Investigation Intern, San Francisco Public Defender's Office; Mediation Intern, San Francisco Small Claims Court; Mediation Intern, U.S. Equal Employment Opportunity Commission; University of California at Los Angeles (B.A., 1995). *Community Service*: Pro Bono Trial Attorney, Eviction Defense Project, Volunteer Legal Services Program of the Bar Association of San Francisco (2012-present). *Awards*: Elected to the Board of Directors of the San Francisco Trial Lawyers Association, 2013-present; Appointed to the Board of Governors of the Alameda-Contra Costa Trial Lawyers Association, 2012-present; "Rising Star for Northern California," *Super Lawyers*, 2010-2013;

Leesfield / Association of Trial Lawyers of America Scholarship, National Winner (1998). *Prior Employment*: Partner, Emison Hullverson Bonagofsky, LLP (2007-2008); Associate, Lieff Cabraser Heimann & Bernstein, LLP, 2005-2007); Associate, Bennett, Johnson & Galler (2001-2005). *Publications and Presentations*: "Cutting Edge Damages," SFTLA/CAOC Webinar with NJP Litigation Consulting (February 2013); "Burn Injury Cases," SFTLA/CAOC Webinar (December 2012); "Toyota Unintended Acceleration Litigation," CAOC Annual Convention (November 2011); "Product Liability Strategies Before Trial," SFTLA Roundtable (October, 2008); "Powerful Mediation Briefs," in The Verdict (ACCTLA 2006). *Member*: Public Justice; American Association for Justice (Attorneys Information Exchange Group; Burn Injury Litigation Group; Motor Vehicle Collision, Highway and Premises Liability Section; Products Liability Section; Section on Toxic, Environmental and Pharmaceutical Torts; Spinal Cord Injury Litigation Group); American Bar Association (Tort, Trial and Insurance Practice Section); Consumer Attorneys of California; State Bar of California; San Francisco Trial Lawyers Association (Board of Directors, 2013-Present; Experts Committee, 2012; Education Committee, 2005-2007, 2012; Carlene Caldwell Scholarship Committee, 2005-2007); Alameda-Contra Costa Trial Lawyers Association (Board of Governors, 2003-2005, 2012-2013); Bar Association of San Francisco (Pro Bono Trial Attorney, Eviction Defense Project, Volunteer Legal Services Program); Consumer Attorneys Association of Los Angeles; Society of Automotive Engineers (SAE) International; Association of Business Trial Lawyers.

**DANIEL M. HUTCHINSON**, Admitted to practice in California, 2005; U.S. District Court, Central District of California; U.S. District Court, Southern District of California; U.S. Court of Appeals for the First Circuit, 2012; U.S. Court of Appeals for the Ninth Circuit, 2005; U.S. District Court, Northern District of California, 2005; U.S. Court of Appeals for the Fourth Circuit, 2008. *Education:* Boalt Hall School of Law, University of California, Berkeley (J.D., 2005), Senior Articles Editor, *African-American Law & Policy Report*, Prosser Prizes in Constitutional Law and Employment Law; Boalt Hall Teaching & Curriculum Committee (2003-2004); University of California, Berkeley Extension (Multiple Subject Teaching Credential, 2002); Brown University (B.A., 1999), Mellon Mays Fellowship (1997-1999). *Employment*: Judicial Extern to the Hon. Martin J. Jenkins, U.S. District Court, Northern District of California, 2004; Law Clerk, Lewis & Feinberg, P.C., 2003-2004; Teacher, Oakland Unified School District, 1999-2002. *Honors & Awards*: "Northern California Super Lawyer," *Super Lawyers*, 2013; Legal 500 recommended lawyer, *LegalEase*, 2013; "50 Lawyers on the Fast Track," *The Recorder*, 2012; "Northern California Rising Stars," *Super Lawyers*, 2009-2012. *Publications & Presentations:* Panelist, "Employment Discrimination Class Actions Post-*Dukes*," Consumer Attorneys of California 50th Annual Convention (2011); "Ten Points from *Dukes v. Wal-Mart Stores, Inc*.," 20(3) *CADS Report 1* (Spring 2010); Panelist, "Rethinking Pro Bono: Private Lawyers and Public Service in the 21st Century," UCLA School of Law (2008); Author and Panelist, "Pleading an Employment Discrimination Class Action" and "EEO Litigation: From Complaint to the Courthouse Steps," ABA Section of Labor and Employment Law Second Annual CLE Conference (2008); Co-Presenter, "Rule 23 Basics in Employment Cases," Strategic Conference on Employment Discrimination Class Actions (2008). *Member*: American Bar Association (Section of Labor & Employment Law Leadership Development Program); Association of Business Trial Lawyers (Leadership Development Committee, 2008-2010); Bar Association of San Francisco; Consumer Attorneys of California; Lawyer's Committee for Civil Rights of the San Francisco Bay Area (Board Secretary, 2011-present; Board of Directors, 2009-2011); National Bar Association; State Bar of California.

**SHARON M. LEE**, Admitted to practice in New York 2002; U.S. District Court, Southern District of New York, 2003; U.S. District Court, Eastern District of New York, 2003; Washington State, 2005. *Education*: St. John's University School of Law (J.D. 2001); *New York International Law Review*, Notes & Comments Editor, 2000-2001; St. John's University (M.A. 1998); St. John's University (B.A. 1997). *Employment*: Milberg Weiss & Bershad, LLP, 2003-2007. *Member*: American Bar Association; Washington State Bar Association; Asian Bar Association of Washington. *Publications & Presentations*: Author, *The Development of China's Securities Regulatory Framework and the Insider Trading Provisions of the New Securities Law*, 14 N.Y. Int'l L.Rev. 1 (2001); Co-author, *Post-Tellabs Treatment of Confidential Witnesses in Federal Securities Litigation*, 2 J. Sec. Law, Reg. and Compliance 205 (3d ed. 2009).

**HEATHER H. WONG**, Admitted to practice in California, 2005; U.S. Court of Appeals, Ninth Circuit, 2005; U.S. District Court, Central and Northern Districts of California, 2005, 2006; U.S. District Court, District of Colorado, 2006. *Education*: University of San Francisco (J.D. & M.B.A., 2005); Beta Gamma Sigma Honor Society (2005); Technical Editor, *Maritime Law Journal*; Staff Editor, *Journal of Law and Social Challenges*; University of California, Berkeley (B.A., 2000). *Awards & Honors*: "Northern California Super Lawyer," *Super Lawyers*, 2013; "Northern California Rising Stars," *Super Lawyers*, 2009-2012. *Publications & Presentations*: Panelist, "It Don't Matter If You're Black or White"—or Female or Older—Primer on Title VII and ADEA," ABA Section of Labor & Employment Law's 4th Annual CLE Conference, Chicago, IL (November 2010); Panelist, "Labor and Employment Law Career Opportunities," ABA Section of Labor & Employment Law's Outreach to Law School Students Task Force Seminar, Santa Clara, CA (March 2010); Presenter, "Rule 23 Basics in Employment Cases," Impact Fund's 8th Annual Employment Discrimination Class Action Conference, Oakland, CA (February 2010); Presenter, "Updates on Employment Law," ALRP MCLE Program, San Francisco, CA (December 2009); Panelist, "EEO Law: Overview and Current Issues under Title VII, the ADEA, and the ADA," ABA Section of Labor & Employment Law's 3rd Annual CLE Conference, Washington, D.C. (November 2009); Panelist, "The Nuts & Bolts of Class and Collective Actions," National Employment Lawyers Association's 19th Annual Convention, Atlanta, GA (June 2008). *Member*: American Association for Justice; American Bar Association (Co-Chair, Leadership Development Program; Young Lawyers Division; Labor & Employment Law Section; Section of Litigation; *Employment Discrimination Law Treatise*, Chapter Monitor, 2007-present); American Constitution Society (Mentor); Asian American Bar Association; Asian American Legal Defense and Education Fund; Association of Business Trial Lawyers; Bar Association of San Francisco (Barristers Club; Labor & Employment Law Section; Litigation Section); *California Class Action Practice and Procedure Treatise* (Chapter Editor, 2007-present); Carver Healthy Environments and Response to Trauma in Schools ("HEARTS") Project (Steering Committee, 2007-present); Consumer Attorneys of California; Legal Services for Children (Pro Bono Awards Luncheon Committee, 2010-present); Minority Bar Coalition (2008 Unity Conference Planning Committee); National Employment Lawyers Association; State Bar of California (Labor & Employment Law Section; Litigation Section).

**ROGER N. HELLER**, Admitted to practice in California, 2001; U.S. District Court, Northern District of California, 2001). *Education*: Columbia University School of Law (J.D., 2001); Columbia Law Review, Senior Editor; Emory University (B.A., 1997). *Employment*: Extern, Honorable Michael Dolinger, U.S. District Court, Southern District of New York, 1999;

Associate, O'Melveny & Myers LLP, 2001-2005; Senior Staff Attorney, Disability Rights Advocates, 2005-2008. *Honors & Awards*: "Northern California Super Lawyer," *Super Lawyers*, 2013; "Trial Lawyer of the Year Finalist," Public Justice, 2012; "Northern California Rising Stars," *Super Lawyers*, 2011-2012; Harlan Fiske Stone Scholar, 1998-2001. *Publications & Presentations*: Co-author, <u>Fighting For Troops on the Homefront</u>, Trial Magazine (September 2006). *Member*: American Bar Association; Bar Association of San Francisco; Consumer Attorneys of California; State Bar of California.

**NIMISH R. DESAI**, Admitted to practice in California, 2006; US District Court, Northern District of California, 2007; US District Court, Central District of California, 2008; US District Court, Northern District of Florida, 2009; U.S. Court of Appeals, Ninth Circuit, 2009. *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D., 2006), Finalist and Best Brief, McBaine Moot Court Competition (2006), Moot Court Best Brief Award (2004); University of Texas, Austin, (B.S. & B.A., High Honors, 2002). *Employment*: Extern, Sierra Club Environmental Law Program, 2004; Researcher, Public Citizen, 2003; Center for Energy and Environmental Resources, 2001-2002. *Awards & Honors:* "Northern California Super Lawyer," *Super Lawyers,* 2013; "Rising Star for Northern California," *Super Lawyers*, 2012. *Publications & Presentations*: "BP, Exxon Valdez, and Class-Wide Punitive Damages," 21 Class Action and Derivative Suit Committee Newsletter (Fall 2010); "American Chemistry Council v. Johnson: Community Right to Know, But About What? D.C. Circuit Takes Restrictive View of EPCRA," 33 *Ecology L.Q.* 583 (Winter 2006); "Lessons Learned and Unlearned: A Case Study of Medical Malpractice Award Caps in Texas," *The Subcontinental*, (Winter 2004, Vol. 1, Issue 4, pp. 81-87); "Separation of Fine Particulate Matter Emitted from Gasoline and Diesel Vehicles Using Chemical Mass Balancing Techniques", *Environmental Science Technology*, (2003; 37(17) pp. 3904-3909); "Analysis of Motor Vehicle Emissions in a Houston Tunnel during Texas Air Quality Study 2000," *Atmospheric Environment*, 38, 3363-3372 (2004). *Member*: State Bar of California; Bar Association of San Francisco; Consumer Attorneys of California; American Bar Association; American Constitution Society; East Bay Community Law Center (Board Member, 2010-present); South Asian Bar Association (Board Member, 2010-present). *Languages*: Gujarati (conversational).

**MICHAEL J. MIARMI**, Admitted to practice New York, 2006; U.S. District Court, Eastern District of New York; U.S. District Court, Southern District of New York; U.S. Court of Appeals for the Second Circuit; U.S. Court of Appeals for the Third Circuit, 2007; U.S. Court of Appeals for the Sixth Circuit; U.S. Court of Appeals for the Eighth Circuit, 2007; U.S. Supreme Court. *Education*: Fordham Law School (J.D., 2005); Yale University (B.A., *cum laude*, 2000). *Awards & Honors:* "New York Rising Star," *Super Lawyers*, 2013. *Publications & Presentations*: Co-Author with Steven E. Fineman, "The *Basic*s of Obtaining Class Certification in Securities Fraud Cases: U.S. Supreme Court Clarifies Standard, Rejecting Fifth Circuit's 'Loss Causation' Requirement," *Bloomberg Law Reports* (July 5, 2011). *Employment*: Milberg Weiss LLP, Associate, 2005-2007. *Member:* State Bar of New York; New York State Trial Lawyers Association; Public Justice Foundation; American Bar Association.

**DEAN M. HARVEY**, Admitted to practice in California, 2007; U.S. District Court, Northern District of California; U.S. District Court, Central District of California; U.S. District Court, Eastern District of California; U.S. District Court, Southern District of California; U.S. Court of Appeals for the Ninth Circuit; U.S. District Court, Eastern District of Wisconsin.

*Education*: Boalt Hall School of Law, University of California, Berkeley (J.D. 2006); Articles Editor, *California Law Review* (2005-2006); Assistant Editor, *Berkeley Journal of International Law* (2004); University of Minnesota, Twin Cities (B.A. *summa cum laude*, 2002). *Prior Employment*: Partner, Lieff Cabraser Heimann & Bernstein, LLP (2013-Present); Associate, Lieff Cabraser Heimann & Bernstein, LLP (2009-2013); Associate, Boies, Schiller & Flexner LLP (2007-2009); Law Clerk, The Honorable James V. Selna, U.S. District Court for the Central District of California (2006-2007); Law Clerk, U.S. Department of Justice, Antitrust Division, San Francisco Field Office (2006); Summer Law Intern, U.S. Department of Justice (2005); Summer Associate, Boies, Schiller & Flexner LLP (2005). *Awards & Honors*: "Super Lawyer for Northern California," *Super Lawyers*, 2013; "Lawyers on the Fast Track," The Recorder, 2013; "Rising Star for Northern California," Super Lawyers, 2010-2012; "William E. Swope Antitrust Writing Prize," 2006. *Publications*: Contributing Author, *The Class Action Fairness Act: Law and Strategy*, American Bar Association (forthcoming); Contributing Author, *Concurrent Antitrust Criminal and Civil Proceedings: Identifying Problems and Planning for Success*, American Bar Association (2013); Panelist, "If You Don't Steal My Employees, I Won't Steal Yours: The Antitrust Treatment of Non-Poaching and Non-Solicitation Agreements," American Bar Association (2013); Co-Editor, *California Class Actions Practice and Procedures* (2010-2013); Articles Editor, *Competition* (the Journal of the Antitrust and Unfair Competition Law Section of the State Bar of California) (2012); Contributing Author, *ABA Annual Review of Antitrust Law Developments* (2011); Panelist, "In the Wake of *AT&T Mobility v. Concepcion:* Perspectives on the Future of Class Litigation," American Bar Association (2011); *New Guidance for Standard Setting Organizations: Broadcom Corp. v. Qualcomm Inc. and In the Matter of Rambus, Inc., 5 ABA Sherman Act Section 1 Newsl. 35* (2008); *Anticompetitive Social Norms as Antitrust Violations,* 94 Calif. L. Rev. 769 (2006). *Member*: American Bar Association (Antitrust Section); Bar Association of San Francisco; San Francisco Trial Lawyers Association; State Bar of California.


### OF COUNSEL

**ROBERT L. LIEFF**, Admitted to practice in California, 1966; U.S. District Court, Northern District of California and U.S. Court of Appeals, Ninth Circuit, 1969; U.S. Supreme Court, 1969; U.S. Court of Appeals, Seventh Circuit, 1972; U.S. Tax Court, 1974; U.S. District Court, District of Hawaii, 1986. *Education*: Columbia University (M.B.A., 1962; J.D., 1962); Cornell University; University of Bridgeport (B.A., 1958). Member, Columbia Law School Dean's Council; Member, Columbia Law School Board of Visitors (1992-2006); Member, Columbia Law School Center on Corporate Governance Advisory Board (2004). *Awards & Honors*: AV Preeminent Peer Review Rated, Martindale-Hubbell; "Northern California Super Lawyers," *Super Lawyers*, 2005-09, "*Lawdragon* Finalist," *Lawdragon*, 2005. *Member*: Bar Association of San Francisco; State Bar of California (Member: Committee on Rules of Court, 1971-74; Special Committee on Multiple Litigation and Class Actions, 1972-73); American Bar Association (Section on Corporation, Banking and Business Law); Lawyers Club of San Francisco; San Francisco Trial Lawyers Association; California Trial Lawyers Association; Consumer Attorneys of California; Fight for Justice Campaign.

**BRUCE W. LEPPLA**, Admitted to practice in California, New York, Ninth Circuit Court of Appeals, California District Courts (Northern, Central, Eastern), New York District Courts

(Southern, Eastern), District of Colorado.  *Education*: University of California (J.D., Boalt Hall School of Law, M.G. Reade Scholarship Award); University of California at Berkeley (M.S., Law and Economics, Quantitative Economics); Yale University (B.A., *magna cum laude*, Highest Honors in Economics).  *Prior Employment*: California-licensed Real Estate Broker (2009-present); FINRA and California-licensed Registered Investment Adviser (2008-present); Chairman, Leppla Capital Management LLC (2008-present); Chairman, Susquehanna Corporation (2006-present); Partner, Lieff Cabraser Heimann & Bernstein, LLP (2004-2008), Counsel (2002-2003); CEO and President, California Bankers Insurance Services Inc., 1999-2001; CEO and President, Redwood Bank (1985-1998), CFO and General Counsel (1981-1984); Brobeck, Phleger & Harrison (1980); Davis Polk & Wardwell (1976-80).  *Publications*: Author or co-author of 11 different U.S. and International patents in electronic commerce and commercial product design, including "A Method for Storing and Retrieving Digital Data Transmissions," United States Patent No. 5,659,746, issued August 19, 1997; "*Stay in the Class or Opt-Out? Institutional Investors Are Increasingly Opting-Out of Securities Class Litigation*," Securities Litigation Report, Vol. 3, No. 8, September 2006, West LegalWorks; reprinted by permission of the author in Wall Street Lawyer, October 2006, Vol. 10, No. 10, West LegalWorks; "*Selected Waiver: Recent Developments in the Ninth Circuit and California, Part 1*;" Elizabeth J. Cabraser, Joy A. Kruse and Bruce W. Leppla; Securities Litigation Report, May 2005, Vol. I, No. 9, pp. 1, 3-7; "*Selected Waiver: Recent Developments in the Ninth Circuit and California, Part 2*;" Elizabeth J. Cabraser, Joy A. Kruse and Bruce W. Leppla; Securities Litigation Report, June 2005, Vol. I, No. 10, pp. 1, 3-9; Author, "*Securities Powers for Community Banks,*" California Bankers Association Legislative Journal (Nov. 1987). *Teaching Positions*: Lecturer, University of California at Berkeley, Haas School of Business, Real Estate Law and Finance (1993-96); Lecturer, California Bankers Association General Counsel Seminars, Lending Documentation, Financial Institutions Litigation and similar topics (1993-96). *Panel Presentations*: Union Internationale des Avocats, Spring Meeting 2010, Frankfurt, Germany, "*Recent Developments in Cross-Border Litigation;*" Union Internationale des Avocats, Winter Meeting 2010, Park City, Utah, "*Legal and Economic Aspects of Securities Class and Opt-out Litigation;*" EPI European Pension Fund Summit, Montreux, Switzerland, "*Legal and Global Economic Implications of the U.S. Subprime Lending Crisis*," May 2, 2008; Bar Association of San Francisco, "*Impact of Spitzer's Litigation and Attempted Reforms on the Investment Banking and Insurance Industries*," May 19, 2005; Opal Financial Conference, National Public Fund System Legal Conference, Phoenix, AZ, "*Basic Principles of Securities Litigation*," January 14, 2005; American Enterprise Institute, "*Betting on the Horse After the Race is Over—In Defense of Mutual Fund Litigation Related to Undisclosed After Hours Order Submission*," September 30, 2004. *Member*: State Bar of California; State Bar of New York; Member, Editorial Board, *Wall Street Lawyer*; National Association of Public Pension Attorneys; Union Internationale des Avocats (Seminar Chairman, 2012 Winter Corporate Governance Seminar); Yale University Alumni Board of Directors (Director, 2001-2005); California Bankers Association (Director, 1993-99); California State Small Business Development Board (1989-1997); University of California at Berkeley, Boalt Hall Alumni Board of Directors (1993-96); Leadership Council, San Francisco Chamber of Commerce (1990-1992); Community Reinvestment Institute (Founding Director, 1989-1990); Member, Yale Whiffenpoofs.

**NICHOLAS DIAMAND**, Admitted to practice in New York, 2003; England; Wales; U.S. District Court, Southern, Eastern, Northern, and Western Districts of New York; US Court

of Appeals, Seventh Circuit; U.S. Supreme Court.  *Education*: Columbia University School of Law (LL.M., Stone Scholar, 2002); College of Law, London, England (C.P.E.; L.P.C.; Commendation, 1997); Columbia University (B.A., *magna cum laude,* 1992).  *Awards & Honors:* "New York Super Lawyer," *Super Lawyers*, 2013; "Rising Star for New York," *Super Lawyers*, 2012. *Employment*: Solicitor, Herbert Smith, London (1999-2001); Law Clerk to the Honorable Edward R. Korman, Chief Judge, U.S. District Court, Eastern District of New York (2002-03).  *Publications & Presentations*:  Contributing Author, *California Class Actions Practice and Procedure* (Elizabeth J. Cabraser, Editor-in-Chief), 2006; Panelist, "Obstacles to Access to Justice in Pharmaceutical Cases," *Pharmaceutical Regulation and Product Liability*, British Institute of International and Comparative Law, April 21, 2006; Panelist, "Pre-Trial Discovery in the United States," Union Internationale des Avocats, Winter Seminar, February 2006; Columnist, *The New York Employee Advocate*, NELA/NY, February 2006-present. *Member*:  New York City Bar Association, New York State Bar Association; Public Justice Foundation.

**LYDIA LEE**, Admitted to practice in Oklahoma 1983; U.S. District Court, Western and Eastern Districts of Oklahoma; U.S. Court of Appeals, 10th Circuit.  *Education*: Oklahoma City University, School of Law (J.D., 1983); University of Central Oklahoma (B.A., 1980).  *Prior Employment*: Partner, Law Office of Lydia Lee (2005-2008); Partner, Oklahoma Public Employees Retirement System (1985-2005); Associate, law firm of Howell & Webber (1983-1985).  *Publications & Presentations*: "QDROs for Oklahoma's Public Pension Plans," *Oklahoma Family Law Journal*, Vol. 13, September, 1998; Co-Author, "Special Problems in Dividing Retirement for Employees of the State of Oklahoma," *OBA/FLS Practice Manual*, Chapter 27.3, 2002; Featured Guest Speaker, *Saturday Night Law*, KTOK Radio; Contributor and Editor, INFRE Course Books for CRA program. *Member*: Central Edmond Urban Development Board (2006-present); Oklahoma Bar Association (1983–present), Member OBA Women in Law Committee (2007-present); National Association of Public Pension Attorneys (1988-present), President (2002-2004), Vice-President (2001-2002), Executive Board member (1998-2004), Chair of Benefits Section, Emeritus Board member, (2004-present); Edmond Neighborhood Alliance Board of Directors (2005-present), President (2006-2007), Past President and Director (2007-present); Central Edmond Urban Development Board (2006-present); Midwest City Regional Hospital, Board of Governors (1992-1996), Served on Physician/Hospital Organization Board, Pension and Insurance Trust Committees, and Chairman of Woman's Health Committee; City of Midwest City, Planning Commission (1984-1998), Chairman (1990-1995), Vice-Chairman (1987– 990), Served on Capital Improvement Committee, Airport Zoning Commission (Tinker AFB), and Parkland Review Board, served on 1991 Midwest City Legislative Reapportionment Committee.

**MORRIS A. RATNER**, Admitted to practice in California, 1991; District of Columbia, 1999; New York, 2000; U.S. District Court, Northern, Central, Eastern, and Southern Districts of California; and U.S. Court of Appeals, Second, Third, Sixth and Ninth Circuits; U.S. District Court, Southern District of New York; U.S. District Court, Eastern District of New York. *Education*:  Harvard University (J.D., *cum laude*, Phi Beta Kappa, 1991); Stanford University (B.A., with distinction, 1988).  *Publications & Presentations*:  Contributing Author, *Holocaust Restitution: Perspectives on the Litigation and its Legacy*, Michael Bazyler and Roger P. Alford, Editors, New York University Press (2006), paperback (2007); Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003);  "Factors

Impacting the Selection and Positioning of Human Rights Class Actions in United States Courts: A Practical Overview," 58 *New York University Annual Survey of American Law* 623 (2003); "The Settlement of Nazi-Era Litigation Through the Executive and Judicial Branches," 20 *Berkeley Journal of International Law* 212 (No. 1, March 2002). *Faculty Appointments*: University of California, Hastings College of the Law, Professor (2012-present): "Legal Profession," "Civil Procedure"; Harvard Law School, Visiting Professor (2010-2011): "Class Actions and Other Aggregate Litigation," "Remedies," "Legal Profession," and "Holocaust Litigation"; Harvard Law School, Visiting Lecturer on Law for Winter Term 2009, teaching "Holocaust Litigation." *Lectures*:  Harvard Law School, Visiting Professor (2010-2011): "Class Actions and Other Aggregate Litigation," "Remedies," "Legal Profession," and "Holocaust Litigation"; Harvard Law School, Visiting Lecturer on Law (Winter Term 2009): "Holocaust Litigation"; Stanford University, History Department (guest lecturer, June 2008, re Holocaust-era litigation); UC Berkeley School of Law Boalt Hall (guest lecturer, 2007, re legal ethics); Columbia Law School (guest lecturer, 2004, re Holocaust litigation); New York University School of Law (guest panelist, 2003, re developments in international law). *Member*: State Bar of California; State Bar of New York; Bar of the District of Columbia.

**DAVID RUDOLPH**, Admitted to practice in California, 2004; U.S. District Court, Northern District of California; U.S. District Court, Southern District of California; U.S. Court of Appeals for the Ninth Circuit. *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D. 2004); Moot Court Board; Appellate Advocacy Student Advisor; *Berkeley Technology Law Journal; Berkeley Journal of International Law*. Rutgers University (Ph.D. Program, 1999-2001). University of California, Berkeley (B.A. 1998). *Employment*:  Associate, Quinn Emanuel Urquhart & Sullivan, LLP, 2008-2012; Law Clerk to the Honorable Saundra Brown Armstrong, U.S. District Court for the Northern District of California, 2007-2008.

## ASSOCIATES

**KENNETH S. BYRD**, Admitted to practice in Tennessee, 2004; U.S. District Court of Appeals, 6th Circuit, 2009; U.S. District Court, Western District of Tennessee, 2007; U.S. District Court, Eastern District of Tennessee, 2006; U.S. District Court, Middle District of Tennessee, 2005.  *Education:* Boston College Law School (J.D., *cum laude*, 2004), Law Student Association (President, 2003-2004), National Moot Court Team (Regional Champion, 2003-2004), American Constitution Society (Secretary, 2002-2003), Judicial Process Clinic (2003), Criminal Justice Clinic (2003-2004); Samford University (B.S., *cum laude*, in Mathematics with Honors, minor in Journalism, 1995). *Employment:* Harwell Howard Hyne Gabbert & Manner, P.C., 2004-2010; Summer Associate, Harwell Howard Hyne Gabbert & Manner, P.C., 2003; Summer Associate, Edward, Angell, Palmer, Dodger, LLP, 2003.  *Member:* American Bar Association; American Constitution Society, Nashville Chapter (Member & Chair of 2008 Supreme Court Preview Event); Camp Ridgecrest Alumni & Friends (Board Member); Harry Phillips American Inn of Court, Nashville Chapter (Associate Member, 2008-2010; Barrister, 2010-2014); Historic Edgefield, Inc. (President, 2009-2011); Nashville Bar Association; Tennessee Bar Association.

**LISA J. CISNEROS**, Admitted to practice in California, 2007, U.S. District Court, Northern District of California, 2012; U.S. Court of Appeals for the First Circuit, 2012; U.S. Court of Appeals for the Eleventh Circuit, 2013; Supreme Court of California, 2007; U.S.

Supreme Court, 2013. *Education*:  Boalt Hall School of Law, University of California, Berkeley (J.D. 2007); Brown University (B.A. *cum laude*, 2001).  *Employment*:  Law Clerk to the Honorable Claudia Wilken, U.S. District Court, Northern District of California, 2010-2012; California Rural Legal Assistance and the National Center for Lesbian Rights, 2007-2010.  *Awards & Honors*: Pride Law Fellowship, 2007-2009; Monterey County Democratic Central Committee 2009-2010; Local Heroes Award, *Monterey County Weekly*, 2009; Emerging Leadership Award, Chicana/Latina Foundation, 2009.  *Publications & Presentations*: "Recognizing and Responding to the Needs of Low-Income Lesbian, Gay, Bisexual, and Transgender Clients," *Clearinghouse Review Journal of Poverty Law and Policy*, (March-April 2010).

**DOUGLAS CUTHBERTSON**, Admitted to practice in New York, 2008; U.S. District Court, Eastern District of New York (2008); U.S. District Court, Southern District of New York (2008).  *Education*:  Fordham University School of Law (J.D. *cum laude* 2007); President, Fordham Law School Chapter of Just Democracy; Senior Articles Editor, *Fordham Urban Law Journal;* Fordham University School of Law Legal Writing Award, 2004-2005; Legal Writing Teaching Assistant, 2005-2006; Dean's List, 2004-2007; *Alpha Sigma Nu Jesuit Honor Society*. Bowdoin College (B.A. *summa cum laude*, 1999), Sarah and James Bowdoin Scholar for Academic Excellence (1995-1999).  *Employment*: Associate, Debevoise & Plimpton, LLP, 2009-2012; Law Clerk to Honorable Magistrate Judge Andrew J. Peck, U.S. District Court, Southern District of New York, 2007-2009. *Awards & Honors:* "Rising Star for Northern California," *Super Lawyers*, 2013. *Member:*  New York Civil Liberties Union Board of Directors.

**MELISSA GARDNER**, Admitted to practice in California, 2013; New York. *Education*: Harvard Law School (J.D. 2011); Student Attorney, Harvard Prison Legal Assistance Project and South Brooklyn Legal Services; Semi-Finalist, Harvard Ames Moot Court Competition; *Harvard International Law Journal*. Western Washington University (B.A. *magna cum laude,* 2005).  *Employment*: Associate, Emery Celli Brinckherhoff & Abady (2012); Law Clerk, South Brooklyn Legal Services (2011-2012); Peace Corps Volunteer, China (2005-2008).

**JORDAN ELIAS**, Admitted to practice in California, 2003; U.S. Court of Appeals, Seventh Circuit, 2010; U.S. District Court, District of Arizona, 2009; U.S. District Court, District of Colorado, 2009; U.S. District Court, Southern District of Florida, 2009; U.S. District Court, District of Minnesota, 2009; U.S. District Court, District of Nevada, 2009; U.S. District Court, Eastern District of Pennsylvania, 2008.  *Education*:  Stanford Law School (J.D., 2003); Member, *Stanford Law Review*; *Streetlaw Program; East Palo Alto Community Law Project*. Yale University (B.A., Phi Beta Kappa, *magna cum laude*, 1998); Phi Beta Kappa; awarded the Field Prize, Yale University's highest writing award, for best senior thesis or dissertation in the humanities; awarded the White Prize for best Yale College essay in American History. *Employment*: Associate, Wilson Sonsini Goodrich & Rosati, 2004-2008; Law Clerk to the Honorable Cynthia Holcomb Hall, U.S. Court of Appeals for the Ninth Circuit, 2003-2004; Law Clerk, City Attorney of San Francisco, Summer 2002; Judicial Extern to the Honorable Charles R. Breyer, U.S. District Court, Northern District of California, Summer 2001; Website Editor, Public Agenda, 1999-2000. *Awards & Honors:* "Trial Lawyer of the Year Finalist," Public Justice, 2012; "Rising Star for Northern California," *Super Lawyers*, 2012-2013. *Member*: State Bar of California; Arbitrator, Bar Association of San Francisco, Attorney-Client Fee Disputes Program; Member, Committee on *Iqbal v. Ashcroft*, Public Justice. *Publications &*

*Presentations:* Co-Author with Jordan Elias, "The Limited Scope of the Ascertainability Requirement," American Bar Association, March 18, 2013.

**JOSEPH P. FORDERER**, Admitted to practice in California, 2011; U.S. District Court, Northern District of California, 2011. *Education*: Columbia University School of Law (J.D. 2011); Harlan Fiske Stone Scholar; Articles Editor, *Journal of Environmental Law*; Outreach Coordinator, Columbia Health Law Association. University of California, Berkeley (B.A., 2008). *Employment*:  Fellowship attorney in the Antitrust section, California Department of Justice, 2011-2012; Law Clerk, Alaska Department of Law, Summer 2010; Judicial Intern for Judge Richard Goldberg, U.S. Court of International Trade, Summer 2009. *Awards & Honors:* Harlan Fiske Stone Scholar, Columbia University School of Law.  *Publications & Presentations*:  "State Sponsored Global Warming Litigation: Federalism Properly Utilized or Abused?", 18 Mo. Envtl. L. & Pol'y Rev. 23 (2010).

**CECILIA HAN**, Admitted to practice in California, 2005; U.S. District Court, Northern District of California, 2008; U.S. District Court, Central District of California, 2009; U.S. Court of Appeals for the Ninth Circuit, 2010.  *Education*: University of California, Hastings College of the Law (J.D., 2004); Executive Editor, *Hasting Constitutional Law Quarterly*, (2003-2004); University of California, Berkeley (BA., Phi Beta Kappa 2000).  *Employment*: Associate, Brayton Purcell, (2005-2007); Judicial Extern to Judge Anthony Kline of California Appellate Court, 2002; Judicial Extern to Magistrate Judge Edward M. Chen, 2003; Morrison & Foerster, Paralegal. *Awards & Honors:* "Rising Star for Northern California," *Super Lawyers*, 2013. *Member:* State Bar of California; Minority Bar Coalition; CAOC; Bar Association of San Francisco.

**DANIEL R. LEATHERS**, Admitted to practice in New York, 2010; New Jersey, 2010; Pennsylvania, 2009; U.S. Court of Appeals, Third Circuit, 2012; U.S. District Court of New Jersey, 2010; U.S. District Court, Eastern District of New York, 2012; U.S. District Court, Southern District of New York, 2012; U.S. District Court, Eastern District of Wisconsin, 2013. *Education*: Case Western Reserve University School of Law (J.D., *cum laude*, 2009); Executive Articles Editor, *Case Western Reserve Journal of International Law*; Pennsylvania State University (B.A. in History & Journalism, 2005).  *Awards & Honors*: "New York Rising Star," Super Lawyers, 2013; International Academy of Trial Lawyers Award for overall Trial Advocacy excellence (May 2009); Paul J. Hergenroeder Award for excellence in Trial Tactics (May 2009); Federal Bar Association Award for excellence in Constitutional Law (May 2009); CALI Excellence for the Future Awards: Trial Tactics (May 2009), Constitutional Law I (May 2007), Constitutional Law II (December 2007).  *Employment*: Judicial Law Clerk to Honorable Carol Higbee, New Jersey Superior Court, Vicinage I Civil Division Presiding Judge, 2009-2010; Summer Associate—Consumer Law Unit, The Legal Aid Society of Cleveland, 2008; Law Clerk, Zipkin Whiting Co., LPA, 2007.  *Member*: New Jersey State Bar Association; New York State Bar Association, 2010; Pennsylvania State Bar Association, 2009; American Association for Justice; New Jersey Association of Justice; American Bar Association.  *Publications*: "Giving Bite to the EU-U.S. Data Privacy Safe Harbor," 41 Case W. Res. J. Int'l L. 193, Vol. 41, No. 1 (2009).

**JASON L. LICHTMAN**, Admitted to practice in Illinois; New Jersey; New York; U.S. Supreme Court; District of Columbia; U.S. Court of Appeals, Third Circuit; U.S. Court of

Appeals, Sixth Circuit; U.S. Court of Appeals, Seventh Circuit; U.S. Court of Appeals, Ninth Circuit; U.S. District Court, Northern District of Illinois; U.S. District Court, New Jersey; U.S. District Court, Northern District of Ohio; U.S. District Court, Eastern District of New York, U.S. District Court, Southern District of New York. *Education*: University of Michigan Law School (J.D., *cum laude*, 2006), Campbell Moot Court Executive Board; Clarence T. Darrow Scholar; Northwestern University (B.A. in Economics, 2000). *Employment*: Judicial Law Clerk to Honorable Kathleen M. O'Malley, United States District Court, Northern District of Ohio, 2008-2010; Litigation Associate, Howrey LLP, 2006-2008; Summer Associate, Howrey LLP, 2005; Summer Associate, Reed Smith LLP, 2004. *Awards & Honors*: "New York Rising Star," Super Lawyers, 2013. *Member*: Bar Association of the District of Columbia; Bar Association of Illinois. *Publications and Presentations:* Contributing Author, "Ninth Circuit Reshapes California Consumer-Protection Law," American Bar Association (July 2012).

   ***SARAH R. LONDON***, Admitted to practice in California, 2009; U.S. District Court, Northern District of California, 2009; U.S. Court of Appeals for the Ninth Circuit, 2009; U.S. District Court, Central District of California, 2010. *Education*: Boalt Hall School of Law, University of California (J.D., 2009), Order of the Coif; Northwestern University (B.A., *cum laude*, 2002). *Awards & Honors*: " Rising Star for Northern California," Super Lawyers, 2012-2013. *Member*: New Lawyers' Division, Consumer Attorneys of California; San Francisco Trial Lawyers Association; State Bar of California.

   ***ANNIKA K. MARTIN***, Admitted to practice in New York, 2005; U.S. District Court, Southern District of New York, 2005; U.S. District Court Eastern District of New York. *Education:* Law Center, University of Southern California (J.D., 2004); Review of Law & Women's Studies; Jessup Moot Court; Medill School of Journalism, Northwestern University (B.S.J., 2001); Stockholm University (Political Science, 1999). *Publications & Presentations*: "Stick a Toothbrush Down Your Throat: An Analysis of the Potential Liability of Pro-Eating Disorder Websites," *Texas Journal of Women & the Law* (Volume 14 Issue 2, Spring 2005); "Welcome to Law School," monthly column on www.vault.com (2001-2004). *Awards and Honors*: "New York Rising Star," Super Lawyers, 2013; 2005 Wiley W. Manuel Award for Pro Bono Legal Services awarded by the State Bar of California for voluntary provision of legal services to the poor. *Member*: New York State Bar Association; Swedish American Bar Association; American Association for Justice; New York State Trial Lawyers Association; New York County Lawyer's Association; New York City Bar Association. *Languages*: Swedish (fluent); French (DFA1-certified in Business French); Spanish (conversational).

   ***MARC A. PILOTIN***, Admitted to practice in California, 2009; U.S. District Court, Northern District of California; U.S. District Court, Southern District of California; U.S. District Court, Central District of California; U.S. District Court, Eastern District of California. *Education*:  Boalt Hall School of Law, University of California, Berkeley (J.D., 2009); Supervising Editor, *California Law Review*; Executive Editor, *Berkeley Journal of Employment and Labor Law*; University of California, Los Angeles, Graduate School of Education and Information Studies (M.Ed., 2005); University of California, Los Angeles, College of Letters and Science (B.A., *cum laude* and College Honors, 2001). *Publications & Presentations*: "Finding a Common Yardstick: Implementing a National Student Assessment and School Accountability Plan Through State-Federal Collaboration," 98 Calif. L. Rev. 545 (2010). *Employment*:  Law Clerk to the Honorable Claudia Wilken, U.S. District Court for the Northern District of

California, 2009-2011; Graduate Student Instructor for Professor Goodwin Liu, Constitutional Law, 2008; Summer Associate, O'Melveny & Myers, LLP, 2008; Judicial Extern to the Honorable Edward M. Chen, U.S. District Court for the Northern District of California, 2007; Law Clerk, ACLU Foundation of Southern California, 2007; Teacher and Grade-Level Chairperson, Ninety-Sixth Street Elementary School, 2004-2006; Administrative Director, UCLA Center for American Politics and Public Policy, 2001-2003. *Awards & Honors:* "Rising Star for Northern California," Super Lawyers, 2013 *Member*: Filipino Bar Association of Northern California (Board Member, 2013-present).

**PHONG-CHAU G. NGUYEN**, Admitted to practice in California, 2012; U.S. District Court, Northern District of California, 2013; U.S. District Court, Central District of California, 2013; U.S. Court of Appeals for the Ninth Circuit, 2013. *Education:* University of San Francisco School of Law (J.D., 2012); Development Director, USF Moot Court Board; Merit Scholar; Zief Scholarship Recipient; University of California, Berkeley (B.A., Highest Honors; Distinction in General Scholarship, 2008). *Employment:* Attorney, Minami Tamaki, 2013; Post-Bar Law Clerk, Velton Zegelman PC, 2012; Law Clerk, Minami Tamaki, 2011-2012; Housing and Economic Rights Advocates, 2011; Greenlining Institute, 2008-2009, 2012. *Member:* State Bar of California; Asian American Bar Association for the Greater Bay Area; San Francisco Trial Lawyers Association.

**NICOLE D. REYNOLDS**, Admitted to practice in California; U.S. Court of Appeals for the Ninth Circuit; U.S. District Court, Central District of California; U.S. District Court, Eastern District of California; U.S. District Court, Northern District of California. *Education*: University of California, Hastings College of the Law (J.D., 2006); Moot Court Best Oral Advocate; Senior Articles Editor, *Hastings Law Journal*; Lewis & Clark College (B.A., *magna cum laude*, 2000). *Employment*: Associate, Green Welling, P.C., 2006-2012; Law Clerk, Family Violence Law Center, 2005; Law Clerk, Law Offices of Waukeen Q. McCoy, 2004. *Publications & Presentations*: Co-author with Kirsten Gibney Scott, "Consumer Protection and Employment Cases after Concepcion," *ABA Section of Litigation*, *Class Action & Derivative Suits Committee Newsletter* (Summer 2011); Co-Author of the California Section of the ABA State Class Action Survey (2012). *Awards & Honors:* "Rising Star for Northern California," Super Lawyers, 2013. *Member*: Antitrust and Unfair Competition Law Section of the California State Bar; Labor and Employment Law Section of the California State Bar; Consumer Attorneys of California; National Association of Consumer Advocates.

**ANNE SHAVER**, Admitted to practice in California, 2008; Colorado, 2008; U.S. District Court, Northern District of California, 2009; U.S. Court of Appeals for the Second Circuit, 2012; U.S. Supreme Court; U.S. Court of Appeals of the Ninth Circuit. *Education*: Boalt Hall School of Law, University of California (J.D., 2007), Order of the Coif; University of California, Santa Cruz (B.A. *cum laude*, 2003), Phi Beta Kappa. *Awards & Honors:* "Northern CA Rising Star," *Super Lawyers,* 2013. *Employment:* Law Clerk to Honorable Betty Fletcher, U.S. Court of Appeals for the Ninth Circuit, 2008-2009; Davis, Graham & Stubbs, LLP, Litigation Associate, 2008; Public Defender's Office of Contra Costa County, 2007; Davis, Cowell & Bowe, LLP, Summer Law Clerk, 2006; Centro Legal de la Raza, Student Director, Workers' Rights Clinic, 2005-2006; Human Rights Watch, Legal Intern, 2005. *Awards & Honors*: "Rising Star for Northern California," Super Lawyers, 2013. *Publications*: "*U.S. v. Fort* and the Future of Work-

Product in Criminal Discovery," 44 Cal. W. L. Rev. 127, 12293 (Fall 2007); "Rule 23 Basics," Impact Fund Class Action Training Institue, May 2011; "A Place At The Table? Recent Developments in LBGT Rights," ABA Labor & Employment Section Conference, April 2012 (moderator); "Transgender Workplace Issues After the EEOC's Landmark Macy Ruling," Bar Association of San Francisco, September 2012 (moderator). *Member*: State Bar of California; State Bar of Colorado; Bar Association of San Francisco; National Employment Lawyers Association; American Bar Association's Equal Employment Opportunity Committee (Programs Committee).

**DARSANA SRINIVASAN**, Admitted to practice in New York, 2008; U.S. Court of Appeals for the Second Circuit, 2010. *Education:* Yale Law School (J.D., 2007); Mary A. McCarthy Fellowship in Public Interest Law; Project Manager, *Yale Law Journal*; Submissions Editor, *Yale Journal of Law & Feminism*. Stanford University (B.A., with Honors and with Distinction; 2003), Phi Beta Kappa. *Employment:* Assistant Solicitor General, New York State Office of the Attorney General Appeals & Opinions Bureau, 2009-2013; Assistant Attorney General, New York State Office of the Attorney General Civil Rights Bureau, 2008-2009; Health Law and Reproductive Rights Fellow, National Women's Law Center, 2007-2008.

**LIN Y. CHAN**, Admitted to practice in California; U.S. District Court, Northern District of California; U.S. District Court, Central District of California; U.S. Court of Appeals for the Fifth Circuit; U.S. Court of Appeals for the Ninth Circuit; U.S. Court of Appeals for the Tenth Circuit. *Education:* Wellesley College (B.A., *summa cum laude*, 2001); Stanford Law School (J.D., 2007); Editor-in-Chief, *Stanford Journal of Civil Rights and Civil Liberties*; Fundraising Chair, *Shaking the Foundations Progressive Lawyering Conference*. *Employment:* Associate, Goldstein, Borgen, Dardarian & Ho, 2008-2013; Associate, Goldstein, Demchak Baller Borgen & Dardarian, 2008-2012; Law Clerk to Judge Damon J. Keith, Six Circuit Court of Appeals, 2007-2008; Clinic Student, Stanford Immigrants Rights Clinic, 2006-2007; Union Organization, SEIU Local 250, 2003-2004; Union Organizer, Service Employees International Union, 2002-2003; Wellesley-Yenching Teaching Fellow, Chinese University of Hong Kong, 2001-2002. *Presentations & Publications*: Author, "California Supreme Court Clarifies State Class Certification Standards in *Brinker*, American Bar Association Labor & Employment Law Newsletter (April 2013); Presenter, "Rule 23 Basics in Employment Cases," Impact Fund's 11th Annual Employment Discrimination Class Action Conference (February 2013); Chapter Author, The Class Action Fairness Act: Law and Strategies; Co-Author, "Clash of the Titans: Iqbal and Wage and Hour Class/Collective Actions," BNA, Daily Labor Report, 80 DLR L-1 (April 2010); Chapter Co-Chair, Lindemann & Grossman, Employment Discrimination Law Treatise, Fifth Edition; Chapter Monitor, Lindemann & Grossman, Employment Discrimination Law Treatise 2010 Cumulative Supplement. *Member:* American Associate for Justice; Asian American Bar Association (Civil Rights Committee Co-Chair, 2011 – Present); Asian Americans Advancing Justice / Asian Law Caucus (Board Member, 2013-present).

**JEROME MAYER-CANTÚ**, Admitted to practice in New York. *Education:* Stanford Law School (J.D., 2010); top 30% of class (based on honors/pass system); *Stanford Law Review* (Executive Board, Senior Notes Editor); Stanford Latin-American Law Students Association. Georgetown University Law Center (1st year curriculum) 2007-2008; Dean's List; Recipient of Everett Merit Scholarship. University of California, Berkeley (B.A., 2005); Honors Thesis: *A Legal Analysis of the Darfur Crisis*. *Employment:* Law Clerk to Honorable Rudolph Contreras,

U.S. District Court, District of Columbia, 2012; Law Clerk to Honorable Ricardo M. Urbina, U.S. District Court, District of Columbia, 2011-2012; Litigation Associate, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 2010-2011; Intern to Chambers of Justice Carlos Moreno, Supreme Court of California, 2009; Intern to U.S. Department of Justice, Criminal Division, 2009; Summer Associate, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 2009; Intern to Chambers of Judge Milan D. Smith, Jr., U.S. Court of Appeals, 9th Circuit, 2008; Research Assistant to Professor Mariano-Florentino Cuellar, Stanford Law School, 2006-2007; Reporter, *Daily Star*, 2006; Researcher, Danish Refugee Council, 2006; Research Assistant, East-West Center, 2005; Legal Advisor, African & Middle Eastern Refugee Assistance, 2005. *Member:* Hispanic Bar Association of DC. *Languages:* Spanish (fluent), French (fluent), Portuguese (proficient), Arabic (proficient - Egyptian and Lebanese dialects).

    <u>Notice on the Firm's AV Rating</u>:  AV is a registered certification mark of Reed Elsevier Properties, Inc., used in accordance with the Martindale-Hubbell certification procedures, standards and policies.  Martindale-Hubbell is the facilitator of a peer review process that rates lawyers.  Ratings reflect the confidential opinions of members of the Bar and the Judiciary. Martindale-Hubbell Ratings fall into two categories—legal ability and general ethical standards.